No. 26-1676

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

SHENNA BELLOWS, in the official capacity as Secretary of the State of Maine;
STATE OF MAINE; JOHN SCHNECK; MARPHEEN CHANN; LEAGUE OF
WOMEN VOTERS OF MAINE,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION .......................................................... 2

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................ 3

SUMMARY OF THE ARGUMENT ......................................................... 10

STANDARD OF REVIEW ..................................................................... 11

ARGUMENT

    I.    The DOJ's demand for an electronic, unredacted
        copy of Rhode Island's SVRL satisfied Title III's
        requirements. ....................................................................... 12

        A.    Courts play a limited role in assessing the
                Attorney General's demand under Title III. ................. 13

                1.    The Attorney General is entitled to
                        Maine's SVRL without meeting the
                        requirements for an administrative
                        subpoena. ........................................................ 15

                2.    Even under this Court's administrative
                        subpoena precedents, the United States
                        is entitled to Maine's SVRL ............................... 23

        B.    Title III authorizes the Attorney General to
                demand records for the purpose of investigating
                compliance with list-maintenance obligations. ........... 29

**TABLE OF CONTENTS (continued):** **PAGE**

     C.     Maine's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA. ..................................................39

     D.     Federalism does not defeat the Attorney General's demand under Title III. ..............................51

     E.     Defendants' arguments regarding pretext provide no basis to affirm. ............................................52

  II.     Defendants' arguments regarding privacy laws do not provide any basis to affirm. ........................................53

     A.     The United States is complying with the Privacy Act. ....................................................................54

     B.     The United States is complying with the E-Government Act. ........................................................58

CONCLUSION ..............................................................................62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**TABLE OF AUTHORITIES**

**CASES:** PAGE

*Alabama ex rel. Gallion v. Rogers,*
187 F. Supp. 848 (M.D. Ala. 1960),
*aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.,*
285 F.2d 430 (5th Cir. 1961) ...................................................13-14

*American Oversight v. United States Dep't of Just.,*
45 F.4th 579 (2d Cir. 2022) ....................................................57

*Arizona v. Inter Tribal Council of Ariz., Inc.,* 570 U.S. 1 (2013) .......51-52

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ....................................12

*Bates v. United States,* 522 U.S. 23 (1997) ...............................31

*Brnovich v. Democratic Nat'l Comm.,* 594 U.S. 647 (2021) ..............33, 57

*Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) .........51-52

*Clemente Props., Inc. v. Pierluisi-Urrutia,*
165 F.4th 1 (1st Cir.),
*petition for cert. pending,*
No. 25-1426 (filed June 25, 2026) ................................ 11-12, 52-53

*Coleman v. Kennedy,* 313 F.2d 867 (5th Cir. 1963)
(per curiam) ....................................................................26, 31

*Dean v. United States,* 556 U.S. 568 (2009) ............................31

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
601 U.S. 42 (2024) ..........................................................34

*Doe v. Chao,* 540 U.S. 614 (2004) ..........................................54

**CASES (continued):**      **PAGE**

*Donaldson v. United States*, 400 U.S. 517 (1971),
  *superseded by statute on other grounds,*
  Tax Reform Act of 1976, Pub. L. No. 94-455,
  90 Stat. 1520................................................................22

*Electronic Privacy Info. Ctr.* (*EPIC*) *v. United States Dep't of Com.,*
  356 F. Supp. 3d 85 (D.D.C.), *vacated and remanded on other*
  *grounds,* 928 F.3d 95 (D.C. Cir. 2019)............................................60

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) .............21-22, 25

*Ex Parte Siebold*, 100 U.S. 371 (1879)...................................................51

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) .............41

*Foster v. Love*, 522 U.S. 67 (1997)........................................................51

*Freeman v. Town of Hudson*, 714 F.3d 29 (1st Cir. 2013) ...............12, 53

*Garcia-Bengochea v. Carnival Corp.,*
  57 F.4th 916 (11th Cir. 2023)........................................................41

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) ...............................30

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
  599 U.S. 166 (2023)......................................................................36

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)...............................14, 26

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962).............................*passim*

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) .............40

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ........................40

*Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374 (1992) ....................38

**CASES (continued):**                                                          **PAGE**

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
    572 U.S. 545 (2014) ................................................................29

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946)....................17

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
    587 U.S. 601 (2019) ................................................................35

*POM Wonderful LLC v. Coca-Cola Co.,*
    573 U.S. 102 (2014) ..............................................................36-37

*Public Int. Legal Found., Inc. v. Bellows,*
    92 F.4th 36 (1st Cir. 2024) ...............................................30, 35, 43

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ..............................33

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012) ................................................................38

*Reynolds v. Sims*, 377 U.S. 533 (1964) ...................................................33

*SEC v. Howatt*, 525 F.2d 226 (1st Cir. 1975) .........................................24

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)............................3-4

*Sugarloaf Funding, LLC v. United States Dep't of the Treasury,*
    584 F.3d 340 (1st Cir. 2009)...................................................18, 23

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ....................60

*U.S. Coachways, Inc. v. Vaccarello*, No. 17-cv-5983,
    2018 WL 3716888 (E.D.N.Y. Aug. 3, 2018) .................................42

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ......................51

**CASES (continued):**      **PAGE**

*United States v. Alabama*, No. 2:08-cv-920
(M.D. Ala. Mar. 27, 2009)......................................................39

*United States v. Benson*, 819 F.Supp. 3d 753 (W.D. Mich.),
*aff'd*, 179 F.4th 470 (6th Cir. 2026),
*petition for reh'g en banc pending*..............................32, 46

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026),
*petition for reh'g en banc pending*.................................*passim*

*United States v. Bormes*, 568 U.S. 6 (2012)..............................38

*United States v. Comley*, 890 F.2d 539 (1st Cir. 1989) ..........18-19, 29, 53

*United States v. Freedom Church*, 613 F.2d 316 (1st Cir. 1979)...........25

*United States v. Georgia*, No. 1:06-cv-2442
(N.D. Ga. Oct. 27, 2006) ..............................................39

*United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995)...........................18

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ............................15

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) ......................54

*United States v. Mississippi*, 380 U.S. 128 (1965) ................................40

*United States v. Powell*, 379 U.S. 48 (1964) ..................................*passim*

*United States v. Salter*, 432 F.2d 697 (1st Cir. 1970) ...........................18

*United States v. Sturm, Ruger & Co.*, 84 F.3d 1 (1st Cir. 1996) ....*passim*

*United States v. Trahan*, 111 F.4th 185 (1st Cir. 2024),
*cert. denied*, 145 S. Ct. 1206 (2025) ...............................40

**CASES (continued):** **PAGE**

*United States v. Winczuk,* 67 F.4th 11 (1st Cir. 2023)...........................40

*United States Dep't of Just. v. Ricco Jonas,*
    24 F.4th 718 (1st Cir. 2022) .......................................................18

*United States Dep't of Just. v. Tax Analysts,*
    492 U.S. 136 (1989) ..............................................................42-43

*Webster v. Doe,* 486 U.S. 592 (1988)...........................................20

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1.....................................................51

**STATUTES:**

Civil Rights Act of 1960 (CRA)
    52 U.S.C. 20701 *et seq.* ...........................................................3
    52 U.S.C. 20701 ................................................................*passim*
    52 U.S.C. 20702 ..................................................................55
    52 U.S.C. 20703 ................................................................*passim*
    52 U.S.C. 20704 ................................................................4, 37
    52 U.S.C. 20705 .............................................................4, 13, 22
    Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960)...............................31

E-Government Act of 2002
    § 201 ..............................................................................59
    § 208(b)(1)(A)(ii)..........................................................58, 60-61
    § 208(b)(1)(B)(i).............................................................58-60
    Pub. L. No. 107-347, 116 Stat. 2899......................................54, 58

Help America Vote Act of 2002 (HAVA)
    52 U.S.C. 20901 *et seq.* ...........................................................1
    52 U.S.C. 21083(a)................................................................61
    52 U.S.C. 21083(a)(1)(A) .......................................................6, 61
    52 U.S.C. 21083(a)(1)(A)(i)......................................................49

**STATUTES (continued):**                                                    **PAGE**

52 U.S.C. 21083(a)(1)(A)(ii) ................................................................ 49
52 U.S.C. 21083(a)(1)(A)(iv) ............................................................... 49
52 U.S.C. 21083(a)(1)(A)(vi) ............................................................ 49-50
52 U.S.C. 21083(a)(1)(A)(viii) ......................................................... 5, 49
52 U.S.C. 21083(a)(2)(A) ................................................................. 6, 25
52 U.S.C. 21083(a)(2)(A)(i)-(iii) .......................................................... 6
52 U.S.C. 21083(a)(4)(A) ...................................................................... 25
52 U.S.C. 21083(a)(5)(A)(i) ............................................................. 6, 25
52 U.S.C. 21083(a)(5)(A)(ii) ................................................................. 6
52 U.S.C. 21083(a)(5)(A)(iii) ................................................................ 6
52 U.S.C. 21111 ..................................................... 21, 24, 34, 55
Pub. L. No. 107-252, 116 Stat. 1666 (2002) .................................... 32

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501 *et seq.* ...................................................................... 1
52 U.S.C. 20501(a)(3) ........................................................................ 32
52 U.S.C. 20501(b)(3) .......................................................................... 5
52 U.S.C. 20507 .................................................................................. 34
52 U.S.C. 20507(a)(4) ...................................................................... 5, 25
52 U.S.C. 20507(i)(1) ....................................................................... 5, 37
52 U.S.C. 20510(a) ................................................... 21, 24, 34
52 U.S.C. 20510(d)(1) ....................................................................... 36

Privacy Act of 1974
5 U.S.C. 552a(e)(4) ....................................................................... 55-56
5 U.S.C. 552a(e)(4)(B) ....................................................................... 57
5 U.S.C. 552a(e)(7) ............................................................................. 55
Pub. L. No. 93-579, 88 Stat. 1896 .................................................... 54
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 .................................... 54

8 U.S.C. 1445(f) ................................................................................. 46

8 U.S.C. 1449 ...................................................................................... 46

8 U.S.C. 1454 ...................................................................................... 46

**STATUTES (continued):**                                          **PAGE**

8 U.S.C. 1454(a) ..................................................................... 46

10 U.S.C. 130c(d)(2)(C) ......................................................... 45

13 U.S.C. 214 .......................................................................... 45

21 U.S.C. 876(a) ..................................................................... 18

26 U.S.C. 7602 ........................................................................ 18

26 U.S.C. 7602 (1954 ed.) ...................................................... 16

26 U.S.C. 7605(b) (1954 ed.) .................................................. 20

28 U.S.C. 1291 .......................................................................... 2

28 U.S.C. 1331 .......................................................................... 2

28 U.S.C. 1343 .......................................................................... 2

29 U.S.C. 657(b) (1994 ed.) .................................................... 18

30 U.S.C. 1732(b) ................................................................... 45

31 U.S.C. 5314(a) ................................................................... 59

42 U.S.C. 2201(c) (1982 ed.) .................................................. 19

44 U.S.C. 3502 ................................................................... 59-60

44 U.S.C. 3502(3)(A) .............................................................. 61

44 U.S.C. 3502(3)(A)(i) ...................................................... 58-59

44 U.S.C. 3502(3)(B) .............................................................. 59

**STATUTES (continued):**                                          **PAGE**

44 U.S.C. 3502(10) ........................................................................58-59

44 U.S.C. 3518(c)(1) .........................................................................59

44 U.S.C. 3518(c)(1)(B) ....................................................................59

44 U.S.C. 3572(f) ..............................................................................45

44 U.S.C. 3601 ..............................................................................59-60

52 U.S.C. 10101 ........................................................................31, 50

52 U.S.C. 10101(a)(1) .......................................................................50

52 U.S.C. 10101(c) ............................................................................50

52 U.S.C. 20301-20311 .....................................................................39

**REGULATIONS:**

28 C.F.R. 0.50(a) ..............................................................................56

68 Fed. Reg. 47,610 (Aug. 11, 2003) ...........................................56-58

70 Fed. Reg. 43,904 (July 29, 2005) ................................................56

82 Fed. Reg. 24,147 (May 25, 2017) .................................................56

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 7767 (1960) ..............................................................31

**RULES:**

Fed. R. App. P. 2 ...................................................................62

Fed. R. App. P. 40(d)(1) .......................................................62

Fed. R. App. P. 41(b)............................................................62

**MISCELLANEOUS:**

1 *New Shorter Oxford English Dictionary* (4th ed. 1993).....................41

106 Cong. Rec. 7767 (1960) ....................................................31

Authority to Obtain & Share Statewide Voter Roll Data,
    50 Op. O.L.C (2026),
    https://www.justice.gov/olc/media/1440346/dl .........................42, 60

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) .....................60

Report of the United States Commission on Civil Rights (1959),
    https://www.usccr.gov/files/historical/1959/59-001-U.pdf ........47-48

*The Oxford Universal Dictionary* (3d ed. 1955) ...............................41-42

*The American Heritage College Dictionary* (4th ed. 2002) ....................60

The Federalist No. 59 (C. Rossiter ed. 1961) (A. Hamilton)...................51

U.S. Dep't of Just., Civil Rights Division, Voting Section,
    https://www.justice.gov/crt/voting-section
    (last visited July 16, 2026).........................................56

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020),
    https://www.justice.gov/jm/jm-9-11000-grand-jury#..................57

**MISCELLANEOUS (continued):**                                    **PAGE**

U.S. Dep't of Just., Mem. of Understanding between the
    United States and Texas (May 13, 2008), available at
    https://www.justice.gov/media/1173461/dl?inline
    (last visited July 17, 2026) ...........................................................39

U.S. Election Assistance Comm'n, Celebrating 20 Years of HAVA,
    https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/
    HAVA_1-Pager_10-27-22_508.pdf. .................................................33

*Webster's New World Dictionary of the American Language*
    (8th coll. ed. 1960) ......................................................................41

*Webster's Third New International Dictionary*
    (1966 ed. unabridg.)....................................................................44

## INTRODUCTION

Title III of the Civil Rights Act of 1960 (CRA) gives the Attorney General sweeping authority to inspect election records. 52 U.S.C. 20703. The United States seeks to exercise this authority to inspect Maine's statewide voter registration list (SVRL)—not to change or maintain the SVRL for itself, but rather to fulfill its clear statutory duty to enforce the list maintenance provisions of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. 20501 *et seq.*, and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq.*

In dismissing the United States' Complaint and denying its Motion for an Order to Show Cause, the district court failed to give effect to this statutory mandate, instead reviewing the Attorney General's demand to a depth that Title III does not permit, imposing an extratextual purpose requirement on Title III, and gutting Title III by misconstruing its language. The district court's holding thwarts Congress's clear direction that officers of election must retain, preserve, and produce election records so that the Attorney General can appropriately enforce voting laws. And consequently, the court's holding prevents the Attorney General from fully enforcing federal laws designed to ensure fair and

secure elections—including but not limited to the NVRA and HAVA. This Court should reverse.

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1343. That court entered a final Order granting defendants' and intervenors' Motions to Dismiss and denying the United States' Motion to Show Cause on May 21, 2026. Add. 1-22.[1] The United States filed a timely Notice of Appeal on June 5, 2026. App. 182. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether summary procedures should apply to the Attorney General's demand for records under Title III of the CRA.

2. Whether the Attorney General may demand records under Title III of the CRA to enforce all voting laws, including the NVRA and HAVA.

3. Whether SVRLs are records that come into the possession of state election officers within the meaning of Title III of the CRA.

---

[1] Doc. __, at __" refers to the docket number and internal page numbers on the district court docket sheet, No. 1:25-cv-468 (D. Me.). "Add. __" refers to page numbers in the Addendum to this Brief. "App. __" refers to the page numbers of the Appendix filed with this Brief.

4. Whether federal privacy laws prevent the DOJ from demanding an electronic, unredacted copy of Maine's SVRL.

## STATEMENT OF THE CASE

1.a. The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. In the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, to governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since enacted additional laws that affect what "records and papers . . . come into [an election officer's] possession," 52 U.S.C. 20701.

- 4 -

Relevant here are the NVRA and HAVA, which help the federal government to ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3). The NVRA requires each State, with exceptions, "for at least 2 years . . . [to] make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). The NVRA further requires each State to conduct "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . change in the residence of the registrant." 52 U.S.C. 20507(a)(4).

Of highest importance to this litigation, HAVA requires States to implement a single centralized computerized SVRL which is required to "serve as the official voter registration list for the conduct of all elections for Federal office in the State," 52 U.S.C. 21083(a)(1)(A)(viii). HAVA mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a

regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters" who should not appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

2. In the summer of 2025, the Department of Justice (DOJ) sent Secretary of State Bellows a letter seeking "information regarding Maine's procedures for complying with the [SVRL] maintenance provisions of the [NVRA]." App. 32. In particular, the DOJ requested that Secretary Bellows "produce for inspection . . . [t]he current electronic copy of Maine's computerized [SVRL] as required by Section 303(a) of

[HAVA]." *Ibid.* The DOJ cited concerns about Maine's responses to the Election Assistance Commission's Election Administration and Voting Survey (EAVS). App. 33. For example, Maine reported that only 3.5% of voters had duplicate registrations, which was much lower than the nationwide average of 12.7%, and Maine failed to provide any data in response to a question about whether duplicate registrations were merged. *Ibid.* Maine had removed 77.2% of voters for moving out of the jurisdiction, which was "more than twice the national average." *Ibid.* And overall, Maine's voter registration rate was "92.4 percent of the citizen voting age population." *Ibid.* The letter thus sought more details about Maine's processes for removing ineligible voters from the voter roll based on this rate. App. 34.

Secretary Bellows refused the request to produce Maine's SVRL. App. 35-40. The DOJ then renewed its request, citing its authority under Title III of the CRA. App. 41-43. When Secretary Bellows still did not provide the DOJ with Maine's SVRL (App. 70-72), the DOJ brought this suit (App. 13-31). The DOJ moved for an order to show cause why the defendants should not be compelled to produce the SVRL. Doc. 5. Two individuals and one organization intervened as defendants (*see* Docs. 10,

18, 49, 51), and all defendants moved to dismiss the suit (Docs. 53, 54, 61).

The district court granted the Motions to Dismiss and denied the Motion for Order to Show Cause. *See* Add. 1-22.

First, the district court rejected the United States' argument that summary procedures should apply. Add. 10-11. The court "[a]nalogiz[ed] the United States' demand under Title III to an administrative subpoena," and held that "Defendants, as the 'subject of the subpoena,' are entitled to 'an opportunity to challenge the subpoena before yielding the information,' and the Department of Justice must 'prove that . . . the subpoena is issued for a congressionally authorized purpose' and that 'the information sought is . . . relevant to the authorized purpose.'" Add. 11 (ellipsis in original) (quoting *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3 (1st Cir. 1996)).

Second, the district court held that the State's SVRL was not a "document[] that c[ame] into the state's possession in connection with its elections." Add. 13. The court stated that Title III "pertain[s] to records and papers that election officials receive from prospective voters . . . not lists or other tools created by election officials for the purpose of

preserving the information provided by voters and ensuring that persons appearing to vote are registered." Add. 13.

Third, the district court decided that Title III cannot be used to enforce the NVRA and HAVA. Add. 18. The court acknowledged that "the text of Title III does not expressly limit the acceptable purposes for which the Attorney General can request documents under that statute." Add. 15. But in "determin[ing] whether the Attorney General's purpose [was] sufficient," the court "start[ed] not with Title III, but with the text and structure of HAVA and the NVRA," and decided that the NVRA's and HAVA's enforcement mechanisms were the more specific, and therefore governing, provisions. Add. 15-18.

Finally, the district court cited concerns about federalism, stating that "states are the primary regulators and administrators of elections for federal office, unless Congress passes legislation that preempts that framework." Add. 19. And the court noted that "the NVRA and HAVA repeatedly charge states—not the federal government—with the maintenance of their own voter rolls." Add. 20.

## SUMMARY OF THE ARGUMENT

Title III gives the DOJ access to a specific, though broad, set of election-related records. The DOJ must provide election officers with notice of its basis and purpose for seeking the records, but Title III places no limits on that purpose, imposes no guidelines for determining the sufficiency of the basis, and requires no showing of relevance to any unenumerated purpose. Title III thus does not contemplate full-scale judicial proceedings, nor even proceedings in the nature of subpoena enforcement. But even under this Court's administrative subpoena precedents, the DOJ would be entitled to the SVRL: the DOJ seeks the SVRL for an authorized purpose, the SVRL is relevant to that purpose and adequately described, and the DOJ has followed the statutory procedures. The district court erred in imposing ordinary pleading requirements of the Federal Rules of Civil Procedure instead of giving full effect to Title III.

Furthermore, Title III contains no limit on the purposes for which the Attorney General can seek to obtain election records. The only requirement is that the Attorney General give the election officer notice

of his purpose. The district court erred in looking first to the NVRA and HAVA to find a limit instead of giving effect to the text of Title III.

And the court further erred in giving Title III's records provision an unnecessarily stilted interpretation—the SVRL is a record relating to voter registration that came into Secretary Bellows's possession. Thus, Title III requires Secretary Bellows to retain, preserve, and produce for inspection Maine's SVRL.

Finally, Maine cannot rely on federal privacy laws to excuse its noncompliance with Title III. The DOJ is complying with both the Privacy Act of 1974 and the E-Government Act of 2002. These statutes do not excuse Maine's refusal to produce its SVRL.

**STANDARD OF REVIEW**

This Court "review[s] the grant of a motion to dismiss for failure to state a claim under [Federal] Rule [of Civil Procedure] 12(b)(6) de novo, taking the well-pleaded facts in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs." *Clemente Props., Inc. v. Pierluisi-Urrutia,* 165 F.4th 1, 11 (1st Cir.), *petition for cert. pending,* No. 25-1426 (filed June 25, 2026). With "narrow exceptions," "a court ordinarily may only consider facts alleged in the complaint and exhibits

- 11 -

attached thereto." *Freeman v. Town of Hudson*, 714 F.3d 29, 35-36 (1st Cir. 2013) (citation omitted). "To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Clemente Props.*, 165 F.4th at 11 (alteration and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

## ARGUMENT

### I. The DOJ's demand for an electronic, unredacted copy of Maine's SVRL satisfied Title III's requirements.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of

poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the state election officer has rejected it, the Attorney General may seek an order from the federal court with "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the grounds that the DOJ cannot use Title III of the CRA to enforce the NVRA and HAVA and that the SVRL is not a record within the scope of Title III. This was error.

## A. Courts play a limited role in assessing the Attorney General's demand under Title III.

Courts undertake a limited role in evaluating the sufficiency of a demand under 52 U.S.C. 20703. The Attorney General's authority under Title III is "purely investigative," *Alabama ex rel. Gallion v. Rogers*, 187

F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and that "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking, through judicial process, records required to be maintained under Section 301, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [Section 303] written demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Title III's special statutory proceeding limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any

other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703). Accordingly, a state official responding to the Attorney General's demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers the records essential." *Ibid.* Nor is "the factual foundation for, or the sufficiency of," this statement "open to judicial review or ascertainment." *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*).

1. **The Attorney General is entitled to Maine's SVRL without meeting the requirements for an administrative subpoena.**

Title III gives the Attorney General authority to demand records required to be preserved under that statute. 52 U.S.C. 20703. The demand must "contain a statement of the basis and the purpose therefor." *Ibid.* But Title III contains no requirement that the Attorney General prove the relevance of the document to a particular investigation or

purpose, perhaps because the Title III demand power extends only to a specific, though broad, set of documents: those "relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. 20701.

The authorization for administrative subpoenas is quite the opposite: the government can demand a wide variety of records and testimony from any person but, because there is no other limit on the person affected or the type of information, the information must be relevant or material to one of the agency's authorized purposes. *See United States v. Powell*, 379 U.S. 48, 53 n.12 (1964) (noting that information can be obtained if it "may be relevant or material" (quoting 26 U.S.C. 7602 (1954 ed.))). The district court analogized this proceeding to a subpoena enforcement and concluded that "[d]efendants, as the 'subject of the subpoena,' are entitled to 'an opportunity to challenge the subpoena before yielding the information,' and the Department of Justice must 'prove that . . . the subpoena is issued for a congressionally authorized purpose' and that 'the information sought is . . . relevant to the authorized purpose.'" Add. 11 (ellipsis in original) (quoting *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3 (1st Cir. 1996)). This conclusion

then laid the groundwork for the district court's reasoning that "voter list maintenance is not among" the "investigatory purposes [that] may support a Title III records demand." Add. 14. The district court erred.

The requirements for obtaining an administrative subpoena—"(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena"—have roots in the Fourth Amendment. *Sturm, Ruger & Co.*, 84 F.3d at 4; *see ibid.* ("As long as the agency satisfies these modest requirements, the subpoena is per se reasonable and Fourth Amendment concerns are deemed satisfied."); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-209 (1946) (discussing how the requirements of relevance, a congressionally-authorized purpose within Congress's power, and adequate specification of the documents satisfy the Fourth Amendment).

And the relevance requirement, in particular, is also tethered to the statutory requirements for administrative subpoenas. *See Powell*, 379 U.S. at 53 n.12; *Sturm, Ruger & Co.*, 84 F.3d at 4 (applying the relevance requirement to an Occupational Safety and Health Administration

subpoena issued pursuant to 29 U.S.C. 657(b) (1994 ed.)); 29 U.S.C. 657(b) (1994 ed.) (emphasis added) (authorizing a court to order a person "to produce evidence if, as, and when so ordered, and to give testimony *relating to the matter under investigation or in question*"). Many of this Court's administrative subpoena precedents have arisen from proceedings under 26 U.S.C. 7602, which authorizes the Internal Revenue Service (IRS) to obtain documents and testimony "relevant or material" to an inquiry under one of four enumerated purposes. *See, e.g.*, *Sugarloaf Funding, LLC v. United States Dep't of the Treasury*, 584 F.3d 340, 344-345 (1st Cir. 2009); *United States v. Gertner*, 65 F.3d 963, 966 (1st Cir. 1995); *United States v. Salter*, 432 F.2d 697, 697-698 (1st Cir. 1970). And when this Court has enforced administrative subpoenas under other statutes, there has still been a statutory textual hook lending itself to a relevance inquiry. *See United States Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 721-722 (1st Cir. 2022) (affirming enforcement of a subpoena under 21 U.S.C. 876(a)); 21 U.S.C. 876(a) (emphasis added) (limiting subpoena power to records "which the Attorney General finds *relevant or material* to" an "investigation *relating to*" statutorily prescribed functions); *United States v. Comley*, 890 F.2d 539, 540, 542

(1st Cir. 1989) (affirming enforcement of subpoena under 42 U.S.C. 2201(c) (1982 ed.)); 42 U.S.C. 2201(c) (1982 ed.) (tying subpoena power to authorized purposes). This limitation makes sense for administrative subpoenas, which are used to compel individuals and corporations to produce what could otherwise be an unlimited scope of documents.

Not so here. First, the United States has requested state documents from a state official—not an individual's private papers. For this reason, Fourth Amendment concerns, which underpin the administrative subpoena requirements, are not implicated. And second, 52 U.S.C. 20703 itself limits any request to a specific set of documents. Thus, there is no need, and no statutory authorization, for a relevance inquiry. Finally, unlike other subpoena statutes, 52 U.S.C. 20703 does not limit the purpose of any demand; a statement of purpose must simply be provided in the demand. As evidenced by a straightforward reading of the CRA, there is consequently no statutorily prescribed set of purposes to which courts could demand relevance.

As a result, the full-scale administrative subpoena requirements do not apply to a Section 20703 action. Instead, "Title III narrowly circumscribes the issues upon which the Court is to act" and thus

requires "a special statutory proceeding." *Lynd II*, 306 F.2d at 225. Because Congress has "specifically identified" the records subject to demand, *id.* at 226, and has *not* specified any means of evaluating the demand's statement of basis and purpose, *cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988), the "issues open for judicial review" are "narrowly confined," *Lynd II*, 306 F.2d at 227. Thus, "a summary proceeding" is in order. *Id.* at 226.

In holding otherwise, the district court relied on *Powell*, 379 U.S. 48. *See* Add. 11. *Powell* explained that "a court may not permit its process to be abused" and that judicial inquiry into the IRS's demand for records was appropriate to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58. That inquiry was specifically authorized by Section 7605(b) of the Internal Revenue Code (IRC), which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. 7605(b) (1954 ed.)). The CRA contains no similar statutory prohibition limiting the authority of the Attorney General to

demand election records. And even if it did, *Powell*'s examples of "improper purpose[s]" are harassment, pressuring a taxpayer "to settle a collateral dispute," and "other purpose[s] reflecting on the good faith of the particular investigation." *Id.* at 58. In other words, *Powell* justified judicial inquiry into the IRS's demand where the IRS may have targeted the taxpayer for nefarious reasons having no bearing on law enforcement at all, not where it may have overreached in its understanding of its legitimate law enforcement powers. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943) (holding that a district court had a "duty" to "order . . . production" where "[t]he evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose").

Here, defendants argued that the Attorney General lacked the authority under the CRA to compel Secretary Bellows to produce Maine's unredacted SVRL to determine the State's compliance with the NVRA and HAVA. Doc. 54, at 15; Doc. 61, at 19. Because this challenge is to the scope of the Attorney General's authority to enforce the NVRA, *see* 52 U.S.C. 20510(a), and HAVA, *see* 52 U.S.C. 21111, it is not a proper subject

for review. *See Endicott Johnson*, 317 U.S. at 509.

To be sure, the CRA provides that after the Attorney General has made a written demand for records that the state election official has rejected, he may seek an order from the federal court "by *appropriate process* to compel the production of such record or paper." 52 U.S.C. 20705 (emphasis added). Appropriate process merely requires, however, that the state election official be "given reasonable notice of the pendency of the proceeding" and the opportunity to challenge "whether or not any specified particular paper or record comes within [Title III's] broad statutory classification." *Lynd II*, 306 F.2d at 226. Consistent with this understanding, the Supreme Court later clarified that "*Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. There is no dispute that Secretary Bellows received the DOJ's written demand for Maine's SVRL, and that she also has received access to the court to resolve disputes as to Title III's coverage or to seek a protective order. That was all the

process to which Secretary Bellows was entitled.

### 2. Even under this Court's administrative subpoena precedents, the United States is entitled to Maine's SVRL.

Even if Title III did not require "a special statutory proceeding," *Lynd II*, 306 F.2d at 225, at most it would mandate the standard applicable to other agencies' document demands, under which courts consider whether "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Sturm, Ruger & Co.*, 84 F.3d at 4.[2] The DOJ has more than met these requirements. The district court analogized the DOJ's demand to an administrative subpoena but failed to recognize the DOJ's compliance with these requirements. *See* Add. 11.

First, the DOJ sought Maine's SVRL to enforce the NVRA and HAVA, which is a congressionally authorized purpose. *See* part I.B, *infra*.

---

[2] Some IRS cases state the third element as a requirement "that the information sought [not be] already within the Commissioner's possession." *Sugarloaf Funding*, 584 F.3d at 345. This difference does not matter here because there is no dispute that the United States does not possess Maine's SVRL.

The district court concluded that the Attorney General had no authority to conduct a "line-by-line audit" of Maine's SVRL to enforce the NVRA and HAVA. Add. 17. But even under this Court's administrative subpoena procedures, the district court's inquiry was far afield. This Court has "repeatedly admonished that questions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings." *Sturm, Ruger & Co.*, 84 F.3d at 5; *see SEC v. Howatt*, 525 F.2d 226, 230 (1st Cir. 1975) ("[W]hether or not certain activities are subject to SEC regulation is not to be decided in a subpoena enforcement action."). In fact, "subpoena enforcement proceedings are designed to be summary in nature, and an agency's investigations should not be bogged down by premature challenges to its regulatory jurisdiction. As long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced." *Sturm, Ruger & Co.*, 84 F.3d at 5-6 (citation modified). The Attorney General is charged with enforcing the NVRA and HAVA, 52 U.S.C. 20510(a), 21111, and the district court erred in parsing *how* the DOJ intends to use the SVRL to enforce those statutes.

Second, the SVRL is relevant to the authorized purposes of HAVA and NVRA enforcement. Those statutes require Maine to make reasonable efforts to perform list maintenance. *See* 52 U.S.C. 20507(a)(4), 21083(a)(2)(A) and (4)(A). The SVRL is perhaps the most relevant evidence as to whether Maine's list maintenance program is reasonable— a low rate of ineligible voters or noncitizens, for example, may suggest a program is more likely to be reasonable; a high rate, by contrast, suggests a program is more likely to be unreasonable. Further, HAVA prohibits a State from accepting or processing a voter registration application that lacks identifying numbers, *see* 52 U.S.C. 21083(a)(5)(A)(i), so the SVRL showing whether Maine has collected or assigned those numbers is relevant to an inquiry into HAVA compliance. And in any case, the relevancy requirement is "minimal"; the question is whether the record "might . . . throw[] light" on Maine's compliance. *United States v. Freedom Church*, 613 F.2d 316, 321 (1st Cir. 1979) (citation omitted); *see Endicott Johnson*, 317 U.S. at 509.

Third, it is undisputed that the DOJ adequately described the record in question.

And fourth, the DOJ followed the proper procedures. The CRA simply requires that the Attorney General provide the state officer with a written demand stating "the basis and the purpose therefor." 52 U.S.C. 20703. The Attorney General need only "identify in a general way the reasons for his demand," such as that it "was made for the purpose of investigating *possible* violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (emphasis added); *see, e.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (citation omitted) ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred.").

The DOJ's demand for an unredacted copy of Maine's SVRL easily satisfied these four requirements. In its July 24 letter, the DOJ cited anomalies and missing answers in the EAVS report, including that Maine removed voters "for having moved outside the jurisdiction" at a rate "more than twice the national average," that Maine failed to answer a question about the merging of registrations, and that Maine had not provided data on confirmation notices. App. 33. In that same letter the DOJ asked Maine to "produce for inspection" Maine's SVRL. App. 32. And

the DOJ's August 18 letter stated that the purpose of the demand was "to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA." App. 42.

Under any reasonable interpretation of this statement, the basis for the DOJ's written demand is clear—that Maine's list maintenance program may violate the NVRA and HAVA—and thus the demand put Secretary Bellows on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. Contrary to defendants' suggestion (Doc. 54, at 17), the DOJ was not required to await Maine's response to its questions about the EAVS anomalies before seeking the SVRL. Nor was it required to take those responses at face value or ask follow-up questions instead of going to the source. *See* Doc. 54, at 17. And for a court to evaluate the DOJ's factual basis by weighing the DOJ's questions and Maine's responses goes far beyond what Title III permits.

Furthermore, the DOJ's August 18 letter specifically incorporated the July 24 letter's statement of basis and purpose. *See* App. 42. Defendants argued before the district court that the facts from the July 24 letter could not constitute the basis because that letter did not mention the CRA. Doc. 81, at 6. But the text of Section 303 does not say

that "basis and purpose" must appear in one letter. 52 U.S.C. 20703; *United States v. Benson,* 179 F.4th 470, 488 (6th Cir. 2026) (*Benson II*) (Nalbandian, J., dissenting), *petition for reh'g en banc pending* (filed July 8, 2026). And in any case, the August 18 letter invoked Section 303, stated that the purpose of the demand was "to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA," and incorporated the July 24 letter. App. 42. This letter gave Secretary Bellows clear notice of both the basis and the purpose of the demand and thus complied with Section 303. *See Lynd II,* 306 F.2d at 226; *Benson II,* 179 F.4th at 488 (Nalbandian, J., dissenting).

***

Despite its inapplicability to this request, the requirements for enforcement of an administrative subpoena have been met, and thus the Attorney General is entitled to Maine's SVRL. Even applying *Powell,* once the Attorney General made a prima facie showing as to the four administrative subpoena requirements, it was defendants' burden to prove that the request was improper. And they are not entitled to discovery on the issue: "[e]xcept in extraordinary circumstances, discovery is improper in a summary subpoena enforcement proceeding."

*Comley*, 890 F.2d at 543 (citation modified). Such extraordinary circumstances would, at a minimum, require evidence, rather than mere speculation, of bad faith. *See ibid.* (holding that absent "firm evidence," even "forceful allegations" of bad faith did not warrant an evidentiary hearing). Nor does the defendants' disagreement with the DOJ's priorities and policy choices show the type of "improper purpose," such as harassment or pressure to settle a collateral dispute, *Powell*, 379 U.S. at 58, that could warrant overriding the Executive's investigative authority.

**B.    Title III authorizes the Attorney General to demand records for the purpose of investigating compliance with list-maintenance obligations.**

Title III of the CRA authorizes the Attorney General to demand "[a]ny record or paper required by [Section 301] to be retained and preserved" so long as the demand states its basis and purpose. 52 U.S.C. 20703. Nothing in Title III limits that purpose or prohibits the Attorney General from using the investigative tool of Section 303 to enforce the NVRA and HAVA.

In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that

language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted); *see Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 45 (1st Cir. 2024). The district court erred at this first step. Rather than beginning with the text of the statute at issue, the court "start[ed] not with Title III, but with the text and structure of HAVA and the NVRA." Add. 15-16. Thus, even though the court acknowledged that "the text of Title III does not expressly limit the acceptable purposes for which the Attorney General can request documents under that statute" (Add. 15), the court failed to give effect to Congress's grant of broad investigative authority.

Beginning—as any analysis ought—with the text of Title III, Section 303 does not give the Attorney General a list of acceptable purposes but simply provides that the demand must state its purpose. 52 U.S.C. 20703. This is a procedural limitation, not a substantive one. The point is that the DOJ must give the election officer *notice* of the purpose— a useless exercise if only one permissible purpose existed. It is the specific set of records covered by Title III—"all records and papers which come into [an officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" (52

U.S.C. 20701)—that limits the purposes for which the Attorney General would invoke his authority under Title III. Because courts ordinarily should "resist reading words or elements into a statute that do not appear on its face," *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)), there is no call to impose an extratextual limit on Section 303's purpose requirement.

Nothing in Title III limits its scope to particular types of investigations, let alone excludes list-maintenance investigation as a permissible purpose. When Congress wants to limit permissible investigative purposes, it knows how. *See* pp. 17-18, *supra* (discussing administrative-subpoena statutes). And elsewhere in the CRA, Congress limited remedies to particular harms (namely, racial discrimination). *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. It is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

There is no reason to superimpose an extratextual limit on Title III and prevent its use to protect the right central to Title III—the right to vote. By broadly authorizing the Attorney General to demand election records from States, "[t]he CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights." *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich.) (*Benson I*), *aff'd*, 179 F.4th 470 (6th Cir. 2026), *petition for reh'g en banc pending* (filed July 8, 2026). Congress passed the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3). HAVA, for its part, is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to

"address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[3]

By mandating list maintenance, the NVRA and HAVA also protect against fraudulent voting, which "dilute[s] the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). The CRA, at the very least, empowers the Attorney General to investigate and assess compliance with other elections statutes, like the NVRA and HAVA.

In holding otherwise, the district court focused on the NVRA and HAVA, concluding that under those statutes each State "is the master of its voter list." Add. 16. It is true that Maine bears responsibility for adding and removing voters from its SVRL in compliance with the NVRA

---

[3] U.S. Election Assistance Comm'n, Celebrating 20 Years of HAVA 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf.

and HAVA. But Congress gave the Attorney General the authority to enforce the NVRA and HAVA, 52 U.S.C. 20510(a), 21111, thereby anticipating that the Attorney General might sometimes need to step in and look "over the shoulder of the state election official" (Add. 18). And the Attorney General is by no means attempting to supplant Maine's responsibility to maintain its voter rolls—this case is about the Attorney General's authority to *inspect* Maine's SVRL, not to *remove* anyone from the SVRL.

Nor does the Attorney General's enforcement authority under the NVRA and HAVA operate in a vacuum, completely separate from his pre-existing Title III investigative authority. Title III gives the Attorney General investigative powers; the NVRA and HAVA give him enforcement powers. These laws operate in harmony. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (discussing the "strong presumption" that "federal statutes touching on the same topic" "can coexist harmoniously" and a court's duty to "giv[e] effect to both" (citation omitted)).

HAVA itself contains no inspection provision, and the NVRA contains only a *public* inspection provision, *see* 52 U.S.C. 20507. Because

of the privacy concerns associated with public inspection, courts have read into the public-inspection provision an option for States to redact "uniquely or highly sensitive personal information," *Public Int. Legal Found.*, 92 F.4th at 56 (collecting cases)—a limitation that may apply even when the Attorney General seeks to inspect those same records. It is implausible that Congress intended for the Attorney General to lack the ability to inspect records so pertinent to his enforcement authority under the NVRA and HAVA. Because it is well-settled that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), a better inference is that Congress saw no need to provide an inspection provision for the Attorney General in these later-enacted statutes, because the CRA provided a pre-existing investigative tool.

For these reasons, the NVRA and HAVA do not "create a comprehensive scheme" that overrides the Attorney General's Title III investigative authority, as the district court concluded. Add. 17. A true "comprehensive scheme" would have included an inspection provision similar to that in Title III so that the Attorney General would have a means of finding out whether an enforcement action was needed without

first filing suit. Instead, the NVRA's inspection provision gives *the public* certain (narrower) inspection rights. And in light of Title III's pre-existing investigative tool, there was no need for HAVA to contain any inspection provision for the Attorney General. These statutes work together. In crafting the NVRA and HAVA, Congress was building on and reinforcing existing voting rights, not erecting siloes.

Nor do the NVRA and HAVA govern Title III as more specific provisions. *Cf.* Add. 17-18. Congress specifically disclaimed any intent that the NVRA abrogate existing remedies. 52 U.S.C. 20510(d)(1); *see Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 191 (2023) (treating a similar provision as support for the availability of a remedy outside the statute). And Title III itself grants the Attorney General specific authority: the authority to inspect a certain set of voting-related records. When two separate statutes "are complementary and have separate scopes and purposes," the "greater specificity" of one matters only if both "cannot be implemented in full at the same time." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014). "[I]t would show disregard for the congressional design to hold that Congress nonetheless intended one [complementary] federal statute to preclude

the operation of the other." *Id.* at 115. Title III, the NVRA, and HAVA are all complementary provisions that can be fully implemented at the same time. Title III supports the Executive's investigative authority, and the NVRA and HAVA give States specific responsibilities and the United States enforcement authority. The statutes work together to secure fair elections. This Court can and should give full effect to each.

As for the inspection provisions, the NVRA's *public* inspection provision, which applies to those "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," is not the more specific provision. 52 U.S.C. 20507(i)(1). Although some records would be inspectable under both provisions, the two provisions focus on different sets of records. And the NVRA's public-inspection provision is just that: a public-inspection provision. It says nothing about the Attorney General's inspection authority and therefore covers a different-in-kind inspection process. The statute regulating the Attorney General's ability to demand voting-related documents (that are specifically *not* subject to public disclosure, 52 U.S.C. 20704) remains 52 U.S.C. 20703.

In holding otherwise, the district court relied on *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), and *United States v. Bormes*, 568 U.S. 6 (2012). These cases are inapposite. *Bormes* dealt with the question whether a general waiver of the United States' sovereign immunity applied when a more detailed scheme existed—against the backdrop principle that such a waiver must be "unequivocally expressed." 568 U.S. at 9-10 (citation omitted). And in *RadLAX*, the Supreme Court considered the relation of two clauses of the same statute and applied the rule that "the specific governs the general." 566 U.S. 639 at 645 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). The Court discussed two purposes for the rule: eliminating contradiction and avoiding superfluousness. *Id.* at 645. Here there is no contradiction, and no provisions of Title III, the NVRA, or HAVA would be rendered superfluous by giving full effect to each act.

Furthermore, the United States previously has pursued successful matters, including in litigation, to obtain SVRLs under Title III of the CRA to investigate issues of list maintenance.[4] For example, in matters

---

[4] The DOJ has long utilized the CRA to investigate possible violations of federal election laws *other* than laws addressing voting

against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and last four digits of social security numbers, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[5]

### C. Maine's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA.

Section 301 of the CRA requires an election official to "retain and preserve, for a period of twenty-two months from the date of any" covered election, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Those same records or papers

---

related racial discrimination, such as the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. 20301-20311; *see* Order, at 2, *United States v. Alabama*, No. 2:08-cv-920 (M.D. Ala. Mar. 27, 2009) (Doc. 24).

[5] *See* Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006). The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See* Consent Decree, *Georgia, supra* (Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), available at https://www.justice.gov/media/1173461/dl?inline (last visited July 17, 2026).

are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703.

1. The "sweeping" retention provision applies to Maine's SVRL. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records").

"[T]he phrase 'relating to' has a broadening effect," *United States v. Trahan*, 111 F.4th 185, 197 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1206 (2025), and typically should be read "expansively," *United States v. Winczuk*, 67 F.4th 11, 17 (1st Cir. 2023) (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). In Section 301, the phrase expands the type of records to be preserved beyond simply applications, registrations, or receipts for payments. Instead, any record "relating to" one of those activities—or even relating to the catchall "other act requisite to voting"—must be preserved. 52 U.S.C. 20701. The SVRL is a record that relates to voter registration. *See* Add. 12 ("I have little trouble accepting that Maine's SVRL "relat[es] to . . . act[s] requisite to voting." (alterations in original; citation omitted)).

Furthermore, any officer in possession of the SVRL came into possession of the SVRL at a distinct point in time. When a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own."). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The Oxford Universal Dictionary* 17 (3d

ed. 1955) (defining "acquire" similarly). Congress likely used the term "comes into his possession" precisely because it is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C., at 8-9 (2026), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into possession" "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself"); *see also U.S. Coachways, Inc. v. Vaccarello*, No. 17-cv-5983, 2018 WL 3716888, at *2 (E.D.N.Y. Aug. 3, 2018) (quoting a contract provision that used the term to cover both created and received documents).

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possessio*n in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (citation and

internal quotation marks omitted; emphasis added). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession of material refers to when and how the possession began. *See ibid.*

2. According to the district court, the SVRL is not a covered "record[]" or "paper[]" under Title III because it is "created by election officials" and therefore does not "come[] into [the] possession" of election officials. Add. 13; 52 U.S.C. 20701. In the district court's view, Section 20701 applies only to those "records and papers that election officials receive from prospective voters to support the exercise of the suffrage by the prospective voters." Add. 13.

This Court has already rejected similar attempts to limit the scope of voting records under other statutes. *See Public Int. Legal Found.*, 92 F.4th 36. In *Public Interest Legal Foundation*, this Court held that Section 8(i)(1) of the NVRA applies to the state voter file because it was as electronic report generated from the central voter registration system, and it reflects the additions and changes made by Maine election officials in carrying out voter list registration and maintenance activities. *See id.* at 49.

For the reasons explained above (pp. 40-42, *supra*), the district court's requirement that election officers receive the relevant records or papers from voters (Add. 13-14) is not the most natural reading of the statutory phrase "come into his possession." *See Benson II*, 179 F.4th at 485 n.3, 486 n.7 (Nalbandian, J., dissenting). Election officers in Maine acquired the relevant records from individual voters in the course of carrying out their duties. By coming into possession of those individual records, these officers merely aggregate them together into a simple record, the SVRL. *See id.* at 484.

Even if one were to accept that SVRLs are merely "the product of the labors of state officials" (Add. 14), the word "come" cannot create a carve-out for self-generated documents. *See* Add. 13 n.10 (contrasting "come into possession" with "in the possession of"). Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp.

as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time.*[6] Following this focus on the *how* and *when* an individual gains possession of a record or paper, 52 U.S.C. 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. Thus the phrase "come into his possession" "cabins an election official's liability to documents she received during her tenure." *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting).

The distinction between records "com[ing] into [one's] possession" and being "in[] [one's] possession," then, is a "temporal" one, *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting)—not a distinction

---

[6] *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

between obtaining records from voters and through the fruits of state officer's labor (Add. 13-14)—as is shown by one of the statutes cited in *Benson I* (on which the district court chiefly relied) as "draw[ing] an explicit distinction between possessing something and having something come into one's possession," 819 F. Supp. 3d at 768 (citing 8 U.S.C. 1454); *see* Add. 12-13. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . may come into possession of it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a). Thus, the phrase "come into possession" implies a temporal change in circumstances. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C. 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.

Context further demonstrates that Congress would not have created such a distinction between documents received from voters and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf); *see also id.* at 479 (majority opinion) (relying on the same report). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant." *Id.* at 486 (Nalbandian, J., dissenting) (citation omitted). These indices would be government-created records, but once an index was "passed . . . up the ladder," the receiving "state official came into possession of the index." *Ibid.* The indices were critical to the Commission because the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that

Congress make available for federal inspection. *Id.* at 137-138. The Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. *Id.* at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). The Commission reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. And the Commission gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88. Now these county tally sheets and county voter registration lists have been replaced by the self-generated electronic state voter registration list as required by HAVA.

Consider also the implication of the district court's interpretation. That reading would exclude from the reach of Sections 20701 and 20703 all of the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper

application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

3. Construing Title III to not include the SVRL itself would paralyze the United States' ability to enforce various federal voting laws. The SVRL is the only statewide federally mandated record of voters required to conduct every election. HAVA states "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii).

It is not just *any* record "requisite to voting," 52 U.S.C. 20701, in an election. Without the SVRL, federal elections cannot occur. The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A)(i). The SVRL must contain "the name and registration information of every legally registered voter in the State." 52 U.S.C. 21083(a)(1)(A)(ii). The SVRL must be "coordinated with other agency databases within the State," 52 U.S.C. 21083(a)(1)(A)(iv), and "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." 52 U.S.C.

21083(a)(1)(A)(vi). Absent this record, conducting federal elections is simply not possible.

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, Uniformed and Overseas Citizens Absentee Voting Act, NVRA, HAVA, or Voting Rights Act of 1965, 52 U.S.C. 10101 (VRA)[7], for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Lynd II*, 306 F.2d at 228. The district court's reading would effectively carve out vast numbers of federal election records, including SVRLs, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

---

[7] The VRA provides that "all citizens of the United States who are otherwise qualified by law to vote at any election . . . shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude." 52 U.S.C. 10101(a)(1). It provides that when "reasonable grounds" exist to "believe that any person is about to engage in any act or practice" in violation of the VRA, the Attorney General may institute an action for relief. 52 U.S.C. 10101(c).

**D.     Federalism does not defeat the Attorney General's demand under Title III.**

The district court erred in relying on federalism concerns. Add. 18-19. The Constitution gives Congress explicit authority to override state laws regarding the conduct of federal elections. U.S. Const. Art. I, § 4, Cl. 1. Because "[e]very government ought to contain in itself the means of its own preservation," Congress has "paramount" authority "over the 'Times, Places and Manner' of congressional elections," and Congress's election regulations "supersede those of the State which are inconsistent therewith." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting The Federalist No. 59, at 362-363 (C. Rossiter ed. 1961) (A. Hamilton), then *Ex Parte Siebold*, 100 U.S. 371, 392 (1879)); *see Foster v. Love*, 522 U.S. 67, 69 (1997) ("[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-833 (1995))).

The States' regulatory role "has always existed subject to the express qualification that it 'terminates according to federal law.'" *Inter Tribal Council*, 570 U.S. at 15 (quoting *Buckman Co. v. Plaintiffs' Legal*

*Comm.*, 531 U.S. 341, 347 (2001)). Election regulations, unlike regulations pursuant to States' "historic police powers," *id.* at 14 (citation omitted), have never been within "the states' exclusive domain," Add. 19. Accordingly, "federalism concerns . . . are somewhat weaker"—not stronger—in the context of elections. *Inter Tribal Council*, 570 U.S. at 14; *see* Add. 19.

### E. Defendants' arguments regarding pretext provide no basis to affirm.

Although the district court did not reach the issue, defendants argued below that the Attorney General's demand for Maine's SVRL is a pretext for establishing a national voter database to target and remove individuals from the voter rolls. *See* Doc. 55, at 8-10. As already discussed, *see* part I.A, *supra*, Title III leaves no room for a court to second-guess the stated basis and purpose of the Attorney General's demand.

Even if the demand were judicially reviewable, the district court is required—as it acknowledged (Add. 7 n.6)—to take "the well-pleaded facts in the [United States'] complaint as true and draw[] all reasonable inferences in favor of" the United States. *Clemente Props., Inc. v. Pierluisi-Urrutia*, 165 F.4th 1, 11 (1st Cir.), *petition for cert. pending*, No.

25-1426 (filed June 25, 2026). And, accepting again for purposes of argument that administrative-subpoena precedents apply, this Court has held that a party resisting a subpoena based on claims of "bad faith" must support its assertions by "firm evidence." *Comley*, 890 F.2d at 542. "In the absence of firm evidence of bad faith, it is not [this Court's] role to intrude into the investigative agency's function," and accordingly, "discovery is improper in a summary subpoena enforcement proceeding" "[e]xcept in extraordinary circumstances." *Id.* at 543 (citations and internal quotation marks omitted).

Defendants' assertions of pretext fall well short of this standard. Defendants' citation of numerous out-of-court statements and news articles to support their contention warranted no credence because these sources are not properly subject to judicial notice. *See Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013); Doc. 55, at 8-10. They cannot provide the "firm evidence" of pretext that defendants need. *Comley*, 890 F.2d at 542-543.

## II. Defendants' arguments regarding privacy laws do not provide any basis to affirm.

The district court also did not reach the defendants' arguments regarding federal privacy laws, but these arguments are likewise

meritless. Maine's duty to comply with Title III is independent of any duty the United States has to comply with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, or the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899. Even if the United States' compliance were lacking—and it is not—Maine's obligations under Title III are separate from, and not dependent on, the United States' obligations under other federal laws. *See United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an IRS summons"). Regardless, though, the United States is complying with federal privacy laws.

## A. The United States is complying with the Privacy Act.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896).

1. Maine relied below on a provision of the Privacy Act that prohibits federal agencies from "maintain[ing] [any] record describing how any individual exercises rights guaranteed by the First Amendment

unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7). *See* Doc. 54, at 20. Enforcing the CRA's willful destruction or alteration requirements, 52 U.S.C. 20702, which includes criminal penalties of up to one year of imprisonment, *ibid.*, and the NVRA's and HAVA's list-maintenance requirements satisfies the law-enforcement exception. *See* 52 U.S.C. 21111 (giving the Attorney General enforcement authority). However, the United States agrees that certain information, like an individual's party affiliation and how that individual votes (including for which party), both "describ[es] how an[] individual exercises" his First Amendment rights and is not "pertinent to" the DOJ's investigation. 5 U.S.C. 552a(e)(7). Accordingly, the United States will not object to a redaction of that information in the State's SVRL. Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand.

2. Maine also argued below that the DOJ failed to identify a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), that covers an unredacted SVRL. Doc. 54, at 22-24. The Privacy Act requires federal agencies to "publish in the Federal

Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. 552a(e)(4). The DOJ did so. It has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[8]

---

[8] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited July 16, 2026).

No more persuasive is defendants' argument that this SORN's identification of "the categories of individuals on whom records are maintained in the system," 5 U.S.C. 552a(e)(4)(B), cannot be read to include all registered voters in Maine and other States. *See* Doc. 54, at 23. The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance and voter fraud. Moreover, because votes case by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich,* 594 U.S. at 672, eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed.

Reg. at 47,611. The Privacy Act therefore provides no basis to dismiss the United States' Complaint.

**B.     The United States is complying with the E-Government Act.**

The United States is also complying with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899. In the district court, Maine argued that because the United States did not allege that it conducted a privacy impact assessment (PIA), the United States had not complied with the E-Government Act. Doc. 54, at 24-25. Pursuant to the E-Government Act, agencies must "conduct a privacy impact assessment" (PIA) before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44

U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with the DOJ's demand for Maine's (or any State's) SVRL. E-Government Act § 208(b)(1)(B)(i); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals "to keep records, file reports, or keep records and file reports" whenever individuals engage in transactions or maintain relationships with "any person with a foreign financial agency").

Second, a "collection of information" does not include information collected during an investigation like the type the Department is carrying out here. "The term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And Section 3518(c)(1)(B), in turn, excludes any collection of information "during the conduct of . . . an . . . investigation involving an agency against specific individuals or entities." The Department's investigation into Maine's

compliance with the NVRA and HAVA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C., at 33, https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr. (EPIC) v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502, 3601. Accordingly, courts give these terms their "ordinary meaning" and may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, "start" (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002) (defining "new" as

"having existed or having been made but a short time" or "different from one of the same category that has existed previously").

The demand in this case did not begin any new collection of information. The Attorney General demanded that Secretary Bellows provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added).

## CONCLUSION

This Court should reverse the district court's order dismissing the DOJ's Title III claim and denying the Motion to Show Cause, and remand with instructions to order Secretary Bellows to immediately produce the requested unredacted SVRL.

Further, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). Contrary to arguments raised in opposition to the United States' Motion to Expedite, a decision in August or September still would allow the United States to work with Maine to take real steps to clean up its SVRL, if necessary, prior to the upcoming general election on November 3, 2026. The United States is confident that States will not ignore out-of-hand alerts from the United States that their SVRLs contain ineligible voters.

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. P. 2, 40(d)(1).

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General

s/ Andrew G. Braniff
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3803

Date: July 17, 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 12,499 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Andrew G. Braniff  
ANDREW G. BRANIFF  
 Attorney

Date: July 17, 2026

# CERTIFICATE OF SERVICE

I certify that on July 17, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff  
ANDREW G. BRANIFF  
Attorney

ADDENDUM

# TABLE OF CONTENTS

**PAGE**

Order Granting Defendants' Motions to Dismiss,
  filed May 21, 2026 (Doc. 114)......................................................................1

Judgment, filed May 21, 2026 (Doc. 115) ...............................................23

52 U.S.C. 20701 ......................................................................................24

52 U.S.C. 20703 ......................................................................................24

52 U.S.C. 20704 ......................................................................................25

52 U.S.C. 20705 ......................................................................................25

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 1:25-cv-00468-LEW |
| SHENNA BELLOWS, in her official capacity as Secretary of the State of Maine, and the STATE OF MAINE, | ) ) ) ) | |
| Defendants, | ) ) | |
| LEAGUE OF WOMEN VOTERS OF MAINE, | ) ) ) | |
| Defendant-Intervenors, | ) ) | |
| JOHN SCHNECK and MARPHEEN CHANN, | ) ) ) | |
| Defendant-Intervenors | ) | |

## **ORDER**

The United States filed this civil action to compel Defendants, the State of Maine and Secretary of State Shenna Bellows, to produce Maine's complete and unredacted computerized voter registration list. The matter is before the Court on the Motions to Dismiss of Defendants (ECF No. 54), Defendant-Intervenors John Schneck and Marpheen Chann (ECF No. 61), and Defendant-Intervenor League of Women Voters of Maine (ECF No. 53). Also before the Court is the United States' Motion for Order to Show Cause (ECF No. 5) why the requested records have not been produced.

Add. 1

Maine, along with many other states, historically have agreed to the Department of Justice's requests for access to their voter rolls. *See*, *e.g.*, *United States v. Maine*, No. 1:06-cv-86, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007) (consent decree providing the United States "an electronic copy of voter information from the CVR"). Comity between coequal sovereigns is the hallmark of a thrumming republic, so it should not surprise the reader, though in these days it likely will, to learn that federal government curiosity in state voter rolls would ordinarily be worked out through cooperation and negotiation in observance of the delicate balance of sovereign authorities, thereby avoiding a clash between sovereigns. The question before me now is whether the Department of Justice can compel the type of access it once enjoyed through consent, in the face of a state's refusal. For the reasons that follow, I conclude it cannot. The Motions to Dismiss are GRANTED and the United States' Motion for Order to Show Cause is DENIED.

## BACKGROUND

On July 24, 2025, a Deputy Assistant Attorney General from the Civil Rights Division of the U.S. Department of Justice sent a letter to Maine's Secretary of State requesting, among other information, "[t]he current electronic copy of Maine's computerized statewide voter registration list [(SVRL)] . . . as required by Section 303(a) of the Help America Vote Act," including "all fields contained within the list," "[p]ursuant to Section 20507(i) of the [National Voter Registration Act]." Compl. Ex. 1 ("July 24 Letter") at 1 (ECF No. 1-1); *see also* Compl. ¶ 31. The Help America Vote Act requires states to "implement . . . a single, uniform, official, centralized, interactive computerized statewide voter registration list" that "shall serve as the single system for storing and

Add. 2

managing the official list of registered voters throughout the State." 52 U.S.C. § 21083(a)(1)(A), (A)(i). To comply with this requirement, Maine created the "central voter registration system," which is the "single electronic information system and database for voter registration information maintained by the Secretary of State and used by all municipal jurisdictions." 21-A M.R.S. § 1(6-A). It includes each registered voter's full name, residential and mailing addresses, date of birth, most recent prior residential address, choice of political party, and election participation history. *See id*. §§ 152(1)-(2), 721. It also includes the voter's driver's license number, nondriver identification card number, or partial social security number, depending on which number the voter provided at registration. *Id*. § 152(1)-(2).

In addition to the demand for Maine's current computerized SVRL, the July 24 Letter also contained the following observations about Maine's responses to the Election Assistance Commission's election administration and voting survey:

- That Maine's voter registration rate in 2024 was 92.4 percent of the citizen voting age population;

- That Maine had 11,011 voters with duplicate registrations (or 3.5 percent), almost four times fewer than the national average (12.7 percent);

- That Maine had 101,771 voters (or 77.2 percent) removed for having moved outside the jurisdiction, more than twice the national average; and

- That data about Maine's confirmation notice mailings[1] was missing.

---

[1] The National Voter Registration Act outlines procedures for the identification of voters who may have changed residences, which include mailing notices to certain voters who (among other criteria) have not voted in the last two elections. *See* 52 U.S.C. § 20507(b)-(e).

Add. 3

*See* July 24 Letter at 2. In connection with these observations, the letter requested information about the actions Maine takes to ensure that ineligible voters are being removed and Maine's processes for sending out and tracking confirmation notices. *Id.*

On August 8, 2025, Secretary Bellows responded, refusing to provide the current computerized SVRL, contending that the request was "overbroad" and that the SVRL contains information protected as "highly sensitive" under Maine law.[2] *See* Compl. Ex. 2 ("Resp. to July 24 Letter") at 1, 3 (ECF No. 1-2); *see also* Compl. ¶ 36. That response also included the Secretary's answers to the July 24 Letter's questions about Maine's survey data, which the United States has alleged "did not provide sufficient details for the United States to evaluate compliance with [the Help America Vote Act] and the [National Voter Registration Act]." Compl. ¶ 37; *see also id.* ¶¶ 38-46.

On August 18, 2025, the Department of Justice sent another letter to the Secretary, renewing its "request for Maine's voter registration list . . . to assess the State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act" and reiterating that "the electronic copy of the [SVRL] must contain all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as

---

[2] Maine law designates the central voter registration system as confidential and exempt from Maine's public records laws. *See* 21-A M.R.S. § 196-A(1). It gives the Secretary discretion to "make available" to government actors "certain voter information for that entity's authorized use only," specifically, "the voter's name, year of birth, residence address, mailing address, electoral districts, voter status, date of registration or date of the voter record if applicable, voter record number and any special designations indicating uniformed service voters, overseas voters, or township voters." *Id.* § 196-A(1)(E). Defendants contend that this "authority does not extend to bulk disclosure of sensitive [personal identifying information] like full date of birth, social security number, and driver's license number." Defs. Mot. to Dismiss at 4.

Add. 4

required under the Help America Vote Act . . . to register individuals for federal elections." Compl. Ex. 3 ("August 18 Letter") at 1 (ECF No. 1-3); *see also* Compl. ¶¶ 47-50.  The letter explained that the request was an exercise of the United States Attorney General's authority under the National Voter Registration Act, the Help America Vote Act, and Title III of the Civil Rights Act of 1960.  August 18 Letter at 1-2.  Of note, Title III requires states to make certain election records and papers[3] available to the United States Attorney General upon a written demand that includes "a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, which the Department of Justice asserted was contained in "our letter dated July 24, 2025 . . . namely, to assist in our determination of whether Maine's list maintenance program complies with the [National Voter Registration Act]."[4] August 18 Letter at 2.

The Secretary responded to the August 18 Letter on September 8, 2025, again refusing to provide the unredacted computerized SVRL.  Compl. ¶ 51.  A week later, the United States filed this lawsuit, alleging violations of the National Voter Registration Act, 52 U.S.C. § 20507(i) (Count I); the Help America Vote Act, *id.* § 21083 (Count II); and

---

[3] The "records and papers" terminology is specific to "records and papers which come into [the] possession [of state election officers] relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election."  52 U.S.C. § 20701.

[4] The August 18 Letter also demanded, in addition to the current computerized SVRL, "all original and completed voter registration applications submitted to the State of Maine from December 1, 2023, through July 1, 2025."  August 18 Letter at 2.  In response to this request, Secretary Bellows explained that, "under Maine law, original voter registration applications are maintained by registrars in each of Maine's roughly 480 municipalities."  Ex. A to Defs. Mot. to Dismiss ("Resp. to August 18 Letter") at 3 (ECF No. 54-A) (citing 21-A M.R.S. § 172).  Since August 18, the United States has shown no interest in these records, which, as far as I understand it, remain available to the United States should it wish to canvas Maine's town halls.  This demand has gone completely unmentioned in both the Complaint and Motion for Order to Show Cause, which only seek to compel production of the current computerized SVRL.

Add. 5

Title III of the Civil Rights Act, *id*. § 20703 (Count III).  The United States seeks an injunction ordering Defendants "to provide the United States the current electronic copy of Maine's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number as required by 52 U.S.C. § 20703."  Compl. ¶ 65.D.

By now, nearly every state has received a request similar to the one at issue here. Many—including Maine—have declined, and as a result, the United States has initiated thirty lawsuits nearly identical to this one.[5]  Six have been dismissed on motions similar to the ones before me now.  *See United States v. Fontes,* –  F. Supp. 3d –, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore,* –  F. Supp. 3d –, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, –  F. Supp. 3d –, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Benson*, –  F. Supp. 3d –, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026); *United States v. Oregon*, – F. Supp. 3d –, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

## DISCUSSION

To avoid dismissal, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To determine whether a complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), courts "separate the complaint's factual allegations (which must be taken

---

[5] *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Justice Office of Public Affairs (Feb. 26, 2026), <https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls> (last viewed May 21, 2026).

Add. 6

as true) from its conclusory legal allegations (which need not be credited)," *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012).  The task is then to ascertain whether, "drawing all reasonable inferences in the pleader's favor," those "well-pled" factual allegations "plausibly narrate a claim for relief" under the law.  *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).[6]

To understand the United States' claim for relief, a summary of the statutory backdrop is necessary.  That backdrop is comprised of the National Voter Registration Act (NVRA), the Help America Vote Act (HAVA), and Title III of the Civil Rights Act of 1960 (Title III).

The NVRA was enacted in 1993 "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1), and "to ensure that accurate and current voter registration rolls are maintained," *id*. § 20501(b)(4).  In furtherance of those ends, the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the

---

[6] Defendants, Defendant-Intervenors, and various *amici curiae* have repeatedly and loudly cast aspersions on the Department of Justice's reasons for seeking so many states' SVRLs.  The United States' representative at oral argument did his best to reassure all involved that requests like the one at issue here are routinely made by the Civil Rights Division and that states (including Maine) have complied in the past. At the hearing, the United States' attorney was emphatic that "this whole notion that somehow there's going to be a national database . . . created from" the voter registration data the Department of Justice has been attempting to compile "is not true," and that "there is no national database that's being created."  Hr'g Tr. 51:3-7 (ECF No. 104).  His efforts to assuage these concerns were almost immediately undermined by the issuance of an executive order directing the Department of Homeland Security to compile a "State Citizenship List" in order to "assist in verifying identity and Federal election voter eligibility."  Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Apr. 3, 2026) ("Ensuring Citizenship Verification and Integrity in Federal Elections").  Fortunately for the United States, this matter is before me on motions to dismiss, and under the applicable standard, the only facts that I consider are those contained in the United States' Complaint and its attachments, which I take as true.  *Morales-Cruz*, 676 F.3d at 224; *Schatz*, 669 F.3d at 55.

Add. 7

registrant; or (B) a change in the residence of the registrant[.]" *Id*. § 20507(a)(4). This program must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," *id*. § 20507(b)(1), and cannot "result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote" unless the state follows certain procedures, *id*. § 20507(b)(2). The NVRA makes subject to public disclosure "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" *Id*. § 20507(i)(1). And it empowers both private parties, *see id*. § 20510(b)(2), and the Attorney General, *id*. § 20510(a), to "bring a civil action in an appropriate district court for . . . declaratory or injunctive relief," *id.*, in the event of a violation.

Following up on the NVRA, Congress passed the Help America Vote Act (HAVA), in 2002. As the United States explains, "HAVA imposes 'minimum requirements' for the conduct of federal elections, which 'allow the states to develop their own laws and procedures to fulfill the requirements' to the extent that they are consistent with the standards set by HAVA." Compl. ¶ 19 (quoting H.R. Rep. No. 107-329, pt. 1, at 35 (2001)). Thus, HAVA provides that:

> [E]ach State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State[.]

52 U.S.C. § 21083(a)(1)(A). The computerized SVRL "shall serve as the single system for storing and managing the official list of registered voters" in that state.

Add. 8

*Id*. § 21083(a)(1)(A)(i). As explained above, the HAVA-mandated SVRL is what the United States seeks to compel Maine to produce.

HAVA also requires "[t]he appropriate State or local election official" to "perform list maintenance with respect to the computerized list on a regular basis." *Id*. § 21083(a)(2)(A)-(B). Similarly, HAVA requires states "to ensure that voter registration records in the State are accurate and updated regularly" by implementing "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible" and "[s]afeguards to ensure that eligible voters are not removed in error." *Id*. § 21083(a)(4)(A)-(B). HAVA also requires states to collect certain information from registrants through their applications, namely, the applicant's driver's license number or social security number, *see id*. § 21083(a)(5)(A)(i), which the state must take steps to verify, *see id*. § 21083(a)(5)(B). Finally, HAVA empowers the Attorney General to bring "a civil action against any State or jurisdiction . . . for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title." *Id*. §§ 21111.

The United States' primary argument in support of its claim to Maine's SVRL invokes a different statute entirely: Title III of the Civil Rights Act of 1960. Predating the NVRA and HAVA by several decades, Title III provides that "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such

9

Add. 9

election," and makes the failure to do so punishable by up to one year of imprisonment. 52 U.S.C. § 20701.  Title III also provides that "[a]ny record or paper" subject to that preservation requirement "shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]"[7]  *Id*. § 20703. The Attorney General's written demand must "contain a statement of the basis and the purpose therefor."  *Id*.  Title III also affords to the U.S. District Court "jurisdiction by appropriate process to compel the production of such record or paper."  *Id*. § 20705.

The United States contends that each of these statutes requires Maine to make its unredacted, current computerized SVRL available to the Department of Justice.  And even more pointedly, the United States contends that Title III's delegation of jurisdiction on this Court to compel production by appropriate process creates "a special statutory proceeding" for the summary disposition of its claim to the requested records.  *See* Pl. Resp. at 8 (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962)), 9-11.  Finding support from a 60-year-old Fifth Circuit decision, the United States argues that in this "special statutory proceeding," there is "no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in

---

[7] The United States points to the terms "reproduction" and "copying" to argue that it is entitled to the complete, unredacted SVRL. Pl. Resp. at 12.  Interestingly, the NVRA frames its disclosure requirement in very similar terms, requiring states to "make [records] available for public inspection and, where available, photocopying at reasonable cost."  52 U.S.C. § 20507(i)(1).  As discussed further below, however, the First Circuit nonetheless concluded that "nothing in the text of the NVRA prohibits the redaction of uniquely or highly sensitive personal information" in records subject to disclosure. *Public Interest Legal Foundation v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

Add. 10

the written demand" or to challenge "the reasons why the Attorney General considers the records essential." *Id*. at 9-10 (quoting *Lynd*, 306 F.2d at 226); *see also* Pl. Mem. Order to Show Cause at 8-9 (ECF No. 5-1). For reasons that follow, I conclude that this case presents something other than a perfunctory matter of compelling compliance with a clear statutory directive. In fact, carefully considered, this case lacks the statutory grounding needed to state a claim upon which relief may be granted.

Title III provides that the Court has "jurisdiction by appropriate process to compel the production" of covered records. 52 U.S.C. § 20705. The Supreme Court, interpreting identical language in a different statute two years after the Fifth Circuit decided *Lynd*, held that because that statute "contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). Analogizing the United States' demand under Title III to an administrative subpoena, as district courts have done in similar cases, *see, e.g., Benson*, 2026 WL 362789, at *7, Defendants, as the "subject of the subpoena," are entitled to "an opportunity to challenge the subpoena before yielding the information," and the Department of Justice must "prove that . . . the subpoena is issued for a congressionally authorized purpose" and that "the information sought is . . . relevant to the authorized purpose."[8] *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3 (1st Cir. 1996).

---

[8] As far as I can tell, no district court has adopted the United States' view of *Lynd*'s "special statutory proceeding." *See Weber*, 816 F. Supp. 3d at 1182; *Oregon*, 2026 WL 1177244, at *8; *Benson*, 2026 WL 362789, at *7; *Amore*, 2026 WL 1040637, at *3-4; *Fontes*, 2026 WL 1177244, at *1 n.1. The United States has pointed to a show-cause order issued by the District of Connecticut in *United States v. Thomas*, No. 3:26-cv-21. *See* Pl. Notice re: Connecticut Order for Show-Cause Hearing (ECF No. 78). As Defendants and Defendant-Intervenors have observed, that order, which was issued *ex parte*, did little more than set a briefing schedule.

Add. 11

Turning to the substance of the United States's claim under Title III, I "start with the text of the statute itself." *See Teles de Menezes v. Rubio*, 156 F.4th 1, 12 (1st Cir. 2025) (internal citation omitted). At first glance, the language of Title III appears to be quite sweeping, requiring state election officers to "retain and preserve . . . all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election," 52 U.S.C. § 20701, and then make any such "record or paper" available to the Attorney General "upon demand," *id*. § 20703. Words and phrases like "all," "any," and "relating to" are certainly expansive. But "[w]ords in a statute are not islands," and "must be read in their context and with a view to their place in the overall statutory scheme." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 55 (1st Cir. 2021) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). While I have little trouble accepting that Maine's SVRL "relat[es] to . . . act[s] requisite to voting," I do not believe that it can be fairly described as a record or paper that "comes into [the] possession" of Maine's election officers, as that phrase is most naturally construed. 52 U.S.C. § 20701; *see also Benson*, 2026 WL 362789, at *9-10; *Fontes*, 2026 WL 1177244, at *3-7.

Title III requires states to preserve certain categories of evidence for a specified time following an election, to allow the Attorney General to investigate and litigate wrongdoing in the conduct of that election.[9] *See* 52 U.S.C. § 20701. To that end, Title III's production and preservation requirements are addressed to "records and papers" that "come into [the]

---

[9] The legislative history that the United States cites in its opposition to Defendants' and Defendant-Intervenors' motions to dismiss supports this understanding. *See* Pl. Resp. at 8 n.2 (quoting H.R. Rep. 86-956 at 1944-45 (1960)).

Add. 12

possession" of the state election official. *Id*. It requires the preservation of those records and papers, *id*., criminalizes their destruction or alteration, *id*. § 20702, and grants the Attorney General access to them, *id*. § 20703. In other words, the Civil Rights Act "is not designed to facilitate the disclosure of voter information," but rather to require "the disclosure of *documents*"—specifically, documents that come into the state's possession in connection with its elections. *Benson*, 2026 WL 362789, at \*10 (original emphasis). "The phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Id.* at \*9 (collecting authority); *see also Receive, Black's Law Dictionary* (12th ed. 2024) ("to come into possession of or get from some outside source"). Title III's commands therefore pertain to records and papers that election officials receive from prospective voters to support the exercise of the suffrage by the prospective voters, not lists or other tools created by election officials for the purpose of preserving the information provided by voters and ensuring that persons appearing to vote are registered.[10]  *See Benson*, 2026 WL 362789, at \*9-10; *Fontes*, 2026 WL 1177244, at \*3-7.

---

[10] The United States argues that state election officials "come into possession" of SVRLs "when they acquire them in the conduct of their official responsibilities, regardless of the information's source." Pl. Resp. to Notice of Supp. Auth. at 1 (ECF No. 111). Essentially, the United States argues that "come into [the election official's] possession" means "in the election official's possession." If that is the meaning Congress intended, however, this strikes me as an odd selection of words to convey it. "[C]ourts 'must give effect, if possible, to every clause and word of a statute,'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal citation omitted)—including, here, the words "come into." *See also Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 773 (2025). Coming into possession of something most naturally implies receipt from an external source. Congress could have required the retention and production of all election-related records and papers "in the possession of" the state election official but did not. The "natural implication" of the failure to adopt this "obvious alternative" is that Congress did not intend the alternative. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014); *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477-78 (2017).

Add. 13

In my view, this resolves the matter: the United States cannot utilize Title III to compel production of Maine's SVRL because it is not a record that comes into the possession of state officials, but is instead the product of the labors of state officials. However, as a separate and independent reason for rejecting the United States' Title III claim, I am also persuaded that the United States' stated purpose for its request is insufficient.

Much of the parties' briefing in this matter, as well as the decisions of other district courts that have declined to compel production of other states' SVRLs, has focused on Title III's requirement that the Attorney General's written demand include a statement of the basis and the purpose for the demand. *See* 52 U.S.C. § 20703. A number of district courts have concluded, as Defendants and Defendant-Intervenors urge me to conclude here, that "the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10; *see also Amore*, 2026 WL 1040637, at *6. Defendants and Defendant-Intervenors have made strong arguments that this is so, but stronger still, in my view, is the argument that whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them.[11]

---

[11] Defendants and Defendant-Intervenors have also urged, and several other district courts have concluded, that the United States was required to, but did not, include in its written demand under Title III a factual basis for its request. *See*, *e.g.*, *Galvin*, 2026 WL 972129, at *3-6. The United States has requested that, in the event I am inclined to reach the same conclusion, it be permitted "to send Secretary Bellows a curing elaboration letter" setting out a factual basis. Pl. Resp. to Notice of Supp. Auth. at 2 (ECF No. 107). Because I decide the motions before me on other grounds, I do not chase this particular thread of the dispute to its conclusion.

Add. 14

Title III's requirement that the Attorney General provide a written "statement of the basis and the purpose" for its demand contemplates assessment of the sufficiency of the basis and the purpose asserted. 52 U.S.C. § 20703; *see also Oregon*, 2026 WL 318402, at *9 ("If any purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function"). The United States' stated purpose for requesting Maine's current unredacted SVRL is to ascertain whether Maine is complying with the list maintenance requirements imposed by the NVRA and HAVA. *See* Compl. ¶ 49. As the United States has explained in its filings, the intended review is apparently quite granular, including an assessment of "compliance with HAVA's requirement to provide the driver's license number, or the last four digits of the Social Security Number," which requires a "review [of] the SVRL to determine whether that information is being collected consistently." Pl. Resp. at 16. The United States has also gestured towards a plan to review the SVRL "to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections." *Id*. at 12-13. I am not persuaded that the Civil Rights Act of 1960 can be leveraged for this purpose.

True, the text of Title III does not expressly limit the acceptable purposes for which the Attorney General can request documents under that statute. But "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (internal citation omitted). To determine whether the Attorney General's purpose is sufficient, I start not with Title III, but with the text and structure of

Add. 15

HAVA and the NVRA—the statutes that impose the obligation to create the computerized list of registered voters that the United States has brought this suit to obtain, and whose technical and list maintenance requirements the United States seeks to enforce. HAVA requires each state's chief election official to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list[.]" 52 U.S.C. § 21083(a)(1)(A). The list must contain "the name and registration information of every legally registered voter" and assign to each "a unique identifier." *Id*. HAVA clearly specifies and repeatedly reiterates that the list must be "defined, maintained, and administered at the State level"—not by the federal government. *Id*.; *see also id*. § 21083(a)(2) (directing "[t]he appropriate State or local election official" to "perform list maintenance with respect to the computerized list on a regular basis").[12] HAVA also expressly leaves "to the discretion of the States" "[t]he specific choices on the methods of complying with" its "requirements." *Id*. § 21085. The NVRA similarly directs its commands for "the administration of voter registration for elections for Federal office"—including those pertaining to voter list maintenance—to "each State." 52 U.S.C. §§ 20507(a), 20507(a)(4). Both statutes could not be clearer: each individual state, and not the U.S. Department of Justice, is the master of its voter list, entrusted with its administration and maintenance.

---

[12] *See also* 52 U.S.C. § 21083(a)(3) (directing "[t]he appropriate State or local election official" to "provide adequate technological security measures to prevent the unauthorized access to the computerized list"); *id*. § 21083(a)(4) (requiring "[t]he State election system" to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly"); *id*. § 21083(a)(5)(A)(iii) ("The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this paragraph, in accordance with State law").

Add. 16

HAVA, moreover, contains specific provisions that govern its enforcement, which do not independently afford the United States access to a state's current, unredacted SVRL. *See* 52 U.S.C. § 21111 (authorizing the Attorney General to "bring a civil action against any State . . . for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title"). The NVRA contains a similar enforcement provision to that found in HAVA. *See id.* § 20510(a) ("The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out this chapter."). It also provides for the disclosure of "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," *id.* § 20507(i)(1), including Maine's computerized SVRL, *see Public Interest Legal Foundation v. Bellows*, 92 F.4th 36, 45-49 (1st Cir. 2024).

Together, the NVRA and HAVA create a comprehensive scheme for the creation and upkeep of states' computerized SVRLs, and for the enforcement of the list maintenance requirements imposed by those statutes. That scheme gives the Attorney General the power to "bring a civil action" against a state that has violated those provisions, *see* 52 U.S.C. §§ 20510(a), 21111, but it does not contemplate the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions. That is why the United States leans so heavily on Title III of the Civil Rights Act, even though it was not drawn with any of our present concerns in mind. Yet, "[i]t is a commonplace of statutory construction that the specific governs the general," particularly

Add. 17

where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal citations omitted); *see also United States v. Bormes*, 568 U.S. 6, 12-13 (2012) (reaffirming the principle that a "precisely drawn, detailed statute pre-empts more general remedies") (internal citation omitted). When "a general authorization and a more limited, specific authorization exist side-by-side," the specific provision controls. *RadLAX*, 566 U.S. at 645. The United States' undertaking to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce is in direct contravention of these principles. If the Department of Justice wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes— which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list.[13]

Finally, giving Title III the construction that the United States requests would also require me to turn a blind eye to traditional principles of federalism and how those

---

[13] The district court in *Benson* concluded differently on this point. *See* 2026 WL 362789, at *8. Because "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," the *Benson* Court reasoned that the several decades separating the passage of the Civil Rights Act from the passage of the NVRA and HAVA was not an important consideration. *Id*. Perhaps so, but "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (internal citation omitted). I remain unconvinced by the proposition that Congress, in requiring states to create and maintain computerized lists of registered voters pursuant to particular specifications, would grant the federal government unrestricted access to those lists to investigate compliance with those specifications—beyond the mechanisms specifically provided for that purpose in those statutes themselves—without saying so explicitly.

Add. 18

principles have found expression in American elections—the backdrop against which Congress enacted the NVRA and HAVA. *See Learning Resources, Inc. v. Trump*, 607 U.S. – , 146 S.Ct. 628, 672 (2026) (Barrett, J., concurring) (emphasizing the importance of "background legal conventions and constitutional structure" in ascertaining "the most natural reading of a statute"). Under our Constitution, states are the primary regulators and administrators of elections for federal office, unless Congress passes legislation that preempts that framework. *See* U.S. Const. Art. I § 4, cl. 1; *Foster v. Love*, 522 U.S. 67, 69 (1997). And Congress's power to do even that is itself subject to limitations. *See, e.g., Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16-17 (2013) ("[T]he Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."). The text of HAVA itself demonstrates sensitivity to this traditional division of labor and a delicate touch to matters bearing upon the relationship between the federal and state governments, recognizing that HAVA presented a new incursion into what had once been the states' exclusive domain. *See, e.g.*, 52 U.S.C. §§ 21084 (emphasizing that "nothing in this subchapter shall be construed to prevent a State from establishing election technology and administration requirements" in excess of those imposed by federal statute), 21085 ("The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State."). Construing the Civil Rights Act of 1960—enacted as strong medicine to address the stubborn ill of racial discrimination in voting booths across the Jim Crow South—to implicitly provide the United States a right to every state's SVRL on demand for purposes of conducting a comprehensive, line-by-line audit of the state's compliance with HAVA and the NVRA

Add. 19

would take a sledgehammer to the balance Congress struck when it required states to create and maintain computerized lists of registered voters in the first place. The implausibility of such a construction is only increased by the manner in which both the NVRA and HAVA repeatedly charge states—not the federal government—with the maintenance of their own voter rolls. *See id.* §§ 20507(a)-(g), 21083(a)(1)(A), 21083(a)(2), 21083(a)(3), 21083(a)(4).

To sum up, the United States has demanded Maine's SVRL under Title III of the Civil Rights Act for the purpose of monitoring compliance with the NVRA and HAVA. But the preservation and disclosure requirements of Title III are not that robust, applying only to records and papers that "come into [the election officer's] possession," 52 U.S.C. § 20701, and not the lists and tools created by the state to administer its elections. Furthermore, the NVRA and HAVA are more recent, more precise statutes with their own objectives and mechanisms for enforcement. If they do not authorize the disclosure that the United States here seeks to compel, Title III does not serve to make those statutes any more demanding. I turn to offer a few parting words on the United States' utilization of those statutes now.

The United States' championing of its claims under the NVRA and HAVA, in both its briefing and its presentation at the hearing on this matter, can only be described as half-hearted. And for good reason, since neither statute gives the United States the power to compel Maine to produce its current computerized SVRL "with all fields." Compl. ¶ 65.D. The First Circuit already determined what the United States is entitled to under the NVRA's public disclosure provision, *see* 52 U.S.C. § 20507(i)(1), in *Public Interest Legal*

20

Add. 20

*Foundation v. Bellows*, 92 F.4th 36 (1st Cir. 2024). While Maine's central voter registration system and reports generated from it fall within the scope of this disclosure provision, *see id*. at 45-50, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" from what the state must disclose, *id*. at 56. It does not, then, require production of the current computerized SVRL "with all fields," unredacted.[14] Compl. ¶ 65.D.

Unlike the NVRA, HAVA contains no disclosure provision at all. The United States points instead to its enforcement provision, *see* 52 U.S.C. § 21111, arguing that by virtue of its power to bring suit to enforce certain of HAVA's requirements, it is entitled to the records it seeks "through the ordinary investigative process" and under Rule 34 of the Federal Rules of Civil Procedure. Pl. Resp. at 16-17. But this is not an action to enforce HAVA's substantive requirements—the only violation of HAVA that the United States has actually alleged is Maine's failure to comply with its demand for the computerized SVRL.[15] *See* Hr'g Tr. 62:13-16 (ECF No. 104) ("But, again, just to clarify, both the NVRA and HAVA claims that we've brought are not substantive violations other than just simply we are entitled to the records."). The United States essentially claims "that it can file a

---

[14] Perhaps the United States could have argued that the Department of Justice is entitled to more under the NVRA than what a public requester (such as the Public Interest Legal Foundation) can obtain, as far as redactions of sensitive personal information go. But in the single paragraph offered in support of the NVRA claim, the United States does not make that case. *See* Pl. Resp. at 13-14.

[15] In its briefing, the United States gestures towards a similar argument with respect to its NVRA claim, which fails for the same reason. The United States asserts that it "has properly alleged in its Complaint that Defendants have failed to engage in reasonable list maintenance efforts" and is therefore entitled to "the voter registration list, which necessarily must be used to ensure the accuracy of the official list of eligible voters, and is some of the best evidence of a state's voter list maintenance efforts." Pl. Resp. at 15. If the United States' pleadings contain any allegation that Maine has not engaged in reasonable list maintenance efforts, in violation of the NVRA, it was not made apparent to me.

Add. 21

HAVA claim, allege no violations of HAVA, and obtain information to support its (as-yet-nonexistent) claim via discovery." *Benson*, 2026 WL 362789, at *2. This assertion has "no basis in the Federal Rules of Civil Procedure," *id.*, nor in any other federal law of which I am aware. *See McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006) ("[P]laintiffs should not be permitted to conduct fishing expeditions in hopes of discovering claims they do not know they have."). Stated a bit more colloquially, the United States has filed a HAVA action in search of a HAVA violation, which is not the preferred order of things in the course of civil litigation.

At the hearing, the United States' attorney characterized the federal government's role in the voter-registration scheme created by HAVA and the NVRA as "one of trust but verify." Hr'g Tr. at 46:20 (ECF No. 104). But the text and structure of those statutes require a greater degree of trust than this Department of Justice would perhaps like to give—and only limited mechanisms for verification. As I see it, this was by design.

## CONCLUSION

For these reasons, the Motions to Dismiss (ECF Nos. 53, 54, and 61) are GRANTED, and the Motion for Order to Show Cause (ECF No. 5) is DENIED.

SO ORDERED.

Dated this 21st day of May, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge

22

Add. 22

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|   Plaintiff | ) |
| | ) |
| v. | )   Civil No.  1:25-cv-00468-LEW |
| | ) |
| SHENNA BELLOWS, et al., | ) |
| | ) |
|   Defendants | ) |

<u>JUDGMENT OF DISMISSAL</u>

In accordance with the Order entered by Chief U.S. District Judge Lance E. Walker, on

May 21, 2026;

JUDGMENT of Dismissal is hereby entered.

Jennifer P. Lyons, Clerk

By:    /s/ Stacey Graf
       Deputy Clerk

Dated: May 21, 2026

Add. 23

**52 U.S.C. 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation.**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**52 U.S.C. 20703. Demand for records or papers by Attorney General or representative; statement of basis and purpose.**

Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

**52 U.S.C. 20704. Disclosure of records or papers.**

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

**52 U.S.C. 20705. Jurisdiction to compel production of records or papers.**

The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.