No. 26-1676

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

SHENNA BELLOWS, in the official capacity as Secretary of the State of Maine; STATE OF MAINE; JOHN SCHNECK; MARPHEEN CHANN; LEAGUE OF WOMEN VOTERS OF MAINE,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

# APPENDIX

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MEREDITH L. BAKER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 532-3803

**TABLE OF CONTENTS**

**PAGE**

District Court Docket ........................................ 1

Complaint,
filed September 16, 2025
(Doc. 1) ........................................ 13

Letter from the DOJ to Secretary Bellows,
dated July 24, 2025
(Doc. 1-1) ........................................ 32

Letter from Secretary Bellows to the DOJ,
dated August 8, 2025
(Doc. 1-2) ........................................ 35

Letter from the DOJ to Secretary Bellows,
dated August 18, 2025
(Doc. 1-3) ........................................ 41

Declaration of Jill M. Ward,
filed September 29, 2025
(Doc. 18-2) ........................................ 44

Declaration of Sarah Stadler,
filed September 29, 2025
(Doc. 18-3) ........................................ 52

Declaration of Patricia Sprague,
filed September 29, 2025
(Doc. 18-4) ........................................ 56

Declaration of Julie L. Flynn,
filed December 12, 2025
(Doc. 55-1) ........................................ 60

**TABLE OF CONTENTS (continued):** **PAGE**

Declaration of Katherine McBrien,
filed December 12, 2025
(Doc. 55-2) .......... 66

Letter from Secretary Bellows to the DOJ,
dated September 8, 2025
(Doc. 55-3) .......... 70

Transcript of Hearing on Motions to Dismiss,
held on March 26, 2026
(Doc. 104) .......... 73

Notice of Appeal,
filed June 5, 2026
(Doc. 116) .......... 182

APPEAL,CLOSED,CONSENTPILOT,STANDARD

# U.S. District Court
# District of Maine (Bangor)
# CIVIL DOCKET FOR CASE #: 1:25−cv−00468−LEW

UNITED STATES OF AMERICA v. BELLOWS
Assigned to: JUDGE LANCE E. WALKER
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
Case in other court: First Circuit, 26−01676
Cause: 28:1345 USA Plaintiff

Date Filed: 09/16/2025
Date Terminated: 05/21/2026
Jury Demand: None
Nature of Suit: 441 Civil Rights: Voting
Jurisdiction: U.S. Government Plaintiff

| Date Filed | # | Docket Text |
|---|---|---|
| 09/16/2025 | 1 | COMPLAINT against SHENNA BELLOWS and STATE OF MAINE, filed by UNITED STATES OF AMERICA. (Service of Process Deadline 12/15/2025) (Attachments: # 1 Exhibit 1: July 24, 2205 DOJ Letter, # 2 Exhibit 2: August 8, 2025 SOS Letter, # 3 Exhibit 3: August 18, 2025 DOJ Letter)(lcb) Modified on 9/17/2025 to add State of Maine (lcb). (Entered: 09/17/2025) |
| 09/16/2025 | 2 | CIVIL COVER SHEET. (lcb) (Entered: 09/17/2025) |
| 09/17/2025 | 3 | ***FILED IN ERROR*** Summons Issued as to SHENNA BELLOWS and STATE OF MAINE.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(Attachments: # 1 Summons for State of Maine)(lcb) Modified on 9/17/2025 to add State of Maine (lcb). Modified on 9/18/2025 to indicated filed in error (lcb). (Entered: 09/17/2025) |
| 09/18/2025 | 4 | Corrected Summonses Issued as to SHENNA BELLOWS, STATE OF MAINE.<br><br>**Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.**<br><br>**Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).**<br><br>(Attachments: # 1 Summons for State of Maine)(lcb) (Entered: 09/18/2025) |
| 09/18/2025 | 5 | MOTION TO SHOW CAUSE why Defendants have failed to produce the demanded records. by UNITED STATES OF AMERICA Responses due by 10/9/2025. (Attachments: # 1 Supplement Memorandum in Support of Motion to Show Cause, # 2 Exhibit 1, DOJ Letter 8/18, # 3 Exhibit 2, SOS Letter 8/8, # 4 Exhibit 3, DOJ Letter 7/24, # 5 Supplement Declaration Letter)(VANDENBERG, DAVID) Modified on 9/19/2025 to clean up duplicative exhibit text (clp). (Entered: 09/18/2025) |
| 09/19/2025 | 6 | RETURN OF SERVICE by UNITED STATES OF AMERICA re 1 Complaint. (VANDENBERG, DAVID) Modified on 9/22/2025 to clean up entry text (nrg). (Entered: 09/19/2025) |
| 09/22/2025 | | SET Answer Deadline for SHENNA BELLOWS and STATE OF MAINE per ECF No. 6: Answer due by 10/10/2025. (nrg) (Entered: 09/22/2025) |
| 09/22/2025 | 7 | NOTICE of Appearance by JONATHAN R. BOLTON on behalf of SHENNA BELLOWS, STATE OF MAINE (BOLTON, JONATHAN) (Entered: 09/22/2025) |

| | | |
|---|---|---|
| 09/22/2025 | 8 | NOTICE of Appearance by JASON ANTON on behalf of SHENNA BELLOWS, STATE OF MAINE (ANTON, JASON) (Entered: 09/22/2025) |
| 09/23/2025 | 9 | NOTICE of Hearing: Conference of Counsel set for 9/26/2025 08:30 AM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 09/23/2025) |
| 09/23/2025 | 10 | MOTION to Intervene *as Defendants and Memorandum in Support* by John Schneck, Marpheen Chann Responses due by 10/14/2025. (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D)(MONTELEONE, JAMES) (Entered: 09/23/2025) |
| 09/23/2025 | 11 | CERTIFICATION for Admission Pro Hac Vice of Branden D. Lewiston filed by JAMES G. MONTELEONE on behalf of Marpheen Chann, John Schneck (Total admission fee $200 receipt number AMEDC−3175300) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (MONTELEONE, JAMES) Modified on 9/24/2025 to insert payment information (lrt). (Entered: 09/23/2025) |
| 09/23/2025 | 12 | CERTIFICATION for Admission Pro Hac Vice of Christopher D. Dodge filed by JAMES G. MONTELEONE on behalf of Marpheen Chann, John Schneck (Total admission fee $ 200 receipt number AMEDC−3175300.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Attachment)(MONTELEONE, JAMES) (Entered: 09/23/2025) |
| 09/23/2025 | 13 | CERTIFICATION for Admission Pro Hac Vice of Elisabeth Frost filed by JAMES G. MONTELEONE on behalf of Marpheen Chann, John Schneck (Total admission fee $ 200 receipt number AMEDC−3175302.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Attachment)(MONTELEONE, JAMES) (Entered: 09/23/2025) |
| 09/23/2025 | 14 | CERTIFICATION for Admission Pro Hac Vice of Tori Shaw filed by JAMES G. MONTELEONE on behalf of Marpheen Chann, John Schneck (Total admission fee $ 200 receipt number AMEDC−3175304.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (MONTELEONE, JAMES) (Entered: 09/23/2025) |
| 09/24/2025 | 15 | NOTICE of APPROVAL by Clerk's Office re 11 Certification for Admission Pro Hac Vice,, 12 Certification for Admission Pro Hac Vice,, 14 Certification for Admission Pro Hac Vice,, 13 Certification for Admission Pro Hac Vice,, Attorney BRANDEN D. LEWISTON,CHRISTOPHER D. DODGE,ELISABETH C. FROST,TORI D. SHAW for Marpheen Chann,BRANDEN D. LEWISTON,CHRISTOPHER D. DODGE,ELISABETH C. FROST,TORI D. SHAW for John Schneck added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Dodge and Shaw must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 10/1/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 09/24/2025) |
| 09/24/2025 | 16 | NOTICE of Appearance by MICHAEL GATES on behalf of All Plaintiffs (GATES, MICHAEL) (Entered: 09/24/2025) |
| 09/26/2025 | 17 | On September 26, 2025, I held a Conference of Counsel with Attorneys Gates, Vandenberg, Bolton, Anton, Dodge, Lewiston, Frost, Shaw, and Monteleone. After hearing from the parties, I ORDERED that they file a joint status report by October 10, |

| | | |
|---|---|---|
| | | 2025, updating the Court regarding the procedural path for this matter going forward. By MAGISTRATE JUDGE KAREN FRINK WOLF: (Court Reporter: Lori Dunbar) (BRF) (Entered: 09/26/2025) |
| 09/26/2025 | | SET Deadlines Regarding Conference of Counsel and per ECF No. 17: Status Report due by 10/10/2025. (nrg) (Entered: 09/26/2025) |
| 09/29/2025 | 18 | MOTION to Intervene *as Defendant* by League of Women Voters of Maine Responses due by 10/20/2025. (Attachments: # 1 Exhibit Proposed Answer, # 2 Affidavit Jill M. Ward Declaration, # 3 Affidavit Sarah Stadler Declaration, # 4 Affidavit Patricia Sprague Declaration)(TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 19 | RULE 7.1 DISCLOSURE STATEMENT by League of Women Voters of Maine. (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 20 | CERTIFICATION for Admission Pro Hac Vice of Alexis Grady filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 21 | CERTIFICATION for Admission Pro Hac Vice of Robert Brent Ferguson filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 22 | CERTIFICATION for Admission Pro Hac Vice of Daniel S. Lenz filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 23 | CERTIFICATION for Admission Pro Hac Vice of Heather Szilagyi filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 24 | CERTIFICATION for Admission Pro Hac Vice of Katherine Hamilton filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 25 | CERTIFICATION for Admission Pro Hac Vice of Renata O'Donnell filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/29/2025 | 26 | CERTIFICATION for Admission Pro Hac Vice of Sejal Jhaveri filed by ALLAN K. TOWNSEND on behalf of League of Women Voters of Maine The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 09/29/2025) |
| 09/30/2025 | | Set Deadlines : Fee for the Certifications for Admissions Pro Hac Vice (ECF Nos. 20−26) due by 9/30/2025. (lrt) (Entered: 09/30/2025) |

| | | |
|---|---|---|
| 09/30/2025 | | Pro Hac Vice Fee Received from Alexis Grady, Robert Brent Ferguson, Daniel S. Lenz, Heather Szilagyi, Katherine Hamilton, Renata O'Donnell, and Sejal Jhaveri. Amount Paid: $1,400. Receipt Number: 4523. Method of Payment: Credit Card. Purpose of Payment: Pro Hac Vice Fee. Date Paid: 9/30/25 (slg) (Entered: 09/30/2025) |
| 09/30/2025 | 27 | NOTICE of APPROVAL by Clerk's Office re 20 Certification for Admission Pro Hac Vice, 25 Certification for Admission Pro Hac Vice, 24 Certification for Admission Pro Hac Vice, 26 Certification for Admission Pro Hac Vice, 21 Certification for Admission Pro Hac Vice, 22 Certification for Admission Pro Hac Vice, 23 Certification for Admission Pro Hac Vice, Attorney ALEXIS GRADY,ROBERT BRENT FERGUSON,DANIEL S. LENZ,HEATHER S. SZILAGYI,KATHERINE S. HAMILTON,RENATA S. O'DONNELL,SEJAL S. JHAVERI for League of Women Voters of Maine added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Grady, Ferguson, Lenz, Szilagyi, Hamilton, O'Donnell, and Jhaveri must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 10/7/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 09/30/2025) |
| 09/30/2025 | 28 | NOTICE/CORRESPONDENCE Re: Nonconsent to Jurisdiction of Magistrate Judge by UNITED STATES OF AMERICA (VANDENBERG, DAVID) (Entered: 09/30/2025) |
| 10/01/2025 | 29 | Unopposed MOTION to Stay *for Lack of Appropriations* by UNITED STATES OF AMERICA Responses due by 10/22/2025. (VANDENBERG, DAVID) (Entered: 10/01/2025) |
| 10/02/2025 | | Case Reassigned to JUDGE LANCE E. WALKER. MAGISTRATE JUDGE KAREN FRINK WOLF reassigned as referral judge. (nrg) (Entered: 10/02/2025) |
| 10/02/2025 | 30 | ORDER granting 29 Motion to Stay. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 10/02/2025) |
| 10/22/2025 | 31 | CERTIFICATION for Admission Pro Hac Vice of M. Eileen O'Connor filed by ALLAN K. TOWNSEND on behalf of LEAGUE OF WOMEN VOTERS OF MAINE The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 10/22/2025) |
| 10/22/2025 | 32 | CERTIFICATION for Admission Pro Hac Vice of Andrew Garber filed by ALLAN K. TOWNSEND on behalf of LEAGUE OF WOMEN VOTERS OF MAINE The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (TOWNSEND, ALLAN) (Entered: 10/22/2025) |
| 10/22/2025 | | Set Deadlines : Filing Fee for Certification Admission Pro Hac Vice (ECF Nos. 31−32) due by 10/23/2025. (lrt) (Entered: 10/22/2025) |
| 10/22/2025 | | Filing Fee Received from LEAGUE OF WOMEN VOTERS OF MAINE: Amount Paid: $400.00. Receipt Number: 5542. Method of Payment: Credit Card. Purpose of Payment: Pro Hac Vice Admission Fee. Date Paid: October 22, 2025 (clp) (Entered: 10/22/2025) |
| 10/22/2025 | 33 | NOTICE of APPROVAL by Clerk's Office re 31 Certification for Admission Pro Hac Vice, 32 Certification for Admission Pro Hac Vice, Attorney MAURA EILEEN O'CONNOR,ANDREW B. GARBER for LEAGUE OF WOMEN VOTERS OF MAINE added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney O'Connor and Garber must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 10/29/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via |

| | | |
|---|---|---|
| | | PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (lrt) (Entered: 10/22/2025) |
| 11/21/2025 | 34 | NOTICE/CORRESPONDENCE Re: Congressional Funding for the U.S. Department of Justice and Request to Lift Stay by UNITED STATES OF AMERICA (VANDENBERG, DAVID) (Entered: 11/21/2025) |
| 11/21/2025 | 35 | STATUS REPORT *and Motion to Modify Briefing Schedules* by UNITED STATES OF AMERICA. (VANDENBERG, DAVID) (Entered: 11/21/2025) |
| 11/21/2025 | 36 | JOINT MOTION to Modify Briefing Schedule by UNITED STATES OF AMERICA. NO PDF attached to this entry. To view document see ECF No. 35 . (clp) (Entered: 11/21/2025) |
| 11/21/2025 | 37 | ORDER re 34 Notice/Correspondence filed by UNITED STATES OF AMERICA. The stay of this case is lifted. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 11/21/2025) |
| 11/21/2025 | 38 | ORDER granting 36 Motion to Modify Briefing Schedule. Plaintiff will file its opposition to motions to intervene (ECF Nos. 10 and 18) by November 25, 2025. The proposed intervenors will file any reply memoranda by December 8, 2025. Defendant and any approved intervenors will file their answers or other responses to the Complaint and their oppositions to the motion to show cause (ECF No. 5) by December 12, 2025. Plaintiff will respond to any motion(s) to dismiss by January 2, 2026. Plaintiff will file any reply in further support of ECF No. 5 by January 2, 2026. Defendant and any approved intervenors will file any reply memoranda in support of any motions to dismiss by January 16, 2026. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 11/21/2025) |
| 11/24/2025 | | Reset Deadlines per Order no. 38: Plaintiff will file its opposition to motions to intervene (ECF Nos. 10 and 18) by November 25, 2025. The proposed intervenors will file any reply memoranda by December 8, 2025. Defendant and any approved intervenors will file their answers or other responses to the Complaint and their oppositions to the motion to show cause (ECF No. 5) by December 12, 2025. Plaintiff will respond to any motion(s) to dismiss by January 2, 2026. Plaintiff will file any reply in further support of ECF No. 5 by January 2, 2026. Defendant and any approved intervenors will file any reply memoranda in support of any motions to dismiss by January 16, 2026. (clp) (Entered: 11/24/2025) |
| 11/25/2025 | 39 | RESPONSE to Motion re 10 MOTION to Intervene *as Defendants and Memorandum in Support*, 18 MOTION to Intervene *as Defendant* filed by UNITED STATES OF AMERICA. Reply due by 12/9/2025. (VANDENBERG, DAVID) (Entered: 11/25/2025) |
| 11/26/2025 | | Reset Deadlines as to 10 MOTION to Intervene *as Defendants and Memorandum in Support* per order no. 38: Reply due by 12/8/2025. (clp) (Entered: 11/26/2025) |
| 11/26/2025 | | Reset Deadlines as to 18 MOTION to Intervene *as Defendant* per order no. 38: Reply due by 12/8/2025. (clp) (Entered: 11/26/2025) |
| 12/03/2025 | 40 | MOTION for Leave to File *Reply Brief in Support of Motion to Intervene That Exceeds Page Limit* by LEAGUE OF WOMEN VOTERS OF MAINE Responses due by 12/26/2025. (TOWNSEND, ALLAN) (Entered: 12/03/2025) |
| 12/05/2025 | 41 | ORDER granting 40 Motion for Leave to File Reply Brief in Support of Motion to Intervene That Exceeds Page Limit. By JUDGE LANCE E. WALKER. (slg) (Entered: 12/05/2025) |
| 12/08/2025 | 42 | REPLY to Response to Motion re 10 MOTION to Intervene *as Defendants and Memorandum in Support* filed by MARPHEEN CHANN, JOHN SCHNECK. (FROST, ELISABETH) (Entered: 12/08/2025) |
| 12/08/2025 | 43 | REPLY to Response to Motion re 18 MOTION to Intervene *as Defendant* filed by LEAGUE OF WOMEN VOTERS OF MAINE. (TOWNSEND, ALLAN) (Entered: 12/08/2025) |
| 12/08/2025 | 44 | Unopposed MOTION for Leave to File *Memoranda of Law Exceeding the Page Limits in LR 7(d)(1)* by SHENNA BELLOWS, STATE OF MAINE Responses due by |

| | | |
|---|---|---|
| | | 12/29/2025. (BOLTON, JONATHAN) (Entered: 12/08/2025) |
| 12/09/2025 | 45 | ORDER granting 44 Unopposed Motion for Leave to File Memoranda of Law Exceeding the Page Limits in LR 7(d)(1). By JUDGE LANCE E. WALKER. (slg) (Entered: 12/09/2025) |
| 12/09/2025 | 46 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by MARPHEEN CHANN, JOHN SCHNECK (Attachments: # 1 Exhibit 1 − United States v. Benson)(FROST, ELISABETH) (Entered: 12/09/2025) |
| 12/10/2025 | 47 | NOTICE/CORRESPONDENCE Re: Response to Notice of Supplemental Authority (ECF 46) by LEAGUE OF WOMEN VOTERS OF MAINE (LENZ, DANIEL) (Entered: 12/10/2025) |
| 12/11/2025 | 48 | NOTICE/CORRESPONDENCE Re: Plaintiff's Change in Position by MARPHEEN CHANN, JOHN SCHNECK (FROST, ELISABETH) (Entered: 12/11/2025) |
| 12/12/2025 | 49 | ORDER granting 10 Motion to Intervene as Defendants by John Schneck and Marpheen Chann. By JUDGE LANCE E. WALKER. (slg) (Entered: 12/12/2025) |
| 12/12/2025 | 50 | NOTICE/CORRESPONDENCE Re: Plaintiff's Change in Position on Intervention by LEAGUE OF WOMEN VOTERS OF MAINE (O'DONNELL, RENATA) (Entered: 12/12/2025) |
| 12/12/2025 | 51 | ORDER granting 18 Motion to Intervene as Defendant by League of Women Voters of Maine. By JUDGE LANCE E. WALKER. (slg) (Entered: 12/12/2025) |
| 12/12/2025 | 52 | RESPONSE in Opposition re 5 MOTION TO SHOW CAUSE why Defendants have failed to produce the demanded records. filed by LEAGUE OF WOMEN VOTERS OF MAINE. Reply due by 12/26/2025. (Attachments: # 1 Exhibit A)(JHAVERI, SEJAL) (Entered: 12/12/2025) |
| 12/12/2025 | 53 | MOTION to Dismiss by LEAGUE OF WOMEN VOTERS OF MAINE Responses due by 1/2/2026. (Attachments: # 1 Exhibit Ex. A − Sept. 8, 2025 Letter)(GRADY, ALEXIS) (Entered: 12/12/2025) |
| 12/12/2025 | 54 | MOTION to Dismiss for Failure to State a Claim by SHENNA BELLOWS, STATE OF MAINE Responses due by 1/2/2026. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(BOLTON, JONATHAN) (Entered: 12/12/2025) |
| 12/12/2025 | 55 | RESPONSE in Opposition re 5 MOTION TO SHOW CAUSE why Defendants have failed to produce the demanded records. filed by SHENNA BELLOWS, STATE OF MAINE. Reply due by 12/26/2025. (Attachments: # 1 Declaration of Julie Flynn, # 2 Declaration of Katherine McBrien, # 3 Exhibit A to Katherine McBrien Declaration, # 4 Exhibit B to Katherine McBrien Declaration, # 5 Exhibit C to Katherine McBrien Declaration)(BOLTON, JONATHAN) (Entered: 12/12/2025) |
| 12/12/2025 | 56 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by ACLU of Maine Responses due by 1/2/2026. (Attachments: # 1 Exhibit Exh.1 (Proposed Amicus Brief))(HEIDEN, ZACHARY) (Entered: 12/12/2025) |
| 12/12/2025 | 57 | CERTIFICATION for Admission Pro Hac Vice of Patricia J. Yan filed by ZACHARY L. HEIDEN on behalf of ACLU of Maine (Total admission fee $ 200 receipt number AMEDC−3219168.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HEIDEN, ZACHARY) (Entered: 12/12/2025) |
| 12/12/2025 | 58 | CERTIFICATION for Admission Pro Hac Vice of Sophia Lin Lakin filed by ZACHARY L. HEIDEN on behalf of ACLU of Maine (Total admission fee $ 200 receipt number AMEDC−3219169.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HEIDEN, ZACHARY) (Entered: 12/12/2025) |

| | | |
|---|---|---|
| 12/12/2025 | 59 | CERTIFICATION for Admission Pro Hac Vice of Theresa J. Lee filed by ZACHARY L. HEIDEN on behalf of ACLU of Maine (Total admission fee $ 200 receipt number AMEDC−3219170.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HEIDEN, ZACHARY) (Entered: 12/12/2025) |
| 12/12/2025 | 60 | CERTIFICATION for Admission Pro Hac Vice of Jonathan Topaz filed by ZACHARY L. HEIDEN on behalf of ACLU of Maine (Total admission fee $ 200 receipt number AMEDC−3219171.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (HEIDEN, ZACHARY) (Entered: 12/12/2025) |
| 12/12/2025 | 61 | MOTION to Dismiss by MARPHEEN CHANN, JOHN SCHNECK Responses due by 1/2/2026. (FROST, ELISABETH) (Entered: 12/12/2025) |
| 12/12/2025 | 62 | RESPONSE in Opposition re 5 MOTION TO SHOW CAUSE why Defendants have failed to produce the demanded records. filed by MARPHEEN CHANN, JOHN SCHNECK. Reply due by 12/26/2025. (FROST, ELISABETH) (Entered: 12/12/2025) |
| 12/15/2025 | 63 | ORDER granting 56 Unopposed Motion for Leave to File Amicus Curiae Brief. By JUDGE LANCE E. WALKER. (slg) (Entered: 12/15/2025) |
| 12/15/2025 | 64 | NOTICE of APPROVAL by Clerk's Office re 57 Certification for Admission Pro Hac Vice, 60 Certification for Admission Pro Hac Vice, 58 Certification for Admission Pro Hac Vice, 59 Certification for Admission Pro Hac Vice, Attorney PATRICIA J. YAN, SOPHIA LIN LAKIN, THERESA J. LEE, JONATHAN J. TOPAZ for ACLU of Maine added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorneys PATRICIA J. YAN, SOPHIA LIN LAKIN, THERESA J. LEE, JONATHAN J. TOPAZ must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 12/18/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (slg) (Entered: 12/15/2025) |
| 12/16/2025 | 65 | BRIEF *Amicus Curiae in Support of Defendants' Motions to Dismiss* by ACLU of Maine. (HEIDEN, ZACHARY) (Entered: 12/16/2025) |
| 12/17/2025 | 66 | NOTICE of Appearance by CAROL GARVAN on behalf of ACLU of Maine (GARVAN, CAROL) (Entered: 12/17/2025) |
| 12/18/2025 | 67 | CERTIFICATION for Admission Pro Hac Vice of Virginia A. Williamson filed by PETER J. BRANN on behalf of Maryland Office of the Attorney General (Total admission fee $ 200 receipt number AMEDC−3222313.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRANN, PETER) (Entered: 12/18/2025) |
| 12/19/2025 | 68 | NOTICE of APPROVAL by Clerk's Office re 67 Certification for Admission Pro Hac Vice. Attorney VIRGINIA A WILLIAMSON for MARYLAND OFFICE OF THE ATTORNEY GENERAL added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Virginia A. Williamson must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 12/23/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (slg) (Entered: 12/19/2025) |

| | | |
|---|---|---|
| 12/22/2025 | 69 | Unopposed MOTION for Leave to File *Amici Curiae Brief of Bipartisan Former State Secretaries of State in Support of Defendants' Motion to Dismiss* by MARY ESTILL BUCHANAN, MILES RAPOPORT, BEN YSURSA, JOAN ANDERSON GROWE, JOHN GALE, PHIL KEISLING, KATHY BOOCKVAR, LEIGH CHAPMAN, SAM REED Responses due by 1/12/2026. (Attachments: # 1 Exhibit A − Amicus Brief)(HEWEY, MELISSA) (Entered: 12/22/2025) |
| 12/22/2025 | | Reset Deadlines as to 5 MOTION TO SHOW CAUSE why Defendants have failed to produce the demanded records. Court closed on 12/26/2025: Reply due by 12/29/2025. (slg) (Entered: 12/22/2025) |
| 12/22/2025 | 70 | ORDER granting 69 Unopposed Motion for Leave to File Amici Curiae Brief of Bipartisan Former State Secretaries of State in Support of Defendants' Motion to Dismiss. By JUDGE LANCE E. WALKER. (slg) (Entered: 12/22/2025) |
| 12/22/2025 | 71 | CERTIFICATION for Admission Pro Hac Vice of Donald K. Sherman, John Brent Hill filed by MELISSA A. HEWEY on behalf of KATHY BOOCKVAR, MARY ESTILL BUCHANAN, JOHN GALE, JOAN ANDERSON GROWE, PHIL KEISLING, MILES RAPOPORT, SAM REED, BEN YSURSA (Total admission fee $ 400 receipt number AMEDC−3223437.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (Attachments: # 1 Admission PHV − JBH)(HEWEY, MELISSA) (Entered: 12/22/2025) |
| 12/22/2025 | 72 | BRIEF re 54 MOTION to Dismiss for Failure to State a Claim *Amici Curiae* by KATHY BOOCKVAR, MARY ESTILL BUCHANAN, LEIGH CHAPMAN, JOHN GALE, JOAN ANDERSON GROWE, PHIL KEISLING, MILES RAPOPORT, SAM REED, BEN YSURSA. (HEWEY, MELISSA) (Entered: 12/22/2025) |
| 12/22/2025 | 73 | NOTICE of APPROVAL by Clerk's Office re 71 Certification for Admission Pro Hac Vice. Attorneys DONALD K. SHERMAN and JOHN BRENT HILL for KATHY BOOCKVAR, MARY ESTILL BUCHANAN, JOHN GALE, JOAN ANDERSON GROWE, PHIL KEISLING, MILES RAPOPORT, SAM REED, and BEN YSURSA added to this specific case only.<br><br>Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorneys Donald K. Sherman and John Brent Hill must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 12/31/2025. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (jgd) (Entered: 12/22/2025) |
| 12/23/2025 | 74 | MOTION for Leave to File *Amicus Brief* by MARYLAND OFFICE OF THE ATTORNEY GENERAL Responses due by 1/13/2026. (Attachments: # 1 Proposed Amicus Brief)(WILLIAMSON, VIRGINIA) (Entered: 12/23/2025) |
| 01/02/2026 | 75 | RESPONSE in Opposition re 54 MOTION to Dismiss for Failure to State a Claim , 53 MOTION to Dismiss , 61 MOTION to Dismiss filed by UNITED STATES OF AMERICA. Reply due by 1/16/2026. (Attachments: # 1 Exhibit Ex. 1 − Court Order (Crook))(VANDENBERG, DAVID) (Entered: 01/02/2026) |
| 01/05/2026 | | Reset Deadlines: Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorneys DONALD K. SHERMAN and JOHN BRENT HILL must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 1/9/2026. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (slg) (Entered: 01/05/2026) |
| 01/06/2026 | 76 | RESPONSE to 74 MOTION for Leave to File Amicus Brief by MARYLAND OFFICE OF THE ATTORNEY GENERAL (WILLIAMSON, VIRGINIA) Modified on 1/7/2026 to reflect this is response to ECF No. 74 (slg). (Entered: 01/06/2026) |

| | | |
|---|---|---|
| 01/07/2026 | 77 | ORDER granting 74 Motion for Leave to File Amicus Brief. By JUDGE LANCE E. WALKER. (slg) (Entered: 01/07/2026) |
| 01/12/2026 | 78 | NOTICE/CORRESPONDENCE Re: Connecticut Order for Show−Cause Hearing Set by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit 1)(VANDENBERG, DAVID) (Entered: 01/12/2026) |
| 01/13/2026 | 79 | NOTICE/CORRESPONDENCE Re: Maine's Response to the United States's Notice (ECF No. 78) by SHENNA BELLOWS, STATE OF MAINE (Attachments: # 1 Exhibit A − CA Order Ex Parte Application., # 2 Exhibit B − CA Ex Parte Application)(BOLTON, JONATHAN) (Entered: 01/13/2026) |
| 01/13/2026 | 80 | NOTICE/CORRESPONDENCE Re: Intervenors John Schneck and Marpheen Chann's Response to the United States's Notice by MARPHEEN CHANN, JOHN SCHNECK (FROST, ELISABETH) (Entered: 01/13/2026) |
| 01/16/2026 | 81 | REPLY to Response to Motion re 61 MOTION to Dismiss filed by MARPHEEN CHANN, JOHN SCHNECK. (Attachments: # 1 Exhibit A − Order from U.S. v. Weber Granting Motion to Dismiss)(FROST, ELISABETH) (Entered: 01/16/2026) |
| 01/16/2026 | 82 | REPLY to Response to Motion re 53 MOTION to Dismiss filed by LEAGUE OF WOMEN VOTERS OF MAINE. (Attachments: # 1 Exhibit A − United States v. Weber Order)(JHAVERI, SEJAL) (Entered: 01/16/2026) |
| 01/16/2026 | 83 | REPLY to Response to Motion re 54 MOTION to Dismiss for Failure to State a Claim filed by SHENNA BELLOWS, STATE OF MAINE. (Attachments: # 1 Exhibit A)(BOLTON, JONATHAN) (Entered: 01/16/2026) |
| 01/22/2026 | 84 | NOTICE of Appearance by BRITTANY BENNETT on behalf of UNITED STATES OF AMERICA (BENNETT, BRITTANY) (Entered: 01/22/2026) |
| 01/23/2026 | 85 | NOTICE of Hearing on Motion re: 61 MOTION to Dismiss, 53 MOTION to Dismiss, 54 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 3/26/2026 09:00 AM Portland Courtroom 1 before JUDGE LANCE E. WALKER. (slg) (Entered: 01/23/2026) |
| 01/29/2026 | 86 | NOTICE of Appearance by CHRISTOPHER J. GARDNER on behalf of UNITED STATES OF AMERICA (GARDNER, CHRISTOPHER) (Entered: 01/29/2026) |
| 01/30/2026 | 87 | Unopposed MOTION by Attorney David D. Vandenberg to Withdraw as Attorney by UNITED STATES OF AMERICA Responses due by 2/20/2026. (VANDENBERG, DAVID) (Entered: 01/30/2026) |
| 01/30/2026 | 88 | ORDER granting 87 Motion of Attorney Vandenberg to Withdraw as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 01/30/2026) |
| 02/06/2026 | 89 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by SHENNA BELLOWS, STATE OF MAINE (Attachments: # 1 Exhibit A − US v. Oregon)(BOLTON, JONATHAN) (Entered: 02/06/2026) |
| 02/20/2026 | 90 | CERTIFICATION for Admission Pro Hac Vice of Noah B. Bokat−Lindell filed by WALTER F. MCKEE on behalf of FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE (Total admission fee $ 200 receipt number AMEDC−3251962.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (MCKEE, WALTER) (Entered: 02/20/2026) |
| 02/20/2026 | 91 | Unopposed MOTION for Leave to File *Amici Curiae Brief* by FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE Responses due by 3/13/2026. (MCKEE, WALTER) (Entered: 02/20/2026) |
| 02/20/2026 | 92 | NOTICE of APPROVAL by Clerk's Office re 90 Certification for Admission Pro Hac Vice. Attorney NOAH B BOKAT−LINDELL for FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE added to this specific case only. |

| | | |
|---|---|---|
| | | Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney Noah B. Bokat−Lindell must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at www.pacer.uscourts.gov by 2/25/2026. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (slg) (Entered: 02/20/2026) |
| 02/20/2026 | 93 | ORDER granting 91 Motion for Leave to File Amici Curiae Brief. By JUDGE LANCE E. WALKER. (slg) (Entered: 02/20/2026) |
| 02/20/2026 | 94 | BRIEF *of Amici Curiae* by FORMER EMPLOYEES OF THE U.S. DEPARTMENT OF JUSTICE. (MCKEE, WALTER) (Entered: 02/20/2026) |
| 03/12/2026 | 95 | MOTION Leave to Participate in Oral Argument *as Amicus Curiae* by ACLU OF MAINE Responses due by 4/2/2026. (HEIDEN, ZACHARY) (Entered: 03/12/2026) |
| 03/12/2026 | | Reset Deadlines as to 95 MOTION Leave to Participate in Oral Argument *as Amicus Curiae* per Judge Walker: Responses due by 3/19/2026. No reply permitted. (slg) (Entered: 03/12/2026) |
| 03/13/2026 | 96 | RESPONSE to Motion re 95 MOTION Leave to Participate in Oral Argument *as Amicus Curiae* filed by UNITED STATES OF AMERICA. Reply due by 3/27/2026. (BENNETT, BRITTANY) (Entered: 03/13/2026) |
| 03/16/2026 | 97 | NOTICE of Appearance by JAMES THOMAS TUCKER on behalf of UNITED STATES OF AMERICA (TUCKER, JAMES) (Entered: 03/16/2026) |
| 03/19/2026 | 98 | RESPONSE to Motion re 95 MOTION Leave to Participate in Oral Argument *as Amicus Curiae* filed by SHENNA BELLOWS, STATE OF MAINE. Reply due by 4/2/2026. (ANTON, JASON) (Entered: 03/19/2026) |
| 03/19/2026 | 99 | RESPONSE to Motion re 95 MOTION Leave to Participate in Oral Argument *as Amicus Curiae* filed by MARPHEEN CHANN, JOHN SCHNECK. Reply due by 4/2/2026. (FROST, ELISABETH) (Entered: 03/19/2026) |
| 03/19/2026 | 100 | RESPONSE to Motion re 95 MOTION Leave to Participate in Oral Argument *as Amicus Curiae* filed by LEAGUE OF WOMEN VOTERS OF MAINE. Reply due by 4/2/2026. (TOWNSEND, ALLAN) (Entered: 03/19/2026) |
| 03/23/2026 | 101 | ORDER granting 95 Motion Leave to Participate in Oral Argument as Amicus Curiae. By JUDGE LANCE E. WALKER. (slg) (Entered: 03/23/2026) |
| 03/26/2026 | 102 | Minute Entry for proceedings held before JUDGE LANCE E. WALKER: Motion Hearing held re 54 MOTION to Dismiss for Failure to State a Claim filed by SHENNA BELLOWS, STATE OF MAINE, 53 MOTION to Dismiss filed by LEAGUE OF WOMEN VOTERS OF MAINE, 61 MOTION to Dismiss filed by MARPHEEN CHANN, JOHN SCHNECK. Motions taken under advisement. Order to issue. (Court Reporter: Lori Dunbar) (slg) (Entered: 03/26/2026) |
| 03/26/2026 | 103 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by MARPHEEN CHANN, JOHN SCHNECK (FROST, ELISABETH) (Entered: 03/26/2026) |
| 03/27/2026 | 104 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Oral Argument re: Motions to Dismiss held on March 26, 2026, before Judge Lance E. Walker. Court Reporter/Transcriber: Lori Dunbar, Telephone Number: (207) 749−4072. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 6/25/2026. (DUNBAR, LORI) (Entered: 03/27/2026) |
| 04/03/2026 | 105 | NOTICE/CORRESPONDENCE Re: of Supplemental Authority by LEAGUE OF WOMEN VOTERS OF MAINE (Attachments: # 1 Exhibit A − Transcript of Hr'g, US |

| | | |
|---|---|---|
| | | v. Amore, No. 1:25−cv−639−MSM−PAS (D.R.I. Mar. 26, 2026), # 2 Exhibit B − March 31, 2026 Executive Order)(JHAVERI, SEJAL) (Entered: 04/03/2026) |
| 04/09/2026 | 106 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by MARPHEEN CHANN, JOHN SCHNECK (Attachments: # 1 Exhibit A − Order, United States v. Galvin)(FROST, ELISABETH) (Entered: 04/09/2026) |
| 04/14/2026 | 107 | NOTICE/CORRESPONDENCE Re: Response to Dkt. 106 *Notice of Supplemental Authority* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit 1 − Transcript of oral arguments)(TUCKER, JAMES) (Entered: 04/14/2026) |
| 04/14/2026 | 108 | NOTICE/CORRESPONDENCE Re: United States's Response to Notice of Supplemental Authority (ECF No. 107) by SHENNA BELLOWS, STATE OF MAINE (BOLTON, JONATHAN) (Entered: 04/14/2026) |
| 04/17/2026 | 109 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by SHENNA BELLOWS, STATE OF MAINE (Attachments: # 1 Exhibit A − Memorandum and Order, United States v. Amore)(ANTON, JASON) (Entered: 04/17/2026) |
| 04/28/2026 | 110 | NOTICE/CORRESPONDENCE Re: Supplemental Authority by MARPHEEN CHANN, JOHN SCHNECK (Attachments: # 1 Exhibit A − Arizona Order)(FROST, ELISABETH) (Entered: 04/28/2026) |
| 05/01/2026 | 111 | NOTICE/CORRESPONDENCE Re: Response to Notice of Supplemental Authority Dkt. 110 by UNITED STATES OF AMERICA (BENNETT, BRITTANY) (Entered: 05/01/2026) |
| 05/15/2026 | 112 | NOTICE/CORRESPONDENCE Re: Supplemental Authority to ECF 5 *(OLC Opinion)* by UNITED STATES OF AMERICA (Attachments: # 1 Exhibit OLC Opinion)(TUCKER, JAMES) (Entered: 05/15/2026) |
| 05/15/2026 | 113 | NOTICE/CORRESPONDENCE Re: United States's Supplemental Authority (ECF No. 112) by MARPHEEN CHANN, JOHN SCHNECK (FROST, ELISABETH) (Entered: 05/15/2026) |
| 05/21/2026 | 114 | ORDER denying 5 Motion for Order to Show Cause; granting 53 Motion to Dismiss; granting 54 Motion to Dismiss for Failure to State a Claim; granting 61 Motion to Dismiss. By JUDGE LANCE E. WALKER. (slg) (Entered: 05/21/2026) |
| 05/21/2026 | 115 | JUDGMENT By DEPUTY CLERK: Stacey Graf. (slg) (Entered: 05/21/2026) |
| 06/05/2026 | 116 | NOTICE OF APPEAL as to 114 Order on Motion for Miscellaneous Relief 1, Order on Motion to Dismiss, Order on Motion to Dismiss for Failure to State a Claim, 115 Judgment by UNITED STATES OF AMERICA .<br><br>**NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (TUCKER, JAMES) (Entered: 06/05/2026) |
| 06/08/2026 | 117 | APPEAL COVER SHEET Re: 116 Notice of Appeal. (cjd) (Entered: 06/08/2026) |
| 06/08/2026 | 118 | CLERK'S CERTIFICATE Re: 116 Notice of Appeal Documents sent to the U.S. Court of Appeals. (cjd) (Entered: 06/08/2026) |
| 06/08/2026 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 116 Notice of Appeal. (cjd) (Entered: 06/08/2026) |
| 06/08/2026 | 119 | USCA Case Number 26−1676 for 116 Notice of Appeal filed by UNITED STATES OF AMERICA. (cjd) (Entered: 06/08/2026) |
| 07/02/2026 | 120 | MOTION by Attorney Jason Anton to Withdraw as Attorney by SHENNA BELLOWS, STATE OF MAINE Responses due by 7/23/2026. (ANTON, JASON) (Entered: 07/02/2026) |

| | | |
|---|---|---|
| 07/02/2026 | 121 | ORDER granting 120 Motion of Attorney Anton to Withdraw as Counsel. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 07/02/2026) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| SHENNA BELLOWS in her official capacity as Secretary of the State of Maine and the STATE OF MAINE. | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

As President Trump said earlier this year, "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic." Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025). Indeed, "[t]he right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id.* Under our Constitution, States "must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id.* Without such safeguards, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006). And "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*

To prevent fraudulent votes from being cast, federal law requires that States conduct routine list maintenance procedures of their statewide voter registration databases. Accurate

voter rolls prevent the opportunity for fraud in federal elections. The Civil Rights Division of the Department of Justice has the duty to ensure that States conduct regular voter registration list maintenance to prevent the inclusion of ineligible voters on any State's voter registration list. This action seeks to remedy Defendant's violations of federal voting laws by their refusal to comply with lawful data requests from the Department of Justice Civil Rights Division. Plaintiff United States of America ("United States") brings this action against the State of Maine and Shenna Bellows in her official capacity as the Secretary of State for the State of Maine, and alleges as follows:

1. The United States brings this action to enforce provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*; the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*; and Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.*

2. Defendants have failed to comply with the important mandates of the NVRA and HAVA by refusing to provide necessary information to enable the United States to assess its compliance. One purpose of the NVRA is to "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). Consistent with these purposes, the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of the death of a registrant or a change in residence of the registrant." *Id.* § 20507(a)(4)(A)-(B).

3. Similarly, HAVA requires the appropriate state or local election official to perform list maintenance with respect to the centralized, computerized statewide voter registration list required under HAVA "on a regular basis[.]" 52 U.S.C. § 21083(a)(1)-(2).

HAVA also requires that states have "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters[,]" with "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(A)-(B).

4. The United States brings this action pursuant to its authority under the NVRA, HAVA and the CRA to compel the State of Maine and its chief state election official, Secretary of State Shenna Bellows, to provide information regarding the State's voter list maintenance procedures and an electronic copy of the statewide voter registration list including all fields, to allow the Attorney General to effectively assess Defendants' compliance with the requirements of the NVRA and HAVA.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); 52 U.S.C. §§ 20510(a) and 21111; and 52 U.S.C. § 20705.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and the Defendants are located in and conduct election administration activities in this District.

## PARTIES

7. Plaintiff United States, through the Attorney General, has authority to enforce the NVRA, 52 U.S.C. § 20510(a), and Sections 21081-83, and 21083a of HAVA, *id.* § 21111. Both the NVRA and HAVA authorize the Attorney General to bring a civil action in an appropriate district court for such declaratory and injunctive relief as are necessary to carry out the relevant

requirements under the statute. *Id.* §§ 20510(a) and 21111. Pursuant to the CRA, 52 U.S.C. § 20705, the Attorney General may compel states to produce certain records and papers relating to the administration of federal elections.

8. Defendant State of Maine is a state of the United States of America and therefore is subject to the requirements of the NVRA, HAVA, and the CRA. 52 U.S.C. §§ 20502(4), 20503, 20701, and 21141.

9. Defendant Secretary of State Shenna Bellows is sued in her official capacity as chief state election official responsible for coordinating Maine's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; 21-A.M.R.S.A.S. 161(2-A). Secretary Bellows is sued in her official capacity only.

## STATUTORY BACKGROUND

### The NVRA

10. The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in Federal elections "while "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(1), (4).

11. Section 8 of the NVRA establishes requirements for the administration of voter registration for elections for federal office in covered states, including Maine. Section 8(a)(4) requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. §§ 20507(a)(4)(A)-(B).

12. Subsections (b), (c), and (d) set forth procedures for the removal of ineligible voters from official lists of voters as part of a state's "program or activity to protect the integrity

of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office[.]” *Id.* § 20507(b).

13. State voter list maintenance programs must be “uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (42 U.S.C. 1973, *et seq*.)[.]” 52 U.S.C. § 20507(b)(1); *see also* S. Rep. No. 103-6 at 31 (Feb. 25, 1993) (“The term ‘uniform’ is intended to mean that any purge program or activity must be applied to an entire jurisdiction.”); *accord* H.R. Rep. No. 103-9 at 15 (Feb. 2, 1993) (same).

14. Section 8(d) of the NVRA provides that a “[s]tate shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence,” unless the registrant

A. confirms in writing that the registrant has changed residence to a place outside the registrar’s jurisdiction in which the registrant is registered; or

B. has failed to respond to a [Confirmation Notice] and has not voted or appeared to vote . . . in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

52 U.S.C. § 20507(d)(1). Section 8(d)(2) sets forth specific requirements for the Confirmation Notice to be sent to registrants, and Section 8(d)(3) provides that a “voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with [subsection 8(d)].” *Id.* §§ 20507(d)(2)-(3).

15. Section 8 of the NVRA also provides an example of a list maintenance program that constitutes a reasonable effort to remove registrants who have become ineligible due to a change of residence. 52 U.S.C. § 20507(c)(1). Under this program, a state uses information from

the United States Postal Service National Change of Address ("NCOA") program to identify registrants who may have changed residence. *Id.* § 20507(c)(1)(A). Where it appears from the NCOA information that a registrant has moved to a new address in the same jurisdiction, the registration record is updated to show the new address and the registrant is sent a notice of the change by forwardable mail that includes a postage-prepaid, pre-addressed return form by which the registrant may verify or correct the address information. *Id.* § 20507(c)(1)(B)(i). Where it appears from the NCOA information that a registrant has moved to a new address in a different jurisdiction, the procedure set out in Section 8(d), described above, is used to confirm the address change. *Id.* § 20507(c)(1)(B)(ii).

16. Section 8(i) of the NVRA provides that:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1). Section 8(i)(2) further specifies:

> The records maintained pursuant to paragraph (1) include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

*Id.* § 20507(i)(2).

17. Section 10 of the NVRA requires each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509.

**The Help America Vote Act**

18. The purpose of HAVA "can be stated very simply—it is to improve our country's election system." H.R. Rep. 107-329(I) at 31 (2001). "Historically, elections in this country have been administered at the state and local level[,]" but Congress found that "the federal government can play a valuable [role] by assisting state and local government in modernizing their election systems." *Id.* at 31-32.

19. HAVA imposes "minimum requirements" for the conduct of federal elections, which "allow the states to develop their own laws and procedures to fulfill the requirements" to the extent that they are consistent with the standards set by HAVA. *Id.* at 35.

20. HAVA required all states to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level," that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

21. The computerized list required by HAVA "shall be coordinated with other agency databases within the State." 52 U.S.C. § 21083(a)(1)(A)(iv).

22. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 provides that a state's "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id*.

23. HAVA mandates that a state may not process a voter-registration application without the applicant's driver's license number, where an applicant has a current and valid driver's license, or, for other applicants, the last four digits of the applicant's Social Security number. *Id.* § 21083(a)(5)(A). For applicants who have neither a driver's license nor a social security number, a state must assign a unique identifying number for voter registration purposes. *Id.* § 21083(a)(5)(A)(ii). A state must then determine the validity of the information provided by the applicant. *Id.* § 21083(a)(5)(A)(iii).

24. HAVA applies to all fifty states, including Maine. *Id.* § 21141.

25. Section 303 of HAVA incorporates by reference certain provisions of the NVRA. *See* 52 U.S.C. § 21083(a)(4)(A). These provisions, unless explicitly noted otherwise, apply to all states covered under HAVA. *Id.*

26. HAVA vests the Attorney General of the United States with sole authority to "bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under "Sections 21081-83, and 21083a of [HAVA]." 52 U.S.C. § 21111.

27. HAVA contains no private right of action. *See* 52 U.S.C. §§ 20901 to 21145.

**The Civil Rights Act of 1960**

28. Congress empowered the Attorney General to request records pursuant to Title III of the CRA, codified at 52 U.S.C. § 20701 *et seq.*

29. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a

period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

30. Section 303 of the CRA provides, in pertinent part, "Any record or paper required by Section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

**FACTUAL ALLEGATIONS**

31. On July 24, 2025, the United States sent a letter to Secretary Bellows seeking information regarding Maine's compliance with the NVRA. Exhibit 1, Letter from Justice Department to Secretary Bellows (July 24, 2025) ("July 24 Letter"). The Letter requested, among other information and documents, a list of the election officials who are responsible for implementing Maine's general program of voter registration list maintenance from November 2022 through receipt of the letter and a description of the steps that Maine has taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. The July 24 Letter also requested – pursuant to Section 8(i) of the NVRA – that Maine provide a current electronic copy of its computerized statewide voter registration list ("SVRL"), required under Section 303 of HAVA. *Id.* at 1.

32. The United States Election Assistance Commission (EAC) was established by HAVA to serve as "a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections." EAC website, "Help America Vote Act," https://www.eac.gov/about/help_america_vote_act.aspx. The EAC "is

an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process." EAC website, "About the EAC," (Sept. 15, 2025) https://www.eac.gov/about.

33. The EAC conducts a biennial Election Administration and Voting Survey ("EAVS"), "an analysis of state-by-state data that covers various topics related to the administration of federal elections[,]" including voter registration and list maintenance. *Id.* The EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), explains that as part of the 2024 EAVS, the states "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance[,]" such as the number of confirmation notices states sent "to verify continued eligibility from registered voters[,]" and the number of voter registration records that state removed from their voter lists. EAC (Sept. 15, 2025), 2024 EAVS Report, https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf, at 7.

34. The July 24 Letter asked questions regarding Maine's compliance with the NVRA, based on the Justice Department's review of the EAVS Report. The period for the inquiries was the close of registration for the November 2022 general election through the close of registration for the November 2024 general election.

35. The Department's July 24 letter asked Maine to produce the requested information and records by encrypted email or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS). Ex. 1 at 3.

36. In response, on August 8, 2025, Secretary Bellows sent a letter refusing to provide Maine's SVRL, stating "Under Maine law, data contained within the [SVRL] is confidential and

may not be disclosed except as specified by statute. 21-A M.R.S.A. § 196-A(l[)].” Exhibit 2 at 3, Letter from Secretary Bellows to the Justice Department (August 8, 2025). Secretary Bellows then asked the Justice Department’s intentions for Maine's voter registration database and how voters’ personally identifying information would be protected, including complying with the Privacy Act of 1974, 5 U.S.C. § 552a. *See* Ex. 2 at 4.

37. Although Secretary Bellows provided responses to the United States’ questions regarding the issues it identified in the EAVS report, these answers did not provide sufficient details for the United States to evaluate compliance with HAVA and the NVRA. Ex. 2.

38. For example, the Justice Department noted that Maine has nearly as many active registered voters as Maine’s citizen voting age population, with a registration rate in 2024 of 92.4 percent of the citizen voting age population. The Department asked Maine to explain what actions it is taking to ensure that ineligible voters are being removed.

39. Secretary Bellows responded, “Your first question suggests that Maine’s rate of registered voters as a percentage of citizen voting age population is somehow too high. I reject the premise of DOJ’s question. Maine’s rate of 92.4 percent (as calculated by the EAC) is entirely consistent with Maine’s longstanding high rates of civic engagement and voter participation…” Ex. 2 at 4.

40. Likewise, in response to Question A3d, Maine indicated it had 11,011 voters (3.5 percent of registrations received during the EAVS Report period) with duplicate registrations, almost four times fewer than the nationwide average of 12.7 percent. In response to the same question for the 2022 EAVS Report, Maine indicated it had 3,638 duplicate registrations (2 percent of registrations received during the EAVS Report period). In addition, no data was provided for Question 13a, regarding which records were merged or linked with another record.

The Justice Department asked Maine to explain what actions it is taking to identify duplicate registrations and to remove those duplicates from the voter registration list. It also requested Maine provide a list of all duplicate registrants who were removed from the statewide voter registration list, and if records were merged, please provide that information.

41. In response, Secretary Bellows stated that "According to the 2024 EAVS survey, Maine's rate of transactions is well within the norm, with no more than half of states that submitted data reporting a lower percentage." Ex. 2 at 4. She then described the processes Maine has in place "to ensure that duplicate applications do not result in duplicate voter registration records" in Maine's voter list. Ex. 2 at 5.

42. The Justice Department also noted that according to Footnote 9 in the Confirmation Notice section of the EAVS Report, the "Maine elections division conducts mass confirmation notice mailings in compliance with NVRA. The last one was completed more than 90 days before the November 2022 general election. The next one is planned for 2025." Therefore, Confirmation Notice data was missing for Questions A10a through A10f of the EAVS Report. The Department asked Maine to explain how it determines who receives a confirmation notice and the confirmation notices that have been sent out. If so, the Department requested to know the results of the confirmation notices using the same category of results used in Questions 10b-f of the EAVS report (*e.g.,* confirming registration, registrations should be invalidated, undeliverable, etc.).

43. In addition, Maine provided no data for Question A12e, regarding persons who were removed after receiving a confirmation notice and then failed to vote in two consecutive federal elections. The July 24 letter requested that Maine explain its process for sending and

tracking confirmation notices and removing persons who have received confirmation notices and failed to vote in two consecutive federal elections.

44. In response to this inquiry, Secretary Bellows referred the Justice Department to a narrative in the August 8 Letter regarding its confirmation notice process. That narrative states, among other things, that Maine conducts "periodic NVRA mailings to identify voters who are no longer eligible to vote at the address listed in [the registration list, and]…registrants are selected for address-confirmation mailings based on a lack of recent voter participation history." Ex. 2 at 2. The last of these mailings occurred in the summer of 2022, before the EAVS reporting period. *Id.*

45. Finally, for Question A12b, Maine listed 101,771 voters (77.2 percent of the total voters Maine removed) for having moved outside the jurisdiction, which is more than twice the national average. The Justice Department asked Maine to explain its process for removing individuals who move out of the jurisdiction. *Id.*

46. In response to this question, Secretary Bellows wrote, "Maine did not remove voters for failure to return NVRA mailings – one of the three categories of removals tracked by EAVS - until after the close of the reporting period. As a result, zero removals in that category are reflected in the EAVS report, skewing the other two percentages relative to other states that did perform such cancellations during the reporting period." Ex. 2 at 5.

47. On August 18, 2025 the Justice Department responded to Maine's August 8 Letter, reminding Secretary Bellows that the First Circuit Court of Appeals confirmed that "Maine's Voter File is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' and is thus subject to disclosure under Section 8(i)(1)." *Pub. Int. Legal Found., Inc. v.*

*Bellows*, 92 F.4th 36, 49 (1st Cir. 2024). Exhibit 4 at 1-2, Letter from Justice Department to Secretary Bellows (August 18, 2025) ("August 18 Letter"). In the same decision, the First Circuit found that a provision of Maine's state privacy law was preempted by the NVRA. *Id.* at 53 ("Maine may not 'condition [] [the right to vote] ... upon compliance with a rule ... [that] is inconsistent in both purpose and effect with the remedial objectives of the [NVRA].'"). *Id.*

48. The Department's August 18 Letter stated that HAVA "provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements."

49. The August 18 Letter also noted that the CRA empowers the Attorney General to request records. *See* Ex. 3 at 2. The Letter then demanded pursuant to the CRA, "an electronic copy of Maine's complete and current VRL. The purpose of the request is to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA." The letter directed that the SVRL should contain "all fields, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA") to register individuals for federal elections. See 52 U.S.C. § 21083(a)(5)(A)(i)." (footnote omitted). Ex. 3 at 1-2.

50. The August 18 letter explained to the Defendants "that HAVA specifies that the 'last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974'" (5 U.S.C. § 552(a) note); 52 U.S.C. § 21083(c)). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the

disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing.

51. On September 8, 2025, Secretary Bellows responded to the Justice Department's letter, again refusing to provide an unredacted computerized SVRL and requested additional information about how the Department complies with the Privacy Act.

52. As explained in the August 18, 2025, letter to Maine, the Civil Rights Division is required to comply with the Privacy Act and has practices and procedures to ensure compliance with the Privacy Act.

53. The information that the Justice Department collects pursuant to its request to Maine will be maintained consistent with Privacy Act protections as explained on the Justice Department's website at https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction. The full list of routine uses for this collection of information can be found in the System of Records Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records", 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the CRA. The records in the SORN are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

54. Maine is a member of the Electronic Registration Information Center (ERIC), an organization comprised of states whose stated mission "is to assist states in improving the accuracy of America's voter rolls and increasing access to voter registration for all eligible

citizens."[1] ERIC is funded by its members, who pay a one-time membership fee and annual dues. *Id.* ERIC's website explains that "[a]t least every 60 days, each member submits their voter registration data and licensing and identification data from motor vehicle departments (MVD) to ERIC." *Id.* ERIC's website states: **"Members submit dates of birth, driver's license/ID card numbers, and Social Security numbers to ERIC** after applying a cryptographic one-way hash to these data points." *Id.*

55. Maine provides the identical information that the Department has requested to ERIC, a private organization which lacks any enforcement authority, yet refuses to adhere to federal law and provide that same information to the Attorney General of the United States.

## CAUSE OF ACTION

### COUNT I: NATIONAL VOTER REGISTRATION ACT, 52 U.S.C. § 20507(i)

56. Plaintiff restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

57. The Justice Department's July 24 Letter requested the information that Maine is required to disclose pursuant to 52 U.S.C. § 20507(i).

58. Maine has failed to provide sufficient responses to the Justice Department's specific inquiries regarding its list maintenance procedures, despite the Attorney General's enforcement authority of these requirements under both the NVRA and HAVA. This information is necessary for the Attorney General to determine if Maine is conducting "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" as required by 52 U.S.C. § 20507(a)(4).

---

[1] *FAQ's*, ERIC, (Sept. 15, 2025) https://ericstates.org/faq/; *see id.*, "Which States Are Members of ERIC?" https://ericstates.org/about/.

## COUNT II: HELP AMERICA VOTE ACT, 52 U.S.C. § 21083

59. Plaintiff restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

60. Defendants have failed to take the actions necessary for the State of Maine to comply with Section 303 of HAVA.

61. Defendants' failure to provide sufficient information in response to requests made by the Justice Department's Civil Rights Division in its July 24 and August 18 letters prevent the Attorney General from evaluating Maine's compliance with HAVA, pursuant to the Attorney General's statutory enforcement authority under 52 U.S.C. § 21111.

62. Defendants' refusal to provide sufficient information prevents the Attorney General from evaluating Maine's procedures that "ensure[] . . . duplicate names are eliminated from the computerized list" pursuant to 52 U.S.C. § 21083(a)(2)(B).

63. Defendants' refusal to provide to the United States the current electronic copy of Maine's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number or the last four digits of their Social Security number prevents the Attorney General from determining Maine's compliance with the list maintenance requirements of HAVA. 52 U.S.C. § 21083(a)(5)(A).

## COUNT III: CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703

64. On August 18, 2025, the Attorney General sent a written demand to Secretary Bellows for the production of specific election records, as authorized by 52 U.S.C. § 20703.

65. Secretary Bellows' September 8, 2025, letter refused to provide the records requested.

Wherefore, the United States respectfully requests that this Court:

A. Declare that Defendants have failed to make available and provide to the United States "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered[,]" in violation of the NVRA. 52 U.S.C. § 20507(i)(1).

B. Declare that the Defendant's refusal to provide the requested records concerning the voter registration and maintenance records prevents the Attorney General from enforcing HAVA;

C. Declare that Defendants' refusal to provide registration records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703;

D. Order Defendants to provide to the United States the current electronic copy of Maine's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number as required by 52 U.S.C. § 20703; and awards such additional relief as the interests of justice may require.

Dated: September 16, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

MICHAEL E. GATES
Deputy Assistant Attorney General
Civil Rights Division

/s/ David D. Vandenberg
MAUREEN S. RIORDAN
Acting Chief, Voting Section
Civil Rights Division
TIMOTHY F. MELLETT
DAVID D. VANDENBERG
Attorneys, Voting Section
Civil Rights Division
950 Pennsylvania Avenue 4CON
Washington, DC 20530
Maureen.Riordan2@usdoj.gov
Timothy.F.Mellett@usdoj.gov
David.Vandenberg@usdoj.gov
Tel. (202) 307-2767
Attorneys for the United States

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 24, 2025

Via Mail and Email

The Honorable Shenna Bellows
Secretary of State
148 State House Station
Augusta, Maine 04333-0148
shenna.bellows@maine.gov; sos.office@maine.gov

Dear Secretary Bellows:

We write to you as the chief election official for the State of Maine to request information regarding Maine's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Maine's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the State's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

> The current electronic copy of Maine's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Maine, with a registration rate in 2024 of 92.4 percent of the citizen voting age population. Please explain what actions Maine is taking to ensure that ineligible voters are being removed.

2. In response to Question A3d, Maine had 11,011 voters (3.5 percent) with duplicate registrations, almost four times fewer than the nationwide average of 12.7 percent. In response to the same question for the 2022 EAVS Report, Maine had 3,638 duplicate registrations (2 percent). No data was listed for Question A12h regarding duplicate registrants who were removed from the statewide voter registration database. Moreover, no data was provided for Question 13a, regarding what records were merged or linked with another record. Please explain what actions Maine is taking to identify duplicate registrations and to remove those duplicates from the voter registration list. Please provide a list of all duplicate registrants who were removed from the statewide voter registration list. If records were merged, please provide that information.

3. Confirmation notice data was missing for Questions A10a through A10f in Maine. According to Footnote 9 in that section of the EAVS Report, the "Maine elections division conducts mass confirmation notice mailings in compliance with NVRA. The last one was completed more than 90 days before the November 2022 general election. The next one is planned for 2025." Please explain how it is determined who receives a confirmation notice. If the confirmation notices have been sent out, please explain how many and when they were sent. If there have been results for the confirmation notices sent, explain the results using the categories in 10b-f of the EAVS Report.

4. Likewise, no data was provided for Question A12e regarding individuals who were removed after receiving a confirmation notice and then failed to vote in two consecutive federal elections. Explain Maine's process for sending out and keeping track of confirmation notices and removing individuals who have received confirmation notices and failed to vote in two consecutive federal elections.

5. For Question A12b, Maine had 101,771 voters (77.2 percent) removed for having moved outside the jurisdiction, which is more than twice the national average. Explain Maine's process for removing individuals who move out of the jurisdiction.

6. Please explain Maine's process for identifying and removing deceased individuals from the voter roll.

Please provide a description of the steps that Maine has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures it used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen
2. Adjudicated incompetent
3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc: The Honorable Julie Flynn
Deputy Secretary of State
184 State House Station
Augusta, Maine 04333-0101
julie.flynn@maine.gov

STATE OF MAINE
DEPARTMENT
OF THE
SECRETARY OF STATE

SHENNA BELLOWS
SECRETARY OF STATE

August 8, 2025

**Via U.S. Mail & E-mail**

Michael E. Gates, Esq.
Deputy Assistant Attorney General
U.S. Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Ave., NW – 4CON
Washington, DC 20530

Re: Your correspondence of July 24, 2025

Dear Attorney Gates:

I write in response to your letter of July 24, 2025, making sweeping and unexplained requests for information and records concerning Maine voters. As Maine's chief election officer, I have a responsibility to protect the sensitive personal information of Maine voters. I have grave concerns about the seemingly overbroad scope of the Department of Justice's information and records requests, which do not appear to be correlated with legitimate investigatory needs. Under Article I of the Constitution, the administration of federal elections is entrusted to the States. While Congress has adopted federal laws such as the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act (HAVA) as an overlay to those state laws, those federal laws do not supplant states as the administrators of federal elections, nor do they grant the Department of Justice (DOJ) authority to second-guess individual voter eligibility determinations by state and local officials.

Given the surprising—indeed, to our knowledge, unprecedented—scope of DOJ's requests for information and records, I ask that DOJ please provide an explanation of why it is making these requests to Maine. If DOJ is investigating voters in Maine or state election administrators for potential violations of federal law, I ask that DOJ provide the specific federal laws that it believes may have been violated in Maine and all facts supporting DOJ's contentions.

To the extent that DOJ's queries may be directed at Maine's obligations under the NVRA to establish systematic programs that make a "reasonable effort" to remove the names of ineligible voters, Maine satisfies and exceeds this federal requirement. Maine law authorizes

148 State House Station · Augusta, Maine · 04333-0148 · Telephone: (207) 626-8400 · Fax: (207) 287-8598

my department to conduct systematic maintenance of the central voter registration system. 21-A M.R.S.A. § 161(2-A). Since the inception of Maine's central voter registration system (CVR) in 2007, my Department's Bureau of Corporations, Elections and Commissions (CEC) has engaged in a concerted program to keep Maine's voter registration data current and accurate. CEC routinely works with municipalities to identify and remove records of deceased voters, voters who have moved, and duplicate voter records. Municipalities review state death records on a monthly basis and cancel the records of voters who have died. In 2024, these routine list-maintenance practices resulted in cancellation of 22,611 registrations for reasons such as death, duplicate records, or relocation.

In addition to these routine maintenance activities, CEC has conducted periodic NVRA mailings to identify voters who are no longer eligible to vote at the address listed in CVR. Under CEC's current process, registrants are selected for address-confirmation mailings based on a lack of recent voter participation history. If a card is returned indicating that the voter has moved or died, their registration record is updated or cancelled accordingly. If the confirmation card is not returned, or returned undeliverable, the voter is designated inactive in the CVR system. The voter can restore their active status by voting in an election, signing a referendum petition, or otherwise demonstrating that they continue to reside at their registered address. If the voter has not restored their active status by the second federal election following the mailing, CEC cancels their registration.

CEC conducted such mailings using U.S. Postal Service National Change of Address (NCOA) data in 2007, 2009, 2011, and 2013. In each of these instances, CEC used NCOA data—which the NVRA expressly endorses as a reasonable approach to list maintenance—to select individuals to receive address-confirmation mailings. CEC also conducted list-maintenance activities in 2017 using data obtained from the Interstate Voter Registration Crosscheck Program, a program allowing for interstate sharing of voter registration data between participating states. When the Crosscheck program was suspended, the Maine Legislature in 2021 authorized Maine to join the Electronic Registration Information Center (ERIC), *see* 21-A M.R.S.A. § 161(2-B), which similarly allows for member states to cross check their voter registration data with those of other states. CEC has been using ERIC data to assist in its list-maintenance efforts since 2022. ERIC's membership agreement is publicly available at the following link: https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf.

In the summer of 2022, CEC conducted by far its largest address-confirmation mailing to date, sending postcards to over 248,000 registered voters in the CVR system. As a result of these mailings, 4,688 voter registrations were cancelled and 221,523 voter registrations were made inactive. Following the second federal election after the mailing, held on November 5, 2024, CEC cancelled the registrations of 180,584 voters who remained inactive following that election.

Collectively, the efforts detailed above have resulted in cancellation of 726,954 registrations between 2007 and 2025. That is more than 78% of the total number of active-status registrations contained in CVR at its creation.

In addition, in 2023 CEC completed implementation of automatic voter registration (AVR) at the Bureau of Motor Vehicles. Now, every time an eligible Maine resident visits a BMV branch for services, they are automatically given an opportunity to electronically register to vote or update their voter registration information. Over time, CEC expects AVR to further improve the accuracy and currency of Maine's voter rolls. In 2024, there were 20,042 AVR transactions, of which 7,857 resulted in updates to existing voter registration records.

With regard specifically to deceased voters, Maine has two programs to ensure that registrations are cancelled upon death. First, each month, Maine registrars are provided with death information from the State's Bureau of Vital Records. Registrars are trained to use this information to cancel the registrations of deceased voters within their jurisdictions. Second, on at least an annual basis, the ERIC program provides CEC with a list of registered Maine voters who may be deceased based on information contained in the Social Security Administration's Limited Access Death Master File. CEC reviews this information and cancels the registrations of deceased voters as appropriate.

A copy of CEC's 2024 report to the Maine Legislature concerning its list maintenance efforts, which provides additional detail concerning those efforts, is attached as Exhibit A.

I turn now to DOJ's more specific requests for information and records.

*Lists of Election Officials*

DOJ asks for a list of "election officials who are responsible for implementing Maine's general program of voter registration list maintenance from November 2022 through receipt of this letter," including local election officials. As Maine's chief elections officer and designated state coordinator under the NVRA and HAVA, I ultimately oversee Maine's compliance with these laws. Any communication concerning my department's compliance with federal law should be sent to me.

List maintenance at the local level is overseen by the registrar of each of Maine's roughly 480 municipalities. We maintain a public list of municipal clerks and registrars at this link: https://www.maine.gov/sos/elections-voting/find-a-municipal-clerk-or-registrar.

*Voter Registration List*

Invoking 52 U.S.C.A. § 20507(i), DOJ asks for the "current electronic copy of Maine's computerized statewide voter registration lists," including "all fields contained within the list." I am unable to comply with DOJ's request. Under Maine law, data contained within CVR is confidential and may not be disclosed except as specified by statute. 21-A M.R.S.A. § 196-A(1

Nor does the NVRA provision DOJ cites require such disclosure. In considering Maine's disclosure obligations under § 20507(i), the U.S. Court of Appeals for the First Circuit recently confirmed that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). The Maine Legislature recently enacted a law recognizing certain CVR information as "highly sensitive information." *See* P.L. 2025, ch. 397, § 12.

In addition to the legal constraints on providing DOJ with the requested data, it is unclear what sort of investigation would necessitate production of a state's entire voter registration database, including fields containing highly sensitive personal information. The request seems particularly overbroad based on our understanding that DOJ has made identical requests of many other states. I therefore ask that DOJ please provide me with the following information: (1) DOJ's intentions for Maine's voter registration database, (2) whether DOJ intends to publicize or further disseminate personally identifying information of Maine voters, (3) whether personally identifying information of voters, including sensitive information such as drivers' license numbers and partial social security numbers, would be subject to public records requests under the Freedom of Information Act, (4) any examples prior to 2025 of DOJ demanding the entirety of a state's voter registration database as part of an investigation, and (5) how DOJ reconciles its request with its legal obligations under the Privacy Act of 1974 and the E-Government Act of 2002.

*Questions Regarding EAVS*

Your letter also asks various questions concerning Maine's submissions to the Election Administration and Voting Survey (EAVS). As an initial matter, EAVS is a program of the independent Election Assistance Commission (EAC), and Maine's obligation to report data concerning its elections runs to that agency, not the Department of Justice. *See* 11 C.F.R. § 9428.7. Were Maine's reporting to the EAC inadequate, we would expect to hear from the EAC. To date, we have not. To the extent your letter suggests that DOJ may enforce EAC reporting rules, I ask that you please provide the legal authority for such a claim.

1. *Registration rate*

Your first question suggests that Maine's rate of registered voters as a percentage of citizen voting age population is somehow too high. I reject the premise of DOJ's question. Maine's rate of 92.4 percent (as calculated by the EAC) is entirely consistent with Maine's longstanding high rates of civic engagement and voter participation. Moreover, as described above, Maine is complying with its obligation under federal law to operate programs that make reasonable efforts to maintain its voter lists, which just this year included cancellation of over 180,000 registrations based on change of residence. To the extent that DOJ contends that Maine's rate of voter registration is somehow improperly high, please provide the basis for DOJ's contention.

2. *Duplicate transactions*

Your letter makes assertions concerning the number and percentage of duplicate transactions in Maine—voter registration transactions in which an existing voter submits a registration application that makes no changes to their existing information in CVR. According to the 2024 EAVS survey, Maine's rate of transactions involving duplicate registrations is well within the norm, with more than half of states that submitted data reporting a lower percentage. Maine appears to be below the nationwide average only because a small number of states reported extremely high rates of duplicate applications, skewing the average rate upward.

Nor is there any reason to believe that Maine's rate of duplicate registrations indicates a problem with duplicate records in CVR. As a matter of common sense, one would expect few voters to submit registration forms that contain no updates to their existing information in CVR. Moreover, Maine has processes in place to ensure that duplicate applications do not result in duplicate voter registration records in CVR. Specifically, CEC trains registrars on proper handling of such duplicate applications. In addition, the CVR system itself contains a safeguard against creation of a duplicate voter record by requiring the operator to conduct a search for an existing record before a new record can be created.

Your question further asserts that Maine did not provide a response to Question A12h in the EAVS survey. This is incorrect. As reflected in the 2024 EAVS Report, Maine reported to the EAC that it had removed 2,900 records from CVR as duplicate records. In removing these records, election officials move any unique information, such as voter participation history, from the duplicate record to the primary record and then cancel the duplicate record.

3. *Confirmation notice data*

Your letter notes that Maine did not report data to EAVS on NVRA confirmation mailings. Maine did not report this data because its last confirmation mailing took place in June 2022, before the start of the EAVS reporting period.

Please see the narrative above for CEC's current procedure for NVRA address confirmation mailings.

4. *Cancellation data*

Please see the narrative above for CEC's practices concerning cancellation of voters based on NVRA address-confirmation mailings. As noted above, CEC earlier this year cancelled over 180,000 registrations as a result of its 2022 address-confirmation mailing.

5. *Removal of Voters based on Change of Residence*

While your letter appears to express concern about the allegedly high percentage of removals attributable to change in address, the basis for DOJ's concern is unclear. Maine registers voters at the municipal level rather than the county level and, as a result, cancellations of registrations due to moves between towns within the same county are common. In addition, Maine did not remove voters for failure to return NVRA mailings—one of the three categories of removals tracked by EAVS—until after the close of the reporting period. As a result, zero removals in that category are reflected in the EAVS report, skewing the other two percentages relative to other states that did perform such cancellations during the reporting period.

To the extent DOJ continues to have a concern about Maine's percentage of removals based on change of address in light of the explanation above, please explain the factual basis for its concern.

*6. Removal of Voters*

Please see the narrative above for Maine's process for identifying and removing deceased voters.

*Removal of Ineligible Voters*

Finally, your letter requests information concerning identification and removal of voters ineligible to vote by reason of citizenship, adjudicated incompetence, and felony conviction. Maine does not disqualify voters based on felony conviction. *See* 21-A M.R.S.A. § 111. Similarly, the Maine Constitution's restriction on voting for "persons under guardianship for reasons of mental illness" was struck down by a federal court as facially invalid. *See Doe v. Rowe*, 156 F. Supp. 2d 35, 50 (D. Me. 2001). Current Maine law expressly protects the right to vote of people under guardianship, allowing disqualification only upon a court finding that the "the adult cannot communicate, with or without support, a specific desire to participate in the voting process." 18-C M.R.S.A. § 5 310(2)(A). Such court orders are extremely rare and, if issued, would be enforced by the relevant municipal registrar.

With regard to citizenship, consistent with the NVRA's requirements, *see* 52 U.S.C.A. § 20508(b)(2)(B) & (3), Maine's registration application requires the applicant to certify that they are a U.S. citizen. CEC trains registrars to reject any voter registration application in which the prospective voter has not made the required certifications. In the event a question were to arise about the citizenship of a voter following registration, Maine law requires the applicable municipal registrar to notice and conduct a hearing to determine the voter's qualifications. *See* 21 A M.R.S.A. § 161(4). Making a false statement or taking a false oath concerning a voter's qualifications is a Class D crime subject to investigation and prosecution by the Office of Attorney General. 21-A M.R.S.A. §§ 33 & 159.

Our Constitution entrusts election administration to the States, not the federal government. I reiterate my deep concern with DOJ's unexplained request for sensitive personal data concerning roughly one million Maine voters – a request that far exceeds what would be necessary for legitimate evaluation of Maine's compliance with our obligations under law. Not only is Maine in full compliance with its obligations under the NVRA and HAVA to make reasonable efforts to maintain its voter lists, but through modernization efforts like automatic voter registration and online voter registration, we are leveraging technology to increase the quality of our list maintenance. Our local and state election officials work hard to preserve the integrity of our elections, and we are proud to be national leaders in voter participation. I ask that, in light of the information provided above, DOJ withdraw its unreasonable request for personal data on individual Maine voters.

Sincerely,

Shenna Bellows

Shenna Bellows
Secretary of State

148 State House Station · Augusta, Maine · 04333-0148 · Telephone: (207) 626-8400 · Fax: (207) 287-8598

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*

*Washington, D.C. 20530*

August 18, 2025

Via Mail and Email

The Honorable Shenna Bellows
Secretary of State
148 State House Station
Augusta, Maine 04333-0148
shenna.bellows@maine.gov
sos.office@maine.gov

Re: **Maine Voter Registration List with All Fields**

Secretary Bellows:

This letter responds to your letter of August 8, 2025. This communication is limited to our request for Maine's voter registration list ("VRL") to assess the State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

As the Attorney General requested, the electronic copy of the statewide VRL must contain all fields, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")1 to register individuals for federal elections. See 52 U.S.C. § 21083(a)(5)(A)(i).

As you know, the First Circuit Court of Appeals confirmed that "Maine's Voter File is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' and is thus subject to disclosure under Section 8(i)(1)." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 49 (1st Cir. 2024). In the same decision, the First Circuit found that a provision of Maine's state privacy law was preempted by the NVRA. *Id.* at

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

53 ("Maine may not "condition [] [the right to vote] ... upon compliance with a rule ... [that] is inconsistent in both purpose and effect with the remedial objectives of the [NVRA].").

HAVA, 52 U.S.C. § 20901 *et seq.*, also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701 *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Maine's complete and current VRL. The purpose of the request is to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA.

As required by Section 303 of the CRA, our letter dated July 24, 2025, provided you with "a statement of the basis and the purpose therefore," *id.*, namely, to assist in our determination of whether Maine's list maintenance program complies with the NVRA. At your request, we have reaffirmed that statement in this correspondence.

In addition to the full electronic VRL, we also request by this letter a copy of all original and completed voter registration applications submitted to the State of Maine from December 1, 2023, through July 1, 2025. To be clear, that means copies of all voter registration applications completed and submitted by prospective voters during that time period. When providing a copy of the requested completed registration applications Maine must ensure that they are provided in unredacted format.

Your letter dated August 8, 2025, also indicated concern regarding federal privacy protections of the VRL and other requested information by the Justice Department. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter,

> or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. As you noted, other federal laws may be applicable, including the Privacy Act. All data received from you will be kept securely and treated consistently with the Privacy Act. Maine's privacy laws, to the extent they are inconsistent with federal law, are preempted.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552(a) note); 52 U.S.C. § 21083(c)). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing.

To that end, provide the requested electronic VRL[2] to the Justice Department within seven days or by August 25, 2025.

Maine's VRL and the requested original and completed voter registration applications may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: The Honorable Julie Flynn
Deputy Secretary of State
184 State House Station
Augusta, Maine 04333-0101
julie.flynn@maine.gov

[2] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, their state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENNA BELLOWS, in her official capacity as the Secretary of State of Maine, and the STATE OF MAINE<br><br>Defendants. | Case No. 1:25-CV-468-KFW |

**DECLARATION OF JILL M. WARD IN SUPPORT OF LEAGUE OF WOMEN VOTERS OF MAINE'S MOTION TO INTERVENE AS DEFENDANT**

Pursuant to 28 U.S.C. § 1746, I, Jill M. Ward, declare as follows:

1. I am an adult resident of the State of Maine and an eligible, registered voter. I currently serve as the President of the League of Women Voters of Maine ("LWVME" or the "League"), a volunteer position I held from 2015-2023 and to which I was reelected in May 2025.
2. I have been a member of the League since 2009, and involved with the Maine Citizens for Clean Elections ("MCCE") since 2008. I previously served as President of MCCE.
3. The League is a nonpartisan, grassroots membership social welfare organization that works to expand civic participation and give political voice to all Mainers.
4. LWVME is the Maine affiliate of the League of Women Voters ("LWV") which was founded in 1920 as an outgrowth of the struggle for voting rights for women. LWV has

more than one million members and supporters, and is organized in more than 750 communities in all 50 states and the District of Columbia.

5. LWVME and our members pursue the shared goal of expanding political participation in Maine by conducting nonpartisan voter registration drives, providing educational materials for voters, conducting outreach to high school and college students to encourage them to vote, and producing high-quality reports on issues of major importance in Maine.

6. During the 2022 election cycle, LWVME registered at least 1,021 voters, canvassed in 15 towns (reaching 1,800 people), and printed and distributed 8,000 voter guides.

7. LWVME also distributed 2,500 copies of our "Make Your Vote Count" booklets. Our Make Your Vote Count booklet offers Mainers comprehensive and easy to understand voting information. It's available in 10 languages.

8. During the 2024 election cycle, LWVME registered at least 618 voters and printed and distributed approximately non-partisan 50,000 voter guides. Over 30,000 individuals accessed the Maine election information on VOTE411.org, our online voter resource.

9. LWVME maintains an email subscription list with more than 5,600 recipients, where it provides updates and information around elections and public policy relating to a functioning democracy in Maine.

10. LWVME has worked tirelessly to protect, preserve, and expand the voting rights of its members and all Maine voters. This has included advocating for same-day registration, automatic voter registration, ranked choice voting, Maine's National Popular Vote bill, and publicly financed elections, among others.

11. LWVME has also staunchly opposed rollbacks of voter protections by opposing mandatory photo identification for all voters and felony disenfranchisement. In 2025, LWVME assessed and tracked 124 bills in the Maine State House and testified on 51.
12. LWVME is part of Democracy Maine, a collaboration between the League, MCCE, and Maine Students Vote, which partners on advocacy and education to support voting rights and civic participation.
13. The League is also part of the Mainers for Modern Elections coalition, which is committed to securing "equitable access to the ballot for every eligible Maine voter" and which advocates for "safe, secure, modern elections."[1]
14. Following successful advocacy for legislation that required election audits and automatic voter registration, the League has continued to push the Secretary of State to fully implement these measures, and has also urged the Secretary to expand voter registration hours.
15. LWVME has 574 members across the state, with local leagues in the Portland area, Bath/Brunswick, the Midcoast area, the Capital area, Hancock County, Piscataquis County, and in the greater Bangor area.
16. In addition to its members, the League relies on the efforts of 601 volunteers to conduct its work, including efforts around voter registration.
17. As politically active Mainers, the vast majority of the League's members and volunteers are registered voters who, in order to register, provided information to Defendants Bellows and the State of Maine. League members are concerned about, and object to, this information being disclosed contrary to law.

---

[1] https://www.lwvme.org/MME

18. The issues in this case are directly related to LWVME's mission because they implicate voters' data, and therefore Mainers' willingness and ability to register to vote. Mainers who learn that the federal government is seeking their data will be less likely to register to vote. Many of those who are already registered will be less likely to publicly participate in our democracy, including by protesting against the federal government, if they know the federal government has recently demanded and received their personal and sensitive information. The government's insufficient justification for seeking this data bears on the League's mission. As one of Maine's oldest and most well-established organizations committed to voting rights and voter participation, the League relies on publicly available election information and works with election officials.

19. The League is also deeply committed to protecting the security and integrity of all Mainers' information, including by recently testifying in support of the data privacy measures contained in LD 1822, Maine's Online Data Privacy Act. This testimony reflected the League's belief that "voters should have sufficient information about candidates and campaign issues to make informed choices" and "transparency and the public's right to know who is using what resources to influence elections are vital to their ability to cast an informed vote." As we stated, "the abuse of our personal data and the resulting distortion of our public conversation was never anticipated by law or regulation and is now out of control." A true and correct copy of the League's testimony is attached as Exhibit A.

20. The League has an interest in protecting the voting and privacy rights of its members and all Mainers.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 29, 2025 in Portland, Maine.

/s/ Jill M. Ward
Jill M. Ward

LEAGUE OF WOMEN VOTERS® OF MAINE

TO: The Honorable Anne Carney
The Honorable Amy Kuhn, Co-Chairs
Members of the Joint Standing Committee on the Judiciary

DATE: May 5, 2025

RE: LD 1822, An Act to Enact the Maine Online Data Privacy Act

---

Good morning Senator Carney and Representative Kuhn.

My name is Ann Luther. I am a resident of Trenton. I'm submitting this written testimony on behalf of the League of Women Voters of Maine, where I serve as a volunteer and chair the League's Advocacy Committee. I am testifying in support of LD 1822.

The League of Women Voters of Maine is a nonpartisan political organization that has been working for over 100 years to encourage informed and active participation in government, to increase understanding of major public policy issues, and to influence public policy through education and advocacy. We never support or oppose any political party or candidate.

The League of Women Voters believes that, especially in the context of elections:

- voters should have sufficient information about candidates and campaign issues to make informed choices;
- transparency and the public's right to know who is using what resources to influence elections are vital to their ability to cast an informed vote;
- and undue influence in the marketplace of ideas can have a corrosive effect on public discourse and election outcomes.

We see profound new challenges that threaten these principles. The massive accumulations of private data — bought and sold as a commodity — allows unknown entities to exert undue influence over voters and elections without disclosure or disclaimer.

Here's how that works: Commercial interests with unprecedented power and reach gather information about us from surveillance devices, our actions on-line, and our smartphones. They know where we live and who our friends are and what we buy. They know our likes and dislikes, our politics and sleep habits. They use or sell that information to political actors who have an interest in manipulating us with targeted messages. Often, that content is mis-, dis-, or mal-information, micro-targeted to susceptible voters. Neither the identities nor the spending of these actors is public. And the public may not even be aware of the purposeful distortion in the information ecosystem. All of this has little connection to rational, issue-based discussion of public policy, candidates, or our shared future. We are not free agents in the marketplace of ideas.

The abuse of our personal data and the resulting distortion of our public conversation was never anticipated by law or regulation and is now out of control. The data privacy measures proposed in LD 1822 would effectively "starve the beast" while also safeguarding vital personal privacy interests. Without the massive accumulation of private data, those who seek to disrupt the marketplace of ideas would not be able to exert as much influence or as effectively tilt the landscape in political campaigns. Legislation with data minimization, data retention, and affirmative opt-in requirements would cut off these malicious actors from the data that allows them to distort our public discourse.

For these reasons, we support LD 1822.

Thank you for the opportunity to testify. I would be happy to answer any questions from the Committee.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHENNA BELLOWS, in her official capacity as the Secretary of State of Maine, and the STATE OF MAINE

Defendants.

Case No. 1:25-CV-468-KFW

**DECLARATION OF SARAH STADLER IN SUPPORT OF LEAGUE OF WOMEN VOTERS OF MAINE'S MOTION TO INTERVENE AS DEFENDANT**

Pursuant to 28 U.S.C. § 1746, I, Sarah Stadler, declare as follows:

1. I am an adult resident of the State of Maine and an eligible, registered voter.
2. I moved to Bath, Maine in 2020, and have been registered to vote in Sagadahoc County ever since. I have voted in Sagadahoc County in every election since 2020.
3. My family has deep connections to Maine and, prior to moving to the state full-time in 2020, I visited during most summers since childhood.
4. When registering to vote, I provided the required information, including my name, address, date of birth, and either my driver's license number or the last four digits of my social security number.
5. Until my retirement, I was a clinical psychiatrist. I mostly worked in private practice and in community clinics, providing long-term therapy and medical care. I remain licensed to practice in Maine.

6. Even prior to joining the League of Women Voters of Maine, I was politically active and engaged in elections. I previously volunteered as a canvasser in Nevada. In the lead-up to the 2024 election, I worked in Grand Rapids, Michigan for three months, registering voters. I performed this work alongside League members and was consistently impressed with their dedication.
7. I joined the League of Women Voters of Maine in January 2025, in part based on my experience in Michigan and because I believe the League had a well-established structure to perform its work and was engaged in substantial issues.
8. As a League member, I have been actively involved in its advocacy work, particularly around issues like those involved in Proposition 1 and the Clean Elections Act. I testified before the legislature on both pieces of legislation.
9. In addition to my work with the League, I have continued to volunteer as a canvasser and poll-watcher.
10. I understand that the United States Department of Justice has filed a lawsuit against Secretary Bellows and Maine seeking the complete, unredacted voter registration file, including voters' driver's license numbers, partial social security numbers, and dates of birth.
11. I am deeply concerned about the Department of Justice's attempt to compel the production of this sensitive data for a number of reasons.
12. First, in both my professional and personal experience, people's ability to maintain their privacy is incredibly important, particularly when it comes to sensitive information regarding voting. I am uncomfortable, for example, with the idea that the federal

government might have unrestricted access to my voter information, regardless of the privacy protections I enjoy as a Mainer.

13. Second, I am deeply concerned about how the Department of Justice may use the unredacted data it is seeking. Specifically, I worry that this data may be used to intimidate or harass voters, and thereby suppress civil participation, or that it will be used to make policy decisions that retaliate against Maine. A friend and a relative have already expressed that they are avoiding or minimizing speaking out against the administration for fear of reprisal.

14. For these reasons, I object to the Department of Justice's unexplained and expansive request for voter data, including my own.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 29, 2025 in Bath, Maine.

/s/Sarah Stadler
Sarah Stadler

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

SHENNA BELLOWS, in her official capacity as the Secretary of State of Maine, and the STATE OF MAINE

*Defendants*.

Case No. 1:25-CV-468-KFW

**DECLARATION OF PATRICIA SPRAGUE IN SUPPORT OF LEAGUE OF WOMEN VOTERS OF MAINE'S MOTION TO INTERVENE AS DEFENDANT**

Pursuant to 28 U.S.C. § 1746, I, Patricia Sprague, declare as follows:

1. I am an adult resident of the State of Maine and an eligible, registered voter.

2. I moved to Portland, Maine in 2013, and have been registered to vote in Cumberland County ever since.

3. When registering to vote, I provided the required information, including my name, address, date of birth, and either my driver's license number or the last four digits of my social security number.

4. Before my retirement last year, I worked for Portland Public Schools, where I coordinated the International Baccalaureate program and served as an instructional coach at Ocean Avenue Elementary School. In that role, I worked with many immigrant families to orient them to the program and to the school.

5. I have been a member of the League of Women Voters of Maine since 2014. I

joined because civic engagement is very important to me, and I wanted to work with like-minded people to foster civic engagement in Maine. As a League member, I have been actively involved in its advocacy work. I have canvassed in neighborhoods, tabled at events, and participated in phone banks to encourage Mainers to vote and answer their questions about the process. I have also lobbied at the State House and testified against LD1149, which would have made absentee voting more difficult.

6. I have also been an election worker since the fall of 2020. It was the height of the COVID-19 pandemic, and I wanted to help make sure Mainers still had the opportunity to vote. I was impressed at how many people came in on Election Day despite the pandemic, and I think the turnout speaks to Maine's strong culture of civic engagement and democratic participation.

7. Since then, I have worked in South Portland and Portland on Election Day, and I have also worked in the City Clerk's office as a volunteer helping to process absentee ballots. Throughout those experiences, I have been impressed at the seriousness with which wardens, poll workers, and the voters themselves take their responsibilities. I have tremendous respect for city clerks, town clerks, and volunteers. Elections in Maine are incredibly well run, and the people handling elections are honest and responsible. Maine law also provides significant protections for the sensitive information contained in voter registration records, which builds trust and contributes to our high rates of voter participation.

8. I understand that the Department of Justice has filed a lawsuit against Secretary Bellows and Maine seeking the complete, unredacted voter registration history of all voters in the state, including their driver's licenses, partial social security numbers, and dates of birth.

9. I am deeply concerned about the Department of Justice's attempt to compel the production of this sensitive data for a number of reasons.

10. First, I am concerned that the Department of Justice will not respect federal and state privacy laws, both as to Maine voters, and to me specifically. While I trust my state with this data, in part because of its strict privacy protections, I do not trust that my personal information wouldn't be used inappropriately. My vote is my voice, and I do not want the Department of Justice to oversee or investigate my voter registration information without a lawful reason to do so.

11. Second, while I am concerned about the safety of my own data in the hands of the Department of Justice, I am even more fearful that the Department of Justice's attempt to obtain this data will chill eligible Mainers from registering to vote and participating in our state's elections. In particular, I believe that that the threat of disclosure will deter new Mainers who have become naturalized citizens—like some of the parents I used to work with at Ocean Elementary—from registering and/or voting because they face a higher risk of being incorrectly flagged as noncitizens by the matching process that the government seems to want to perform with Maine's voter roll data.

12. Third and finally, as a Maine election worker, I am concerned by the Department of Justice's suggestion that something nefarious is going on with Maine's voter rolls simply because Maine has high rates of civic engagement. The Constitution requires states to administer their own elections, and Maine takes this responsibility very seriously.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 28, 2025 in Portland, Maine.

/s/Patricia Sprague
Patricia Sprague

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENNA BELLOWS in her official capacity as Secretary of the State of Maine and the STATE OF MAINE,<br><br>Defendants. | Docket No. 1:25-cv-00468 |

**DECLARATION OF JULIE L. FLYNN**

I, Julie L. Flynn, hereby declare as follows:

1. I am over the age of 18 and reside in Windham, Maine

2. I have personal knowledge of the matters to which I attest. In preparing this declaration, I also reviewed records regularly kept by the Secretary of State's Office that are available to me and that I rely on in my official duties. If called to testify, I could and would competently testify to these statements.

3. I am the Deputy Secretary of State for the State of Maine, in charge of the Bureau of Corporations, Elections and Commissions, and have held this appointed position since February of 1999. I served as Director of the same Bureau, including the Elections Division, from March 1995 until I was appointed Deputy. The Elections Division is currently comprised of 13 staff members, including a Bureau Director, a Director of the Division of Election Administration and an Assistant Director of Elections and an Assistant Director of Voter Registration, all of whom work closely with me.

4. The Secretary of State, through the Elections Divisions, oversees state and federal elections in Maine and, together with municipal election officials, administers the Maine election laws set forth in Title 21-A of the Maine Revised Statutes, including the voter registration laws set forth in Chapter 3 of Title 21-A.

5. The Maine Legislature has designated the Secretary of State as the coordinator of state responsibilities under the federal National Voter Registration Act of 1993 ("NVRA") and the federal Help America Vote Act of 2002 ("HAVA"). See 21-A M.R.S. §§ 180 & 221

6. HAVA requires states, including Maine, to implement and maintain "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

7. The Secretary of State's office, working with outside vendors, created the statewide electronic system required by HAVA, which is known as the Central Voter Registration system, or CVR. CVR became fully operational in the spring of 2007.

8. CVR is both a database and software application. The database portion of CVR contains various personally identifiable information (PII) about every registered voter in the state. The data includes nearly all the information that a voter provides in his or her registration form as well as other information. Our office maintains the database in its secure data center. Using the software application, our office can run queries on the database to generate reports and lists based on the data.

9. Below is a non-exhaustive list of data fields contained in CVR:

- name;
- residence address;

- mailing address;
- previous addresses since date of registration or 2007, whichever is later;
- phone number (if provided by the voter in response to an optional question on the application);
- email address (if provided by uniformed service or overseas voters in response to a question on the federal post card application);
- date of birth;
- enrollment status, indicating the political party, if any, in which the voter is enrolled;
- enrollment history, indicating all changes in the voter's party enrollment since 2007;
- the voter's electoral districts (e.g., 1st or 2nd congressional district);
- a history of all prior Maine electoral districts in which the voter has been qualified to vote since 2007;
- U.S. citizenship status, as attested on the application;
- the personal identifier provided by the voter on the registration application, which must be a Maine's driver's license number or nondriver identification number or, if the applicant has neither form of identification, the last four digits of the voter's social security number. (For voters who have none of these numbers, and for some voters who registered before HAVA became effective, CVR assigns the voter a unique identification number.);

- whether the voter has obtained an exemption to the signature requirement due to a physical disability, as well as the identities of the individuals who assisted with or witnessed the application;
- voter participation history, meaning a record of all state and local elections in which the voter has voted since 2007;
- absentee ballot history, indicating whether the voter voted by absentee ballot in each election and, if so, the date of the request and the method by which the ballot was returned;
- any special designations indicating uniformed service voters, overseas voters, or township voters;
- date of registration;
- source of registration (e.g., Bureau of Motor Vehicles, other state agency, online, by mail, etc.);
- voter status, meaning whether the voter is "active," or is "inactive" due to a failure to respond to an address-confirmation mailing and is thus at risk of having their registration cancelled if they fail to vote in two general elections. Other statuses include "cancelled," and "pre-registered" or "pending age," which designate applicants who are age 16 or 17 respectively, who may submit applications under Maine law.
- an audit history of all changes to the voter record since 2007.

10. As of December 11, 2025, CVR contained 1,039,579 individual records for active and inactive voters, each containing the PII of a registered voter.

11. Maine law provides that "information contained electronically in the central voter registration system and any information or reports generated by the system are confidential," subject to 10 exceptions lettered A through K. See 21-A M.R.S. § 196-A(1)(A)–(K).

12. Even where state law allows certain disclosures of CVR data under these exceptions, it limits such disclosure. For example, it does not permit the Secretary of State to disclose to other governmental entities many of the fields listed above, including driver's license numbers, social security numbers, full dates of birth, party affiliation, and voter participation history. See 21- A M.R.S.A. § 196-A(1)(E).

13. Since implementation of CVR in 2007, our office has engaged in a program of maintaining the voter registrations documented in CVR, as required by the NVRA and HAVA. The Secretary of State's August 8, 2025 letter to the Department of Justice, which is attached as Exhibit 2 to the Complaint in this action, accurately describes that list-maintenance program. The Elections Division expects to send out its next NVRA address-confirmation mailing, which will be similar to the 2022 mailing described in the letter, by early 2026.

14. As mentioned in the Secretary's August 8 letter, Maine is a member of the Electronic Registration Information Center (ERIC). ERIC matches Maine's voter data in encrypted form against a variety of other data sources, resulting in periodic reports flagging registrations in CVR that may need to be corrected or cancelled. ERIC helps the Elections Division identify registrants who have moved out of state or to different jurisdictions in Maine, registrants who have died, and registrants with duplicate records in CVR. As would be the case with the results of any automated matching system, the Elections Division staff must review each registration flagged by ERIC to confirm the results and make any necessary corrections.

15. The data Maine transmits to ERIC is fundamentally different than the voter data that I understand the Department of Justice (DOJ) is demanding from Maine. Prior to transmission to ERIC, voter data is encrypted into deterministic character strings called "hashes." The hashing process allows ERIC to determine whether the transmitted data match data from other sources, including other member states, even though ERIC itself has no ability to decrypt the data. My understanding of DOJ's demand is that it expects Maine to transmit the voter data in a form that allows DOJ (and any other actors to whom DOJ might transfer the data) to view the unencrypted voter PII.

16. The Maine Legislature specifically directed the Secretary of State to contract with the ERIC program to assist with list maintenance. See 21-A M.R.S.A. § 161(2-B). The Legislature has not authorized the Secretary to enter any sort of similar agreement with the federal government.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 12, 2025

/s/ Julie L. Flynn
JULIE L. FLYNN
DEPUTY SECRETARY OF STATE

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENNA BELLOWS in her official capacity as Secretary of the State of Maine and the STATE OF MAINE,<br><br>Defendants. | Docket No. 1:25-cv-00468 |

**DECLARATION OF KATHERINE MCBRIEN**

I, Katherine McBrien, hereby declare as follows:

1. I am over the age of 18 and reside in Lincolnville, Maine

2. I have personal knowledge of the matters to which I attest. In preparing this declaration, I also reviewed records regularly kept by the Department of Secretary of State that are available to me and that I rely on in my official duties. If called to testify, I could and would competently testify to these statements.

3. Since January 6, 2025, I have served as the Chief Deputy Secretary of State. I report directly to the Maine Secretary of State and oversee all aspects of the Department of Secretary of State's ("Department's") responsibilities, including the administration of county, state, and federal elections by the Department's Bureau of Corporations, Elections, and Commissions (CEC).

4. CEC's responsibilities include operation and maintenance of Maine's central voter registration system (CVR), which contains personally identifiable information (PII) on every registered voter in Maine.

5. On August 28, 2025, I attended a videoconference meeting held by the National Association of Secretaries of State (NASS). NASS is a nonpartisan professional organization that conducts regular meetings attended by secretaries of state and their staff.

6. Deputy Attorney General Michael Gates from the United States Department of Justice (DOJ) spoke at the August 28, 2025 NASS meeting concerning demands by the Department of Justice to States seeking electronic lists of the PII of all registered voters contained in their centralized voter registration systems.

7. Maine's Secretary of State received such a demand from DAG Gates on behalf of DOJ on July 24, 2025. The letter demanded "the current electronic copy of Maine's computerized statewide voter registration list" including "all fields contained within the list."

8. The Secretary of State responded to the DOJ's letter on August 8, 2025, the DOJ replied on August 18, 2025, and the Secretary of State responded to that reply on September 8, 2025. The DOJ did not respond to the Secretary's September 8, 2025 letter. True and correct copies of the first three letters are attached to DOJ's complaint in this action. A true and correct copy of the final letter from the Secretary is attached as Exhibit A.

9. At the August 28th NASS meeting, DAG Gates stated that DOJ had made or would be making the same demand for voter data to all 50 states.

10. DAG Gates indicated that DOJ intended to analyze the voter data and provide feedback to the States with the goal of producing "clean" voter lists free of ineligible voters. DAG Gates declined to answer questions about the methodology that DOJ intended to use to analyze the voter data.

11. Although DAG Gates provided few specifics about what DOJ planned to do with States' voter data, it was my overall impression that at least part of DOJ's plans involved (a)

feeding States' voter registration data into one or more electronic matching systems that would flag allegedly problematic registrations and (b) providing those results back to the States with the expectation that states would cancel or otherwise correct those registrations prior to the November 2026 federal election.

12. On November 18, 2025, the Secretary of State, along with secretaries from nine other states, sent a letter to the Attorney General and the Secretary of Homeland Security requesting further information concerning their plans for using the voter data they have demanded. A true and correct copy of this letter is attached as Exhibit B. To date, neither the Attorney General nor the Secretary of Homeland Security has provided any written response to the letter.

13. The Department, along with many other States, already participates in a data-matching program for voter registration data operated by the Electronic Registration Information Center (ERIC), in which encrypted voter data is matched with other data to identify potentially problematic registrations such as deceased voters and duplicate registrations.

14. The Department has neither the capacity nor the desire to participate in a second such program administered by the federal government.

15. Among other things, the Department is concerned that DOJ may intend to feed Maine's voter data into a system operated by the Department of Homeland Security (DHS) called the Systematic Alien Verification for Entitlements (SAVE) program. The SAVE program allows users to search for individuals to determine whether they may or may not be U.S. citizens. DHS recently issued a Systems of Record Notice (SORN) for the SAVE program describing a significant expansion of the program, including expanded search functionality and the addition

of social security numbers and driver's license numbers as well as data concerning individuals who are U.S. citizens by birth.

16. On December 1, 2025, Maine's Secretary of State joined secretaries from 11 other states in submitting a public comment on SAVE's expansion, setting forth their opposition to the expansion of the SAVE program on grounds that its use to verify voter eligibility is likely to misidentify eligible voters as non-citizens and to chill participation by eligible voters. A true and correct copy of the Secretaries' public comment is attached as Exhibit C.

17. To date, Maine has not received any request directly from DHS or DOGE for its voter data.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: December 12, 2025

/s/ Katherine McBrien
KATHERINE MCBRIEN
CHIEF DEPUTY SECRETARY OF STATE

EXHIBIT
A

STATE OF MAINE
DEPARTMENT
OF THE
SECRETARY OF STATE

SHENNA BELLOWS
SECRETARY OF STATE

September 8, 2025

**Via U.S. Mail & E-mail**

Maureen Riordan
Senior Counsel, Department of Justice
U.S. Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Ave., NW – 4CON
Washington, DC 20530
maureen.riordan2@usdoj.gov

Re: Department of Justice (DOJ) correspondence of August 18, 2025

Dear Attorney Riordan:

I write in response to the letter of Assistant Attorney General Harmeet Dhillon, dated August 18, 2025. Per her instructions, I am directing this correspondence to you.

I have carefully reviewed AAG Dhillon's letter and continue to have grave concerns about the appropriateness and legality of DOJ's request for personally identifying information (PII) concerning all of Maine's approximately 1 million voters, including such highly sensitive information as drivers' license numbers, partial social security numbers, and full dates of birth. As I noted in my previous letter of August 8, 2025, the Maine Legislature has expressly designated such PII as highly sensitive information within Maine's central voter registration system and the First Circuit Court of Appeals has expressly recognized that section 8(i) of the National Voter Registration Act (NVRA) does not require disclosure of such information. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024).

I also requested in my August 8th letter that DOJ explain how its unprecedented request for sensitive PII on every Maine voter complies with the Privacy Act of 1974 and the e-Government Act of 2004. It appears beyond debate that DOJ is compiling a system of records concerning individuals within the scope of the Privacy Act. Yet we have been unable to identify any System of Records Notice (SORN) published by DOJ in the federal register explaining to the public how, among other things, voters' PII will be stored, accessed, and retained within DOJ systems. Nor has DOJ pointed to any applicable SORN in its correspondence. Rather, it has

responded with what appears to be a non sequitur, pointing to a provision in the Help America Vote Act (HAVA) that allows states to require certain voters to provide partial social security numbers to register to vote notwithstanding a provision of the Privacy Act that generally forbids such requirements. If anything, this HAVA exception allowing states to require voters to provide their partial social security numbers only underlines the importance of the Privacy Act's requirements that DOJ explain to the public how it plans protect their sensitive PII.

I have similar concerns about DOJ's compliance with the e-Government Act of 2004, Pub. L. No. 107–347, 116 Stat. 2899. Broadly speaking, under section 208 of that law, DOJ is required to conduct a privacy impact assessment before it either develops or procures information technology that collects, maintains, or disseminates PII or initiates any new collection of information using information technology that involves the PII of 10 or more persons. The privacy impact assessment must state, among other things, why the information is being collected, the intended use of the information, with whom the information will be shared, and how the information will be secured. Moreover, the privacy impact assessment must, in most cases, be made publicly available.

It is my understanding that DOJ intends to feed Maine's voter file into some sort of unidentified information technology system in an attempt to identify duplicate and other invalid registrations. Yet we have been unable to identify any privacy impact assessment applicable to DOJ's attempt to collect PII on hundreds of thousands of Maine voters (as well as millions more across the rest of the country) for this purpose. Moreover, DOJ's previous correspondence identifies no such assessment. I ask that DOJ please identify an applicable assessment or explain why DOJ contends that the e-Government Act does not apply to its requests for voter PII.

The requirements of the Privacy Act and the e-Government Act are no mere technicalities. Data breaches, including breaches of governmental systems, are an unfortunately regular occurrence. Moreover, there have been recent and alarming allegations of mishandling of sensitive PII by the federal government.[1] Mainers are entitled to know—and to provide input on—how their PII will be collected, stored, and used by the federal government.

DOJ's letter of August 18th also expands the legal basis for its request for Maine's unredacted voter file, citing section 401 of HAVA and section 301 of the Civil Rights Act of 1960 (CRA) in addition to the NVRA. We do not believe that these provisions are applicable to DOJ's request for voters' PII.

Section 401 of HAVA simply allows the Attorney General to bring a civil action to enforce provisions of HAVA. It does not grant the Attorney General any administrative subpoena authority or similar rights to obtain data or records from states outside the context of litigation. In any event, DOJ's correspondence has not set forth any facts or allegations suggesting that Maine is not in compliance with HAVA. To the contrary, my letter of August 8, 2025, demonstrates Maine's compliance with HAVA's list-maintenance requirements.

---

[1] Nicholas Nehamas, "DOGE Put Critical Social Security Data at Risk, Whistle-Blower Says," *New York Times* (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/us/politics/doge-social-security-data.html.

While the CRA does contain a provision allowing the Attorney General to demand inspection or copying of certain records relating to voter registration, it requires the Attorney General's demand to contain a "statement of the basis and the purpose therefore." 52 U.S.C.A. § 20703. While DOJ's August 18th letter states an alleged "purpose" for the request of "ascertain[ing] Maine's compliance with the list maintenance requirements of the NVRA and HAVA," this stated purpose is unrelated to the purpose of the CRA, which is to allow DOJ to investigate questions concerning infringement or denial of constitutional voting rights in order to determine whether a suit under the CRA is appropriate. Nor does the August 18th letter explain the basis for making a sweeping request for voters' sensitive PII in order to determine the adequacy of Maine's procedures for conducting list maintenance. If there is any precedent for using the CRA's inspection provisions to review a state's list-maintenance practices—particularly in the absence of any allegation that the state's list-maintenance practices are in violation of the NVRA or HAVA—we ask that DOJ please provide it.

In any event, neither HAVA nor the CRA exempts DOJ from complying with the Privacy Act and the e-Government Act before collecting sensitive PII on all Maine voters.

Finally, DOJ's August 18th letter makes a new request for a copy of "all original and completed voter registration applications submitted to the State of Maine from December 1, 2023 through July 1, 2025." This new request raises many of the same issues discussed above concerning Maine's electronic voter registration list. Moreover, it is difficult to understand what possible legitimate investigative purpose could be served by such an undifferentiated request for all registration applications in a 19-month period. In any event, under Maine law, original voter registration applications are maintained by registrars in each of Maine's roughly 480 municipalities. 21-A M.R.S.A. § 172.

If DOJ is willing to provide additional information addressing my concerns above, I will carefully consider that information. At this time, however, I am unable to comply with the DOJ's requests for unredacted information concerning all Maine voters.

Sincerely,

Shenna Bellows
Secretary of State

148 State House Station · Augusta, Maine · 04333-0148 · Telephone: (207) 626-8400 · Fax: (207) 287-8598

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

______________________________

UNITED STATES OF AMERICA, CIVIL ACTION

Plaintiff Docket No: 1:25-468-LEW

-versus-

SHENNA BELLOWS, in her official capacity as Secretary of State of the State of Maine, and the STATE OF MAINE,

Defendants,

JOHN SCHNECK and MARPHEEN CHANN,

Defendant-Intervenors,

LEAGUE OF WOMEN VOTERS OF MAINE

Defendant-Intervenors.

______________________________

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for **Oral Argument re: Motions to Dismiss** held before **THE HONORABLE LANCE E. WALKER**, United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 26th day of March 2026 at 9:02 a.m. as follows:

Appearances:

For the Plaintiff: James Thomas Tucker, Esquire
Brittany E. Bennett, Esquire

For the Defendants: Jonathan R. Bolton, Esquire
Jason Anton, Esquire

For the Intervenor Defendants Schneck and Chann: Christopher D. Dodge, Esquire
Branden D. Lewiston, Esquire
James G. Monteleone, Esquire

For the Intervenor Defendants League of Women Voters of Maine: Sejal S. Jhaveri, Esquire
Alexis Denae Grady, Esquire
Andrew B. Garber, Esquire
Katherine S. Hamilton, Esquire
Robert Brent Ferguson, Esquire
Allan K. Townsend, Esquire

For Amici ACLU and ACLU of Maine: Zachary L. Heiden, Esquire
Carol Garvan, Esquire

Lori D. Dunbar, RMR, CRR
Official Court Reporter

(Prepared from manual stenography and computer aided transcription)

(Open court)

THE COURT: Good morning, all. We're here in the matter of United States versus Shenna Bellows. This is Civil Case No. 1:25-CV-468. Counsel, could I have you enter your appearance, please.

MR. TUCKER: Good morning, Your Honor. James Thomas Tucker and Brittany Bennett for the United States.

THE COURT: Good morning.

MR. BOLTON: Good morning, Your Honor. Jonathan Bolton, and I'm here with Jason Anton, Assistant Attorney Generals, for the State of Maine and Secretary of State Bellows.

THE COURT: Good morning.

MR. DODGE: Good morning, Your Honor. Christopher Dodge on behalf of Voter Intervenors Marpheen Chann and John Schneck, joined by my colleague Branden Lewiston and Jim Monteleone.

THE COURT: Good morning.

MS. JHAVERI: Good morning, Your Honor. Sejal Jhaveri for the League of Women Voters, and I'm joined by my colleagues Allan Townsend, Brent Ferguson, Alexis Grady, Kate Hamilton, and Andrew Garber. My apologies.

THE COURT: You did better than I could have done.

MR. HEIDEN: Good morning, Your Honor. I'm Zachary Heiden for Amici Curiae ACLU and ACLU of Maine, along with my

colleague Carol Garvan.

THE COURT: Good morning, Mr. Heiden.

All right. We're here on the motion to dismiss. I'll hear from counsel.

MR. BOLTON: Good morning, Your Honor. I -- I'd like to -- I'm going to try to sort of cover the waterfront here in terms of the various arguments in the motion to dismiss, and I'm happy to go into, you know, more or less detail on any of the particular portions as the Court sees fit.

But I'd like to start with the Title III claim, Title III of the Civil Rights Act claim, because I think it's probably where most of the sort of light and heat in this case is. And we've put forward multiple arguments as to why that claim should be dismissed, but I think I'd like to start with what I think is a very simple and straightforward reason why the claim should be dismissed, and that is because Section 303 of the Civil Rights Act requires a, quote, demand in writing and the demand, quote, shall contain a statement of the basis and the purpose therefor.

The -- the DOJ has not provided a statement of the basis for its demand for Maine's voter registration database. These are important requirements; they're not procedural technicalities. Requiring a statement of purpose and a true and complete statement of purpose is a check against DOJ

pursuing sensitive information for improper reasons, and the requirement of a basis is a check against DOJ pursuing sensitive information without any reasonable belief that a violation has occurred. Basically it is a provision that prevents fishing expeditions.

So what does the record before the Court on the motion to dismiss show? It shows that there is a July 24th letter provided -- sent by the Department of Justice to the Secretary of State asking for the unredacted voter registration database under the NVRA, not the CRA. And then there's a list of questions that contains statements about reports that Maine made to voter data to the EAVS report but contain no allegations that Maine was not in compliance with its list maintenance requirements.

Then we -- we -- the Secretary of State provided a detailed response to all the Department of Justice's questions about its list maintenance programs, detailing in great detail a six-page, single-spaced letter, what the State of Maine does to keep the voter lists clean.

And then we receive a letter from the Department of Justice, which is the demand under Section 303, because it actually cites the CRA for the first time and asks for the voter registration database under the CRA for the first time. And it contains a statement of purpose, which again we have problems with as well; it does not contain any statement of

basis at all. And that is a very simple straightforward reason that, even putting aside all the other arguments that have been made in this case, this demand that was made does not comply with the plain text of Section 303.

And I think one I guess last point I want to make, maybe anticipating what Your Honor is going to hear from the Department of Justice, is that the questions that were -- that were submitted in the July 24th letter, those cannot be construed as the basis for the request. I mean, for one thing, there's -- there's no language in the letter that ties those questions to any concern or any belief, any suspicion, any probable cause that the State of Maine is not in compliance with its list maintenance obligations.

And it also -- the fact that those statements were -- those questions were asked at the same time that the list was requested by DOJ suggests that they went into this actually knowing nothing about Maine's voter list maintenance program, so they're asking for information and they're demanding the list at the same time. If they didn't know anything about what we were doing --

THE COURT: So that was one of my questions. So the statement of purpose, your -- your argument, I take it, is that the statement of purpose needs to be made at the outset, meaning the sequence in which the demand is made, the statement of purpose has to be made at the same time as the

request. It has to come first.

MR. BOLTON: Correct, the -- and that's the plain text of the statute. The -- the demand must include a statement of purpose and a statement of basis; that's in the statute. Our view of the demand is the August 18th letter as the demand.

THE COURT: Because I think the State's brief at page 16 concedes that the DOJ properly stated a purpose but that as things unfolded between the July and August letters it didn't state a basis; is that -- is that the State's position?

MR. BOLTON: We -- we would concede that the DOJ stated a purpose actually in both letters. We -- we disagree that it is a proper purpose and that -- and we have deep concern about whether it is the true purpose. But --

THE COURT: What do I -- can we stop there for a moment?

MR. BOLTON: Yeah.

THE COURT: So what do I do with that -- what do I do with that argument regarding the sufficiency of the purpose? Do -- is that important for purposes of a motion to dismiss? Do I have to weigh the sufficiency of the purpose and get into whether it's pretextual or not? And, if so, how do I do that?

MR. BOLTON: So I think there are a couple ways to go. First of all, if you find that there's no basis stated in

the demand, then you don't have to go any further than that.

THE COURT: Understood.

MR. BOLTON: If you find that there is a basis that can somehow be imputed from the letters, then on the purpose -- I think there are two issues with the purpose. One is that in our view a purpose of -- just taking it at face value, a purpose of assessing a state's list maintenance program and whether it makes reasonable efforts to remove ineligible voters is not a purpose that is contemplated by Title III of the CRA, because the CRA was designed to assist the Attorney General in combating racial discrimination in voting rights. It was not intended to provide the sort of umbrella power --

THE COURT: All right. So the DOJ, as you well know, says that's not in the text of the statute so we shouldn't bother ourselves with what the intent might have been behind the statute. We're limited to what's written in the words of the statute. What do you have to say about that?

MR. BOLTON: Well, I think that can't be right, and I think even the DOJ would say there are limits on what they can request under the statute. The problem is if the statute said something about the purpose, then we -- what the permissible purposes are, then we'd obviously have to interpret that and we'd be bound by that. But where it has no statement at all it -- I think it's -- you know, you have to

read statutes to avoid absurd results. And it can't be the case that the Department of Justice or the Attorney General can request the voter file for literally any reason.

I mean, if the vote -- if the Department of Justice requested the voter file because they want to find out who the Republicans and who the Democrats are, which they could do from this voter file, and so they could give preferential treatment to one party -- or one type of voter and against another, that can't possibly be a proper purpose under the CRA. So there has to be some limiting principle.

THE COURT: So even if you wouldn't have to -- it strikes me that the State wouldn't have to concede -- the State wouldn't have to really be married to its position that the purpose has to be connected to the intent behind the Civil Rights Act, that it has to be connected to evidence or concern about racial discrimination, but you could argue to the Court that -- that the DOJ has to make some rational connection between the purpose behind the demand and the reason that they're asking for it. They've really requested -- they've really made no connection whatsoever, I think, is the argument the State's making.

MR. BOLTON: That's right, no, they've -- they've made no suggestion that this has anything to do with combating -- if I understand Your Honor's question, they have not tried to connect those two things in any way. And I don't

think that they -- that they could. Because I think at the end of the day, you know, what -- they've told us what they want to do, which even again if you accept at face value is to see if Maine is doing a good enough job of removing ineligible voters in accordance with the requirements of the NVRA and HAVA, that has nothing to do with racial discrimination in voting. So those purposes are not -- the purpose they've given is incompatible with what we think is the purpose of the records provision in the CRA.

So that's one thing. That's something that the Court can clearly decide on a motion to dismiss because it's just looking at the -- it's just statutory interpretation and looking at what DOJ has said in the letters that have been incorporated by reference in the complaint. So that's easy, I think, under the motion to dismiss standard.

I think the other -- the question of whether it's pretextual, I think there is -- you know, this is something that we think could be resolved on a motion to dismiss under the plausibility standard under *Iqbal*, and I think the California court in *Weber* and the *Oregon* case have both reached conclusions about pretext based on a record on a motion to dismiss, so I think I would commend those decisions to the Court.

And I think there are some things that the Court can look at in considering pretext that are clearly things that

can be considered in a motion to dismiss. One of those things is the fact that DOJ is not -- clearly not targeting specific states based on specific concerns. They are making the same -- they're initiating litigation in states all around the country seeking the same information in sort of this cookie-cutter way, which suggests that they -- the purpose is not to investigate specific concerns about specific states but it is to compile this sort of national voter registration database. So that's evidence of pretext that the Court can take judicial notice of.

THE COURT: So say more about that argument. So the -- as evidence for the fact that -- to support the argument that the DOJ isn't interested in a careful, thoughtful, bespoke, tailored, targeted concern with each state's method of preserving these voter rolls, they're taking this blanketed litigation effort against all states, that suggests that they're not carefully looking at each state's individual issues or problems.

MR. BOLTON: I think what it suggests, Your Honor, is that the true purpose here, which is not stated in their letter, is to compile some sort of national database. And we don't know what they're going to do with that database, but one thing we strongly suspect is that they're going to run it against other databases that the federal government has and then produce lists back to the states that say, we want you to

remove these people from your list, which that is not the role of the federal government under the statutory framework that the Congress has constructed. It's states that run their voter list maintenance programs that decide how they're going to work, that decide which voters are eligible and not eligible. And HAVA's very clear about that, that states decide the methodology of compliance with these requirements. The federal government's role is just to ensure that the states have a program, they have processes in place that make a reasonable effort to remove these voters. That's all.

So what they should be asking, if they were concerned, are the -- the kinds of questions, you know, how -- what -- how frequently do you do, you know, voter list maintenance? How frequently do you send out postcards to people? What do you do to remove deceased people from your list? Those are the sorts of questions that you would expect if there was real concern about this. You would not expect requests for, give us your entire voter registration database with a million people in it containing their Social Security numbers and all sorts of sensitive information and including information about political party and, you know, how people exercise their First Amendment rights. That goes way beyond what you would need to know in order to make these kinds of assessments.

So let me -- I'll just turn briefly to -- I guess the last thing I would say is I think with regard to the -- the

purpose in the -- in the CRA -- of the CRA and why it's not as expansive, I think if you look at -- the legislative history is very strong, and I think even the *Lynd* case, which they rely on very heavily, says that the purpose here is to remedy racial discrimination. So, again, I think that that's -- there's very strong -- unusually strong legislative history on this point.

Turning briefly to the other claims, the NVRA claim, I think it's notable that in the other cases that DOJ has brought more recently they're not even raising an NVRA claim anymore. In this -- it may be a more live issue in other jurisdictions. Within the First Circuit this question is resolved under the *Bellows* case. Sensitive voter data -- highly sensitive voter data, which certainly includes Social Security numbers and driver's license numbers and we would argue includes dates of birth and other information as well, does not have to be provided. The First Circuit is very clear on that, and I think that resolves that claim.

And then finally under HAVA, I think their argument under HAVA is frankly hard to follow. They are not alleging any violation of HAVA. They are simply alleging that somehow they should be -- their HAVA claim suggests that they should be able to get in discovery information that might support whether the State is violating HAVA.

THE COURT: The way I understand the HAVA claim is

that the way to a HAVA claim is to make a HAVA claim to find out if you have a HAVA claim.

MR. BOLTON: I agree completely, Your Honor, I think that's how I understand as well. That is not how civil litigation works. They need to have the claim before they come in the door. The whole purpose of a motion to dismiss is to make sure that there's actually a viable claim before you get to open the doors to discovery, so I think that claim also is -- you know, falls fairly easily.

So let me just turn a little bit to the Privacy Act claims, which are affirmative defenses, and the E-Government Act, and then I'll leave time for the intervenors to speak.

But, you know, the -- with the Privacy Act my understanding is, you know, the DOJ is making an argument that, well, this is a requirement that -- that these requirements apply to the federal government, they don't apply to the states, so you can't raise a Privacy Act claim. And I think the issue here is that the DOJ is coming to this Court, is asking this Court -- is invoking this Court's jurisdiction to try and force, compel, the Secretary of State to turn over information.

And I think as part of the Court's exercise of its authority under this provision of the CRA it would be totally -- it's appropriate for the Court to consider whether the -- whether turning over this -- whether the -- whether the

federal government receiving this information would violate federal law.

And our contention is that it would under the Privacy Act for the two reasons we talked about in our brief. One, that it -- that this -- all of the information in the voter registration database reflects people's exercise of their First Amendment rights, because the very fact of whether somebody's registered to vote or not is the exercise of First Amendment rights. So that is one problem.

And the other problem is that they have not -- the DOJ has not complied with the procedural requirements required under the Privacy Act. The main one is that when you're making a major change to the system of records that you're maintaining, you have to provide notice to the public and notice to Congress before you do that. And that's a really important requirement, especially when what we're talking about here is the Department of Justice acquiring hundreds of millions of voter registration records from all across the country.

I mean, I can't imagine that a -- a collection of data that's more deserving of -- of a new public notice than something like that. That is not something that the DOJ has done before. I think the amicus briefs of the former Department of Justice employees talk to this point. This is a completely new, unique thing that the Department of Justice is

doing. They need to tell Congress; they need to tell the public; they need to listen to concerns the public might have about privacy.

And I think with the E-Government Act, just to close, Your Honor, I think the -- that law requires a privacy assessment before -- again, for the same reasons when you're doing a major new collection of data like this, I think the -- the idea that the DOJ has suggested that the E-Government Act doesn't apply because they weren't the original collectors of the data, they're trying to get the data from states that collected the data, it's not consistent with the statutory text, which isn't written in a way that requires that the federal government be the original collector of the data.

And -- and, secondly, it's not consistent with the purpose of the statute, which is just to protect people's privacy, which is just as at risk through this process that the DOJ has employed today where it's trying to get data from the states that the states got from individuals than if it goes to the individuals directly.

THE COURT: What's the role of the federal government in enforcing HAVA and NVRA list maintenance requirements?

MR. BOLTON: Can you repeat that, Your Honor?

THE COURT: Sure. What's the role of the federal government in enforcing HAVA and NVRA list maintenance

requirements?

MR. BOLTON: Yeah, they have a role, Your Honor. I think they can bring, you know, civil suits under -- under both statutes. But, again, the role is not -- well, we object very strongly to is I think the approach that the Department of Justice is taking here suggests that they think that their role is to actually do the list maintenance and to tell the states, you remove this list of people. That seems to be where this is all headed. The -- as far as we can tell, and that is not their role.

THE COURT: So -- right. So I -- I sense there's a bit of shadowboxing going on here as far as what we expect the other side is doing without a lot of evidence that that's what the other side is doing. So that's what I'm trying to get a grip on because I actually have to do a thing here.

MR. BOLTON: Sure.

THE COURT: So -- so if we were at a diner and talking about I bet that's what they're trying to do, that would be one thing, but that's not my charge. So I'm trying to get a grip on, you know, we have at least, at least, two and arguably three statutory schemes that we're contending with here, but two for sure charge the federal government with -- at least ostensibly charge the federal government with some oversight in enforcing list maintenance requirements. And I would just be curious to hear from the defendant and the

defendant intervenors as to what they think that is, what the role of the federal government is in that regard.

MR. BOLTON: Well, sure. So, Your Honor, I think again the -- both HAVA and the NVRA require the states have a list maintenance program that makes reasonable efforts to remove people that have changed residences and people that have -- that have died. And HAVA also contains a provision in terms of preventing duplicate records within the electronic database.

So I think the federal government has a role there, but it's the -- in enforcing that, but the role is to make sure that the processes that the State has in place are sufficient.

So, again, you know, if we were doing postcard mailings -- if we weren't doing postcard mailings at all or if we were doing them once every ten years, every decade or something like that, maybe then that's a concern, the federal government can step in and say, you need to be doing these more frequently. Maybe if we don't really have a good program to remove deceased people the federal government can say, you need to have a better program. We do, in fact, have a very good program to do that that we talk about in the correspondence. So those are the sorts of things but they're procedural requirements.

Ultimately the requirement is not that you have sort of, quote, unquote, clean lists; it's that you have a program that

makes a reasonable effort to achieve that goal.

So the questions they should be asking should be procedural questions, what are you doing. It shouldn't be, we're going to feed your database into our -- whatever system they might be planning to do that and we're going to give you a list of who you have to remove. That's not their role. And HAVA's explicit on that.

THE COURT: Do those statutory scheme -- ultimately, though, you'd concede that those statutory schemes do authorize the federal government at some point to require the states to turn over those lists to the federal government.

MR. BOLTON: I would not concede that, Your Honor, because I don't see the utility -- I don't think that those lists -- they're a snapshot at a point in time of who's on the list. And I don't think that that provides sufficiently useful information about whether we have the right processes in place. So, no, I wouldn't concede that, Your Honor.

THE COURT: Okay. So not ever. So those statutory schemes really -- those statutory schemes -- HAVA in particular strikes me as a scheme that authorizes the federal government to enforce the integrity of voter registration, but it doesn't have internally contained within that statute an auditing or disclosure mechanism.

MR. BOLTON: Correct, yeah.

THE COURT: I think we established that. So what

we're left with from the perspective of the federal government, the interaction between the federal government and each Secretary of State, is a colloquy much like is represented in the July and August letters between Secretary Bellows and the DOJ, and that's where -- that's where the requirement ends in your view.

In other words, the DOJ has no authority to require that the list ever really be turned over under those two statutes. It's -- it's only really a requirement to explain the processes and procedures and that the State is following those processes and procedures with meticulous integrity and that the DOJ has to take that for what it's worth.

MR. BOLTON: Well, I don't think it has to take it for what it's worth, necessarily. I mean, I think the DOJ could -- under, for instance, the NVRA's public disclosure provisions, they could ask for records that confirm, you know, what -- that what we're telling them in the letters is the actual process that's happening. So I think there's opportunities to do investigation into that to confirm that what we're telling them is correct.

And, you know, I think that -- it's actually very common, right, when there's an enforcement concern between the federal and the state government that they ask a bunch of questions and we try to answer them as best we can and try to assuage, you know, their concern. And if there is a concern

that's not assuaged, we try to figure out how to -- you know, how to address it, so I think that's a common approach.

You know, I think there are many instances where the federal government is not necessarily going to have the sort of administrative subpoena power to probe these things and -- you know, in any way it chooses.

THE COURT: That's -- sorry, that's what my question is getting to. I was just trying to understand from your perspective. So ultimately, though, the federal government in your view doesn't ultimately have the authority under at least those statutory schemes, short of an enforcement action, a civil action, to say, well, give me the list so I can make sure what you're telling me squares with what the lists demonstrate.

MR. BOLTON: I -- yes, that is our position, and, you know, I think there are other -- again, there are other ways that the Department can get at that information in terms of --

THE COURT: What other ways would those be?

MR. BOLTON: Well, again, you know, they can use the NVRA public disclosure provision to ask for records or the -- or the Maine's Freedom of Access Act, right? Many of these records about how our process works are going to be public records that they can ask for and they can assess those.

And, again, I mean, this goes to -- this is about

process and whether Maine has the right process. It's not about do they -- are X number of deceased people on the rolls. That is not the federal government's role to make that assessment. It's to figure out are the processes correct or not -- or sufficient, are the processes sufficient or not, are they reasonable. And the *Benson* case, the other *Benson* case, the Sixth Circuit *Benson* case, I think is very clear that this is not a perfection standard, this is a reasonable standard, it's a very modest standard that the states have to meet.

THE COURT: Thank you.

MR. BOLTON: Thank you, Your Honor.

MR. DODGE: Good morning, Your Honor, Chris Dodge on behalf of Voter Intervenors Marpheen Chann and John Schneck.

I'd like to do three things with my time. One, I just sort of want to contextualize this case for the Court in view of the broader effort nationwide by DOJ to collect these voter lists.

Second, I want to add an argument on the CRA that I think is sort of rooted in the Supreme Court's recent body of textualist case law that I think supports Mr. Bolton's argument that their CRA claim fails as a matter of law because the CRA cannot be grafted into the voter list maintenance context DOJ seeks to use it for.

And then, third, I just sort of want to close with some of I think the big-picture federalism concerns here.

So sort of just where we are, Maine had the privilege here of being the first state to be sued by the federal government on this issue, but it surely has not been the last. You know, when the briefing completed here, 20 states had been sued by DOJ; we are now up to 30. Within those 30 cases, three have been dismissed; I'm sure Your Honor knows that. Not a single Court has yet found the Department to have stated a valid claim in any of these cases. As Mr. Bolton alluded to, in the vast majority of their complaints DOJ has now abandoned their NVRA and HAVA arguments, and with good reason.

I think it's also worth pointing out to the Court that in the Ninth Circuit and Sixth Circuit appeals that have germinated from those motions to dismiss they have also abandoned those arguments, even though those were cases where they initially brought those claims. So their Ninth Circuit briefs, which were filed last week, their Sixth Circuit brief filed earlier this week, have just completely abandoned the NVRA.

And I think that sort of shows where these cases are and what the issue has crystallized down to, which is can the Department of Justice use the Civil Rights Act in an unprecedented way to enforce the NVRA and HAVA. And I think this gets to the colloquy you just had with Mr. Bolton, and I think it's the right area of focus.

And that gets to what I'd like to say about textualism

here, which my friends on the other side seem to think favors them, and I actually think it very strongly cuts against them for a number of reasons.

And I want to start by just quoting their brief because I think it's their sort of lodestar argument for why they get to do this. They say at page 12 of their brief, the DOJ, quote, cannot meaningfully investigate and enforce the list maintenance requirements of HAVA and the NVRA without having access to the voter identification numbers required by federal law.

I find that to be an extremely confusing argument because the NVRA and HAVA give them enforcement powers. Congress put enforcement powers in both those acts, and so I don't know what they mean when they say they can't enforce the NVRA and HAVA when both those statutes include express enforcement provisions. 52 U.S.C. 21111, the AG can sue to enforce the substantive provisions of HAVA. 52 U.S.C. 2510, the AG can sue to enforce the NVRA. And then of course the NVRA's public disclosure provision, which gets them the vast majority of the voter list except for the sensitive information.

And so to Your Honor's question to Mr. Bolton about what is the role of DOJ here, you know, they can bring lawsuits on these laws, and if they have a valid basis for those lawsuits, if they can plausibly state a HAVA claim, which they plainly

have not here, if they can plausibly state a NVRA claim, well, then you're off to federal discovery rules and, you know, they can start using that process to get additional information. But they've got to at least show they can get in through the door. That's what Congress established in those laws. They didn't grant wide-ranging, presuit discovery under the NVRA.

Now, they do that in other contexts. There are laws where DOJ has further-ranging presuit, you know, administrative subpoena power. It is conspicuously absent in the NVRA and HAVA, because Congress did not want precisely what is happening here, DOJ knocking on the door of every state and saying, voter lists, now. Well, why? Doesn't matter. CRA, it's a law passed 60 years. It's never been used for this purpose. It's clearly about, you know, protecting against racial discrimination in voting but it doesn't matter. We're going to look at the text in isolation.

And so I think it gets to the nub of the issue here, which is that DOJ just doesn't like the enforcement powers Congress has actually given it for list maintenance so it's reaching out to another statutory context and saying, well, wouldn't it be nice if this was in the NVRA, wouldn't it be nice if this was in HAVA. But it's not.

Their answer to all this is textualism, that the Court just needs to put on blinders and look at 20703 in complete isolation and say, okay, you know, this applies to any

conceivable purpose whatsoever. And that's just not how textualism works. And the Supreme Court has made that clear again and again and again over the last 10 years.

And I'll start with some famous words from Justice Scalia where he says, words, like syllables, acquire meaning not in isolation but within their context. And, you know, that's in *K Mart Corp v. Cartier, Inc.*, 486 U.S. at 319, and I think it fundamentally rejects the idea that you just look at the CRA in complete isolation here.

And this is also a major theme of the Supreme Court's major questions doctrine in recent years basically says, we don't look at statutory text in isolation to just suddenly find remarkable federal power. There's no history of the CRA being used in this way. They did not just stumble upon some remarkable grant of far-ranging power to the federal government.

Justice Barrett I think discusses this very eloquently in her concurrence in the *Learning Resources* decision, the tariff case from just a couple months ago. She says this: Textualists, like all those who use language to communicate, do not interpret words in a vacuum. Instead we use context, including background legal conventions, common sense, and constitutional structure to ascertain a text's most natural meaning. That's her concurrence quoting her other concurrence in *Biden v. Nebraska*.

And I think that shows you how textualism is intended to work by its proponents, you know, whether or not that's even the lens the Court wishes to apply, it's not the Government's version of textualism. And this all gets to, you know, another very famous aphorism of Justice Scalia's in the *Whitman Trucking* [sic] decision, which is that Congress does not hide elephants in mouseholes. And DOJ is coming to this court today saying it has found a big elephant.

And as Mr. Bolton alluded to, they do not have a limiting principle for this elephant. They think it can rampage far and wide. According to them, or at least their manner of interpretation, Title III can be used for essentially any purpose. I mean, Mr. Bolton gave you an example of sort of retaliation in the voting context, but it could be any. They could do it for tax enforcement, antitrust investigation, I mean, literally any purpose. Their view is that the role of the Court here is to rubber-stamp their request.

And I think there are two other more specific textualism problems here that I want to highlight for the Court. The first is the specific general canon, and Justice Scalia discusses this in *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, and him and Bryan Garner both discuss it a lot in *Reading Law*, their statutory interpretation treaty.

And here you have a specific provision that addresses

what kind of presuit, general sort of discovery DOJ can take in the list maintenance context, and that's the NVRA's disclosure provision. You know, everyone agrees they can use that subject to its limitations as set forth by the First Circuit in *Bellows* and many other circuit cases. So that's a specific canon that says, yeah, you can do this.

They then want to find a more general canon outside of the relevant statutory framework imported into the NVRA and have it predominate over a more specific provision that speaks to this actual issue, and that's also not how textualism works. And it would also render the public disclosure provision, you know, completely superfluous as to DOJ.

And, you know, their response might be, well, that's a general public disclosure provision; it's not specific to DOJ. You know, Congress knows how to write laws. They know how to write a law to say DOJ gets this, the public gets that. In fact, the NVRA does that in another context because DOJ can just sue. A private litigant who wants to sue does have a cause of action, but they have to perfect it by sending a letter to the relevant chief election officer before they can sue. DOJ doesn't have that requirement.

So even the NVRA itself evinces that Congress knows how to give the Attorney General more privileged position in enforcement when it wishes to. It did not do so in the public disclosure provision; again, presumably because it didn't want

new administrations coming in every four years and saying, you know, Nebraska, let's see it, you know, pony up. Maine. That's clearly not what is intended under the NVRA.

And then sort of my last textualism point I want to highlight for the Court, and this is from Justice Gorsuch's decision in *Epic Systems Corporation*. It is an obligation of the Court to read laws as a harmonious whole rather than at war with each other.

But when you do what DOJ wants to do here, which is import a provision of the CRA into the NVRA, effectively, you do set those statutes at war with each other because they are doing very fundamentally different things, even, you know, forget their legislative purpose.

The entire point of the NVRA and HAVA is dynamic list maintenance. It says to the states, hey, you know, you've got to have a computerized system, you've got to update it pretty consistently, you know, to maintain the most -- you know, to a reasonable extent you have to maintain good information on where people are living, who's alive, who's been convicted of a felony, and so forth. So it's a dynamic method of maintaining the voter list.

In contrast, the CRA is all about preservation and not changing things. In fact, in Section 302 of the CRA, which is 52 U.S.C. 20702, it makes it a criminal offense for election officials to alter election records. It says you've got to

take the election record and hold it for 22 months, and if you alter it you have committed a crime. The NVRA and HAVA issue the exact opposite command. They say you have to be altering these records with great -- with some measure of frequency in order to maintain, you know, that they're up to date.

So under DOJ's logic of sort of smushing these laws together, every single time an election official in Maine or elsewhere -- you know, imagine California, they have 23 million registered voters who are moving, passing away, with great frequency -- every single time you change your centralized voter list you have to pull down a copy, save it, preserve it, keep it for 22 months. Otherwise you're arguably committing a crime under the CRA. And that's also a textualist canon, that when we have these parallel statutory regimes we don't just pick and choose to sort of construct the one we want. We take them as Congress writes them.

And so Congress plainly did not intend to subject election officials to criminal liability because they're not saving some absurd number of voter lists under the CRA's provision. That could not be what Congress intended, and I don't think my friend on the other side will argue that.

So that's sort of three distinct, I think, textualist reasons that show why the CRA claim just fails as a matter of law. You can resolve it on a motion to dismiss. You know, I certainly join and it's in our briefing, too, all the other

arguments why the CRA claim fails as a matter of law. It's just very obvious from its context in history that Congress passed it as an enforcement mechanism for the Civil Rights Act of 1957.

You know, maybe you can have a reasonable disagreement about whether it extends slightly beyond that to other civil rights or voting rights laws. It doesn't extend to list maintenance, and we know that because Congress wrote the enforcement mechanisms it wanted for list maintenance for DOJ.

And so that gets sort of to my final set of observations, which is that this case is -- is, you know, replete with federalism red flags. The very obvious one, which I think my friend Ms. Jhaveri will touch on, is pretty obvious, which is that states under our constitutional structure are the chief regulators of elections. And HAVA's legislative history here I think really compellingly sets forth why this blanketing of lawsuits across the country should be really troubling.

I mean, Congress made express there that a north star aspect of our constitutional structure is decentralized elections, and what is happening in Maine and across the country is in so much tension with that. It is nothing less than the first step towards nationalizing our elections. And prominent members of the present executive branch have made very clear that they would like to nationalize elections,

which is just in direct tension with the structure of the elections clause. And not just the elections clause, but every law Congress has passed on the subject of voter registration has made clear that states have primacy in this realm and are not the agents of the federal government, which is essentially what Maine is being compelled to be here.

The second federalism point related is that, you know, it is a foundational aspect of American federal government that the federal government is a -- is one of limited powers. You know, DOJ does not have any inherent authority; it does not sort of have a freestanding power. Its power is derivative of that which is granted by Congress. Any time DOJ acts, it has to be subject to a statute or a statutory authorization.

And I think the Court should be troubled by the fact that DOJ's view in this case is that the Court should really not look too closely at whether or not statutory authorization is being complied with here or, you know, just needs to see if some words are written down on a piece of paper. I think that is contrary to how structurally we have always treated, you know, what is an essen -- sort of like a search warrant here, a demand for documents. There has to be some aspect of judicial review to ensure that DOJ is operating in compliance with its statutory mandate.

And I -- you know, I think Your Honor alluded to this

with the point about the fact that there are 30 lawsuits, many of them with near carbon copy complaints, you know, really undercuts the notion that there is a specific concern with any given state. It is in fact an effort to sort of compile a national database.

And so with that I'm glad to answer any further questions from the Court. Otherwise, I'll give my friend Ms. Jhaveri some time.

THE COURT: Thank you.

MS. JHAVERI: Good morning, Your Honor.

THE COURT: Good morning.

MS. JHAVERI: Sejal Jhaveri for the League of Women Voters of Maine.

Your Honor, first I'd like to be useful so any particular issue you'd like to discuss I'd be happy to.

I would like to start with talking about HAVA. Your Honor raised a series of questions with the State of Maine of the relationship between the role of the State and the role of the federal government in HAVA, and I'd like to address those issues.

So certainly there is a role for the federal government in HAVA, as the State has said. But the State is primary in complying with the election procedures in HAVA and that follows, you know, essentially from the Constitution where states are primary regulators of their elections, with

Congress having additional oversight, and then giving, as Mr. Dodge just said, direct statutory authority for other federal agencies like the Department of Justice.

Now, I think it's helpful to get a little bit into the nitty-gritty of HAVA to understand why this request for sensitive voter data doesn't really help the DOJ in its function as an oversight of the general programs under HAVA.

So first I will address the idea of a computerized state voter registration list, which, again, is something that the states are required to do under HAVA. Now -- and this alludes back to sort of what Mr. Bolton was saying about kind of the factual background here.

The United States sent a series of questions in its first letter and, as Mr. Bolton described, those are the exact type of questions you would expect related to the oversight of election administration. One point I want to make is that in its follow-up letter, where it raises the CRA for the first time, it doesn't actually ask any follow-up questions about the election administration procedures. And that should -- should -- if it had done so, I think, depending on the questions, would very much be in line with its oversight responsibilities. But instead its second letter requests simply the full voter registration list, including sensitive voter data. And it does not even request the public version of the list, which is something it may have sought under the

NVRA.

So that disconnect is important when considering the role of HAVA. So it wants to know that there's a computerized voter registration list. It could have asked for the public list. It did not do so. It could have asked for the procedures for how the State maintains its voter list. I don't believe that that was one of the questions, though I do think some of the questions maybe get at that point. Again, no follow-up as to that particular part, which could have been very well within its oversight responsibility.

The second provision of HAVA that the Department cites that I'd like to spend a little time on is this requirement for a HAVA identifier, and so that identifier is typically a driver's license number or the last four of a Social Security number. For those individuals who lack those, the State is required to create one. And that is a requirement under HAVA.

But I think actually a recent consent decree by the United States helps demonstrate why this singular request for the sensitive voter data does not help it even in that request. So the United States, and I'm sure counsel for the United States will talk about this as well, recently entered into a consent decree with the State of North Carolina where it -- there were allegations in the complaint that North Carolina had failed to collect these HAVA identifiers.

Now, the complaint itself states that the North Carolina

voter registration form did not require the HAVA identifier. The Maine voter registration form, and this is cited in our brief, does require a HAVA identifier. So we have a separal factual underpinning here.

Second, the -- the request for the sensitive voter -- for voter data still would not have the State -- would not -- excuse me, the federal government comply with its responsibility. Basically what it's supposed to do is make sure the State has a process for making sure it keeps this data. It's -- if it just looks at a list of numbers, it -- it can't really tell anything about how it's collecting the data, whether it's being input properly, any of those questions. And those are questions the United States could have asked as follow-up questions to the State of Maine. It did not. It did not ask any of those questions.

And so while HAVA certainly contemplates a role for the Department of Justice, the Department is far exceeding its role in requesting the sensitive voter data without any reason for believing that there's an issue in the State of Maine.

And so with that I'd -- I'd turn to talk about basis and purpose, unless Your Honor has any further questions.

THE COURT: Go ahead.

MS. JHAVERI: Okay. So I just want to build a little bit on what Mr. Bolton stated about basis and purpose, and mostly to answer your question, Your Honor, about what you

can consider on a motion to dismiss about the purpose. You know, the League agrees with Mr. Bolton and with Mr. Dodge that the United States has failed to state basis at all, and that in and of itself is enough to grant the motions to dismiss.

But when we look at purpose, as Mr. Bolton argued, it cannot be that any purpose is sufficient for -- for a request under the Civil Rights Act. And so the purposes stated by the Department are compliance with the NVRA and compliance with HAVA.

Now, I think Mr. Bolton and Mr. Dodge went through well enough why requesting sensitive voter data is not required for the reasonable -- assessing the reasonableness of a general list maintenance program, and I just discussed the other provisions of HAVA that are at issue.

So when we see that the purpose doesn't relate to the actual information being requested, this -- this Court can consider the other -- other information that is out there that illuminates maybe what else is going on here. And, you know, counsel have already raised that this is one of 30 cases.

I would point Your Honor to a couple other pieces of information. The first is that the Department in certain instances has sent memorandums of understanding to various states and asked them to sign requesting the same private voter data. And in doing so there's a provision in that MOU

that would allow the United States to send a list to the states to remove voters, and that I think gets to the point Mr. Bolton was getting at where it does -- there is information to show that the United States is attempting to supplant the State's role in list maintenance rather than effectuating its own role.

And I would also encourage the Court to look at decisions -- these are court decisions in other -- other instances of data collection, so the *Center for Taxpayers versus Internal Revenue Service*, which is a case out of the District of Columbia, 1:25-CV-00457. And in that case the federal government directed the IRS to provide confidential tax information to ICE, data sharing which the Court found to be unlawful. And specifically the Court said the IRS violated the Internal Revenue Code approximately 42,695 times by disclosing last known taxpayer addresses to ICE through the TIN matching without confirming that ICE's request set forth the address of the taxpayer with respect to whom the requested return information related.

In another case out of California, *California v. U.S. Department of Health and Human Services*, the Northern District of California found that the level of detail that the Center for Medicare and Medicaid Services agreed to provide was unlawful and narrowed the agreement following litigation. So these are court decisions that the Court can look to to look

at a general aggregation of data across the federal government.

These pieces of evidence -- and the third piece I would point you to is something that my colleagues have discussed, which is sort of the changing narratives for why the U.S. is requesting this information. In the first letter to the State of Maine, the NVRA was the only listed statute. In the second letter it ostensibly dropped the NVRA and raised both HAVA and for the first time raised the Civil Rights Act.

The complaint seems -- you know, includes all three statutes, though, as Mr. Dodge said, in continuing litigation in other cases the United States has essentially said it's just the Civil Rights Act that it's pursuing under the sort of continuing to change both factual and legal bases for its request. And its request has not changed, right? It's that continued sensitive voter data that's at the heart of the request. That can be evidence of pretext, as the courts in both California in the *Weber* decision and *Oregon* found.

So this Court doesn't need to look at, you know, things that might not be able to be considered on a motion to dismiss in order to have enough context and information. And I just go back to the statement of basis and purpose because it is a plausibility standard, and so it can't be that we take the United States just for its word. It has to be that it's a plausible statement of basis and purpose based on the facts it

alleges, as any other litigant would have to do in any other motion to dismiss or --

THE COURT: It's a relatively low standard but it's not a standardless standard. I mean, there has to be some plausible nexus. There has to be an association between the reason given and the data points. And it seems to me that your argument is, given the constellation of the travel of all of these cases and the data points that you provided the Court, your argument seems to be there is no nexus or whatever nexus there is is constantly changing and it's paper thin.

MS. JHAVERI: That's exactly right, Your Honor, that's exactly my argument. And I will just spend one moment, if you would not mind --

THE COURT: I don't.

MS. JHAVERI: -- A little additional argument.

THE COURT: Do I look like I mind? I don't.

MS. JHAVERI: No, sir. I also want to just spend a little time talking about the case *Kennedy v. Lynd*. It's a case that the United States relies pretty heavily on, and I just want to raise a few points about it to kind of address its applicability to our current world, our current case law, and also why it is not as supportive of the United States's position as it may argue.

So, as this Court well knows, it is not bound by an out-of-circuit case from more than 60 years ago. But even if

this Court were to consider *Lynd,* the United States would not be entitled to its requested relief. The United States attaches much of its argument to *Lynd*. Specifically it relies on *Lynd* for two major propositions, the requirement for a special sort of expedited statutory proceeding and what I would argue is the U.S.'s argument for a lack of meaningful judicial review of the statements of basis and purpose.

But at the same time *Lynd* undercuts plaintiff's own procedural argument. For example, plaintiff never addresses *Lynd*'s directive, which follows directly from its discussion of the statutory proceedings so these are connected thoughts, that Title III provides an effective means whereby preliminary investigations of registration practices can be made in order to determine whether or not such practices conform to constitutional principles.

The United States has alleged only that it needs this information for statutory purposes. There's no constitutional principles that it's alleged. And, again, that goes right to its argument about the special statutory proceeding. So this Court should proceed as normal under a normal 12(b)(6) process and apply the Federal Rules of Civil Procedure.

I would also point out that *Lynd* seems to be aware about -- of the risk of -- of private information and notes -- excuse me -- and notes that the United States authority under Title III does not reach into private records. It states,

first, we are not discussing confidential private papers and effects. We are, rather, dealing with public records. And this is at page 225 in *Lynd*.

And I encourage this Court to think of the term private records in our modern context. And the First Circuit's analysis in *PILFI v. Bellows* I think is very applicable here where this particular information, a voter's date of birth, Social Security number, driver's license number, those -- that information is sensitive, private information and could put a burden on the right to vote if it is disclosed freely.

And so *Lynd* is -- as is the case out of the 1960s and certainly the context of *Lynd* is important here, too. As -- as we've discussed in terms of the context of the CRA, it was combating a real problem of voter registration forms being destroyed by county registrars. But even if this Court were to consider *Lynd*, it doesn't -- it doesn't get the Department to where it is seeking. It does not -- it does not give the Department unfettered access to private voter data.

And so I think with that I would just close with a few thoughts of why the United -- why this should be dismissed on a motion to dismiss. And I will just turn back to this idea of these have to be factual allegations under a plausibility standard. So I'll just sum up a few of the points that I've made.

First, the State of Maine responded to DOJ's letters

about list maintenance processes, and the Attorney General, instead of following up on these processes, filed this lawsuit for sensitive voter data less than a week later. Why? If it's interested in list maintenance procedures, why did it not follow up? And the United States has not sought the public voter registration list even within its oversight responsibilities. Why? It seeks the sensitive, private voter data.

As discussed earlier, there's no indication that Maine is not collecting HAVA identifiers. Why does the United States demand access to sensitive voter data for a problem it knows doesn't exist in the State of Maine?

And to Mr. Bolton's point, the United States continues to allege that it is in compliance with the Privacy Act and other federal laws but will not confirm that -- will not share this data with the Department of Homeland Security or eventually aggregate this data. Why?

These questions and many others have been unanswered by the United States in the course of this litigation and the 29 other parallel states. This Court should find that the United States has failed to state a claim for relief, as three other district courts have found, and grant the League of Women Voters of Maine's motion to dismiss. Thank you.

THE COURT: Thank you.

MR. HEIDEN: Very briefly, Your Honor, Zachary

Heiden for the amici.

Just to go back to where Mr. Bolton began, that the Government was obligated under its 303 request to state both a true basis and a complete basis, and they have not done so. You asked earlier about what at this stage, at the motion to dismiss stage, you were -- it was appropriate for you to consider. It's entirely appropriate even at this stage to consider statements by the Attorney General, by officers in the Attorney General's Office, and by other executive branch officials about their intent with this data, what they intend to use this data for, which contradicts what they have said in some of these court filings.

And that is especially troubling because of their lack of compliance with the Privacy Act and the Electronic Government Act. You put those things together and it does raise all sorts of concerns.

THE COURT: Give us a summary of some of those statements.

MR. HEIDEN: Well, the statement -- the particular concerns about the statements that were made to the Secretary of States about the -- the interest in creating a national voter registration roll, a national voter roll, and the statements in connection with the Minnesota immigration enforcement made by the Attorney General connecting their seeking of voter files from Minnesota with the immigration

surge that happened in Minnesota.

And the Department of Justice's refusal to rule out here and in cases across the country future uses that are not connected with civil rights enforcement, that are not connected with voter roll maintenance issues, should cause trouble. It certainly causes trouble -- is troubling to those of us who have observed these cases across the country.

And the last point I'll just make is, you know, in connection my colleagues have already made, we can imagine a different HAVA, right? We can imagine Congress writing a HAVA that might authorize the sort of actions that the Department of Justice is trying to -- to take here. I'm not sure that would be constitutional, I'm not sure it would be -- comply with federalism principles, but we can imagine how the words might be written that would allow them to access sensitive information for any purpose or no purpose. But that's not the HAVA that Congress enacted. Congress enacted quite a limited HAVA and quite a limited NVRA and, you know, we have to follow what Congress wrote.

I'm happy to answer any questions the Court might have.

THE COURT: Thank you, Mr. Heiden.

MR. HEIDEN: Thank you, Judge.

MR. TUCKER: Your Honor, if it's okay I'll just stay here.

THE COURT: Yes, of course.

MR. TUCKER: Spread out a little bit. Obviously I have a lot to cover --

THE COURT: Yes.

MR. TUCKER: -- for the last 65 minutes.

THE COURT: Counsel, do me a favor and just pull that microphone up a little closer to you.

MR. TUCKER: Oh, I'm sorry.

THE COURT: Thank you.

MR. TUCKER: Is that okay?

THE COURT: Perfect, yes.

MR. TUCKER: Fantastic.

So I guess just by way of starting, let me just address the federalism issue. So clearly the United States agrees that we have a federal structure, and that federal structure does make states in the first instance primarily responsible for conducting elections, including those for federal office. But that's not to say that the federal government has no role, nor do I think Your Honor heard opposing counsel say that they have no role.

It really is one of trust but verify, that Congress, through the Federal Elections Clause, has enacted statutes that basically say we're going to make the states primarily responsible under the NVRA, under HAVA; but at the same time we want to make sure that the United States has the ability to verify that they're actually doing that. In the event that

they're not, you know, the DOJ needs an opportunity, the Attorney General needs a means to determine whether or not they're in compliance, and if they're not, at that point in appropriate circumstances bring an enforcement action.

Here, by way of just background with the State of Maine, Maine was actually one of the first offenders under HAVA. They were one of a handful of states the Department of Justice sued in the early 2000s shortly after HAVA was enacted in 2002 because Maine was not in compliance with the state law computerized voter registration list requirements. And in response to that the State of Maine entered into a consent decree in 2007, and I'll just put the Westlaw cite on the record. So the Westlaw cite is 2007 Westlaw 1059565, and it was entered on April 4th of 2007.

One of the requirements in that consent decree specifically goes to one of the points that's been raised suggesting that somehow statewide voter registration lists are not encompassed by the CRA. There the State of Maine actually agreed that they were. Paragraph 11 of the consent decree says, quote, defendants shall maintain -- and the defendants there were the same two defendants, the State of Maine and the Secretary of State -- shall maintain -- shall retain or require municipal officials to retain voter registration and list maintenance records related to the terms of this decree as set forth in 42 U.S.C. 1974. That was the previous stat --

statute for Section 301 of the CRA, which is 52 U.S.C. 20701. It was reclassified.

And then at the very last sentence of that it says, the State shall make these records and any reports that may be generated from the CVR, the computerized voter registration list, available to counsel for the United States upon request. There that was both a HAVA -- primarily a HAVA enforcement action to determine whether or not Maine was in compliance with HAVA.

One of the reasons why it was contemplated in that consent decree is, turning to what counsel had said, why would the United States need these records? It's because to be able to determine whether or not the HAVA identification requirements in Section 303(a)(5) are being complied with, we need to actually see the records to see if there is a HAVA identifier.

Now, counsel talked briefly about North Carolina. I will just say I was lead counsel in North Carolina, so let me explain why it is. And this is actually background in terms of what precipitated a lot of what we're seeing nationally in terms of this litigation.

North Carolina was -- didn't just -- we didn't just allege, North Carolina acknowledged that it had used a non-HAVA-compliant voter registration form. So it was a facial violation of HAVA. What we found, though, is based

upon the records, based upon the information that the State of North Carolina disclosed, roughly a quarter of a million voter registrations had been processed and were in their system as active registered voters that lacked a HAVA identifier. And, again, the HAVA identifiers are either a driver's license or state ID number, the last four of the social, or a unique identifier that the State itself has assigned.

But what we ended up finding through what they disclosed is that, of the roughly 250,000 give or take, about 103,000 were the facial violation. A majority of the records that were in their system that lacked a HAVA identifier, the voter registrant, the applicant had actually provided it on a registration form. It had simply not been entered. There were coding mistakes; the clerk simply didn't add it into the system. And so what that precipitated was a look at the fact that this appeared to be a problem.

There are at least two other states currently that appear to have facial violations that the United States is currently addressing those with the individual states. But given the fact that the majority of the records that were missing the identifiers, they had been provided in the first instance, that is part of the reason why the United States said we need to look at this.

Now, one of the things that counsel has said is they've said that this is an unprecedented effort. It is. And it's

unprecedented for a very simple reason. HAVA was enacted in 2002. Twenty-four years later Section 303(a)(5) specifically looking at the identifiers and looking at some of the list maintenance provisions within HAVA has simply not been enforced.

Up to this date, previously HAVA enforcement actions by the Attorney General were limited to three different areas. The first one was whether or not they had a computerized statewide voter registration list. And, as I mentioned, Maine did not initially; at least they didn't have it in complete compliance. The second was whether or not states were offering provisional ballots. And then the third there have been more recently some actions that involved accessibility.

You know, one of the requirements of HAVA is that the voting machines that are provided have to be accessible to those who may have disabilities. But there's never been an active effort to look at whether or not the identifiers are being actually applied by the states, and again we found facial violations that they are not.

And then in addition we are saying the instances in which the data is certainly suggestive of the fact that the HAVA identifiers are not, you know, actually entered in the records even where the State is asking for them. There can be a number of reasons for that. The most common one seems to be a coding issue where the data is not being entered or is not

being entered accurately, but we need to look at the underlying data to see that.

So a related point is this whole notion that somehow there's going to be a nationwide database that's going to be created from it. That is not true. We've said it repeatedly every single time. We can tell Your Honor for the record that there is no national database that's being created. Are we asking all the states for this? Yes. We're not targeting any particular state. We're simply looking at all the states to determine their compliance with both HAVA and the NVRA, as *Lynd* basically says for purposes of the CRA we should be doing, the Attorney General should be doing for purposes of Title III.

In doing that, when the data comes into the Department, the data is separated from each individual state. No state data is joined together. It is highly restricted in terms of who can even access that data within the Civil Rights Division. For example, if I'm not assigned to a state, I will have no access to even any of the information coming out of it for -- you know, in terms of any analysis, any assessment.

To the extent that that data may be run against other databases, again, that's something that's been routine, the United States has done in the past. Counsel has suggested that somehow the United States has never asked for a statewide voter registration list or used it for this purpose. That's

not true.

In 2006 the United States entered into a consent decree with the State of Georgia to obtain its SVRL for purposes of list maintenance. In 2008 the United States entered into an MOU with Texas. The United States in 2009 sued both Alabama and Vermont and specifically asked the SVRL for purposes of determining compliance with UOCAVA, the Uniformed Overseas Citizens Voting Absentee Act. I think I got it right. And then of course it's been used for Voting Rights Act enforcement. It was in Ford County, Kansas; it was in Georgia in 2000 -- in 2021.

But in addition there have been at least other instances in which the -- you know, the -- let me just turn to it real quick to make sure I get it right -- in Indiana there was a consent decree again that specifically requires production of SVRL for purposes of list maintenance. That case number was 1:06-CV-1000, Southern District of Indiana, June 27th, 2006. So that's just by way of overview of why -- why is it the United States is doing -- what is it doing with this data.

I think the other thing that Your Honor heard a lot, especially towards the end, is somehow a suggestion that speculation, conjecture, would be -- there's some sort of nefarious purpose at play here. Why else would the Attorney General ask for this? And I've already explained to you exactly why.

The other thing is that what they're raising is a lot of what ifs. What if the United States does this with the data, what if the United States does that. The what ifs are something that the Court can control. In the order compelling production, the Court can absolutely set the parameters of how the data's going to be used, to whom it's going to be disclosed, the terms and circumstance under which it can be disclosed, the terms and conditions under which it can be run against other databases.

And on that point I should just mention, why would there be a need to run it against other databases? Well, so first of all, let's talk about deaths, for example. One of the things that is routine that when we've gotten the SVRLs in the past, statewide voter registration lists in the past, is we run it against the Social Security Death Index. That's the definitive index to determine whether or not a voter should have been removed because they're simply no longer with us.

You know, there are other means of doing that. For example, I know in terms of the NVRA, for purposes of reasonable efforts, one of the standards courts oftentimes look at is whether or not there's been regular use of the National Change of Address system. That's something else that we can run it against. Are there things just simply running the records by themselves that it's apparent that there are multiple duplicate registrations? It's not for purpose of the

United States engaging in list maintenance itself. That is, as counsel has said, properly the role of the states and localities that administer elections, but it's not to say the United States has no role at all. It definitely does.

Where it's clear that there is information suggesting that a state is not engaged in reasonable efforts, the United States has been charged by Congress to bring an appropriate enforcement action. Counsel mentioned Section 401 of HAVA, which is 52 U.S.C. 21111. That specifically gives the Attorney General the exclusive authority to bring enforcement actions under the Help America Vote Act. And so, again, where there is evidence the United States will pursue it and will appropriately, as Congress has charged, bring an enforcement action.

Now, in terms of the specific requirements under Title III, they're very simple, and I think everyone would agree the standards are very simple. Section 303 of the CRA tells us that the United States has to send a written demand to an officer of election that identifies the records being sought and states a basis and purpose therefor. The United States did that.

Counsel has suggested that somehow they conceded that the United States stated a purpose for purpose of assessing compliance with both HAVA and the NVRA, but they've suggested somehow that the United States failed to state a basis. The

United States in its briefing has consistently said the basis merely needs to be the statutory basis, but in the event that a factual basis is needed, if the Court finds that there is one, and we don't think that Your Honor needs to find a factual basis, the United States stated one here in its July 24th letter.

Now, it wasn't just a series of questions that were asked. And in fact I would specifically commend to the Court's attention to look at ECF 5-4, that's the letter of July 24th. There it identified a number of things. It did ask questions, but the -- it was providing factual information with those questions, and let me just go through a few of them.

So, for example -- let me get to the right one -- it indicates a very, very high registration rate. Now, I think all of us in a perfect world would love to see a hundred percent registration rates. What the United States has found in terms of list maintenance is that typically if you have a voter registration rate that is greater than 90 percent of the citizen voting age population, that is typically -- it's not per se a violation or failure to conduct list maintenance; it is something that's suggestive that there could be a problem.

And I'll give you an example of where there clearly is a problem just facially. A lot of this -- this data is all coming from data that the states, including Maine,

self-reported to the Election Assistance Commission in the biennial EAVS report, which just again gives the states an opportunity to talk about voter registration procedures.

In that report the State of Alaska identified that it had a voter registration rate of 103 percent of the citizen voting age population, which is an impossibility. That again is suggestive that either there are people who have died who have not been removed, there may be a number of duplicates, there could be a whole variety of reasons. But, again, Maine's raised a -- I'm saying not a red flag on that. It's more of a yellow flag. When you get above 95 percent, that's almost consistently evidence almost on its face that you are not engaged in a reasonable list maintenance, but there is something suggestive here that there could be a problem.

Again, in number two on the same page, the United States talks about the number of duplicate registrations that were removed was almost four times lower than the national -- the nationwide average. And, again, that was consistent. It wasn't just from 2024; it went back to the 2022 EAVS report.

The other -- again, with confirmation notices, no confirmation notices had been mailed out since 2022. And this is -- this is towards the end of 2025. Again, that's suggestive that the State is not engaged in reasonable list maintenance procedures. Counsel had used the year 10 -- you know, 10 years. If a state is waiting 10 years to send out

confirmation notices, I think it's fair to say to say that that's probably a fireable violation of the NVRA at that point. Because people move, people die, people who may be eligible to vote no longer are.

You know, again, you could have a large number of duplicate registrations through no fault of the applicant. Part of it is an outgrowth of the NVRA itself. When people go to Department of Motor Vehicles they ask you -- they're required by law to ask you each time whether or not you want to register to vote. Sometimes people go there and can't remember and they'll say yes and you end up having a duplicate registration created.

And then you also will see in that letter the United States identified that there was a lot of data that the State simply did not provide. So that is more than enough for purpose of stating a factual basis, in the event the Court finds that there needs to be such a factual basis.

But, again, I think the other problem with this is much of what Your Honor heard in terms of what counsel has said in support of the respective motions to dismiss is suggesting that somehow we have to actually state a substantive claim before we can bring a claim under Title III. Title III has always been meant to be a presuit investigatory tool that gives the United States the ability to get the records and to, quote -- again going back to the *Morton Salt* decision which is

discussed in our brief -- it's either because the United States believes there is a violation or it simply wants to determine and confirm that there in fact is not a violation.

And, again, the Supreme Court has made crystal clear that under these circumstances where you have a presuit investigatory tool such as Title III it's completely appropriate for the United States and the Attorney General to be able to do that.

So, again, just going back, circling back to the -- what we're required to show, there is no question under these circumstances, Your Honor can certainly consider the letters on their face, the July 24th letter at ECF 5-4, followed up by the letter of August 18th, which is at ECF 5-2, that the United States did provide a statement, a written statement, of the basis and purpose to an officer of election identifying the specific election records being requested, and of course those requests on both occasions were rejected.

So just in terms of the -- let me just go through, I think, some of the other arguments that have been raised.

I guess let me just pause there and see if Your Honor has any specific questions about just the prima facie case.

THE COURT: Well, so I notice that you spent a great deal of time talking about HAVA and some of the background history regarding enforcement actions around the country utilizing HAVA and some of the history here in Maine, in the

consent decree here in Maine in the early 2000s. And so my question is, in those cases is it true that those were initiated through enforcement mechanisms or voluntary compliance in those states? In other words, did those states turn over their lists or were those civil actions like the one we're contending with here?

MR. TUCKER: So in Maine it was a civil action, but the consent decree I believe was filed either at the same time or shortly after the complaint was filed because it was a facial violation. The United States actually didn't need records for purposes of determining that Maine was not in compliance with computerized statewide voter registration list requirements.

THE COURT: All right. So what is -- what's the Government's position now with respect to the National Voter Rights Registration Act claim? Because, as you know, in the First Circuit the relief you're seeking isn't authorized under First Circuit precedent, so what do we do with that?

MR. TUCKER: So, Your Honor, respectfully, I think we said this in our brief, that we believe both the HAVA records request, which we again said we believe it falls just globally under Section 401, the enforcement powers that the Attorney General has, and the separate Section 8(i) that they're mooted out. As counsel said at the beginning, we certainly would agree, that the CRA claim is really the

dominant claim here.

I think part of the problem counsel had also suggested that somehow there was a nefarious purpose because the suit's evolved. There was no nefarious purpose. It was a simple fact that what we were finding that by bringing all the claims together, since the NVRA and HAVA claims were nonsubstantive claims, just simply seeking the records, it was confusing the courts, and understandably so, because Title III provided a very simple, straightforward means to get the records, and so that's why the majority of the cases that have been filed in the United States has not brought the separate records under Section 8(i) of the NVRA or under HAVA.

So, respectfully, what the United States would suggest is in the event that the Court finds that relief is appropriate under the motion to compel, which the United States believes that the Court should, it can simply deny the other remaining claims as moot under the circumstances and dismiss them.

THE COURT: So why aren't you just bringing a HAVA claim? It seems to me that that's more targeted to the purpose.

MR. TUCKER: Part of it is because we don't know what we don't know. And I understand Your Honor kind of talked about we need HAVA to --

THE COURT: Sounds like Don Rumsfeld just entered

the room. What did you just say?

MR. TUCKER: We really -- and I guess maybe it's fortuitous that you're saying this, especially given the fact that we're in the same neck of the woods again. But, no, it -- it gets -- it gets to the very fundamental point.

THE COURT: Are you trying to -- so let me understand. So are you trying to conjoin the Civil Rights Act to help you establish a claim, an enforcement action under HAVA? Because, as I see it, the only way that you're going to be able to get the full relief that you're seeking under HAVA is through the Civil Rights Act.

MR. TUCKER: In terms of pre -- presuit investigation for a substantive claim under HAVA, yes, Your Honor, that's correct.

THE COURT: Okay.

MR. TUCKER: But do we know -- do I know as I stand here today that we're going to bring a HAVA enforcement action? No, we don't know because we can't do that without the records. *Lynd* has a very great explanation of this. That -- and --

THE COURT: Hold on, so I'm just trying to catch up with you. So I haven't been doing these types of cases nearly as long as you have so let me catch up.

So -- so the -- the reason you can't bring independently a HAVA action here -- and I was being a little cute at the

beginning of the hearing, but I was having difficulty understanding the HAVA action because it seems as if your colleagues were having a little fun with you calling this a bit of a fishing expedition. I don't think they meant that literally, maybe they did. But the HAVA action seems to me to be your -- you're asserting a HAVA action to open up the discovery rules to see if there's a HAVA action. And it seems that you're bringing a civil rights action in hopes that that will be the hook to require disclosure of the list from the Secretary of State to then advance your HAVA action. Because the HAVA action otherwise doesn't have internally any disclosure obligation.

MR. TUCKER: No, that's correct, Your Honor. But, again, just to clarify, both the NVRA and HAVA claims that we've brought are not substantive violations other than just simply we are entitled to the records, produce the records.

And, again, I think that's also why even in the *Benson* decision the Court talked about how the Court found it somewhat confusing because there the Court found that the -- it was a summary proceeding under the CRA and that her interpretation of it was that the full ambit of rules under the Federal Rules of Civil Procedure would not apply, and she explains in detail why, including getting -- you know, getting to the underlying reason of why it is the Attorney General's asking for it.

But at the same time she recognized that the United States did not necessarily do itself a solid in that case because it brought the NVRA and HAVA claim seeking records, and so she said, given that, that's why she decided to apply the federal rules to --

THE COURT: So I understand what you're saying, the HAVA action is not a substantive -- I understand what you mean by that, but I think you said it -- it affords you the ability to -- HAVA allows you the ability to access the records. Well, that's not entirely true; is it? I mean, you have -- there's an enforcement mechanism under HAVA.

MR. TUCKER: Yes.

THE COURT: Okay. Is that what you mean by that?

MR. TUCKER: Yes, Your Honor. And just to clarify, I will state for the record, because I think Your Honor certainly wants me to get there, there is no specific records production requirement in HAVA, and the United States recognizes that because the text of the statute is clear, there is no such requirement.

THE COURT: Okay. So just so I understand, the NVRA claim -- you're not advancing the NVRA claim here in the First Circuit because it really doesn't give you the relief you're seeking; is that right?

MR. TUCKER: Yes, Your Honor, because again, as counsel has pointed out --

THE COURT: Yes, you're not advancing it anymore?

MR. TUCKER: Well, again, I guess just to clarify what -- what I'm allowed to say in terms of what we're -- what the United States --

THE COURT: You can say whatever you want. I just want to know what I'm working on when I leave the bench.

MR. TUCKER: The United States simply believes that the Court can simply -- simply say that the -- that claim is moot based upon how it rules on the Civil Rights Act claim.

THE COURT: Okay. So what we're left with is the interaction between the Civil Rights Act and HAVA. Yes?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay. So let's go back to, if you would -- I know you have other parts of your argument you'd like to get to, but I'd like you to address intervenor defendants, Mr. Dodge? Mr. Dodge's arguments, if you would, please. And he clearly did his research on me because he focused most of his arguments on a textualist approach, which puts you in a bit of a corner, I think. But try to get out of that corner, if you would.

So his argument -- you heard his argument. His argument is basically that, leave aside this precarious, somewhat difficult managing of whether or not the Government adequately stated a basis and purpose and what order they stated a basis and purpose or whether they stated a basis at all that the

Civil Rights Act can't be fairly read -- a more general act can't be fairly read to try to shoehorn a more specific -- specific act, meaning HAVA, to afford you the right to access the Secretary of State's voter rolls. So do something with that for me that makes sense.

MR. TUCKER: So I guess in a couple of ways. First of all, I would just say -- just commend to the Court's attention that the *Benson* Court did adopt a very -- a very strict text and structure review of the statute, and the Court concluded there that the CRA clearly encompasses both the NVRA and HAVA, but particularly there the Court was focused on the NVRA because the NVRA is a statute enforcing voting rights and that that's encompassed within Title III, which is a statute to enforce voting rights.

As we explained in our brief, Title III itself specifically just -- it's not titled records to be produced for voting discrimination, records to be produced for race or color discrimination. It's entitled federal election records.

THE COURT: Yeah.

MR. TUCKER: The words in the text and structure of Title III do not use the words race, they don't use discrimination, they don't use voting discrimination, but what's really important here is that Congress, the same Congress that passed Title III, in Title VI of the act in Section 601 did specifically use the words race or color.

And that's why, as we explained in our briefing, Congress has been very adept at being able to use the words race or color or language minority status where it's appropriate to do so. It did so later in the same statute that we're talking about in 601. It did it in the Civil Rights Act of 1964 where it uses the words race or color or ethnic status, for example. It did so in the Voting Rights Act, were replete throughout the statute of the Voting Rights Act. It refers to race, color, language, minority status. It did it in the Fair Housing Act, which was part of the Civil Rights Act of 1968.

So the reason why Congress didn't do that is because Congress wanted to afford the Attorney General the maximum authority that he or she could have to determine whether or not a state or local jurisdiction was in compliance with federal election laws governing the right to vote. And in that point it is really clear that counsel somehow suggested that we could use this for any purpose. The United States has never said that, nor will we say that now. The purpose has to be something related to the governance of federal elections. So we can't use it to -- for like tax enforcement I think was the example that was given. Clearly that's not what was intended nor has the United States at any time said this was a purpose the United States would use it for.

So just given that, given the fact that the text and

structure is very clear, and even *Lynd* going through it and all of the Fifth Circuit decisions, as well as the district court decisions in the Fifth Circuit, specifically refer to the fact that this is -- this is to be used for purpose of determining compliance with federal law. They don't say federal Constitution law; they don't say the U.S. Constitution.

It is certainly true and it's not surprising, if you're reading a case from Mississippi or Louisiana in 1962 or '63, that those cases were -- did clearly involve discrimination on the basis of race or color. But, again, even the Fifth Circuit in talking about the statute did not include limiting language saying this can only be the purpose by which it's used.

Part of that is also -- I think it's necessary here to actually talk about the context within which the very Civil Rights Acts were passed, both '57 and '60. We were dealing with very innovative jurisdictions in the south that were coming up with very creative ways to disenfranchise black voters, in some places Latino voters, in other parts of the country American Indians and Alaska natives. And Congress recognized that it had fallen short in 1957.

And specifically what was happening following 1957 when our division, the Civil Rights Division, was created is it did provide a means to supposedly expedite the process for getting

litigation results to be able to remove discriminatory barriers to black voters.

But what Congress found was that -- and you see this is part of obviously what's been alluded to with the Civil Rights Act of 1960 and Title III, if you were bringing a claim suggesting there was discrimination in registration of black voters, a lot of the local officials and state officials destroyed the records. So you have no records to show that there's been any discriminatory treatment.

That's why Section 302 was added, specifically focusing on criminal penalties to make it clear that jurisdictions for a period of 22 months after any federal election, whether it's a primary, general, or special election, have to retain the records. And in fact the cases even suggest that it goes back further than that because if there were prerequisites to vote within that 22-month period, even if the record was created before that, that record would need to be retained.

And then of course getting to the Voting Rights Act of 1965, that's what ultimately gave -- part of it was very strong medicine specifically focused on preclearance, making states and jurisdictions subject to the administrative preclearance requirements of the Voting Rights Act. And again it's because you had very creative and adaptive jurisdictions.

Now, in doing all of that, as *Benson* points out, you know, a text and structural review doesn't mean that you view

the statute in isolation, nor is there any statutory rule of construction that says that merely because a statute follows it that Congress wasn't aware that it had passed the Civil Rights Act in 1960 with this requirement. And that's precisely why it wasn't necessary to have a separate provision requiring disclosure under HAVA or the NVRA that only applied to the Attorney General because Congress already did that. It was already available in the Civil Rights Act in Title III.

And that's why, even though notwithstanding the -- the -- certainly the inference that somehow the United States has never used Title III before for other purposes outside of voting discrimination. I've given Your Honor numerous examples where that's simply not true. And it's been true, you know, going all the way back to when HAVA was adopted, all the way through as recently as just obviously last year and currently the cases that we're litigating now.

I should correct one thing just in terms of giving an update in terms of where the cases are. There's been a suggestion, I think, I don't know that this was what the intent was, but the discussion of MOUs. So there are a total of 17 states that have agreed in one form or another as of today that they're going to provide the statewide voter registration list. Two of those were by an MOU, and I believe it was the states of Alaska and Texas. Fourteen of those were states that just simply gave the data to the United States,

understanding of course that we're going to be in compliance and be in compliance with the Privacy Act and other federal privacy laws.

The 17th state is just from a couple of days ago. The United States sued the State of Oklahoma, which has entered into a consent decree with the United States that was filed I believe it was two days ago that, again, is going to require the State to produce its statewide voter registration list within five days. So, again, I just wanted to clarify that in terms of the MOUs.

Now, there was a provision in the MOU that did say in at least I think the two that were executed, saying that if the United States uncovers information that suggested that the State hasn't engaged in reasonableness maintenance procedures, the United States will disclose that information to the state and the state has 45 days to clean it up. But I will also say that in the MOUs that were offered to other states it was also made clear that we don't have to put a deadline on it.

Typically what you will see with most of the list maintenance cases, courts generally look at -- reasonable list maintenance oftentimes focuses on how much are you doing in a period of a year. And that's obviously because it's for practical reasons. Election officials have other things to do, like running elections, so it's simply not possible for them to engage in list maintenance.

Something that you certainly see in most states is that it's very commonplace that where you see confirmation notices go out states often times will set a particular time of the year to do it. And I will say that it's certainly been what I observed that most of the time that you will see those confirmation notices go out it tends to be late winter/early spring because it's in between the fall elections and when you have candidate qualifying beginning for the next year. And so it's a convenient time for the states to do that.

And so, you know, just taking all of that together, I -- I guess -- have I answered Your Honor's question, just going back to the text and structure?

THE COURT: You did, you did. Before you move on, I just wanted to bring you back to I think where we began, which is if you could succinctly, if it's possible to do that, not because of you, mostly because of me, if you could I think you started off by advancing the argument that the purpose and the basis articulated by the DOJ doesn't need to be supported by a factual -- that I don't need to conclude that it was supported by particular facts.

Could you -- could you elaborate on that argument? Do I have that correct, first of all?

MR. TUCKER: Yes, Your Honor.

THE COURT: Okay, go ahead.

MR. TUCKER: And so as I -- as I had stated,

certainly -- and I know counsel has pointed to the early CRA cases, mainly I think it's in footnotes where they reference that in some of the -- certainly some of the early cases the Attorney General had specific evidence that there were, you know, particular violations and they specifically articulated that.

Here, again, the United States, just simply identifying the statute, the United States has taken the position and continues to take the position that the basis is simply the statutory basis under which you're seeking it. The purpose, as counsel has conceded, clearly the United States stated that it's for purposes of determining whether or not there's compliance.

THE COURT: The Government has the authority; therefore, we can -- that's the -- that's the basis.

MR. TUCKER: Yes, Your Honor. But, again, in the alternative we have also said even to the extent the Court believes a factual basis is needed we clearly have one here. I mean, the letter at ECF 5-4 goes into pretty great length in terms of in detail, certainly much more than what you'll see in terms of details with the CRA letters that are discussed in the early CRA cases.

THE COURT: So I believe at least perhaps the defendant and all the intervenor defendants raised this point that -- I know that the League of Women Voters certainly

raised this point -- that the exchange between the Attorney General's Office and the DOJ was cut off by the filing of the suit without any more exchange of robust and candid exchange of ideas about list maintenance. And I think the implication of that argument is that the Secretary of State stood ready to answer any questions that the DOJ might have had regarding list maintenance but that the DOJ didn't follow up.

So what am I to make of that regarding the sincerity of the DOJ's inquisitive nature regarding the integrity of Maine's voter rolls?

MR. TUCKER: Again, going to the text and structure of the CRA, there's no exhaustion requirement, there's no sincerity requirement, and in fact the cases interpreting it make it clear that it's -- when there is a reference to a limited inquiry, it's not to say the Court has no authority. Absolutely the Court has a lot of authority of these cases, but the case law makes clear that it's a very limited range of what the questions are, mainly focused on the specific elements of the prima facie case. And obviously most of the issues that have been raised here go to the basis and purpose that the United States has laid out.

There seems to be no dispute that Secretary Bellows is an officer of election. There certainly seems to be no dispute that she rejected the request to produce the records. I think it really just focuses more on the basis and purpose

and whether or not -- whether or not Your Honor believes that it falls within it, and the United States believes here it clearly does.

I should just mention briefly that in terms of the, you know, the scope of the records -- and this goes to kind of the heart of the decision that *Benson* had found that it believed -- and I will just use the Court's words very strongly out of deference to the Court there -- she used the words, this may be an overly pedantic reading of the statute.

And the United States agrees it was overly pedantic because it -- she was suggesting that somehow computerized lists are not covered. Other courts, when they've encountered this, have found that computerized lists are, even under the CRA.

And one case unfortunately we did not put in our brief but I will mention it because the Court does specifically talk about the scope of records that fall within Section 301. It's a 1985 decision out of the Southern District of Indiana, and the case is *McIntyre versus Morgan*. It's at 624 F.Supp. 658 at page 664, and it talks about -- the quote is, this statute -- referring to Section 301 -- encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes like the ones we requested in UOCAVA cases, tally sheets, computer programs used to tabulate votes, as well as the ballots

themselves.

So, again, it's a very broad definition, and it's consistent with what *Lynd* said. *Lynd* had said that, you know, all means all. I mean, you can't be much more succinct than that in describing what it covers. Again, as long as the federal election records that fall within the timeframe that Congress contemplated at Section 301, which is the 22 months before any federal election.

So, again, there we think that -- and respectively we said this before the Sixth Circuit, that the Court was a little overly pedantic in looking at it and in fact was inconsistent with how Section 301's been applied by other Courts because --

THE COURT: It strikes me as somewhat asymmetrical the Government's textualist approach to the application of the Civil Rights Act on the one hand with respect to blinkering myself to the legislative history that led to the passage of that act but not to that portion of the statute. And I admit that that's not the most -- the application of the textualist approach to that language is not the most artful version of the textualist approach that I've ever seen, but nevertheless that is a textualist approach. And I was wondering how do you square those two what I view as an asymmetrical approach to the DOJ's argument there.

MR. TUCKER: You know, I think it can be squared,

again, as I had said that part of it was when Congress passed Title III they did want to make it -- they wanted to provide the Attorney General with as broad a power as possible. And I guess a good way to explain this is that even going back to -- you know, looking at some of the statutes that were passed during that timeframe, obviously the very early cases, very early voting cases you had focused on the grandfather clauses.

THE COURT: Yeah.

MR. TUCKER: And the problem is that you would end up having statutes like that or procedures that were adopted that were facially neutral, so you wouldn't be able to determine it was a violation of race or color but it definitely had that effect. That's what it was designed to do. And so for that reason Congress intentionally meant for Title III to be as broad as possible to give that authority. But also, again, that authority is not unlimited. You know, counsel somehow suggested that we can come in with a blank check and the Court's going to sign it. I don't expect Your Honor would sign a blank check if it were presented to you, nor would we ask you to sign one.

Even *Lynd* itself talks about towards the very end of the decision, I think it's 306 F.2d., I think it's at 230, specifically does refer to and counsel had referred to if there was private and personal information that was nonpublic. The Court has the absolute inherent authority to craft an

order compelling production that's subject to certain requirements, including compliance with federal privacy laws, and including -- to the extent that the Court wants to confine us within the specific basis and purpose that we have stated, specifically the purpose, certainly the Court should do that.

I should also say on that note, I think -- I think this is why it's been a little bit awkward that this has been briefing that we've seen consistently throughout the United States that the Privacy Act and the privacy arguments are all combined with a motion to dismiss. It's not really an appropriate vehicle to do it. Typically there are affirmative defenses that you would expect to get at later in the case.

But to the extent that Your Honor has any questions or concerns about compliance with federal privacy laws, I've been specifically instructed that the United States is willing to offer its privacy officer from the Office of Privacy and Civil Liberties to be available to -- whether it's through a declaration stating exactly how the data's going to be -- how it will be retained and used within the scopes of the Court's order compelling production or if the Court has any particular questions to even offer that the privacy officer would be willing to come to court to answer any questions, again, to be consistent with, you know -- with the scope of the Court's order.

I -- I will certainly -- certainly in terms of what the

United States -- what it's requested, how it expects to use it consistent with federal privacy laws, there are privacy interests here. There are certainly legitimate voter privacy interests, and the United States is fully prepared to protect those voter privacy interests.

One of the things that was suggested is, well, what if -- you know, again it's those what ifs, the what ifs that can be controlled by the four corners of the order that would be issued. What if the United States wants to look at the specific voter registration and try to go through and do something by party? Well, that's something that certainly Your Honor can control, the -- you know, in terms of what it is, what information is being produced.

The HAVA identifiers are something that the United States absolutely needs to be able to do to assess whether or not the State of Maine is in full compliance with the requirements of the Section 303(a)(5) for the reasons I explained earlier. But certainly there is other data that's in the voter registration file or history that would not necessarily -- but would not be necessary to produce to the United States, and certainly that's something that the United States would follow whatever the confines are of an appropriately tailored order.

And just to be clear, I know counsel had suggested that -- referred to other agencies, not the Civil Rights

Division, referring to other agencies who have not complied with the Court's orders. As I stand here today, putting my neck on the line, I will tell you the United States respectfully will abide by any order that Your Honor issues.

In the event that the United States gets a request for any other federal agency for use of any of the data that would be produced pursuant to the order compelling production, the United States would not respond to that other than to say we have a court order in place, we would make the Court aware of the fact that we have received such a request, and to the extent that that -- the request appears to conflict with the order the Court has issued, we will -- you know, we will bring that to the Court's attention so that, again, if the Court finds it does conflict with the order we can go back and say we can't do that. The Court has directed that it be used for this limited purpose and this limited purpose only. You've requested something that's outside of the four squares of that order that's been issued, and we will be in compliance with that order.

THE COURT: Counsel, you may have already touched on this, and if you have I apologize. But has the CRA ever been utilized in this way in enforcement actions before anywhere? I mean, before this most recent push.

MR. TUCKER: So, again, it's -- as I mentioned, it's unprecedented in terms of 303(a)(5), but it's not

unprecedented in terms of places that it's been used. I mentioned Texas. I mentioned Georgia, and just so I have on the record, the Georgia case cite was 1:06-CV-02442, and that was Northern District of Georgia October 2006. I had mentioned Indiana already, and those were again all list maintenance. And specifically the consent decree and the MOU in each one of those instances specifically say the statewide voter registration list is being produced for purposes of assessing and determining compliance with the list maintenance requirements of NVRA and/or HAVA.

THE COURT: And those cases took the shape roughly of this case, meaning you got -- the DOJ received access to voter rolls much in the way you're asking this Court to get access to the State of Maine's voter rolls?

MR. TUCKER: Yes, Your Honor.

THE COURT: Grew to see if there was a HAVA action through the Civil Rights Act.

MR. TUCKER: Yes, Your Honor, to see whether or not there were -- based upon the data that was received that there appeared to be violations, subsequent violations.

THE COURT: And you did that through the Civil Rights Act.

MR. TUCKER: Yes, Your Honor.

THE COURT: And there was no challenge or resistance through litigation to the propriety of doing that through the

Civil Rights Act?

MR. TUCKER: Well, there were initially two. Certainly Georgia and Indiana did not initially agree because typically what the United States does, and it's very consistent with what the United States did here through the letters, the United States will send out a presuit letter basically placing the jurisdiction on notice -- we actually call it a notice letter -- that the United States believes there was a violation, and here they -- they were saying specifically we believe the violation is you're not in compliance with Title III of the Civil Rights Act. And when the jurisdiction declined to produce the records, that precipitated the lawsuit. But, again, in both instances the jurisdictions did ultimately agree to consent decrees.

THE COURT: All right. So the issue wasn't litigated to conclusion.

MR. TUCKER: No, it was not, Your Honor.

THE COURT: All right, thank you.

MR. TUCKER: And do you have any other questions for me on that?

THE COURT: No, thank you.

MR. BOLTON: Thank you, Your Honor. I just want to cover a few things that my friend went over in his presentation.

First, I'm -- I think it's really striking that the

argument that the DOJ is making for why they have a basis for this request is the use of the identifiers.

THE COURT: Striking meaning you were impressed by it.

MR. BOLTON: Striking meaning that if you look at the DOJ's correspondence with the Secretary of State you will find no reference to any concern about identifiers anywhere in that correspondence, and that is -- in fact, we just heard that the DOJ regards that those questions that were asked of the Secretary of State in the July letter, that is their basis for seeking this data. There's nothing about Social Security identifiers. There is no -- not even a question for us to answer and to assure them that we do in fact collect that data with our HAVA-compliant voter registration form. We could have provided them assurance of that; we could have shown them the form. They never asked. So for them to say now --

THE COURT: He says there's no exhaustion requirement or satisfaction requirement or sincerity requirement.

MR. BOLTON: Well, there's a requirement, though, that they state the basis, and they're now saying that their basis is something different than what they -- now they claim that they -- and we obviously disagree that they stated any basis, but the basis that they're now asserting in litigation is not the basis that they stated -- they claim they stated in

their letter.

THE COURT: Through the series of questions I'm not trying to give you a hard time, I'm trying to lead you to a conclusion maybe. So I'm trying to lead you to this conclusion. So what am I to do with that? What should I do with that?

MR. BOLTON: Well, first of all, we don't think --

THE COURT: What should I make of that?

MR. BOLTON: Well, we think there was not a basis stated.

THE COURT: Understood.

MR. BOLTON: But I think what you should do with that, if you think that those questions might form the basis for finding a basis, the fact that it is now a different basis being asserted suggests that those are pretextual bases and that that -- they did not satisfy the requirement of stating a true basis for why they wanted the records.

So I think the other -- some other issues, consent decrees, the Court should not rely on what happened with consent decrees. The states by definition consented to whatever disclosures DOJ asked for in those cases. They may have had all sorts of reasons for doing that, they may have deep concerns about whether it was -- DOJ had any authority to get that information, but they were trying to achieve some other more important result so they agreed to that. It tells

you nothing about the legality of these requests. It just tells you what states were willing to agree to in those specific circumstances, which may have been very, very different than what we're facing here.

Certainly in any -- none of those situations involved a 50-state dragnet seeking every state's voter registration database, which obviously raises huge policy concerns that might not have been raised in a specific context, specific violation that was maybe very clear involving a specific state. So I think -- I just think those are irrelevant to the issues before the Court.

I think there is an assertion about there is not a national database that's going to be created or that is -- I think what was said is that there is not one that is being created. Well, they don't have the data for most of the states yet because 30 states are in litigation over this. They have it sounds like maybe a dozen states' data. And I didn't hear a statement about what they may or may not do in the future, which is the concern that we have. What happens when they have all 50 states' data, what are they going to do? We don't know; they won't tell us.

So let me get to the questions that the DOJ asked. And I think -- I covered this in my opening presentation, I'm not going to go in great detail, but there is no language in that letter -- we don't think that's the right letter to focus on

anyway, but even if the Court disagreed, there's no language in that letter that ties those assertions that this is the data that was reported on Maine's EAVS form to we think there is a violation as a result. So the language of the letter doesn't support the idea that that's a basis.

But putting that aside, there are -- there are huge problems with the idea that those factual assertions constitute a basis, substantive problems. I mean, just to take the biggest one, is that one of the -- one of the questions says Maine didn't report data on duplicates. And if you look at the EAVS report on page 189, we did report the exact data that they said we didn't report. So there's a factual error in one of the bases that the Court can see. You can look at it. And it's appropriate on a motion to dismiss because that EAVS report is definitely proper for the Court to consider. It's a published government report that's referred to over and over again in the materials attached to the complaint.

Another problem, I'll just briefly address this notion of the voter registration rate, which counsel focused on quite a bit. Maine's -- at the time of the EAVS report, Maine's voter registration rate as a percentage of citizen voting age population was 92 percent. That number is virtually meaningless without having more context around it.

And the reason for that is that a high registration rate

could -- it doesn't give you any information in a vacuum. And part of it is that -- we talk about this in a footnote, in a long footnote in our brief, but there's a numerator and denominator problem. The numerator comes from a different time period than the denominator, so it's inherently unreliable for that reason.

But even if you could take it as reliable, the problem is is that a high number, a number in the low 90s, is entirely consistent with a population that votes at high rates, a citizen age voting population that votes at high rates, and that's what Maine has.

And if you look at the other data in the EAVS report in the preface, I think it's pages 15 through 17, around there, it shows that Maine has very high levels of actual voter participation in the 2024 election that's consistent with having a high registration rate. So we are registered in Maine at a high rate because we vote at very high rates. So it doesn't tell you anything about our list maintenance practices; it just tells you that we are really good at voting in Maine.

And I don't want to go -- I don't want to belabor it, but we can go through all of these and none of these suggest any problem with Maine's voter registration list, and we cover that in the footnote in our brief.

So just a few other things. On the HAVA point I think

Your Honor covered it really well. I just want to quote from the *Benson* decision which says, there's simply no basis in the Federal Rules of Civil Procedure for the United States' suggestion that it can file a HAVA claim, allege no violations of HAVA, and obtain information to support its as yet nonexistent claim via discovery. I think Your Honor said the same thing or something close to that. We think that's the correct analysis there.

And then on the textualist point, I'm going to leave that mostly to Mr. Dodge. He is very eloquent and I'm sure he has a lot of thoughts about the colloquy you had with my friend. But I would just point out that even DOJ agrees you can't read Section 303 just based on the plain text. They agree there are limitations that are implicit in the text that aren't expressly stated, so we just have a disagreement about what those limitations are. And I would submit that it makes more sense to look at the legislative history, to look at what Congress was actually trying to accomplish, to figure out what those limitations are, as opposed to just providing a sort of broad ability to cast this dragnet to get voter data for any reason that the DOJ wants.

And that -- which I guess reminds me, another point I just wanted to make about the basis. The fact that DOJ asserts that a basis can be sort of we just want to check to see how you're doing, I don't think that's a fair

interpretation of the basis requirement.

I mean, for the basis requirement to have any meaning, I mean, that would mean -- that would make the requirement essentially meaningless, that they could ask -- and this is I think the *In Re Coleman* case, which is actually favorable to them mostly, this is a 1962 case, but it says, idle curiosity is not sufficient, even under that very -- otherwise very favorable case, and that would be idle curiosity, essentially. That's not enough.

And it has to -- the statute has to be given meaning, and that has to be mean that the basis -- has to mean something more than we'd like to see. It has to mean we think you're doing something wrong, and we have some articulable reason to think that. And that has -- that did not happen here. That was not stated.

And then the last point I'll make on this Oklahoma consent agreement that was discussed. My friend made the point that this agreement apparently provides Oklahoma -- provides that the DOJ will provide data back to Oklahoma and then they will have 45 days to, quote, clean it up. And that's exactly the problem that I was referring to in my opening remarks, which is that is the federal government telling a state not you need to fix this or that procedure that you're using, but you need to make changes to your voter list and we're going to tell you what those changes are, and

if you don't make them you're going to be in violation of apparently this consent agreement. That is an overstep of the federal government's role in list maintenance.

They have enforcement authority over procedure, over if -- if Maine again were engaged in unreasonable procedures to do its list maintenance there might be a role there. There's not a role for the federal government to say remove Joe Smith because we think, you know, he's deceased. That's the State's job.

THE COURT: Thank you.

MR. BOLTON: Thank you.

MR. DODGE: Hello again, Your Honor. Just a few final points, being mindful of the Court's time.

My friend from the DOJ, I understood his chief sort of textualist defense of the CRA interpretation they're putting forth to be, well, the phrase of color or race color is absent from the statute, ergo question mark.

I mean, he basically seems to say that that statutory provision is all encompassing and capacious merely because it is not limited expressly to racial claims. That argument's a canard. We don't argue that the CRA is limited exclusively to racial claims. I mean, you know, there's been some allusion to the legislative history here. My friend sort of selectively quotes a snippet of it.

If you read the legislative history, it will hammer you

over the head with the fact that this law was passed to add an enforcement tool to the 1957 Civil Rights Act. The 1957 Civil Rights Act, while undoubtedly motivated by racial discrimination, is itself not limited to claims based on race. It includes substantive voting rights protections that can be enforced even where there is not a specific allegation of racial discrimination. Provisions like the materiality provision, which Courts have said you can enforce, you know, regardless of whether or not there's an express or -- express or even, you know, an effect. You don't need to prove a racial element to it, so that's just a canard. I think the point is that, you know, when you engage in a contextual textualist analysis, you do have to understand the realm in which this language is operating, and you can't just pick and choose.

Mr. Bolton alluded to this, and I think he was exactly right, which is that the -- the history of consent decrees both sort of undercuts DOJ's position and also proves nothing in its favor. It undercuts DOJ's position because, again, page 12 of their motion to dismiss opposition they say, well, it has to be the case that we can get these materials because how else would we enforce HAVA. And yet here I hear a very robust history of HAVA enforcement using the tools Congress put into HAVA, including here in Maine, so query why they can't enforce HAVA when in fact my friend has alluded to just

such enforcement here in this state. What it tells you is that there are channels for enforcement. They've used them in the past. They just don't like them right now.

And, you know, going to North Carolina, which Ms. Jhaveri touched on, I think that also proves that, even where there's some concern of, well, maybe states aren't being diligent in collecting and recording the identifiers, the HAVA identifiers, DOJ is still able to enforce that. They did it in North Carolina. There was a public process through their board of elections there that gave rise to public information that there might have been some shortcoming there, and DOJ filed a HAVA complaint, you know, stated a claim, exercised their actual statutory authority, and then entered into a consent decree. And so the notion that HAVA is toothless or can't be enforced otherwise is just completely undercut by their own argument.

By the same token, Mr. Bolton put it very well, you know, voluntary compliance is voluntary. You asked my friend on the other side whether or not he has any history to point to here of the CRA being enforced in the HAVA context. What I actually heard him say, or not say but by implication concede, there is not a single court decision in 60 years, not one, they haven't cited in their brief, they haven't given it to you here today, where a Court in a contested context has said, well, yeah, okay, it was passed for the civil rights law but,

you know, if you sort of squint it's really broad, sure, use it for HAVA, use it for the NVRA. There's no Court that has ever said that, and I think for many of the reasons put forth today this Court should not make itself the first.

And for the same notion, you know, the trust but verify sort of argument that my friend made, I will get back to what my friend from the ACLU I thought put very well, which is we can imagine a different HAVA. We can imagine a HAVA that has capacious, pre-enforcement subpoena power for the Government. Your Honor is surely aware that Congress knows how to draft those provisions in other contexts; they just didn't do it here.

THE COURT: Well, your friend from the DOJ said that Congress does know how to do that. The reason they didn't do that is they knew well that the CRA already provided that mechanism.

MR. DODGE: I just don't think that's how Congress writes statutes in this country.

THE COURT: How does Congress write statutes?

MR. DODGE: Well, maybe that's a harder question than I'm giving credit for, but I think if there was a suggestion that the CRA was incorporated into HAVA we would have seen it, not least of all because the NVRA was passed prior to HAVA and did include a disclosure provision. As I said before, Congress knows how to distinguish between the

Attorney General and private litigants in these statutes.

I also think, you know, while they are broadly in the election context, they are both in -- in reference to very different subject matter, list maintenance and civil rights. And so the suggestion that, well, Congress just assumed the statute, it mostly -- you know, was most vigorously enforced for a period in the early '60s would just sort of be this backdrop, all-encompassing power is very, very dubious, not least of all because, again, if you look at HAVA, it stresses again and again in its substantive provisions and in its legislative history that states are responsible for the enforcement of HAVA.

So surely if they were going to carve out a mile-wide exception to that, that states are actually responsible for, you know, creating the list, maintaining the list, surely they would have done so expressly rather than leaving this gross implication of federal power sort of unspoken but looming. That does not make sense in a statute that is all about state primacy.

The *Benson* case, that's a fun one to read; there's a lot of interesting stuff in that case. I'll quibble with one small part of it, which is there is a suggestion in the district court's decision that textualism is sometimes just kind of looking at text alone and not looking at subsequently enacted statutes and reading different statutory regimes in

context of part of a broader body of law. And I do think that's sort of oversimplifying textualism.

I think again the dialogue between Justices Gorsuch and Barrett in the *Learning Resources* decision recently, I think they agree on this point and so it's spelled out in both their concurrences very ably, that textualism is not squinting and looking at some text and blinding yourself to its context. That's a very simplistic notion of textualism that the Court has just again and -- you know, I said *Biden v. Nebraska* and *Learning Resources.* You could find dozens of Supreme Court decisions to that effect in the last decade or so.

I haven't read this 1985 case my friend refers to. You know, I'll note that that was far in advance of both the NVRA and HAVA. So the notion that it's sort of speaking to how those statutes might interplay with the CRA, that doesn't work because those laws didn't exist. And so, you know, my friend had no answer to the fact that the CRA requires you not to alter documents but HAVA requires you to constantly alter a document, and certainly the 1985 case doesn't get them out of that problem.

And then just a final point, unless Your Honor has additional questions, you know, it's been raised by a few different folks today the 12(b)(6) standard here. We are here on a motion to dismiss. There's been some suggestion of what the Court should look to, what facts it should consider.

I'll give two thoughts. One, I do think there's a lot the Court can take judicial notice of here, both directly through what's incorporated into the complaint, the EAVS report and the like, public statements made by officers in the executive branch. At the same time I don't think the Court -- I think this case is very ripe for resolution on matters of law at the 12(b)(6) stage.

I think there are many paths the Court can take to dispose of this case without having to strain whatsoever to decide -- you know, to weigh any facts, assess it under the plausibility standard. There are pure statutory grounds for resolving all these claims. The NVRA, it's *Bellows*; HAVA, it's there's no disclosure provision; the CRA is, you know, the absence of a legally suitable basis or purpose. Regardless of what you want to make of what they've purportedly said on either of those prongs, there's just -- there are pure matters of law for rejecting that. And so I just want the Court to sort of rest easy that this is a case that is properly resolved on a 12(b)(6) motion.

THE COURT: Thank you, counsel.

MS. JHAVERI: Your Honor, I'll just pick up right where Mr. Dodge left off and just agree wholeheartedly, as we discussed in our previous colloquy, that this case can be disposed of on a 12(b)(6) motion to dismiss and that this Court is not required to accept the statements made by -- by

plaintiff. It's required to look at the allegations of the complaint and do they meet the *Iqbal* standard. In this case they do not. And for the reasons that Mr. Bolton and Mr. Dodge said, there is no statement of basis here, and there is not a legally cognizable purpose.

I do want to just touch on one point about basis. I think the -- I would point to the *Oregon* Court's analysis here of the idea that basis can just be the statutory scheme, and the *Oregon* Court essentially says that that would conflate the idea of basis and purpose and in order to give the statute -- each word in the statute meaning we must look at something different for basis and purpose. And, as Your Honor knows well, the early cases like *Lynd* talk about factual evidence that DOJ has that there is a difference in registration rate between black and white voters or evidence of discrimination between black and white voters as a factual basis. So I think that's pretty well covered in the case law.

And I would just -- to go back to the point on judicial review, this Court certainly has the authority to make sure that what the Department is alleging in its complaint falls within its own statutory authority. As I stated when I was up here before, there is a constitutional framework at work here, there are statutory frameworks at work here, and the United States is exceeding its authority under both the Constitution and those statutes. And the -- the briefing demonstrates that

quite clearly. And this Court can dismiss even just on that fact.

I just -- some small factual points I wanted to just touch on. Counsel listed a number of instances in which the CRA has been used sort of dating through the 2000s. I do want to just make very clear that it sounds to me at most three but likely two of those are the only instances of actually getting the voter registration lists. And so those other instances of using the CRA, for example, counsel referenced a Georgia case in 2021, that was actually for provisional ballots and other ballot forms. So I just want to focus on like the sensitive voter data that's at issue here, and that's, from what I can tell, at best three examples, two of which, you know, we've already discussed are consent decrees or MOU. And there was a third Indiana example that I hadn't quite followed so I apologize, but it was new to me.

I recommend looking at the briefing of the former DOJ attorneys in this case that does give some detailed explanation of the use of the CRA and why this truly is very out of the norm of the interpretation the Department has even had of its authority under the CRA.

And just a -- one additional point on the sort of back and forth between the State and the Attorney General. I'll just note that in the September 8th letter from Secretary Bellows she notes that she -- she does note that she at this

time would not give up the unredacted voter registration lists but offers to continue to discuss the -- discuss the privacy concerns that she raises in that same letter. Of course, the response was the filing of this lawsuit. You know, Mr. Tucker is correct, there is no exhaustion requirement here, but that doesn't mean this Court can't look at what is reasonable in the context of what is happening here. This Court doesn't have to ignore the -- the sequence of events that led to the filing of this lawsuit and the evolving purposes given in support of this lawsuit.

So unless the Court has any other questions, thank you.

THE COURT: Thank you.

MS. JHAVERI: My apologies, there was one other point. Mr. Tucker referenced at times a motion to compel. I just wanted to clarify the record, there is no motion to compel in this case. There is a motion for an order to show cause. If this Court would like argument on that, I'm sure we can provide it, but I just wanted to clarify that point.

THE COURT: Thank you.

MS. JHAVERI: Thank you.

THE COURT: I'm looking at you, Mr. Heiden.

MR. HEIDEN: Very briefly, Your Honor.

The Department of Justice alluded to among the reasons why it might want this record that it might want to investigate whether people who are eligible voters who had

lost their eligibility had not been removed from the roll. As a matter of Maine law, people who are eligible voters don't typically lose their eligibility. People in Maine have, as you well know, the right to vote when they're under guardianship, they have to right to vote while they're in prison or in jail, and we don't disenfranchise people who have been convicted of crimes.

If this was really a case about something that was going on in Maine, we would expect the Department of Justice to know those things. Thank you, Your Honor.

THE COURT: Thank you, sir.

MR. TUCKER: And I will try to be very brief. I've been given a little bit, but I'll be able to go through it pretty quickly.

I guess just a starting point, circling back to the standard on a motion to dismiss, as Your Honor knows, obviously under the circumstances the Court is required to draw all the reasonable inferences in the United States' favor, but certainly what the United States has heard counsel say is saying that, notwithstanding that, you should draw the inferences in our favor because we've got a lot of speculative things, we hear a lot, there are a lot of things that have been said in the press, and for all those reasons don't apply the -- or, you know, somehow ignore the fact that the claims that the United States has asserted, again specifically

focusing on the CRA claim, is certainly a plausible claim.

Now, in terms of the -- counsel had also mentioned that the letter -- he said that it stated no basis in it and specifically didn't refer to HAVA. It actually does refer to HAVA. The August 18th letter -- and it also explains why it's necessary. In Footnote 1 of the August 18th letter it says, in charging the Attorney General with enforcement of voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that the Justice Department be able to conduct an independent review of each state's list, which is exactly what the United States is doing. Footnote 2 of the same letter basically just identifies the specific HAVA identifiers that the United States needs to be able to do that.

So, again, the United States feels very comfortable in having Your Honor look at ECF 5-2 and 5-4 and draw Your Honor's own conclusions as to what it says and what it doesn't say because, again, the language is pretty clear that it does -- it does in fact cover this.

I would just point out again in terms of the consent decrees, one of those consent decrees did involve the State of Maine. I know that counsel for the intervenors had also said that somehow North Carolina, because we didn't need the SVR, the statewide voter registration list, it shows we can bring enforcement actions without it. It's not true for the reasons

I already elaborated at length. Facial violations that is absolutely true. If you see something that is violating HAVA on its face or the NVRA on its face, you've got a violation, you don't need data. But the problem is -- and again this was true in North Carolina -- the majority of registration applications that were missing are -- the records that were missing HAVA identifiers were actually records that had been done through a nonfacially violative application. So they had actually complied and provided the information to the State of North Carolina; it just simply was not entered.

We can't just take it on faith. I mean, there have been too many instances in which the United States has had states come back and say we're in full compliance, here are all the procedures. We appreciate certainly getting the information with the explanation of what the procedures are, but the Attorney General's been specifically charged with a purpose here, and that purpose is to ensure that there is full compliance with federal election law, including HAVA and NVRA.

Counsel I think just misspoke, but I want to make sure that -- to clear up the record a bit. He said that states are primarily responsible for enforcing HAVA. It's not true. I think he meant to say are primarily responsible for implementing, and that is in fact true. The Attorney General is the only one that has the authority under the statute in Section 401 to enforce.

And, again, there seems to be a suggestion that this basis -- even if Your Honor finds that a factual basis is necessary, that a basis needs to be a strong basis showing that we could go into court today and bring a HAVA or NVRA substantive claim and win, and that's not true, again, for the reasons that *Lynd* explained. You can't be expect -- you cannot expect the Attorney General to be able to go in and prove a violation using -- based upon records that the very jurisdiction has denied them, and that's why we are here.

I know counsel for one of the intervenors had also suggested, well, maybe we cut the conversation off a little bit short, there could have been further dialogue. I didn't want to say this on the record because it's certainly been in the press, but I will say this, it's a pretty definitive statement when Secretary Bellows says Pam Bondi can go jump in the Gulf of Maine. That was a pretty definitive rejection, and at that point, even if there were some sort of exhaustion requirement in the statute, which counsel concedes there is not, there is no point in having further dialogue with someone who's made that sort of statement to you.

So let me just go through and make sure I've got -- so in terms of the number of states that previously the United States -- that I ran through that counsel suggested it was no more than three, it's five states the United States has gotten this data, a statewide voter registration list for various

purposes, and I'll just go through the list.

It was Texas in 2008, it was Georgia in 2006, and again both of those were for purposes of looking at list maintenance. It was Maine in 2007 for purposes of looking at compliance with HAVA. It was Alabama in 2009 for purposes of UOCAVA, and it was Indiana for -- in 2006 for purpose of list maintenance. Vermont it's unclear. It's possible -- I think Vermont we may have also gotten but -- gotten the absentee ballots. We didn't actually ask for the statewide list there.

And in terms of -- in terms of Oklahoma, I know that counsel also raised this 45-day issue. Oklahoma negotiated that consent decree with the Attorney General. Oklahoma agreed to producing it in 45 days or taking steps to remove ineligible voters within 45 days. A state certainly has the ability to negotiate in good faith the terms under which it's going to settle contested litigation, and that's what Oklahoma did there.

And, again, to make clear, the MOUs that the United States has discussed with a number of states did not include that requirement because some states clearly did not like that. And, again, it's not the United States suggesting that it's somehow removing the primacy of the states engaging in the list maintenance functions themselves. It's simply pointing out there's a violation; it appears there's a lack of reasonable list maintenance; here's what we expect you're

going to do in response, again, consistent with what the United States has done in a variety of cases that it has resolved whether by consent decree or by court order. It oftentimes -- it's very commonplace that there will be a time period under which certain efforts have to be undertaken. Oftentimes there are reporting requirements that the state or local jurisdiction has to identify what they've done, give the United States an opportunity to go back to them, and basically just to see if they're moving towards substantial compliance with the statute.

I guess I need to say definitively for the record, I thought it was pretty unequivocal that there is not going to be a national voter registration database. Counsel had I guess inferred that I was only saying that as of now there is not one. There is not going to be one. The Department's position is it is not creating a nationwide voter registration database. These are particularized states, the data is going to be kept separate from other states. It's being used solely for the purposes that we've stated in the letters, to assess compliance with both HAVA and the NVRA, both the HAVA identifier requirement but also the list maintenance requirement.

Counsel had also said -- for the intervenors had said, quote, this is a -- a quote, I hope I'm getting it correct, no Court at all has said it, referring to the CRA, applies to the

NVRA and HAVA. There was a Court that said it, *Benson* said it. It's at 2026 Westlaw 362789, and the discussion's at stars 7 through 9 of the decision. There the Western District of Michigan did say, yes, the CRA -- records request under Title III of the CRA does apply to the NVRA because the NVRA is a statute to enforce voting rights; therefore, it falls within the four corners of the CRA.

I'll just mention briefly on the *Language Resources* and the major questions doctrine. I guess it's a rabbit hole I trust the Court probably doesn't want us to jump down, but the United States believes that clearly the major questions doctrine does not apply here. It's because -- for the three main reasons when the Court has applied the major questions doctrine.

First of all, the statute is clear and unambiguous, as Courts repeatedly have said in looking at it, so it's knocked out for that reason. Major questions doctrine, including the *Learning Resources* case, involved an issue of whether or not there was a broach into what would otherwise be delegated powers from Congress to the executive branch, with the executive branch doing something with powers that were delegated beyond what Congress had intended. That's clearly not the case here. This is the conventional enforcement authority that the Attorney General has for any federal election law.

And then finally the other reason, obviously, there -- especially looking at the tariffs case is that there was a substantial commitment of funds. They were talking about $15 trillion in the *Learning Resources* case. This doesn't involve any kind of large commitment of resources or funds that's somehow changing national policy because, again, this is just consistent with the garden variety, the sort of enforcement actions investigations, enforcement actions that the Attorney General does.

And I -- I believe I guess the only other point I would make is that certainly the United States' reading of the amicus brief filed by the former DOJ attorneys is that it -- it simply doesn't add much. I mean, if the Court reads through it, you'll see that it involves a lot of duplicative arguments that have already been made. But the other thing I would point out is that it's also missing a lot about the context that I've talked about here today, and it's even missed some of the cases that we've raised specifically pointing out instances in which the Department of Justice has used Title III.

I think one thing that we will certainly agree with with that brief is the brief certainly says that it's unprecedented. It is unprecedented, as I said at the very beginning, in the sense that Section 303(a)(5) and the list maintenance requirements of HAVA have simply languished since

they were enacted by Congress in 2002. There's nothing inherently wrong with the Attorney General going through -- not just a single state, not singling out Maine, not singling out any particular state, but looking at a national level to determine what is the level of compliance. That is the mandate that we get every time there is a change in administration, there may be a change in priorities. This is one of the administration's priorities, and it's completely consistent with what Congress passed about the NVRA and HAVA in -- you know, in a bipartisan fashion.

So for that reason, unless Your Honor has any further questions for me, of which I'd be happy to entertain.

THE COURT: I don't. Thank you very much, counsel.

MR. TUCKER: Thank you.

THE COURT: All right. Anything else, Mr. Bolton?

MR. BOLTON: Your Honor, I -- I think I'd be gilding the lily to say much more at this point. The one thing I just did want to emphasize is that, had the Department of Justice come back to the Secretary of State with follow-up questions about our list maintenance practices, which we extensively discussed in our six-page letter to the DOJ, we absolutely would have provided them with additional information.

THE COURT: Thank you.

MR. DODGE: Yes, very briefly, I'll concede Mr. Tucker's point that *Benson* is I guess that one and only

case. I think it's not persuasive on that point for the reason I addressed in my rebuttal, which is that in reaching that conclusion I think it took a rather cramped view of textualism that focuses too much on isolated text and not sufficiently on statutory context. And I -- I think the Court appreciates that point so I won't add to that.

THE COURT: Understood, thank you. Counsel?

MS. JHAVERI: Nothing further, Your Honor.

THE COURT: Thank you.

MR. HEIDEN: No, thank you.

THE COURT: Thank you. All right. Thank you, everyone. The only thing more enjoyable to a judge, in addition to an interesting and novel legal issue, is a host of good lawyers making good argument so I appreciate it. I'll have it under advisement and have a decision to you soon. Okay. We're in recess.

(Time noted: 11:30 a.m.)

**C E R T I F I C A T I O N**

I, Lori D. Dunbar, Registered Merit Reporter, Certified Realtime Reporter, and Official Court Reporter for the United States District Court, District of Maine, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: March 27, 2026

/s/ Lori D. Dunbar

Official Court Reporter

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENNA BELLOWS, in her official capacity as the Secretary of State of Maine; and the STATE OF MAINE,<br><br>Defendants. | Case No: 1:25-cv-00468-LEW |

**NOTICE OF APPEAL**

Plaintiff UNITED STATES OF AMERICA, by and through the Attorney General, appeals to the United States Court of Appeals for the First Circuit from this Court's Order denying the United States' Motion for an Order to Show Cause and granting Defendants' Motion to Dismiss and Intervenors' Motions to Dismiss (ECF 114) and final judgment (ECF 115) entered in this action on May 21, 2026.

Dated: June 5, 2026

Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

ANDREW G. BRANIFF
Acting Chief, Appellate Section

*/s/ James Thomas Tucker*
TIMOTHY F. MELLETT
JAMES THOMAS TUCKER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 307-2767
Email: james.t.tucker@usdoj.gov

Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ James Thomas Tucker*
James Thomas Tucker

## CERTIFICATE OF SERVICE

I certify that on July 17, 2026, I electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney

Date: July 17, 2026