No. 26-1676

# United States Court of Appeals
## For the First Circuit

UNITED STATES,

Plaintiff – Appellant,

v.

SHENNA BELLOWS, in the official capacity as Secretary of the State of Maine; STATE OF MAINE; JOHN SCHNECK; MARPHEEN CHANN; LEAGUE OF WOMEN VOTERS OF MAINE,

Defendants – Appellees

*On appeal from the United States District Court, District of Maine*

**BRIEF OF DEFENDANTS-APPELLEES STATE OF MAINE AND SHENNA BELLOWS**


AARON M. FREY
Attorney General

Jonathan R. Bolton
Jack Dafoe
Assistant Attorneys General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
(207) 626-8800
jonathan.bolton@maine.gov
jack.dafoe@maine.gov

*Attorneys for Defendants-Appellees State of Maine and Shenna Bellows*

Kelly Morrell
Deputy Attorney General

Of Counsel

## Table of Contents


Table of Contents ........ i

Table of Authorities ........ ii

Statement of the Issues ........ 1

Statement of the Case ........ 3

- Introduction ........ 3
- Statement of Facts ........ 4
- Procedural History ........ 15

Summary of the Argument ........ 18

Argument ........ 21

I. The district court was not required to rubber-stamp DOJ's demand. ........ 21

II. DOJ stated an invalid purpose for its demand ........ 31

- A. DOJ's stated purpose must be valid. ........ 31
- B. The district court correctly held that NVRA and HAVA enforcement is not a valid purpose. ........ 33
- C. A valid purpose under Title III must relate to combating racial discrimination in voting. ........ 39

III. The district court correctly held that the SVRL is not a record covered by Title III. ........ 44

IV. DOJ failed to state a basis for its demand. ........ 52

V. DOJ's demand violates federal privacy laws. ........ 58

- A. DOJ's demand violates the Privacy Act. ........ 58
- B. DOJ's demand violates the E-Government Act. ........ 63

Conclusion ........ 65

Certificate of Compliance with Rule 32(a) ........ 66

Certificate of Service Form for Electronic Filing ........ 67

## Table of Authorities

CASES

*Albright v. United States*, 631 F.2d 915 (D.C. Cir. 1980) .......................... 60

*Application of Howard*, 325 F.2d 917 (3d Cir. 1963) .............................. 25

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) .................................... 7

*Booth v. Hume Pub., Inc.*, 902 F.2d 925 (11th Cir. 1990) ......................... 23

*Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44 (1st Cir. 2021) ............... 59

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) ..................... 39, 47

*Corley v. United States*, 556 U.S. 303 (2009) .......................................... 32

*Daly v. United States*, 393 F.2d 873 (8th Cir. 1968) ............................... 22

*DJ Mfg. Corp. v. Tex-Shield, Inc.*, 347 F.3d 337 (1st Cir. 2003) ........... 42

*Donaldson v. United States*, 400 U.S. 517 (1971) .................................. 28

*Fed. Rsrv. Bank of Atlanta v. Thomas*, 220 F.3d 1235 (11th Cir. 2000) 22

*Freeman v. Town of Hudson*, 714 F.3d 29 (1st Cir. 2013) ...................... 21

*Garris v. FBI*, 937 F.3d 1284 (9th Cir. 2019) .......................................... 60

*In re Weinstein*, 272 F.3d 39 (1st Cir. 2001) ........................................... 40

*Katzenbach v. McClung*, 379 U.S. 294 (1964) ......................................... 23

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ..................................... 42

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .................... 18, 24, 29, 57

*League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297 (D.D.C. June 22, 2026) ............................... 13

*Matamoros v. Starbucks Corp.*, 699 F.3d 129 (1st Cir. 2012) ................ 40

*N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404 (1960) ............................... 22

*N.Y. Times v. Gonzalez*, 459 F.3d 160 (2d Cir. 2006) ............................ 23

*Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232 (1st Cir. 1997) ............................ 32

*Pitta v. Medeiros*, 90 F.4th 11 (1st Cir. 2024) ............................ 21

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) ............................ 38

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ......... 34

*Pub. Int. Legal Found., Inc. v. Benson*, 136 F.4th 613 (6th Cir. 2025) .. 35

*Public Interest Legal Foundation v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ............................ 34

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ............................ 37, 38

*Rodi v. S. New England Sch. of Law*, 389 F.3d 5 (1st Cir. 2004) ........... 58

*S.E.C. v. Wencke*, 783 F.2d 829 (9th Cir. 1986) ............................ 23

*Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ........ 33

*United States Dep't of Just. v. Ricco Jonas*, 24 F.4th 718 (1st Cir. 2022) ............................ 30

*United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ............................ 47

*United States v. Abbas*, 100 F.4th 267 (1st Cir. 2024) ............................ 33

*United States v. Adams*, No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026) ............................ 12, 44, 54

*United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026) ....... 13, 40, 53

*United States v. Apodaca*, 251 F. Supp. 3d 1 (D.D.C. 2017) ................... 26

*United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ............................ 13, 25, 44

*United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481 (D. Me. May 21, 2026).........................................................................13

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) 13, 25, 41, 44, 45, 48, 51, 53, 54, 57

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026)... 13, 44, 46

*United States v. Caldwell*, 2026 WL 2186515 (D.N.J. July 29, 2026)...12, 44

*United States v. DeMarinis*, No. CV SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026)..........................................................13, 25

*United States v. Evans*, No. CV-25-4403, 2026 WL 2267774 (D.D.C. Aug. 6, 2026)........................................................12, 34, 42, 43, 44, 46, 49, 51

*United States v. Fontes*, No. CV-26-00066, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026).........................................................13, 44, 47

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026) . 13, 27, 53, 54, 55, 57

*United States v. Griswold*, No. 25-CV-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026) ....................................................... 12, 25, 44, 54

*United States v. Koski*, No. 3:26CV42, 2026 WL 2032532 (E.D. Va. July 14, 2026)..................................................................... 13, 44, 48

*United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995)......................28

*United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026)....................................................... 12, 27, 44, 53

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983).......................59

*United States v. McKay*, 372 F.2d 174 (5th Cir. 1967) ...........................25

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ..........................30

*United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026) .......... 13

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026) ... 13, 14, 25, 27, 29, 32, 40, 53, 55, 57

*United States v. Powell*, 379 U.S. 48 (1964) .......... 18, 24, 26, 28

*United States v. Scanlan*, No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026) .......... 13, 44, 46, 49, 52, 53, 55

*United States v. Schmidt*, No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026) .......... 13, 44

*United States v. Simon*, No. 25-cv-3761 (D. Minn. Aug. 17, 2026) .. 12, 44

*United States v. Sturm, Ruger & Co.*, 84 F.3d 1 (1st Cir. 1996) ...... 30, 31

*United States v. Thomas*, No. 3:26-CV-21, 2026 WL 2070437 (D. Conn. July 17, 2026) .......... 13, 44

*United States v. Trahan*, 111 F.4th 185 (1st Cir. 2024) .......... 46

*United States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026) .......... 13, 33, 40, 53

*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026) 13, 14, 27, 29, 40, 52, 54, 55, 63, 64

*United States v. Wisconsin Elections Comm'n*, No. 25-CV-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026) .......... 13, 44, 46, 48

*United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023) .......... 23

*United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979) .......... 33

*Weems v. McCloud*, 619 F.2d 1081 (5th Cir. 1980) .......... 22

## STATUTES

1 M.R.S.A. § 402 .......... 5

21-A M.R.S.A. § 1 .......... 4, 45
21-A M.R.S.A. § 152 .......... 5, 59
21-A M.R.S.A. § 161 .......... 7, 8
21-A M.R.S.A. § 162-A .......... 5
21-A M.R.S.A. § 196-A .......... 5, 6, 46
21-A M.R.S.A. § 721 .......... 5, 46, 59
21-A M.R.S.A. § 753-B .......... 5
26 U.S.C. § 7605 .......... 26
44 U.S.C. § 3502 .......... 65
44 U.S.C. § 3518 .......... 65
5 U.S.C. § 552a .......... 59, 61, 62
52 U.S.C. § 20703 .......... 10, 27, 29
52 U.S.C. § 20705 .......... 21, 24
52 U.S.C. § 20501 .......... 43
52 U.S.C. § 20507 .......... 6, 9, 34, 37, 39, 49
52 U.S.C. § 20507 .......... 35
52 U.S.C. § 20510 .......... 37
52 U.S.C. § 20701 .......... 16, 30, 44
52 U.S.C. § 21083 .......... 7, 35
52 U.S.C. § 21085 .......... 7, 35
8 U.S.C. § 1454 .......... 49
E-Government Act § 208 .......... 63, 64

P.L. 2001, ch. 637 .......... 45

P.L. 2005, ch. 453 .......... 4

OTHER AUTHORITIES

Report of the United States Commission on Civil Rights (1959) .......... 50

U.S. Election Assistance Commission, "Election Administration and Voting Survey 2024 Comprehensive Report" (June 2025) .......... 56

RULES

Fed. R. Civ. P. 1 .......... 22

Fed. R. Civ. P. 81 .......... 28

REGULATIONS

68 Fed. Reg. 47,610 (Aug. 11, 2003) .......... 61

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 4, cl. 1 .......... 36

LEGISLATIVE DOCUMENTS

H.R. Doc. No. 75 (1st Sess. 1959), *reprinted in* 105 Cong. Rec. 1922 (Feb. 5, 1959) .......... 41

H.R. Rep. No. 86-956 (Aug. 20, 1959), *reprinted in* 1960 U.S.C.C.A.N. 1925 .......... 41

SECONDARY SOURCES

"Statement by the President Upon Signing the Civil Rights Act of 1960," May 6, 1960 .......... 41

Nick Corasaniti and Dustin Volz, *Trump's Homeland Security Chief Threatens Election Officials with Prison Time*, N.Y. Times (July 17, 2026) .......... 15

Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong. 13-14 (Mar. 20, 1959) .......... 41

EXECUTIVE ORDERS

Exec. Order 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) .......... 8, 9

Exec. Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) .......... 14, 15

## Statement of the Issues

1. Does the provision in Title III of the Civil Rights Act of 1960 ("Title III") conferring jurisdiction to compel production of election records demanded by the Department of Justice ("DOJ") impliedly abrogate the Federal Rules of Civil Procedure, leaving targets of those demands with no right to meaningful judicial review?

2. Does Title III authorize DOJ to demand that Maine produce its entire unredacted electronic voter registration database, containing the sensitive personally identifiable information ("PII") of more than one million registered voters, for the alleged purpose of investigating whether Maine has a reasonable voter-list-maintenance program?

3. Is Maine's self-created electronic voter registration database a record that "come[s] into [the] possession" of Maine election officials, such that it may be demanded under Title III?

4. Did DOJ's demand, which does not allege Maine is or may be violating any federal law, comply with Title III's requirement that the Attorney General state the basis for the demand?

5. Does DOJ's demand for the electronic PII of over one million Maine voters, without issuing the required public notice and without conducting a privacy impact analysis, violate federal privacy laws?

## Statement of the Case

### *Introduction*

This is one of 30 actions by DOJ to force States to turn over to the federal government the entire contents of their electronic voter registration databases, containing the sensitive PII of millions of voters. DOJ claims that it is making this unprecedented demand to investigate compliance with the modest voter-list maintenance requirements of the National Voter Registration Act of 1993 ("NVRA") and the Help America Vote Act of 2002 ("HAVA"), which require States to design and implement programs that make a "reasonable" effort to remove from their rolls voters who have died or moved out of the jurisdiction.

The district court, joining (so far) 22 other district courts across the country and the Sixth Circuit Court of Appeals, concluded that DOJ lacks authority to demand the contents of a State's voter registration database. The court correctly concluded that Title III, a statute enacted to investigate racial discrimination in voting in the 1960s, has no application to DOJ's purported efforts to enforce unrelated list-maintenance obligations under the NVRA and HAVA. It also correctly concluded that the plain language of Title III limits DOJ's power to demand records to those records that "come into [the] possession" of

state officials, thereby expressly excluding States' self-created voter registration databases.

DOJ's arguments to the contrary should be rejected. DOJ advocates a reading of Title III that would turn federal courts into rubber stamps for whatever records demands DOJ sees fit to issue, no matter how improper or untethered to Title III's civil rights–era purposes. Furthermore, its argument that a State's voter registration database is a record subject to Title III relies on a tortured interpretation of "come into [the] possession" that would render the phrase effectively meaningless.

This Court should thus affirm the well-reasoned decision of the district court. Alternatively, it should affirm on any one of several alternative bases argued below and apparent from the record, including DOJ's failure to state any sort of factual basis for its demand and its failure to comply with the federal Privacy Act and E-Government Act.

## *Statement of Facts*

### *Maine's Central Voter Registration System*

Since 2007, Maine has maintained an electronic database of all Maine registered voters in its central voter registration system ("CVR"). *See* P.L. 2005, ch. 453, § 40; 21-A M.R.S.A. § 1(6-A). Data fields

contained in CVR include data derived from voter registration applications, such as name, residence address, mailing address, party affiliation, date of birth, and date of registration. *See* 21-A M.R.S.A. § 152(1)–(2). Also included is the number the voter provided on their voter registration application to verify their identity, which can be that voter's Maine driver's license number, nondriver identification card number, or the last four digits of their social security number. *See id.* § 152(1)(M).

CVR also contains data from other sources, such as a history of all elections in which the voter has participated (including in which party's primaries the voter has participated), *id.* § 721; whether the voter has been designated "inactive" by Maine's voter-list maintenance program, and is thus at risk of cancelation, *id.* § 162-A(2); information about the voter's absentee ballot requests, including whether returned ballots were challenged or rejected, *id.* § 753-B(6); and the date that the voter's record was last altered in CVR, *id.* § 196-A(1)(B).

Maine law designates CVR data as confidential and exempts it from Maine's public records law. 21-A M.R.S.A. § 196-A(1); 1 M.R.S.A. § 402(3)(A). While an exception to that confidentiality law gives the

Secretary discretion to provide certain CVR data to government entities upon request, that authority does not extend to bulk disclosure of sensitive PII, like full dates of birth, social security numbers, and driver's license numbers. 21-A M.R.S.A. § 196-A(1)(E). Maine law designates such PII contained in CVR, along with other categories of data, as "highly sensitive personal information" that cannot be disclosed even to authorized requestors. *Id.* § 196-A(1)(K)(2). Maine law also does not allow the Secretary to disclose voters' party affiliation and voter participation history to other governmental entities. *See id.* § 196-A(1)(E) (omitting party enrollment and voter participation history from list of disclosable fields).

*Federal and State Voter-List Maintenance Requirements*

The NVRA and HAVA require States to conduct programs to maintain the accuracy and currency of their voter lists. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by reason of death or change in residence "from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). Subject to certain restrictions aimed at protecting voters

from being wrongfully purged from voting lists, the NVRA leaves it to the States to design and operate their list-maintenance programs.

HAVA introduced various election reforms in the wake of the 2000 presidential election, including a requirement that States maintain centralized voter registration databases and adopt "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(1)(A), (a)(4)(A). While HAVA clarified that the NVRA's list maintenance requirements apply to the new voter registration databases, "[n]othing in HAVA broaden[ed] the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). HAVA also expressly provides, consistent with the NVRA, that "specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." 52 U.S.C. § 21085.

Maine law specifically provides for list maintenance, authorizing the Secretary to conduct statewide maintenance of CVR and requiring her to adopt rules for conducting NVRA-compliant voter-list maintenance. 21-A M.R.S.A. § 161(2-A). It likewise permits the

Secretary to share CVR data with a consortium of other states for the purpose of list maintenance. *Id.* § 161(2-B). Under this authority, Maine has become a member of the Electronic Registration Information Center ("ERIC") and engages in list maintenance based on ERIC's analysis of the data Maine submits to it. Compl. ¶ 54 (Appendix ("A") 27–28). Data shared with ERIC is encrypted via "a cryptographic one-way hash," *id.*, meaning ERIC receives only encrypted codes ("hashes") representing voter data, which ERIC can compare with hashes from other sources for matching purposes but cannot itself decrypt.

*The Department of Justice's Demand for Unredacted Voter Data*

In March 2025, President Trump issued an Executive Order ("EO") titled "Preserving and Protecting the Integrity of American Elections." *See* Exec. Order 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025). Among other things, the EO ordered the federal government to acquire and analyze state voter list data. Specifically, the EO directed that

> the Department of Homeland Security, in coordination with the [Department of Government Efficiency] Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where

> necessary and authorized by law, for consistency with Federal requirements.

*Id.* at § 2(b)(iii).

On July 24, 2025, Maine received a letter from DOJ demanding, without explanation, Maine's entire "computerized statewide voter registration list" (hereinafter, the "SVRL") including "all fields contained within the list." A32. DOJ cited the NVRA's public disclosure provision, 52 U.S.C. § 20507(i)(1), as the sole basis for its demand. *Id.* DOJ's letter also asked a series of questions concerning Maine's list-maintenance program and Maine's responses to the Election Assistance Commission's 2024 Election Administration and Voting Survey ("EAVS"). A33–34.

In response, the Secretary affirmed that Maine satisfies and exceeds its obligations under the NVRA and provided a detailed explanation of Maine's list-maintenance program. She explained, among other things, that Maine recently cancelled nearly 200,000 registrations following an NVRA-compliant address-confirmation mailing. *See* A35–37. The Secretary responded to each of DOJ's questions concerning the EAVS data. A38–40. The Secretary also asked DOJ several questions about how it planned to use and protect

the SVRL and whether its request was consistent with federal privacy laws. A37–38.

On August 18, 2025, DOJ responded in a letter ignoring most of the Secretary's inquiries and reasserting its demand for the full unredacted voter file containing "all fields," including "date of birth," "state driver's license number," or "the last four digits of the registrant's social security number." A41. For the first time, DOJ contended that its demand was made under HAVA and Title III, in addition to the NVRA. A42.

Title III specifies that any demand by DOJ for voting records "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. In its August 18 letter, DOJ stated that the purpose of its demand "is to ascertain Maine's compliance with the list-maintenance requirements of the NVRA and HAVA." A42. DOJ further asserted, "our letter dated July 24, 2025, provided you with 'a statement of the basis and the purpose therefor[],' namely, to assist in our determination of whether Maine's list-maintenance program complies with the NVRA [and HAVA]." *Id.* (internal citation omitted). DOJ did not otherwise identify any basis for the demand.

The Secretary responded to DOJ's second letter on September 8, 2025, expressing continued concern that the demand exceeded DOJ's authority and violated federal privacy laws. A70–72. The Secretary invited DOJ to provide additional information addressing her concerns. A72. DOJ did not respond and instead filed the present action.

*DOJ's Complaint Against Maine*

DOJ's complaint contains three counts, alleging that Maine's refusal to provide its unredacted SVRL to DOJ (1) violated the public access provision of the NVRA, (2) violated HAVA, and (3) violated Title III. DOJ has abandoned all but the final claim in this appeal.

Like DOJ's letters, the Complaint does not accuse Maine of noncompliance with any list-maintenance requirements. *See* Addendum ("Add.") at 21 n.15 ("If the United States' pleadings contain any allegation that Maine has not engaged in reasonable list-maintenance efforts, in violation of the NVRA, it was not made apparent to me."). Rather, the complaint alleges only that the Secretary's initial response to DOJ "did not provide sufficient details" to assess compliance. *See* Compl. ¶37 (A23). Yet the Complaint also admits that DOJ demanded Maine's unredacted voter file

simultaneously with its initial requests for information, and thus before it even received the Secretary's response to its questions. *See* Compl. ¶¶31–46 (A21–25).

The complaint also acknowledges that DOJ's collection of voter data is subject to the federal Privacy Act and incorporates by reference a System of Records Notice that it alleges complies with the Act. Compl. ¶ 53 (A27).

*DOJ's Coordinated Nationwide Effort to Obtain State Voter Lists*

DOJ's suit against Maine is part of a larger effort to obtain SVRLs from most, if not all, States. DOJ has sued at least 30 States seeking their SVRLs. *United States v. Evans*, No. CV-25-4403, 2026 WL 2267774, at *5 (D.D.C. Aug. 6, 2026). So far, 23 district courts have dismissed DOJ's lawsuits for a variety of legal deficiencies, with the Sixth Circuit affirming dismissal of the Michigan suit.[1] To date, no court has ruled in DOJ's favor.

---

[1] *See United States v. Simon*, No. 25-cv-3761 (D. Minn. Aug. 17, 2026); *United States v. Aguilar*, No. 3:25-cv-00728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026); *Evans*, 2026 WL 2267774; *United States v. Griswold*, No. 25-CV-03967, 2026 WL 2235374 (D. Colo. Aug. 3, 2026); *United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026); *United States v. Caldwell*, No. CV 26-2025, 2026 WL 2186515 (D.N.J. July 29, 2026); *United States v. Adams*, No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026); *United States v. Thomas*, No.

It has become apparent that DOJ intends to run all the SVRLs it obtains through the Department of Homeland Security's ("DHS's") Systematic Alien Verification for Entitlements ("SAVE") system in an attempt to identify noncitizen registrants.[2] A DOJ attorney arguing against a motion to dismiss in Rhode Island admitted that DOJ intends to "run [the SVRL] against DHS's SAVE database." R.I. Hr'g Tr. (ECF No. 105-1) at 50:17–23; *see also United States v. Weber*, 816 F. Supp. 3d

---

3:26-CV-21, 2026 WL 2070437 (D. Conn. July 17, 2026); *United States v. Koski*, No. 3:26CV42, 2026 WL 2032532 (E.D. Va. July 14, 2026); *United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026); *United States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026); *United States v. Bd. of Elections of N.Y.*, No. 1:25-CV-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026); *United States v. Scanlan*, No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Schmidt*, No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. DeMarinis*, No. CV SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Wisconsin Elections Comm'n*, No. 25-CV-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, No. 1:25-CV-00468, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, No. CV-26-00066, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich.), *aff'd*, 179 F.4th 470 (6th Cir. 2026) (reh'g en banc denied Aug. 14, 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

[2] States including Maine have raised substantial concerns about the accuracy and reliability of SAVE data. *See* McBrien Decl., Ex. C (ECF No. 55-5) at 20–26. An expanded version of the system was recently enjoined by a federal court for violations of the Social Security Act, Privacy Act, and the Administrative Procedure Act. See *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. CV 25-3501 (SLS), 2026 WL 1784297, at *1 (D.D.C. June 22, 2026).

1168, 1185 (C.D. Cal. 2026) (noting that DOJ has asked states to run their SVRLs through SAVE).

It further appears, despite DOJ's denials below, that DOJ is aiming to create a national database of eligible U.S. voters. As one court observed, "[i]t appears that DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1186; *accord United States v. Oregon*, 828 F. Supp. 3d 1092, 1106 (D. Or. 2026). A recent Executive Order, "Ensuring Citizenship Verification and Integrity in Federal Elections," Exec. Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026), directs DHS to compile a "State Citizenship List" for each state to "assist in verifying identity and Federal election voter eligibility." *See* Add. at 7 n.6 (pointing to this EO as a reason for skepticism of DOJ's representations that it is not seeking SVRLs to compile a national voter database).

Federal officials have threatened to criminally prosecute state and local election officials if they do not act on information provided to them by the federal government, presumably including any results derived from running SVRLs through SAVE. Nick Corasaniti and Dustin Volz,

*Trump's Homeland Security Chief Threatens Election Officials with Prison Time*, N.Y. Times (July 17, 2026), *available at* https://tinyurl.com/45ycs8ev; *see also* Exec. Order 14,399 (directing DOJ to prioritize investigation and prosecution of state and local election officials).

*Procedural History*

On September 18, 2025, DOJ augmented its civil complaint with a motion for order to show cause, asking the district court to require immediate production of the SVRL. Maine opposed that motion, contending that Title III did not provide for an expedited special statutory proceeding and that, in any event, Maine was entitled to discovery concerning DOJ's true purposes for seeking the SVRL.

On December 12, 2025, Maine and two sets of intervenors filed motions to dismiss the complaint. Relevant here, Maine argued that DOJ's demand failed to state a basis and proper purpose for its demand pursuant to Title III, and that DOJ's demand violated the federal Privacy Act and E-Government Act. Intervenors further argued that the SVRL was not a record covered by Title III, which applies only to

records that "come into [the] possession" of election officials. *See* 52 U.S.C. § 20701.

On May 21, 2026, the district court granted the motions to dismiss and denied the motion for an order to show cause. The court first rejected DOJ's contention that Title III contemplates a "special statutory proceeding" in which Maine was not entitled to "ascertain the factual support for, or sufficiency of" the required statement of basis and purpose. Add. at 10–11.

The court then concluded that the SVRL is not the type of record that States must maintain and potentially produce to DOJ under Title III. The court concluded that Title III's command to preserve records that "come into [the] possession" of election officials "pertain[s] to records and papers that election officials receive from prospective voters to support the exercise of the suffrage by the prospective voters, not lists or other tools created by election officials for the purpose of preserving the information provided by voters and ensuring that persons appearing to vote are registered." Add. at 13.

The court further concluded, as an alternate basis for dismissal, that enforcing list-maintenance obligations is not a proper purpose for a

record demand under Title III. The court observed that the "granular" review DOJ intended to perform on the SVRL was incompatible with the NVRA and HAVA, both of which "could not be clearer [that] each individual state, and not [DOJ], is the master of its voter list, entrusted with its administration and maintenance." Add. at 15–16.

The district court did not reach Maine's arguments that DOJ failed to state a "basis" for its Title III demand and that DOJ's demand violates the federal Privacy Act and E-Government Act.

DOJ appealed the district court's order and, on June 17, 2026, filed a motion to expedite briefing of the appeal. Maine opposed, arguing that the motion to expedite confirmed DOJ's intent to pressure Maine to purge individual voters from the rolls shortly before the November election. This Court denied the motion.

## Summary of the Argument

The district court properly determined that DOJ is not entitled to a special statutory proceeding with no meaningful judicial review of DOJ's demand. As numerous district courts have now held, DOJ's reliance on *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) for this proposition is misplaced given the Supreme Court's determination only a few years later that the type of statutory language used in Title III does not exempt a proceeding from the Federal Rules of Civil Procedure. *See United States v. Powell*, 379 U.S. 48, 58 n.18 (1964).

On the merits, the district court correctly held that DOJ failed to state a valid purpose for its demand for Maine's SVRL. DOJ's argument that Title III's purpose requirement is merely "procedural" would, among other things, render this constraint upon DOJ overreach entirely toothless.

The district court further correctly held that enforcement of list-maintenance obligations under the NVRA and HAVA are not valid purposes under Title III, as Congress provided specific mechanisms to enforce those statutes that do not include the right to demand States' nonpublic records. These specific mechanisms negate any inference

that Congress intended the general mechanism set forth in Title III to apply to list-maintenance enforcement.

In the alternative, the Court should hold that NVRA and HAVA enforcement is an improper purpose because Title III was enacted as a tool to aid specifically in investigations of racial discrimination in voting. In interpreting the ambiguous scope of the purpose requirement, this Court should rely on the copious legislative history demonstrating that Title III was enacted to combat that specific social ill.

The Court should also affirm the district court's holding that the SVRL is not covered by Title III because it is not a paper or record that "comes into [the] possession" of state officials, as required by Title III, but rather is created by those officials. The district court's holding on this issue is in accord with the Sixth Circuit and numerous district courts. It is also the only reading of the statute that gives meaning to all the words of the statute without surplusage.

The Court may also affirm the district court on the alternate ground that DOJ never stated "the basis" for its request as Title III requires. As several courts have held, to prevent redundancy with the

purpose requirement, this provision requires DOJ to state a factual basis for its investigation. DOJ's letters to the Secretary did not do so. Moreover, the questions that DOJ now implausibly identifies as its "basis" were stated in a prior letter and not DOJ's demand under the Title III.

Finally, the Court may also affirm on the alternate grounds that DOJ's demand violates both the Privacy Act and the E-Government Act. DOJ seeks records of protected First Amendment activities of voters without a proper purpose required by the Privacy Act and has also not issued the System of Records Notice required before it can collect PII on over one million Maine voters. Moreover, DOJ has not conducted the Privacy Impact Assessment required by the E-Government Act prior to collecting such vast quantities of PII.

## Argument

This Court reviews de novo the grant of a motion to dismiss. *Freeman v. Town of Hudson*, 714 F.3d 29, 35 (1st Cir. 2013). The Court treats non-conclusory factual assertions in the complaint as true but "need not give weight to legal conclusions contained in the complaint." *Id.* The Court may also consider "documents which are of undisputed authenticity, official public records, central to the plaintiff's claim, or sufficiently referred to in the complaint." *Pitta v. Medeiros*, 90 F.4th 11, 14 n.2 (1st Cir. 2024). The Court is "free to affirm an order of dismissal on any basis made apparent from the record." *Freeman*, 714 F.3d at 35.

### I. The district court was not required to rubber-stamp DOJ's demand.

Title III provides that the district court "shall have jurisdiction by appropriate process to compel the production of such record[s]" covered by Title III's preservation and production requirements. 52 U.S.C. § 20705. In the proceedings below, DOJ took an inconsistent approach in seeking to compel production of Maine's SVRL. On the one hand, DOJ filed an ordinary civil complaint under the Federal Rules of Civil Procedure. On the other, it filed a motion for order to show cause seeking to bypass the civil rules on a theory that Title III creates a

"special statutory proceeding" that forecloses any meaningful judicial inquiry into whether DOJ's demand states a valid factual basis and purpose and otherwise complies with federal law. The district court was correct in rejecting DOJ's argument. *See* Add. at 11.

As a general matter, the Federal Rules of Civil Procedure "govern the procedure in all civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1; *cf. Fed. Rsrv. Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000) (interpreting similar language to "apply to any proceedings in a court of justice by which an individual pursues a remedy which the law affords" (quoting *Weems v. McCloud*, 619 F.2d 1081, 1088 (5th Cir. 1980))). The Supreme Court has repeatedly endorsed "the uniform and regular civil procedure laid down by the Federal Rules," such that absent "express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law." *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960); *accord Daly v. United States*, 393 F.2d 873, 876 (8th Cir. 1968) ("Except when expressly authorized by statute[,] summary procedures are to be substituted for plenary actions only in narrowly defined special

situations.”); *S.E.C. v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) (“We agree that courts should be ‘reluctant’ to authorize the use of summary proceedings unless there is a strong reason for doing so.”). The necessary “express statutory authorization” consists of “procedures and remedies specifically tailored to a limited subset of cases.” *N.Y. Times v. Gonzalez*, 459 F.3d 160, 166 (2d Cir. 2006); *see also United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 436 (2023) (“[W]e do not lightly infer that Congress has [overridden Fed. R. Civ. P. 1]; and silence on the subject is seldom enough.”).

Nothing in Title III identifies “procedures . . . specifically tailored” to an enforcement action under the statute. *Cf. Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (recognizing that a provision in the Civil Rights Act of 1964 creates a “special statutory proceeding” for certain actions); *Booth v. Hume Publ’g, Inc.*, 902 F.2d 925, 931–32 (11th Cir. 1990) (recognizing that the Federal Arbitration Act, which sets forth a series of rules and procedures, creates a special statutory proceeding in which the federal rules are applicable only where the Act is silent). In fact, § 20705 does not create anything “special” at all,

merely referring to "appropriate process" without further specification. Absent such specification, the ordinary rules of civil procedure apply.

For its contrary position, DOJ relies exclusively on *Lynd*, a 64-year-old decision from a different jurisdiction. DOJ Br. at 14–15. That decision, with little supporting reasoning, concluded that 52 U.S.C. § 20705 creates a special statutory proceeding in which the target of a DOJ demand for records is denied virtually all of the protections of the civil rules and may not even seek to "ascertain the factual support for, or the sufficiency of" DOJ's statement of basis and purpose. 306 F.2d at 226. *Lynd* has not been cited on a single occasion by any federal court in over 40 years for the proposition that Title III creates a special statutory proceeding.

That dearth of caselaw is likely because *Lynd*'s holding was almost immediately undermined by the Supreme Court's decision in *Powell*, which held that a provision of the tax code permitting enforcement of summonses "by appropriate process"—the same phrase used in § 20705—did *not* create a special statutory process. 379 U.S. at 58 n.18. Rather, because the provision did not "specify[] the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of

Civil Procedure apply." *Id.*; *accord United States v. McKay*, 372 F.2d 174, 175 (5th Cir. 1967); *Application of Howard*, 325 F.2d 917, 919 (3d Cir. 1963).

The district court correctly recognized that *Powell* is fatal to DOJ's attempt to rely on *Lynd*. Add. at 11. And it is not alone. Every court to consider DOJ's argument has rejected *Lynd*'s approach to Title III. *See, e.g.*, *United States v. Benson*, 179 F.4th 470, 483 n.2 (6th Cir. 2026) (recognizing that *Powell* and other decisions "carve[] out a role for the courts in reviewing civil investigative demands like the government's"); *Oregon*, 828 F. Supp. 3d at 1102 ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*."); *United States v. Griswold*, No. 25-CV-03967, 2026 WL 2235374, at *3 (D. Colo. Aug. 3, 2026); *United States v. DeMarinis*, No. CV-SAG-25-3934, 2026 WL 1780586, at *3 (D. Md. June 18, 2026); *Bd. of Elections of N.Y.*, No. 1:25-CV-1338, 2026 WL 1999921, at *7 (N.D.N.Y. July 10, 2026).

DOJ attempts to distinguish *Powell* by arguing that § 20705 involves demands for "state documents from a state official—not an individual's private papers." DOJ Br. at 19. But DOJ's attempt to

collect highly sensitive data on over one million Maine voters implicates precisely the same privacy interests that the traditional safeguards on administrative subpoenas are meant to protect. *See generally United States v. Apodaca*, 251 F. Supp. 3d 1, 5 (D.D.C. 2017) (recognizing that third parties may establish Fourth Amendment or statutory standing to challenge federal administrative subpoenas issued to state agencies).

More to the point, DOJ's attempt to distinguish *Powell* from *Lynd* ignores its actual reasoning. *Powell* did not turn on the Fourth Amendment rights of private individuals. Rather, *Powell* concluded that the civil rules applied because the administrative subpoena statute at issue in that case contained "no provision specifying the procedure to be followed." *Powell*, 379 U.S. at 58 n.18. Title III is indistinguishable from the statute in *Powell* in this key respect.

DOJ further argues that *Powell*'s holding was meant to implement an anti-harassment provision in the tax code, 26 U.S.C. § 7605(b), and that Title III contains no comparable protections against DOJ seeking records for improper purposes or otherwise acting in bad faith. DOJ Br. at 20–21. But as several courts have now recognized, Title III's requirement that DOJ specify "the basis" and "the purpose" for its

demand, 52 U.S.C. § 20703, is precisely such a protection. *Weber*, 816 F. Supp. 3d at 1184 (requirement to state basis and purpose is to prevent DOJ "fishing expedition"); *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026) (requirement to state the basis ensures that Attorney General *has* a basis for demand); *United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877, at *5 (C.D. Ill. July 31, 2026) (purpose requirement should not be interpreted to give Attorney General "unfettered authority to demand voting records"). DOJ's approach of denying targets of its records demands any procedural mechanism to question the legitimacy of the demand would render this important safeguard entirely ineffectual.

In its effort to suggest that the district court was required to merely rubber-stamp DOJ's demand, DOJ also misreads *Powell* as limiting inquiry into whether the federal government was acting "for nefarious reasons." DOJ Br. at 21. As the district court and other courts have recognized, there is in fact strong evidence that DOJ is seeking the SVRL for nefarious purposes. *See* Add. at 7 n.6; *Weber,* 816 F. Supp. 3d at 1186 ; *Oregon,* 828 F. Supp. 3d at 1106–07. Should this case be remanded, even under the standards applicable to

administrative subpoenas, Maine would be entitled to discovery on that issue. *See United States v. Markwood*, 48 F.3d 969, 983 (6th Cir. 1995) (observing that discovery is allowed on a "preliminary and substantial demonstration of abuse" of the court's process (internal quotation marks omitted)). But, in any event, *Powell* does not limit the available avenues of judicial inquiry as DOJ suggests. To the contrary, *Powell* states that the government must show that its "investigation will be conducted pursuant to a legitimate purpose." *Powell*, 379 U.S. at 57. DOJ's inability to satisfy that requirement here is precisely why (on one alternative basis) the district court dismissed its Complaint. Add. at 14–18.

Finally, DOJ's reliance on *Donaldson v. United States*, 400 U.S. 517 (1971), is misplaced. That case interpreted Rule 81 of the Federal Rules of Civil Procedure, which does not apply here. And, even if it did, *Donaldson* merely stands for the proposition that a federal court, in its discretion, may "limit the application of the rules" in a summary enforcement proceeding under Rule 81, so long "as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Id.* at 528–29. Here, in contrast, DOJ seeks an

inflexible rule that would preclude any meaningful challenge to a Title III demand.

Alternatively, DOJ argues that even if a "special statutory proceeding" pursuant to *Lynd* does not apply, the district court went "far afield" of this Court's administrative subpoena precedents in dismissing DOJ's case. DOJ Br. at 23–28. This argument also misses the mark.

As an initial matter, DOJ's demand was not in fact an administrative subpoena—it was a records demand under 52 U.S.C. § 20703. Thus, while the district court "[a]nalogiz[ed]" the demand to an administrative subpoena, Add. at 11, it is far from clear that Maine is limited to the procedural protections available to recipients of such subpoenas. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182 (observing that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures"); *Oregon*, 828 F. Supp. 3d at 1103 (applying the Federal Rules of Civil Procedure "as in any other case").

In any event, even if administrative subpoena procedures applied, the issues raised by Defendants and decided by the district court are within the scope of those procedures. The district court's first basis for

dismissal was that the statute defining the records subject to demand, 52 U.S.C. § 20701, could not be construed to cover SVRLs. Such arguments may properly be raised by the targets of administrative subpoenas. *See United States Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 731 (1st Cir. 2022) (considering merits of defendant's contention that federal agency lacked statutory authority for subpoena); *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (requiring the government's inquiry to be "within the authority of the agency").

Consideration of whether DOJ had a valid basis and purpose and whether its demand violates federal privacy laws is similarly cognizable in the administrative subpoena context. As DOJ acknowledges, one prong of the test for assessing the validity of an administrative subpoena requires DOJ to establish that "proper procedures have been employed in issuing the subpoena." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). As DOJ also acknowledges, Title III's requirement that DOJ state "the basis" and "the purpose" for its demand are such procedures. *See* DOJ Br. at 26. So too are the requirements that DOJ issue a System of Records Notice under the

Privacy Act and conduct a privacy impact assessment under the E-Government Act. *See* Part V, *supra*.

Thus, in observing that the NVRA and HAVA do not "contemplate the line-by-line audit of each state's computerized SVRL by the federal government," Add. at 17, the district court was not engaged in a prohibited analysis of DOJ's "substantive authority to regulate," *see* DOJ Br. at 24 (quoting *Sturm, Ruger & Co.*, 84 F.3d at 5). Rather, it was properly determining whether DOJ had complied with Title III's express procedural requirement that the Attorney General state a valid "purpose" for his demand. *See* Add. at 17–18.

## II. DOJ stated an invalid purpose for its demand.

### A. DOJ's stated purpose must be valid.

Title III requires DOJ to state in writing "the purpose" of any demand for voting records. 52 U.S.C. § 20703. The district court concluded that DOJ's stated purpose of ascertaining Maine's compliance with the NVRA and HAVA is not a valid purpose under Title III, given that those statutes contain their own specific enforcement frameworks that do not contemplate pre-enforcement disclosure of sensitive voter data. Add. at 14–18.

As a threshold matter, DOJ argues that the district court erred in concluding that its stated purpose for the demand must be *valid*. It argues instead that the purpose requirement is a mere "procedural limitation, not a substantive one." DOJ Br. at 30. In other words, in DOJ's view, the Attorney General could comply with the statute's requirements by stating any purpose at all, even a patently improper purpose or one entirely unrelated to Title III.

That cannot be correct. In interpreting a statute, courts may look to the "practical effect of the arguments made." *Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1238 (1st Cir. 1997). Moreover, a statute must be interpreted to avoid rendering part of the statute "inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks omitted). Here, DOJ's argument would render the purpose requirement essentially meaningless. As one court put it, "[i]f any purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 828 F. Supp. 3d at 1104; *accord United*

*States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877, at *6 (S.D. W. Va. July 13, 2026).

### B. The district court correctly held that NVRA and HAVA enforcement is not a valid purpose.

DOJ's arguments against the district court's conclusion that Title III does not extend to enforcement of the NVRA and HAVA are without merit.

DOJ's arguments ignore Title III's context. DOJ characterizes the district court's interpretation of the purpose requirement as an "extratextual limit on Title III." DOJ Br. at 32. But "[i]t is a familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers." *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201 (1979) (internal quotation marks omitted).

Moreover, in considering the plain meaning of a statute, a court must "read the words Congress enacted 'in their context and with a view to their place in the overall statutory scheme.'" *United States v. Abbas*, 100 F.4th 267, 283 (1st Cir. 2024) (quoting *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023)). Title III is part of a larger statutory framework enacted to address "the maze of

voter registration requirements employed by southern states to disenfranchise their black residents." *Evans*, 2026 WL 2267774, at *8. The district court's interpretation of the purpose requirement as excluding enforcement of list-maintenance requirements, which would not be enacted until decades later for purposes unrelated to the social ills that prompted Title III, properly contextualized the purpose requirement within the overall statutory framework.

Indeed, this Court engaged in such a contextual analysis in a related context in *Public Interest Legal Foundation v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ("*PILF*"). In construing the NVRA's public disclosure provision, 52 U.S.C. § 20507(i), this Court followed the holdings of several other courts to conclude that "uniquely or highly sensitive personal information" contained in a State's SVRL need not be disclosed, even though the NVRA contains no such exceptions in its text. 92 F.4th at 56; *see Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (redactions to SVRL authorized by "text and purposes of the NVRA, and privacy considerations found in Federal and State laws"). A similar analysis applies here.

In taking issue with the district court's interpretation of Title III, DOJ relies on a warped picture of the statutory framework created by the NVRA and HAVA. In DOJ's telling, Congress created a framework in which a state "add[s] and remov[es] voters from its SVRL," while the Attorney General "look[s] over the shoulder of the state election official" as necessary to fulfill his enforcement responsibilities. DOJ Br. at 33–34. But in fact it is the States that are charged with designing and implementing programs to remove ineligible voters from their SVRLs. *See, e.g.*, 52 U.S.C. § 20507(a)(4) (NVRA); 52 U.S.C. §§ 21083(a)(1)(A) (HAVA). For HAVA, federal law specifies that "[t]he specific choices on the methods" of compliance "shall be left to the discretion of the State." 52 U.S.C. § 21085. DOJ's role is limited to enforcing the NVRA's and HAVA's modest requirement of a "reasonable" list-maintenance program, which requires merely "a serious attempt that is rational and sensible." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025). As the district court concluded, Add. at 16, the NVRA and HAVA give DOJ no authority to dictate to Maine who should and should not be registered to vote—the only conceivable reason DOJ could be seeking Maine's unredacted SVRL.

Building off its warped view of the statutory framework, DOJ suggests that Congress omitted from the NVRA any subpoena authority based on an assumption that the DOJ could simply leverage its unrelated authority under Title III to secure any records it needed. DOJ Br. at 36. Unsurprisingly, DOJ points to no legislative history supporting this implausible supposition. There is no reason to think that Congress would have assumed that a 1960 law intended to facilitate investigations of racial discrimination could be used by DOJ to augment its powers to enforce list-maintenance obligations under the NVRA and HAVA.

Moreover, DOJ's argument that the NVRA and HAVA are not a "comprehensive scheme," and thus intended to be supplemented by Title III, because they lack a broad authority to demand records, DOJ Br. at 35, begs the question. Given (1) the substantial discretion the NVRA and HAVA delegate to states to design their own list maintenance practices, (2) States' primary role under the U.S. Constitution as the administrators of federal elections, *see* U.S. Const. art. I, § 4, cl. 1, (3) DOJ's limited enforcement responsibilities, and (4) the NVRA's existing public disclosure provision under 52 U.S.C.

§ 20507(i), Congress's decision not to give the DOJ sweeping subpoena power over state election records is best understood as a *feature* of the NVRA's and HAVA's comprehensive scheme, rather than an indication that the scheme is not comprehensive. *See* Add. at 20 (noting that DOJ's interpretation of Title III would "take a sledgehammer to the balance Congress struck" in enacting HAVA).

DOJ's citation to the NVRA's general provision stating that the "rights and remedies" set forth in the NVRA's enforcement provision "are in addition to all other rights and remedies provided by law," DOJ Br. at 36 (citing 52 U.S.C. § 20510(d)(1)), does not undermine the district court's reasoning. The district court's analysis concerned the proper interpretation of the "purpose" requirement in Title III. *See* Add. at 15. Language in the NVRA about the scope of "rights and remedies" is irrelevant to that analysis. And, in any event, the context of that provision makes clear that the relevant "rights" are rights to bring suit, not to issue administrative subpoenas.

DOJ also attacks the district court's reliance on *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), for the proposition that "[w]hen 'a general authorization and a more limited,

specific authorization exist side-by-side,' the specific provision controls." Add. at 18 (quoting *RadLAX*, 566 U.S. at 645). DOJ cites *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014) for the proposition that complementary statutes with "*separate* scopes and purposes" can be simultaneously implemented if they do not conflict. (Emphasis added.) But DOJ's entire suit depends on Title III and the NVRA and HAVA *not* having "separate scopes and purposes"—with Title III essentially being a tool for NVRA and HAVA enforcement. *POM Wonderful* thus does not support DOJ's position.

Nor is DOJ correct that the district court misapplied the canon regarding general and specific authorizations. *RadLAX* describes the canon as applying when "a general permission or prohibition is contradicted by a specific prohibition or permission." *RadLAX*, 566 U.S. at 645. That is the case here: to the extent Title III contains a seemingly general permission to demand records, that permission is contradicted by the detailed and specific statutory frameworks under the NVRA and HAVA, which provide various investigative and enforcement tools—including a more limited disclosure provision in the

case of the NVRA, *see* 52 U.S.C. § 20507(i)—but conspicuously omit any provisions allowing the Attorney General to demand records.

Finally, DOJ takes issue with the district court's invocation of federalism to support its purpose analysis, pointing to caselaw holding that Congress may enact laws superseding state election laws. DOJ Br. at 51–52. But the district court's point was not that Congress cannot regulate federal elections; it was that Congress's choices in the NVRA and HAVA reflect a sensitivity and deference to the States' role under the Constitution as the primary administrators of federal elections. Add. at 18–20. Such consideration of congressional intent was entirely proper. *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) ("A court's lodestar in interpreting a statute is to effectuate congressional intent.").

### C. A valid purpose under Title III must relate to combating racial discrimination in voting.

Though the district court ultimately rested its conclusion that DOJ stated an invalid purpose on the exclusive nature of the NVRA's and HAVA's enforcement frameworks, it acknowledged that Maine and the Intervenors made "strong arguments" that Title III "must relate to a purpose of investigating violations of individuals' voting rights." Add.

at 14. Should this Court be unpersuaded by the district court's more specific "purpose" analysis, it should follow the analysis of the multiple district courts that have dismissed DOJ's demands for SVRLs on this basis. *See United States v. Amore*, 831 F. Supp. 3d 149, 157–58 (D.R.I. 2026); *Oregon*, 828 F. Supp. 3d at 1105; *Weber*, 816 F. Supp. 3d at 1182–83; *Warner*, 2026 WL 2018877, at *7.

Consideration of legislative history, historical context, and underlying policies is appropriate where the meaning of statutory text cannot be determined simply from the text itself. *In re Weinstein*, 272 F.3d 39, 48 (1st Cir. 2001); *see Matamoros v. Starbucks Corp.*, 699 F.3d 129, 134 (1st Cir. 2012) (courts may "resort to extrinsic aids to statutory construction (such as legislative history)" where wording of a statute leads to an "unreasonable result"). As demonstrated in Part A above, Title III cannot plausibly be interpreted as permitting DOJ to demand records for any purpose at all, including even patently improper ones. Use of these additional interpretative tools is therefore necessary to determine the scope of acceptable purposes under the statute.

Title III was designed to protect the "key constitutional right of every American, the right to vote without discrimination on account of

race or color." "Statement by the President Upon Signing the Civil Rights Act of 1960," May 6, 1960, *available at* https://tinyurl.com/3ses36xe. Yet there was a gap in existing law at the time, which then–Attorney General William Rogers described as a lack of "power to require the production of election records during any investigation of complaints that qualified persons have been denied the right to vote in violation of federal law," without which "assembl[ing] the necessary proof of discrimination [was] impracticable, if not impossible." Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong. 13-14 (Mar. 20, 1959), *available at* https://tinyurl.com/2caa3m27. Accordingly, at President Eisenhower's recommendation, *see* H.R. Doc. No. 75 (1st Sess. 1959), *reprinted in* 105 Cong. Rec. 1922 (Feb. 5, 1959), the records provision was adopted to "provide[] a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956 (Aug. 20, 1959), *reprinted in* 1960 U.S.C.C.A.N. 1925, 1944; *see also Benson*, 179 F.4th at 475 (describing Title III as Congress's response to the "largely

ineffective" efforts to enforce the Civil Rights Act of 1957); *Evans*, 2026 WL 2267774, at **8–10 (recounting legislative history of Title III).

In short, Title III in general, and § 20703 in particular, is part of a larger statutory framework to combat racial discrimination in voting. Given this context, Congress could not plausibly have intended to authorize through § 20703 demands unrelated to combating racial discrimination in voting, let alone patently improper ones. *See DJ Mfg. Corp. v. Tex-Shield, Inc.*, 347 F.3d 337, 342 (1st Cir. 2003) (relying on legislative history to give a "narrow reading" to statutory language).

DOJ's demand for Maine's SVRL for the alleged purpose of enforcing list-maintenance requirements in the NVRA and HAVA is entirely unmoored from Title III's purpose. *Cf. Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962) (noting that statistical evidence in a Title III records-production proceeding indicating a failure to remove voters who moved away or died was "a matter which does not bear any particular importance to the present inquiry"). Nothing in either of DOJ's letters to Maine suggests any concern about racial discrimination in voting. A32–34, 41–43. DOJ's demand, therefore, is invalid.

Finally, DOJ argues that the NVRA and HAVA have purposes consistent with Title III's purpose. But even if parts of the NVRA might concern "discriminatory and unfair registration laws," DOJ Br. at 32, the list-maintenance requirements that DOJ purportedly seeks to enforce here are not among them. As the NVRA expressly states, the purpose of those requirements is to "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4). While that purpose is laudable, it has nothing to do with addressing the sorts of systematic barriers to voting experienced by Black voters in the 1960s-era South. Similarly, the goal of protecting against "fraudulent voting" and the resulting dilution of the voting power of qualified voters, DOJ Br. at 33, is unrelated to Congress's goal in enacting Title III. Congress was concerned that states were refusing to register qualified voters, not that they were registering unqualified voters. *See Evans*, 2026 WL 2267774, at *8.

## III. The district court correctly held that the SVRL is not a record covered by Title III.

The district court also correctly concluded, in accord with the Sixth Circuit and 16 district courts,[3] that the SVRL is not the type of "record" that elections officials are required to preserve and produce to the Attorney General under Title III.

Under Title III, states are required to preserve only those "records and papers" that "come into [the] possession" of election officers "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ's ability to demand records is limited to such records "required . . . to be retained and preserved" by § 20701. *Id.* § 20703.

As the Sixth Circuit observed, while Title III does not define "come into . . . possession," various dictionaries and other sources contemporaneous to the enactment of Title III do. *Benson*, 179 F.4th at

---

[3] *See Benson*, 179 F.4th at 478–83; *Simon*, slip op. at 16–23; *Aguilar*, 2026 WL 2364502, at *4; *Evans*, 2026 WL 2267774, at *11; *Griswold*, 2026 WL 2235374, at *5, *Matthews*, 2026 WL 2212877, at *4, *Caldwell*, 2026 WL 2186515, at *8, *Adams*, 2026 WL 2123871, at *5, *Thomas*, 2026 WL 2070437, at *7, *Koski*, 2026 WL 2032532, at *6, *Bd. of Elections of N.Y.*, 2026 WL 1999921, at *11; *Scanlan*, 2026 WL 1864054, at *6; *Schmidt*, 2026 WL 1850016, at *2; *Wis. Elections Comm'n*, 2026 WL 1430354, at *5, *Fontes*, 2026 WL 1177244, at *7; *Benson*, 819 F. Supp. 3d at 770.

478. And those sources make clear that the phrase means to "acquire," "obtain," or "receive." *Id.* (citing sources).

The SVRL is part of Maine's CVR system, "a single electronic information system and database for voter registration information maintained by the Secretary of State." 21-A M.R.S.A. § 1(6-A). CVR was created pursuant to legislation directing the Secretary to "develop and implement a centralized voter registration system." P.L. 2001, ch. 637 (codified until repealed at 21-A M.R.S.A. § 191), *available at* https://tinyurl.com/3k84zzfp.

Thus, the SVRL is not something that is "received" or "acquired" by the Secretary from an external source. Rather, it was "develop[ed]" and "implement[ed]"—and is currently "maintained"—by her Office. 21-A M.R.S.A. § 1(6-A); P.L. 2001, ch. 637. As the Sixth Circuit observed, "[a]n ordinary English speaker would not say that she has come into possession of something that she created, established, and maintained." *Benson*, 179 F.4th at 479. Thus, to "give effect to the phrase 'come into [their] possession' and prevent it from being surplusage," § 20701 should be interpreted to exclude self-created records such as the SVRL. *United States v. Scanlan*, No. 25-CV-371,

2026 WL 1864054, at *4 (D.N.H. June 29, 2026) (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 769 (W.D. Mich. 2026), *aff'd* 179 F.4th 470 (6th Cir. 2026 (reh'g en banc denied Aug. 14, 2026)).[4]

DOJ raises several arguments against this straightforward reading of the statutory text. None are persuasive. DOJ points to the "broadening effect" of the phrase "relating to." DOJ Br. at 40 (quoting *United States v. Trahan*, 111 F.4th 185, 197 (1st Cir. 2024)). But, as a syntactical matter, "relating to" modifies the subsequent description of the types of "records and papers" that must be preserved, not the requirement that the record "come into [the] possession" of the Secretary. *See Evans*, 2026 WL 2267774, at *8. "Relating to" therefore may broaden the scope of records covered *if* they come into the

[4] DOJ is factually mistaken that the SVRL is merely an "aggregat[ion]" of voter registration applications. DOJ Br. at 44. Although CVR contains data derived from individual voter registrations, it also contains data derived from other sources, such as a history of elections in which the voter has participated, *see* 21-A M.R.S.A. § 721, detailed information on any absentee ballot requests, *id.* § 753-B(6), and whether the voter has been designated "inactive" through Maine's list-maintenance program, *id.* § 162-A(2). The CVR also contains data that it generates internally, such as the date that a voter record was altered. *Id.* § 196-A(1)(B). The SVRL therefore cannot be analogized to a bundle of paper voter registration applications in electronic form for purposes of Title III. *See Wisc. Elections Comm'n*, 2026 WL 1430354, at *4 (observing that SVRLs "contain additional information that Congress may very well have wanted to exempt from production").

Secretary's possession, but it does not modify the scope of the "come into possession" requirement.

DOJ argues that "come into [the] possession" should be understood broadly to include obtaining possession "by any means," including self-creation. DOJ Br. at 41–42. But DOJ's argument runs headlong into the canon against surplusage. Under that canon, "[c]ourts "generally ought not to interpret statutes in a way that renders words or phrases either meaningless or superfluous." *Barr*, 954 F.3d at 37. Under DOJ's interpretation, Congress could have omitted the words "which come into [the] possession" altogether, and the meaning of the statute would be unchanged. The canon against surplusage counsels against such a result. *See United States v. Fontes*, No. CV-26-00066, 2026 WL 1177244, at *2 (D. Ariz. Apr. 28, 2026) ("[I]f § 20701 was intended to encompass records created by the state, that meaning could have been achieved by omitting the phrase altogether.").

DOJ's reliance on *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989), interpreting the dissimilar Freedom of Information Act, is similarly misguided. As the Sixth Circuit points out in *Benson*, *Tax Analysts* was not construing any statutory language

analogous to Title III's "come into [the] possession" language. 179 F.4th at 481. Rather, it was construing the term "agency records" and properly giving that term an expansive meaning to include self-created records. *Id.*; *accord United States v. Koski,* 2026 WL 2032532, at *6, (E.D. Va. July 14, 2026).

DOJ's related argument that "come into [the] possession" should be read as a temporal restriction, DOJ Br. at 41, 45, as opposed to a source restriction, is similarly without merit. As courts have observed, "§ 20701 already has an explicit temporal component" requiring preservation of records for 22 months, rendering implausible any "hidden meaning about additional time restraints" within the statutory text. *Koski*, 2026 WL 2032532, at *6; *see United States v. Wis. Elections Comm'n*, No. 25-CV-1036, 2026 WL 1430354, at *4 (W.D. Wis. May 21, 2026).

DOJ also relies on *PILF*, which held that the Secretary must disclose to a private group a less sensitive version of the SVRL. DOJ Br. at 43. But in its decision this Court in *PILF* relied on the "sweeping language that Congress adopted" in the NVRA's public disclosure provision. 92 F.4th at 48. That language contains no limitation

requiring records to "come into [the] possession" of the relevant official. *See* 52 U.S.C. § 20507(i).

DOJ argues that Congress has previously used phrases similar to "come into possession" to "regulate acquiring information or property through improper means or to trigger duties to act based on acquiring information or property at a particular time." DOJ Br. at 45. "But the fact that Congress often uses 'come into possession' with other words specifying when or the manner in which something is acquired tells us nothing about the ordinary meaning of 'come into possession.'" *Evans*, 2026 WL 2267774, at *7. Moreover, as the New Hampshire District Court observed in rejecting this argument, "Congress has consistently employed the phrase 'comes into possession' to describe the process by which a person receives something from an external source, including in the statutes cited by the United States." *Scanlan*, 2026 WL 1864054, at *5 (discussing various examples). This holds true even for DOJ's "lead statutory exemplar," 8 U.S.C. § 1454(a). *Id.*; *see* DOJ Br. at 46. DOJ cites not a single example of a statute that describes something self-created as "coming into possession" of the creator.

DOJ next points to county-maintained indices of "vouching" as alleged examples of government-created records used in civil rights investigations in the 1950s. But, contrary to DOJ's suggestion, the 1959 report of the Commission on Civil Rights contains no recommendation that these indices specifically be made "available for federal inspection." DOJ Br. at 48. Rather, the report contains a generalized recommendation that "all State registration and voting records shall be public records and must be preserved for a period of 5 years." Report of the United States Commission on Civil Rights at 138 (1959), *available at* https://www.usccr.gov/files/historical/1959/59-001-U.pdf. Comparing this broad recommendation to the text of Title III—which makes certain voting records available to the Attorney General on a confidential basis for a much shorter period and subject to procedural restrictions—demonstrates that Congress's approach was significantly more cautious than the approach advocated by the Commission.

Moreover, as the *Evans* court and others have set forth in detail, the primary issue that Title III sought to address was not accessing in-house state government records, but preventing southern states'

destruction of voting registration applications by Black citizens. *See Evans*, 2026 WL 2267774, at *9 (noting that "the Alabama law authorizing the destruction of rejected registration materials was repeatedly cited as the mischief that Title III was enacted to address"); *see also Benson*, 179 F.4th at 479 (noting that under Title III "election officers would have to retain and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had"). In any event, the fact that the Commission on Civil Rights may have occasionally reviewed government-generated records as part of its investigations cannot override the plain statutory text of Title III.

Finally, DOJ's assertion that it needs access to the States' unredacted SVRLs to enforce a plethora of federal voting laws, DOJ Br. at 49–50, rings hollow. DOJ has pointed to only a handful of historical examples in which it obtained complete SVRLs from states with those states' consent and no cases in which it successfully compelled production of such lists in adversary proceedings. *See* DOJ Br. at 39. Were DOJ regularly using complete, unredacted SVRLs to enforce voting laws, one would expect such cases to be commonplace. What is

more, as the district court recognized, DOJ has available to it the various "pre-suit investigation and enforcement mechanisms" provided by the NVRA and HAVA. Add. at 18. The Court should require DOJ to rely on these existing tools rather than grant it sweeping and unprecedented power to compile sensitive data on hundreds of millions of Americans for purposes that, at minimum, include undertaking an unauthorized "line-by-line audit" of every State's voter rolls. Add. at 19.

## IV. DOJ failed to state a basis for its demand.

While DOJ articulated "the purpose" for its demand, albeit an invalid one, it entirely failed to articulate "the basis" for its demand, as separately required by Title III. *See* 52 U.S.C. § 20703.

Multiple courts have elucidated the "statement of the basis" requirement based on the plain text of the statute. The "basis" for a demand is the factual basis—i.e., evidence that there are potential violations of federal law. *Scanlan*, 2026 WL 1864054, at *7 ("If 'the purpose' denotes the investigative objective of the demand, it follows that 'the basis' in this context is the evidentiary or factual predicate giving rise to the demand in the first place."); *see also Weber*, 816 F. Supp. 3d at 1184 ("The basis is the reasoning provided by the DOJ

regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law.”).[5] That basis must be expressly stated. *See Galvin*, 830 F. Supp. 3d at 128 (“[T]he text [of Title III] makes clear that ‘the basis’ of the demand must be made express . . . .”); *Benson*, 179 F.4th at 476 (noting that DOJ must “make[] a ‘demand in writing’ that specifies ‘the basis and the purpose’ for the inspection (quoting 52 U.S.C. § 20703)).

Crucially, the “basis” for the demand is distinct from the “purpose,” and a demand must include an express statement of both to be valid under Title III. *Scanlan*, 2026 WL 1864054, at *6 (“On its plain terms, [the statutory language] signals that ‘basis’ and ‘purpose’ are separate, non-overlapping requirements, each of which must independently be satisfied.”); *accord United States v. Aguilar*, 2026 WL 3:25-CV-00728, at *5 (D. Nev. Aug. 14, 2026); *Galvin*, 830 F. Supp. 3d at 128; *Oregon*, 828 F. Supp. 3d at 1103; *Amore*, 831 F. Supp. 3d at 156; *Warner*, 2026 WL 2018877, at *5. As courts have noted, “requiring the Attorney General to articulate both a factual predicate and an

[5] *Accord Galvin*, 830 F. Supp. 3d at 130; *Oregon*, 828 F. Supp. 3d at 1103–04; *Matthews*, 2026 WL 2212877, at *5; *Amore*, 831 F. Supp. 3d at 156.

investigative objective before compelling production of state records is entirely consistent with Title III's overall structure, which conditions the government's inspection power on compliance with these threshold requirements." *Scanlan*, 2026 WL 1864054, at *7; *see also Weber*, 816 F. Supp. 3d at 1184 ("The requirement that [DOJ] state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute.").

Further, both the statement of the basis and the statement of the purpose must be included together in the same demand. *See* 52 U.S.C. § 20703 (providing that "*[t]his demand* shall contain a statement of the basis *and* the purpose therefor" (emphasis added)); *Benson*, 179 F.4th at 483 ("The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose. None of the three letters [from DOJ to Michigan] contains both a statement of the basis along with the purpose of the government's request for Michigan's qualified voter file."); *accord Galvin*, 830 F. Supp. 3d at 128; *Griswold*, 2026 WL 2235374, at *4; *United States v. Adams*, No. 3:26-CV-00019, 2026 WL 2123871, at *6 (E.D. Ky. July 23, 2026). Nor can DOJ rely on a

"patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'" from multiple pieces of correspondence between DOJ and the target of the demand for records. *Oregon*, 828 F. Supp. 3d at 1104; *accord Galvin*, 830 F. Supp. 3d at 128; *Griswold*, 2026 WL 2235374, at *4.

Against this backdrop, it is evident that DOJ failed to make the statutorily mandated statement of the basis for its demand. On their face, neither of the DOJ's two letters to the Secretary—dated July 24 and August 18, 2025—provide an express basis statement specifying "the evidentiary or factual predicate giving rise to the demand in the first place." *Scanlan*, 2026 WL 1864054, at *7; *Galvin*, 830 F. Supp. 3d at 129. Neither letter therefore provides the statutorily required express statement of "specific, articulable facts pointing to the violation of federal law." *Weber*, 816 F. Supp. 3d at 1184.

DOJ contends that a basis can be inferred from the July 24 letter's recitation of data from and queries about the most recent EAVS survey. DOJ Br. at 26–27. But even assuming, contrary to the plain statutory language, that a basis can be implied rather than expressly stated, a factual basis for DOJ's demand cannot be imputed from the letter's

queries about the EVAS data, such as that Maine has a high voter registration rate. Indeed, the most cursory look at the EAVS data referenced in the July 24 letter fatally undercuts any implication that this data supplies a basis for suspecting Maine of noncompliance with federal law.[6]

Moreover, even if this Court were to conclude that the July 24 letter includes a statement of the basis for the demand, the July 24 letter does not include a statement of purpose. Indeed, as noted above, for the statement of purpose, DOJ points to the August 18 letter, in which it "stated that the purpose of the demand was 'to ascertain Maine's compliance with the list-maintenance requirements of the

---

[6] For example, DOJ noted Maine's rate of registered voters as a percentage of its citizen voting-age population ("CVAP"), which, at 92.4%, is about six points above the national average of 86.6%. Compl. Ex. 1 at 2; U.S. Election Assistance Commission, "Election Administration and Voting Survey 2024 Comprehensive Report" (June 2025) at 157 & 160, *available at* https://www.eac.gov/sites/default/files/2025-06/2024_EAVS_Report_508c.pdf. But an above-average percentage of registrations cannot reflect poor list maintenance if those registrants are voting. That is the case in Maine. According to the same EAVS data, Maine's 2024 election turnout as a percentage of its CVAP (74.8%) was even more of an outlier than its registration percentage, 10 points above the national average of 64.7%. *Id.* at vi-vii. Maine's percentage of registered voters who voted in the 2024 election (80.9%) is also significantly above the national average of 74.8%. *Id.* These high turnout statistics are inconsistent with any notion that Maine's registration numbers are inflated with large numbers of defunct registrations. Mainers are registered at higher rates because they vote at higher rates.

NVRA and HAVA.'" DOJ Br. at 27 (quoting A42). Courts, however, have emphasized that Title III's plain language requires that the statement of purpose and the statement of basis be present in the same document. *See Benson*, 179 F.4th at 483; *Galvin*, 830 F. Supp. 3d at 128. And courts have rejected the type of argument DOJ makes to this Court, that a single Title III-compliant demand can be cobbled together from multiple sources. *See Oregon*, 828 F. Supp. 3d at 1104; *Galvin*, 830 F. Supp. 3d at 128.

Finally, even if the Court somehow accepts that DOJ's letters expressly stated the basis that DOJ proffers in its brief— "that Maine's list maintenance program may violate the NVRA and HAVA," DOJ Br. at 27—DOJ's claim still fails. As explained above, demands under Title III must support investigations into racial discrimination in voting. *See* Part II.C, *supra*. If the purpose of a Title III voter records demand is limited to investigating racial discrimination in voting, it follows that the basis for a Title III voter records request must be a factual basis for suspecting that the subject of the request is engaging in racial discrimination in voting. *Cf. Lynd*, 306 F.2d at 229 n.6 (basis statement

alleged that "distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction").

## V. DOJ's demand violates federal privacy laws.

This Court should also affirm because DOJ's demand for Maine's SVRL violates the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, and the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899. The Court can consider the affirmative defenses of DOJ's non-compliance with privacy laws in a motion to dismiss because "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004). Further, DOJ does not contend on appeal that it did not have to plead its compliance with these privacy laws or that its noncompliance with these laws cannot be considered as a basis for Maine's motion to dismiss.

### A. DOJ's demand violates the Privacy Act.

The Privacy Act flatly forbids federal agencies from maintaining any "record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by

the individual about whom the record is maintained *or unless pertinent to and within the scope of an authorized law enforcement activity*." 5 U.S.C. § 552a(e)(7) (emphasis added). The SVRL contains precisely such First Amendment–protected information, reflecting each voter's party affiliation, if any, and a history of in which elections they chose to vote. 21-A M.R.S.A. §§ 152(1)(L) & (2); 721. A federal database of such information is ripe for the very types of abuses—e.g., targeting voters based on their party affiliation—that the Privacy Act was enacted to prevent.

DOJ contends that its demand for the SVRL falls within the law enforcement activity exception.[7] DOJ Br. at 54–55. This argument fails.

---

[7] On appeal, DOJ also argues that "Maine's obligations under Title III are separate from, and not dependent on, the United States' obligations" under the Privacy Act. DOJ Br. at 54. This argument was not made below and is therefore not preserved for this Court's review. *See Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021). Regardless, the sole case cited by DOJ to support its separate obligations argument, *United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983), concerns enforcement of an IRS summons against an individual taxpayer and bears little persuasive authority on the distinct factual and legal scenario posed by the voter file demand.

Reflecting "Congress' own special concern for the protection of First Amendment rights," *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980), the law enforcement activity exception is necessarily "narrow," *Garris v. FBI*, 937 F.3d 1284, 1296 (9th Cir. 2019). DOJ, however, merely points to its broad authority to enforce the requirements of Title III, the NVRA, and HAVA, *see* DOJ Br. at 55, and fails to plead or otherwise provide any explanation as to why it needs the sensitive PII of every Maine voter to assess Maine's compliance with these statutes. In short, DOJ has not demonstrated that its sweeping demand for information implicating the First Amendment falls within the Privacy Act's narrow law enforcement activity exception.[8]

DOJ also fails to plead that it has complied with the Privacy Act by notifying the public and Congress of its intentions to compile a massive database of voter PII. The Privacy Act requires federal agencies to publish a System of Records Notice ("SORN") that

---

[8] Notably, for the first time on appeal, DOJ now agrees that its voter file demand implicates First Amendment rights and represents it would not object to the redaction of "certain information, like an individual's party affiliation and how that individual votes (including for which party)." DOJ Br. at 55. This new concession, however, is vaguely defined in scope and does not address the fundamental issue—that DOJ failed to plead that its sweeping demand for information implicating the First Amendment complies with the Privacy Act.

specifically describes any "system of records" held by the agency that contains records about individual Americans. 5 U.S.C. § 552a(e)(4). A SORN must specifically delineate the categories of records maintained, categories of individuals contained in the records, expected "routine use[s]" of the records, categories of users, and policies governing access, storage, and disposal. *Id.* The agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and provide an opportunity for public comment on the proposed use. *Id.* § 552a(e)(11). Notice must also be provided to the Office of Management and Budget and to Congress. *Id.* § 552a(r).

In its complaint, DOJ points to a specific SORN, the "Central Civil Rights Division Index File and Associated Records" SORN, as amended, which DOJ claims satisfies its Privacy Act obligations regarding the demand for voter files. *See* Compl. ¶ 53 (A27); 68 Fed. Reg. 47,610 (Aug. 11, 2003). DOJ contends that this SORN provides notice of its voter file demand because the SORN lists routine uses for DOJ's collection of voter information. DOJ Br. at 56. But while discovery may be necessary to determine whether DOJ's intended uses of the SVRL

are covered by these routine uses, the SORN relied on by DOJ is inadequate as a matter of law in multiple other respects. Specifically, the SORN fails to identify (i) "the categories of individuals on whom records are maintained in the system," 5 U.S.C. § 552a(e)(4)(B); (ii) "the categories of records maintained in the system," *see id.* § 552a(e)(4)(C); or (iii) "the categories of sources of records in the system," *id.* § 552a(e)(4)(I), such that a reasonable reader of the SORN would understand that DOJ was compiling state voter registration databases with sensitive PII of millions of registered voters.

DOJ fails to address most of these inadequacies, which Maine specifically identified before the district court. Rather, DOJ makes a single argument it did not make below—that the "Central Civil Rights Division Index File and Associated Records" SORN does identify "the categories of individuals on whom records are maintained in the system," 5 U.S.C. § 552a(e)(4)(B), because all Maine voters are either "subjects of investigations" or "victims" with regard to potential NVRA or HAVA violations. DOJ Br. at 57. The Court should reject this unpreserved and unsupported argument that would functionally swallow the Privacy Act's specific notice requirements. *See Weber*, 816

F. Supp. 3d at 1193–94 ("This SORN does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity—some identified to this [c]ourt and others not.").

### B. DOJ's demand violates the E-Government Act.

The E-Government Act requires that an agency conduct a privacy impact assessment ("PIA") before it "initiat[es] a new collection of information that . . . includes any information in an identifiable form . . . if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." *See* E-Government Act ("EGA") § 208(b)(1)(A)(ii), (b)(1)(B)(i). DOJ contends that it was not required to conduct a PIA because it did not directly pose identical questions to individuals and did not "initiat[e] a new collection of information." DOJ Br. at 59–61.

DOJ misreads the Act. The EGA's description of a relevant "new collection" turns not on whether the federal government directly contacts individuals, but rather on whether the information sought (a) permits the identification of specific individuals, and (b) is obtained in

aggregate, i.e., from "10 or more persons." *See* EGA § 208(b)(1)(A)(ii)(II). Nothing in the text of the Act limits a "new collection of information" to direct federal contact with individuals, nor would such a limitation be consistent with the Act's broad purpose of protecting individual privacy. *See* EGA § 208(b)–(c). Similarly, DOJ's bald assertion that its voter file demand did not "initiat[e]" a "new" collection of information simply because Maine has already compiled the information it seeks, *see* DOJ Br. at 60–61, is entirely inconsistent with the Act's purpose. It would defy common sense to conclude that a federal agency need not consider privacy impacts from an expansive collection of sensitive personal information simply because the information may have been previously compiled by a non-federal entity. *See Weber*, 816 F. Supp. 3d at 1194 ("The information the DOJ seeks to collect from California—like names and addresses of voters—is personal information protected by the E-Government Act [and] the request made by the DOJ to California is a new one, thus initiating a new collection of data.").[9]

---

[9] DOJ also now makes an argument it never raised before the district court, that the "collection of information" triggering the PIA requirement does not include any

## Conclusion

The Court should affirm the district court's dismissal of DOJ's complaint.

DATED: August 17, 2026

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
JACK DAFOE
Assistant Attorneys General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov
jack.dafoe@maine.gov

*Attorneys for Defendants-Appellees*

collection "during the conduct of . . . an . . . investigation involving an agency against specific individuals or entities"—in this case, Maine. DOJ Br. at 59 (citing 44 U.S.C. §§ 3502(3)(B) and 3518(c)(1)(B)). The Court should reject this unpreserved and unsupported argument, which would allow agencies to avoid the PIA requirement simply by characterizing any demand for information as part of an "investigation."

**Certificate of Compliance with Rule 32(a)**

1. This brief contains 12,850 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 with 14-point typeface and Century Schoolbook type style.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov

*Attorney for Defendants-Appellees*

**Certificate of Service Form**
**for Electronic Filing**

I hereby certify that on August 17, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jonathan R. Bolton

JONATHAN R. BOLTON
Assistant Attorney General
6 State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8800
Fax (207) 626-8518
jonathan.bolton@maine.gov