**No. 26-1676**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

SHENNA BELLOWS, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE STATE OF MAINE; STATE OF MAINE; JOHN SCHNECK; MARPHEEN CHANN; LEAGUE OF WOMEN VOTERS OF MAINE,
*Defendants-Appellees*.

ON APPEAL FROM THE ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE

# BRIEF OF AMICUS CURIAE ACLU OF MAINE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

ZACHARY L. HEIDEN
CAROL GARVAN
AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION
P.O. Box 7861
Portland, Maine 04112
(207) 619-6224

THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

*Counsel for Amicus Curiae ACLU of Maine*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ............ ii

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ............ 1

INTEREST OF AMICUS CURIAE ............ 1

INTRODUCTION ............ 2

BACKGROUND ............ 5

ARGUMENT ............ 7

I. THE UNITED STATES SEEKS TO UNLAWFULLY CONSTRUCT A NATIONAL VOTER DATABASE AND USE IT TO DISENFRANCHISE VOTERS. ............ 7

II. THE UNITED STATES FAILED TO COMPLY WITH THE STATUTORY REQUIREMENTS OF TITLE III. ............ 17

A. The United States Failed to State a Valid Purpose for Its CRA Demand. ............ 20

B. The Purpose Offered by the United States Is Pretextual. ............ 23

CONCLUSION ............ 28

CERTIFICATE OF COMPLIANCE ............ 30

CERTIFICATE OF SERVICE ............ 31

# TABLE OF AUTHORITIES

## Cases

*Alabama v. United States*,
304 F.2d 583 (5th Cir. 1962) ........ 7

*Bowman Dairy Co. v. United States*,
341 U.S. 214 (1951) ........ 19

*California v. Trump*,
No. 26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026) ........ 15

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) ........ 20

*Coro, Inc. v. Federal Trade Commission*,
338 F.2d 149 (1st Cir. 1964) ........ 19

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ........ 27

*Doe v. Edlow*,
No. 26-cv-494, 2026 WL 1945085 (S.D. Ohio July 6, 2026) ........ 28

*Federal Education Association v. Trump*,
795 F. Supp. 3d 74 (D.D.C. 2025) ........ 28

*In re Administration Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025) ........ 19

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) ........ 7

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ........ 7, 20

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ........ 19

*New York Times Co. v. Department of Defense*,
No. 26-cv-1690, 2026 WL 1872765 (D.D.C. June 30, 2026) ........ 28

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .......... 20, 28

*PA Fair Elections v. Pennsylvania Department of State*,
337 A.3d 598 (Pa. Commw. Ct. 2025) .......... 10

*Public Interest Legal Foundation v. Benson*,
136 F.4th 613 (6th Cir. 2025) .......... 21, 22

*Schatz v. Republican State Leadership Committee*,
669 F.3d 50 (1st Cir. 2012) .......... 24

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 19

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) .......... 22

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) .......... 19, 20

*United States v. Cartwright*,
230 F. Supp 873 (M.D. Ala. 1964) .......... 7

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989) .......... 18, 23

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) .......... 24

*United States v. Matthews*,
No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026) .......... 22

*United States v. Mayton*,
335 F.2d 153 (5th Cir. 1964) .......... 5

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) .......... passim

*United States v. Powell*,
379 U.S. 48 (1964) .......... 18

*United States v. Schmidt*,
No. 25-cv-01481, 2026 WL 1850016 (W.D. Pa. June 27, 2026)......25, 27

*United States v. Warner*,
No. 26-cv-156, 2026 WL 2018877 (S.D. W.Va. July 13, 2026).......19, 27

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)..........................................26, 27

**Statutes**

52 U.S.C. § 20501.........................................................................................4

52 U.S.C. § 20507.............................................................12, 21, 22, 26

52 U.S.C. § 20701.....................................................................................4, 5

52 U.S.C. § 20703.......................................................................................passim

52 U.S.C. § 20705.........................................................................................6

52 U.S.C. § 20901.........................................................................................4

52 U.S.C. § 21083.......................................................................................21

52 U.S.C. § 21085.......................................................................................21

**Regulations**

Executive Order No. 14,399,
91 Fed. Reg. 17125 (Mar. 31, 2026) ........................................14, 15, 25

**Constitutional Provisions**

U.S. Constitution Article 1, § 4, Clause 1................................................4

**Other Authorities**

106 Congressional Record 5,326 (1960)...............................................6, 18

Alexandra Berzon & Nick Corasaniti,
*Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*,
N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ....................10

Carter Walker,
*This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT, Feb. 12, 2024, https://perma.cc/HQ9C-TMT7 ........ 10

*CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*,
Citizens for Responsibility and Ethics in Washington (published Dec. 19, 2025), https://www.citizensforethics.org/legal-action/lawsuits/crew-sues-doj-for-failing-to-produce-records-on-voter-data-collection/ [https://perma.cc/2BB3-WMN2] ........ 16, 17

Devlin Barrett & Nick Corasaniti,
*Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html ........ 8

Doug Bock Clark,
*She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6 ........ 10

Emily Bazelon & Rachel Poser,
*The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://perma.cc/L39A-S5VZ ........ 10

House of Representatives Report No. 86-956 (1959) ........ 5

Jeremy Roebuck & Katie Bernard,
*'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILADELPHIA INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ ........ 10

Jonathan Shorman,
*DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ........ 9

Jonathan Shorman,
*Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ ............................... 13

Jude Joffe-Block,
*Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL .. 8

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry,
*Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated August 19, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information [https://perma.cc/5CXY-8EDT] ........................................................ 2, 12

Kyle Cheney,
*Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245 ........................................................................ 11

Miles Parks & Jude Joffe-Block,
*Trump's DOJ Focuses in on Voter Fraud, with a Murky Assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8 ................... 8

*Read Bondi's Letter to Minnesota's Governor*,
N.Y. TIMES, Jan. 24, 2026, https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html ............................................................................... 13, 14

Reid J. Epstein & Nick Corasaniti,
*Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ........................................................................ 14

Sarah Lynch,
*US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09 . 9

Sarah N. Lynch,
*Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS (updated Mar. 26, 2026), https://perma.cc/89QF-UP3M .......................................... 9, 25

The Federalist No. 60 (Alexander Hamilton).......................................... 4

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, amicus curiae American Civil Liberties Union of Maine states that it is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock.

## INTEREST OF AMICUS CURIAE

The American Civil Liberties Union is a nationwide, nonprofit organization that, since 1920, has sought to protect the civil liberties of all Americans, with 54 affiliates across the United States. The ACLU of Maine (ACLU-ME) is the Maine affiliate. ACLU-ME has previously appeared in this Court, as both counsel and amicus, in cases raising significant questions about the meaning of the Constitution, its limitations on government power, and the breadth of rights it grants. ACLU-ME is committed to defending the Constitution and the Bill of Rights, and to extending their promises to all Mainers. With nearly 8,000 members across the state, ACLU-ME seeks to protect Maine voters whose rights would be infringed by the relief sought by the Plaintiff.

The parties have consented to the filing of this amicus brief. [1]

## INTRODUCTION

The United States has demonstrated a troubling pattern of behavior, obscuring the true purposes underlying its actions and leaving the public and the courts to wonder whether the government can be trusted. The instant suit is but one example.

This is one of more than thirty such lawsuits brought as part of the United States Department of Justice's (DOJ) attempt to seize millions of citizens' sensitive voter data over the objection of their own state governments.[2] This effort invokes the civil rights laws as a pretext to

[1] No party or party's counsel to this case authored this brief or contributed money intended to support the filing of this brief. No other person other than amicus, its members, or its counsel contributed money intended to support the filing of this brief.

[2] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated August 19, 2026), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information [https://perma.cc/5CXY-8EDT]. The thirty-one actions are: *United States v. McGrane*, No. 26-cv-00197 (D. Idaho filed Apr. 1, 2026); *United States v. Adams*, No. 26-cv-00019 (E.D. Ky. filed Feb. 26, 2026); *United States v. Caldwell*, No. 26-cv-02025 (D.N.J. filed Feb. 26, 2026); *United States v. Henderson*, No. 26-cv-00166 (D. Utah filed Feb. 26, 2026); *United States v. Ziriax*, No. 26-cv-00361 (W.D. Okla. filed Feb. 26, 2026); *United States v. Warner*, No. 2:26-cv-00156 (S.D. W. Va. filed Feb. 26, 2026); *United States v. Raffensperger*, No. 26-cv-00485 (N.D. Ga. filed Jan. 23, 2026); *United States v. Koski*, No. 26-cv-00042 (E.D. Va. filed

gather sensitive personal information of registered voters across the country. But the United States' demands do not satisfy the core statutory requirement that any such demand for information under Title III of the Civil Rights Act of 1960 (CRA) include a written statement of "the basis and the purpose therefor." 52 U.S.C. § 20703. While Appellees address the United States' failure to meet the statutory requirements, *amicus*

Jan. 16, 2026); *United States v. Fontes*, No. 26-cv-00066 (D. Ariz. filed Jan. 6, 2026); *United States v. Thomas*, No. 26-cv-00021 (D. Conn. filed Jan. 6, 2026); *United States v. Evans*, No. 25-cv-04403 (D.D.C. filed Dec. 18, 2025); *United States v. Matthews*, No. 25-cv-03398 (C.D. Ill. filed Dec. 18, 2025); *United States v. Wis. Elections Comm'n*, No. 25-cv-01036 (W.D. Wis. filed Dec. 18, 2025); *United States v. Griswold*, No. 25-cv-03967 (D. Colo. filed Dec. 11, 2025); *United States v. Nago*, No. 25-cv-00522 (D. Haw. filed Dec. 11, 2025); *United States v. Galvin*, No. 25-cv-13816 (D. Mass. filed Dec. 11, 2025); *United States v. Aguilar*, No. 25-cv-00728 (D. Nev. filed Dec. 11, 2025); *United States v. Albence*, No. 25-cv-01453 (D. Del. filed Dec. 2, 2025); *United States v. Oliver*, No. 25-cv-01193 (D.N.M. filed Dec. 2, 2025); *United States v. Amore*, No. 25-cv-00639 (D.R.I. filed Dec. 2, 2025); *United States v. Hobbs*, No. 25-cv-06078 (W.D. Wash. filed Dec. 2, 2025); *United States v. DeMarinis*, No. 25-cv-03934 (D. Md. filed Dec. 1, 2025); *United States v. Hanzas*, No. 25-cv-00903 (D. Vt. filed Dec. 1, 2025); *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. filed Sept. 25, 2025); *United States v. N.H. Sec'y of State*, No. 25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Simon*, No. 25-cv-03761 (D. Minn. filed Sept. 25, 2025); *United States v. Bd. of Elections of N.Y.*, No. 25-cv-01338 (N.D.N.Y. filed Sept. 25, 2025); *United States v. Schmidt*, No. 25-cv-01481 (W.D. Pa. filed Sept. 25, 2025); *United States v. Bellows*, No. 25-cv-00468 (D. Me filed Sept. 16, 2025); *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. filed Sept. 25, 2026); *United States v. Oregon*, No. 25-cv-01666 (D. Or. filed Sept. 16, 2025).

writes separately to detail that the supposed purpose offered by the United States is pretextual.

The Elections Clause of the United States Constitution entrusts states, not the federal executive, with responsibility for managing most aspects of federal elections, unless Congress specifically legislates otherwise. *See* U.S. Const. art. 1, § 4, cl. 1. This was a conscious choice by the Framers to promote federalism and protect democracy from "tyrants." The Federalist No. 60 (Alexander Hamilton). Where Congress has legislated in the elections arena, it has done so to protect and expand the franchise, including through Title III of the CRA, 52 U.S.C. § 20701 *et seq*., as well as the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act (HAVA), 52 U.S.C. § 20901 *et seq*. And even then, it has left the details of election administration and voter registration list maintenance to the states.

No federal law entitles the United States to the voter data it seeks. This Administration's heedless intrusion into the machinery of our elections threatens the very structure established by the Framers to ensure liberty. The district court correctly dismissed the Complaint. This Court should now affirm.

## BACKGROUND

Congress enacted Title III of the CRA to stop states in the Jim Crow South from denying thousands of Black citizens the ability to register to vote. *See, e.g.*, H.R. Rep. No. 86-956, at 7 (1959). The CRA followed the Civil Rights Act of 1957, Congress's first attempt since Reconstruction to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). Congress "found it necessary to legislate again in 1960 with respect to th[e] problem of assuring full rights of suffrage to all Americans." *Id.* Title III sought to empower DOJ "to require the production of [election] records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law." *United States v. Oregon*, 828 F. Supp. 3d 1092, 1097 (D. Or. 2026). The statute requires that state and local elections officials retain and preserve "all records and papers that come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be

made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703.

While Congress intended that the Attorney General investigate violations of constitutional rights, some, including Florida Congressman William Cramer, were also concerned about DOJ using the powers granted by Title III for "fishing expedition[s]." 106 Cong. Rec. 5,326 (1960). To address these concerns, Congress adopted Rep. Cramer's amendment to Title III, which added a requirement that the Attorney General's demand for records include "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703; *see also* 106 Cong. Rec. 5,326 (1960). And Congress expressly authorized judicial review over such statements of basis and purpose, by specifying that "[t]he United States district court for the district in which a demand is made pursuant to [S]ection 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The federal government initially used Title III as intended, to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583,

585–86 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (registration records subject to the CRA showed that discriminatory registration practices led to less than 10% of Black citizens being registered to vote); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (reviewing data from an investigation pursuant to Title III which revealed that voting registrars engaged in racially discriminatory practices resulting in only 7.5% of Black citizens being registered). And in conducting those investigations, DOJ adhered to the statutory requirement to set forth in writing "the basis and the purpose" for its records demand, 52 U.S.C. § 20703—that is, the factual basis for why DOJ suspected a potential legal violation as well as its investigatory purpose of how the requested records would bear upon that suspicion. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

## ARGUMENT

### I. THE UNITED STATES SEEKS TO UNLAWFULLY CONSTRUCT A NATIONAL VOTER DATABASE AND USE IT TO DISENFRANCHISE VOTERS.

DOJ's requests for private, sensitive voter data from Maine and other states are part of the federal government's unprecedented attempts

to intrude upon state election administration, including in connection with novel efforts to construct a national voter database, and to otherwise use untested forms of database analysis to scrutinize state voter rolls and challenge voters' eligibility.

DOJ officials "have been clear that they are interested in a central, federal database of voter information."[3] Within months of the new Administration taking office, DOJ officials asked staffers from the new "Department of Governmental Efficiency" (DOGE) to identify supposed noncitizens in state voter rolls by matching voter data with data from the Social Security Administration (SSA), efforts which have incorrectly flagged numerous U.S. citizens as ineligible to vote.[4]

DOJ has been coordinating in these novel efforts with the federal Department of Homeland Security (DHS), according to reported

[3] *E.g.*, Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[4] *E.g.*, Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6P7X-NZXL; Miles Parks & Jude Joffe-Block, *Trump's DOJ Focuses in on Voter Fraud, with a Murky Assist from DOGE*, NPR, May 22, 2025, https://perma.cc/6QPB-NLZ8.

statements from both agencies and DOJ's admissions in open court.[5] One article from around the time that DOJ first began filing these lawsuits extensively quoted a former lawyer from DOJ's Civil Rights Division, describing DOJ's aims in this case and others like it with respect to the collection and aggregation of voter data:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

[5] *See* Mar. 26, 2026 Hr'g Tr. at 50:21–23, 65:1–66:18, *United States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025) (admitting planned provision of voter data to DHS); *see also, e.g.*, Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS NEWS (updated Mar. 26, 2026), https://perma.cc/89QF-UP3M; Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://perma.cc/L39A-S5VZ.[6]

Administration officials have also been working with outside "election integrity" advocates to misuse voters' sensitive personal data. For example, as detailed in a federal court filing on behalf of the SSA:

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze

[6] DOJ's efforts to obtain massive amounts of private voter data are being undertaken in coordination with self-proclaimed "election integrity" advocates who have previously sought to mass-challenge voters and overturn elections. For example, Heather Honey, who is currently serving as DHS's "deputy assistant secretary for election integrity," was involved in efforts to overturn the 2020 election, to compel states to engage in aggressive purges of registered voters, and to abuse voter data to make flawed mass challenges to disenfranchise thousands. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing complaint brought by group affiliated with Honey challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA); *see also, e.g.*, Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://perma.cc/R8ZU-GGZZ; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6; Jeremy Roebuck & Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ; Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, VOTEBEAT, Feb. 12, 2024, https://perma.cc/HQ9C-TMT7.

> state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corr. to the Rec. at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-cv-596, Dkt. No. 197 (D. Md. Jan. 16, 2026).[7] The filing, which does not specify the terms of the "Voter Data Agreement" or the activities these federal government actors or others undertook pursuant to it, also indicates that, around the same period, DOGE actors shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6.

Additional government documents indicate how the United States ultimately plans to use voters' sensitive personal data: to assert control

[7] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245.

over voting eligibility in the states, to order the disenfranchisement of voters, and potentially to contest the results of state-run elections.

In particular, the United States has, in connection with the demands for voter data, asked states to execute a memorandum of understanding (MOU). Dist. Ct. Dkt. 52-1.[8] The terms of the MOU purport to vest the United States with substantial new authority to identify supposedly ineligible voters on state voter rolls and to compel states to remove these voters from the rolls, depriving them of the franchise. Specifically, under the MOU's terms, federal officials may take custody of the voter rolls, identify supposed "ineligible voters," and then compel states to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis. *Id.* at 5. These removals are purportedly required by the MOU despite the procedural protections afforded by the NVRA, which requires voters to be notified prior to removal and bars systematic removal programs within 90 days of an election, 52 U.S.C. § 20507.[9] The MOU would thereby turn states'

[8] Copies of the MOU provided to many states are aggregated and posted in Martinez-Ochoa, O'Connor, & Berry, *Tracker of Justice Department Requests*, *supra* n.2.

[9] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds*, STATELINE, Dec. 18, 2025,

own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states.

The actions of the President and other high officials also highlight the Administration's impermissible aims. For one example, on January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[10] Like Maine, Minnesota has been sued by the federal government seeking access to its unredacted voter rolls. The letter sets out three actions that the federal government wanted Minnesota to take to "restore the rule of law, support ICE officers, and bring an end to the chaos," one of which was to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that

---

https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

[10] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html (Bondi Letter); *see also* Order, *Tincher v. Noem*, No. 25-cv-4669 (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting preliminary injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[11] For another example, just weeks later, President Trump announced his desire to "nationalize" elections in certain states. "We should take over the voting, the voting in at least many — 15 places," he said, "[t]he Republicans ought to nationalize the voting." Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html. And the next month, the President issued an executive order purporting to require the creation of a national voter registration list, *see* Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026). The order calls for DHS to "compile and transmit to the chief election official of each State a list of individuals confirmed to be United States citizens" who reside in the state and will be over eighteen at the time of the next federal election. *Id.* § 2(a), at 17125. DHS is to use "Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases," in doing so. *Id.* The order also directs the United States Postal Service (USPS) to provide each state

---

[11] Bondi Letter at 2–3.

with a list of voters "who are enrolled with the USPS . . . for mail-in or absentee ballots," and, remarkably, to refuse to transmit a ballot "from any individual unless those individuals have been enrolled on a State-specific list." *Id.* § 3(b)(C)(iii)–(iv), at 17126. That executive order was subsequently held unlawful. *See generally California v. Trump*, No. 26-cv-11581, 2026 WL 1826490, at *1 (D. Mass. June 25, 2026).

In the proceedings below, DOJ provided a recently-issued memorandum from the Office of Legal Counsel. *See* Mem. Op. for the Assistant Att'y Gen., Civ. Rts. Div. dated May 12, 2026, Dist. Ct. Dkt. No. 112-1 (OLC Memo). That memorandum explains that DOJ's efforts to seek statewide voter lists come "[i]n response to the President's order to identify those who may be voting illegally," and that DOJ plans "to share the lists with Homeland Security Investigations . . . or another unit within DHS." *Id.* at 1 (stating the memorandum discusses whether DOJ "may share such lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote"). Conspicuously, sharing the list is not meant to enforce the NVRA or HAVA, nor could it be, as DHS plays no role in enforcing those laws.

Internal documents recently produced by DOJ in response to Freedom of Information Act (FOIA) requests confirm that it plans to use Maine's data in collaboration with DHS, rather than for any purpose related to the NVRA or HAVA.[12] These documents show that DOJ entered into an agreement with DHS in July 2025 to run state voter lists through the Systemic Alien Verification for Entitlements (SAVE) program.[13] Notwithstanding the NVRA and HAVA's delegation of authority to the States—not the federal government—to conduct list maintenance, these documents also reflect DOJ lawyers' intention to "inform" states that their "voter lists should be run against [SAVE] . . . as part of their list maintenance responsibilities under the NVRA and HAVA."[14] The documents also indicate that DOJ contemplated using the

---

[12] *See CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*, Citizens for Resp. & Ethics in Wash. (published Dec. 19, 2025) https://www.citizensforethics.org/legal-action/lawsuits/crew-sues-doj-for-failing-to-produce-records-on-voter-data-collection/ [https://perma.cc/2BB3-WMN2] (last accessed Aug. 20, 2026).

[13] *See id.*, Apr. 14, 2026, Records: Part 1, CREW v. DOJ-CRT-00828 [https://perma.cc/CQU6-68RR].

[14] *Id.* at CREW v. DOJ-CRT-00752.

data for criminal enforcement, noting "Crim Section may have some uses for the data . . . once we get results from SAVE."[15]

These are not the purposes that the United States disclosed to Maine or has advanced in this litigation. And the FOIA documents make clear that DOJ's silence on these additional uses was deliberate: DOJ lawyers simultaneously took the position in internal discussions that the Department had no obligation "to give the states information about what we are going to do with the data," and remarkably, "No judge will have authority to limit us beyond a promise of Federal law compliance."[16] Put simply, the United States cannot say it has stated "the purpose" of its demand while internal documents show its lawyers meant to disavow any obligation to disclose its intended uses.

## II. THE UNITED STATES FAILED TO COMPLY WITH THE STATUTORY REQUIREMENTS OF TITLE III.

The massive intrusion into state election administration that has characterized this Administration further illustrates DOJ's failure to comply with Title III's requirement to set forth a "demand in writing"

---

[15] *Id.*, Apr. 14, 2026, Records, Part 2, CREW v. DOJ-CRT-001182 [https://perma.cc/T9B9-XJQW].

[16] *Id.* at CREW v. DOJ-CRT-001163.

that "shall contain a statement of *the* basis and *the* purpose therefor." 52 U.S.C. § 20703 (emphasis added). This failure to fulfill these requirements of Title III provides further grounds to affirm.

A Title III demand requires a written "statement of the basis and the purpose" for the records the Attorney General is seeking. 52 U.S.C. § 20703. Title III's "basis" and "purpose" requirements are critical safeguards created precisely to prevent the statute from becoming a vehicle for DOJ to conduct baseless fishing expeditions and to provide proper notice to election officials of the nature of the federal government's inquiry. *See* 106 Cong. Rec. 5,326 (1960) (statutory language introduced to prevent "fishing expedition[s]"). Those safeguards are consistent with the application of other federal statutes allowing federal agencies to obtain records in service of investigations, which are enforceable if, among other things, the underlying investigation has a proper purpose and there is an actual nexus between that purpose and the specific information sought. *See United States v. Comley*, 890 F.2d 539, 541–42 (1st Cir. 1989) (citing *United States v. Powell*, 379 U.S. 48, 57–58 (1964)); *compare Comley*, 890 F.2d at 542 (upholding subpoena based on government affidavits specifying proper purpose and detailing

evidentiary basis for requested information), *with In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (quashing administrative subpoena against hospital where asserted basis and purpose was an internal DOJ memo directing officials "to undertake appropriate investigations"), *on appeal* No. 25-2092 (1st Cir.).[17]

Title III's use of the word "*shall* contain" demonstrates that providing the basis and the purpose are mandatory. *See, e.g.*, *United States v. Benson*, 179 F.4th 470, 483 (6th Cir. 2026) (emphasis added); *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877, at *5 (S.D. W.Va. July 13, 2026). Such mandatory commands are "impervious to judicial discretion" and must be followed to comply with the statute. *E.g.*, *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)).

And the statute's language, providing that the demand "contain a statement of *the* basis <u>and</u> *the* purpose thereof," confirms that "basis" and "purpose" are two are conceptually distinct and independent

[17] *See also, e.g.*, *Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964) ("[S]ubpoenas are not issued on bare suspicion. They are not licenses for extended fishing expeditions in waters of unknown productivity in the vague hope of 'catching the odd one.'" (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951)).

requirements. 52 U.S.C. § 20703 (emphases added); *see also Benson*, 179 F.4th at 483. And by twice using the definite article, the statute requires not just a conceivable or possible basis or a purpose, but *the* complete basis and *the* complete purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021) (noting that the inclusion of a definite article with a singular noun implies that each noun is "a discrete thing"); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024).

### A. The United States Failed to State a Valid Purpose for Its CRA Demand.

The statutorily required "purpose" is an explanation of how the requested records would help determine if there is a legal violation. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6. As the district court recognized, Title III requires an "assessment of the sufficiency of . . . the purpose asserted," Add.15; otherwise, "[i]f *any* purpose . . . would suffice, then the requirement of stating the demand's purpose would serve no function," *Oregon*, 828 F. Supp. 3d at 1104.

The United States fails to explain any connection between its purported "purpose" and the request for the full and unredacted voter file. Its August 18 Letter merely states "[t]he purpose of the request is to

ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA." App.42. But this misunderstands Maine's obligations under the NVRA and HAVA: to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; 52 U.S.C. § 21083(a)(2)(A) (cross referencing the list maintenance requirements from the NVRA to govern HAVA list maintenance).

An unredacted voter registration file is not necessary—or even helpful—to investigate Maine's compliance with its federal list maintenance obligations. A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. 52 U.S.C. § 20507(a)(4) (A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the state's discretion. *See id.* §§ 20507(a)(4), (c)(1); *id.* § 21083(a)(2)(A); *id.* § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file, representing one point in time, does not. *See Pub. Interest Leg. Found. v. Benson*, 136 F.4th 613, 624–26 (6th Cir.

2025), *cert. denied*, 146 S. Ct. 1772 (2026); *Oregon*, 828 F. Supp. 3d at 1097; *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *1 (C.D. Ill. July 31, 2026); *United States v. Amore*, 831 F. Supp. 3d 149, 152–53 (D.R.I. 2026). Even were the United States to use voter file data to identify voters who had moved or died and who appeared on Maine's voter list at a single point in time, that would not amount to Maine failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Benson*, 136 F.4th at 624–27 (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this voter list maintenance context). Indeed, the inclusion at any particular point in time of some voters who may have potentially moved out of state on Maine's voter registration list is, if anything, to be expected. Section 8(d) of the NVRA explicitly sets out a set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d). This striking mismatch

between DOJ's stated purpose and the actual operation of the NVRA provides yet another reason to affirm dismissal. *See Oregon*, 828 F. Supp. 3d at 1104 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function.").

**B. The Purpose Offered by the United States Is Pretextual.**

At the end of the day, discussion of ascertaining compliance with the NVRA is beside the point, because it is not the actual purpose motivating the request. Title III states DOJ must provide a statement of "the basis and the purpose," rather than some conceivable basis and purpose. 52 U.S.C. § 20703. DOJ's stated purpose is contradicted by the United States' own public statements, which provide "firm evidence" of pretextual motives and an improper purpose, an independent basis to affirm. *E.g.*, *Comley*, 890 F.2d at 542.

Incredibly, DOJ distances itself from any obligation to provide the actual purpose for its request. *See* U.S. Br. at 10 ("Title III places no limits on that purpose, imposes no guidelines for determining the sufficiency of the basis, and requires no showing of relevance to any unenumerated purpose."). But the statute is clear: "[A]s conveyed by the

statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis." *United States v. Galvin*, 830 F. Supp. 3d 122, 127 (D. Mass. 2026). Likewise, the definite article "the" governs Title III's requirement that the requester provide the purpose. If other purposes were permitted, it is hard to imagine why the demand letter must include a statement of "the purpose" rather than "a purpose." Instead, the much more natural reading of the statute is that DOJ must provide its actual purpose.

The growing mound of evidence discussed above confirms that DOJ has not done so, because determining states' compliance with list maintenance obligations is not its actual purpose. Courts can consider judicially noticeable materials in deciding a motion to dismiss. *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55–56 (1st Cir. 2012). Here, judicially noticeable materials—including DOJ's own filings and public statements—shed light on its actual plans. *See supra* Section I. The United States' own statements demonstrate that the true purpose of its request for state voter rolls is not ascertaining compliance with list maintenance obligations. The United States has filed over 30 nearly identical lawsuits demanding States' complete unredacted statewide

voter registration lists (SVRLs), including sensitive personally identifiable information. *See supra* n.2. Consistent with extensive public reporting, it has now admitted in open court that it will use and share the gathered information with agencies such as the Department of Homeland Security, thus potentially facilitating immigration investigations. Mar. 26, 2026 Hr'g Tr. at 50:21–23, 65:1–66:18, *United States v. Amore*, No. 25-cv-639 (D.R.I. filed Dec. 2, 2025).[18] Immigration enforcement is nowhere mentioned in DOJ's written CRA demand. App.41–43. The Administration also has not been coy about its desire for a national voter registration list, and it only months ago issued an executive order requiring the creation of one.[19] Again, those efforts are not mentioned in the CRA demand, either.

The statements and documents in the public record reveal the Administration's intentions: "[T]o create a nationwide voter-database, for potential weaponization in future elections; as a 'fishing expedition,' hoped to advance unsubstantiated claims of non-citizen voting; and as a tool for immigration enforcement." *United States v. Schmidt*, No. 25-cv-

[18] *See* Lynch, *Justice Dept. Close*, *supra* n.5; *see also supra* nn.3–7 and accompanying text.

[19] Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026).

01481, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1184 (C.D. Cal. 2026); *Oregon*, 828 F. Supp. 3d at 1106, 1108. Yet the United States has repeatedly invoked only voter list maintenance as the stated purpose for its nationwide effort to seize states' voter rolls.

The concern that DOJ has not disclosed the true and complete purpose or purposes of its demands for state voter roll data as required by Title III is particularly acute in light of the MOU that the United States has asked states to sign in connection with its SVRL requests. *See* Dist. Ct. Dkt. No. 52-1. Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, the MOU runs directly afoul of those statutes. For example, the MOU purports to allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," *id.*, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the bar against systematic voter removals close to an election. *See generally* 52 U.S.C. § 20507. The MOU confirms that DOJ's actual purpose for seeking the sensitive personal information of millions of Maine voters involves not ascertaining compliance with the

NVRA and HAVA, but defying those statutes in order to unlawfully centralize control over state voter rolls in the hands of the federal executive.

The Court need not ignore public information demonstrating DOJ's failure to provide a statement of the actual purpose for its demand. It is not "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). It "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 816 F. Supp. 3d at 1184, 1186; *accord Oregon*, 828 F. Supp. 3d at 1106–08; *Schmidt*, 2026 WL 1850016, at *2; *Warner*, 2026 WL 2018877, at *8 n.9.

Indeed, in light of the myriad evidence demonstrating the inconsistency between the United States' plans for voters' data and its stated purposes, "[t]he presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 828 F. Supp. 3d at 1107. And it is not only in the context of this tranche of cases that federal courts have recognized that the United States is no longer entitled to this presumption. Rather, in cases across

the country, involving many different issues, courts have found that such a presumption no longer attaches. *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90 (D.D.C. 2025) (collecting examples); *New York Times Co. v. Dep't of Def.*, No. 26-cv-1690, 2026 WL 1872765, at *13 (D.D.C. June 30, 2026) (considering "whether such a presumption continues to exist in light of the current administration's extensive pattern of illegal and unconstitutional behavior"); *Doe v. Edlow*, No. 26-cv-494, 2026 WL 1945085, at *23 (S.D. Ohio July 6, 2026) ("The presumption of regularity and integrity previously and routinely afforded to the Executive branch . . . has been undeniably eroded in this jurisdiction and across the country." (citation modified)).

DOJ was required to state, in writing, "*the* purpose" for its demand. 52 U.S.C. § 20703 (emphasis added); *see Niz-Chavez*, 593 U.S. at 165–166. The pleadings and public record show that it did not. The Court can affirm on that basis.

## CONCLUSION

The decision below should be affirmed.

Dated: August 24, 2026

Respectfully submitted,

*/s/Theresa J. Lee*

ZACHARY L. HEIDEN
CAROL GARVAN
AMERICAN CIVIL LIBERTIES
UNION OF MAINE FOUNDATION
P.O. Box 7861
Portland, Maine 04112
(207) 619-6224
heiden@aclumaine.org
cgarvan@aclumaine.org

THERESA J. LEE
SOPHIA LIN LAKIN
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
tlee@aclu.org
slakin@aclu.org

*Counsel for Amicus Curiae ACLU of Maine*

**CERTIFICATE OF COMPLIANCE**

I certify this motion complies with the length limits set forth in Fed. R. App. P. 29(a)(5) because this brief contains 6,001 words excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 24, 2026

*/s/ Theresa J. Lee*
Theresa J. Lee

*Counsel for Amicus Curiae*
*ACLU of Maine*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I electronically filed the foregoing brief by using the ECF system.

I certify that the participants in the case are registered ECF users and that service will be accomplished by the ECF system.

Dated: August 24, 2026

*/s/ Theresa J. Lee*
Theresa J. Lee

*Counsel for Amicus Curiae*
*ACLU of Maine*