**No. 26-1676**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

SHENNA BELLOWS, in the official capacity as Secretary of the State of Maine; STATE OF MAINE; JOHN SCHNECK; MARPHEEN CHANN; LEAGUE OF WOMEN VOTERS OF MAINE,

*Defendants-Appellees*,

On Appeal from the United States District Court
for the District of Maine in Case No. 1:25-cv-00468
Hon. Lance E. Walker

# BRIEF OF *AMICI CURIAE* LOCAL ELECTION OFFICIALS IN SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF AFFIRMANCE OF DISMISSAL AND DENIAL OF MOTION FOR ORDER TO SHOW CAUSE

Shannon Eddy
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
shannon@publicrightsproject.org
(510) 738-7688

*Counsel for Amici Curiae*

# TABLE OF CONTENTS


STATEMENT OF INTEREST .......... 1

SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 4

I. COURTS PLAY A VITAL ROLE IN ASSESSING ELECTION-RELATED RECORDS REQUESTS, INCLUDING DEMANDS UNDER THE CIVIL RIGHTS ACT .......... 4

  A. The District Court properly exercised its authority to evaluate the DOJ's demand .......... 5

  B. Without judicial review, local elections offices and their attorneys could be overwhelmed by records demands .......... 6

II. THE DOJ DID NOT PROVIDE A SUFFICIENT BASIS FOR ITS DEMAND .......... 11

  A. The efforts of state and local election officials in Maine meet the list maintenance requirements of the NVRA and HAVA .......... 12

  B. In the experience of local election officials, EAVS data points are not evidence of unreasonable list management practices .......... 16

CONCLUSION .......... 24

APPENDIX A – LIST OF *AMICI* .......... 25

# TABLE OF AUTHORITIES

**CASES**

*Am. Civ. Rts. Union v. Philadelphia City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .................................................. 14, 16

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ........................................ 13, 14, 16

*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772
(2026) ...................................................................... 13, 15, 22

*United States v. Aguilar*,
No. 3:25-cv-00728, 2026 WL 2364502 (D. Nev. Aug. 14,
2026) ............................................................................ 6

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026) ........................................... 9, 10

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ................................................... 6

*United States v. Koski*,
No. 3:26CV42, 2026 WL 2032532 (E.D. Va. July 14, 2026) ......... 6

*United States v. Powell*,
379 U.S. 48 (1964) ................................................................ 5

*United States v. Simon*,
No. 25-cv-03761, slip op. at 2 (D. Minn. Aug. 17, 2026) ............... 3

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996) ........................................................ 5

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........................................ 6

**STATUTES**

52 U.S.C. § 20501(a)(2) ......................................................... 1

52 U.S.C. § 20501(b) .......... 1

52 U.S.C. § 20507(a) .......... 12, 13

52 U.S.C. § 20507(c) .......... 13, 21

52 U.S.C. § 20507(d) .......... 13, 20

52 U.S.C. § 20705 .......... 5

52 U.S.C. § 20922 .......... 17

52 U.S.C. § 21083(a) .......... 12, 13

**REGULATIONS**

Exec. Order No. 14399, 91 Fed. Reg. 17125 § 2(b) (Mar. 31, 2026) .......... 11

**OTHER AUTHORITIES**

Ali Swenson & Gary Fields, *The Justice Department Seeks Voter and Election Information From at Least 19 States, AP Finds*, AP News (Aug. 3, 2025) .......... 3

Andrew Garber, *Mass Voter Challenges*, Brennan Ctr. for Just. (July 21, 2026) .......... 8

Assoc. Press, *Justice Department Requests Access to Dominion Voting Equipment Used in Missouri in 2020*, CNN (Sept. 4, 2025) .......... 10

Brett Sholtis, *'PA Fair Elections,' tied to powerful conservative groups, pushes to remove people from voter rolls*, WESA (Sept. 28, 2024) .......... 9

Carter Walker, *Efforts to challenge Pennsylvania voters' mail ballot applications fizzle,* Spotlight PA (Nov. 8, 2024) .......... 9

Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?*, MIT Political Science Department Research Paper No. 2018-20 (2018) .......... 18

ERIC, *How ERIC Works* .......... 15

ERIC, *Technology & Security Overview* .......... 15

Gilare Zada, *SF Officials Push Back as DOJ Seeks Data on Voters Removed Over Citizenship Rules*, KQED (July 31, 2025) .......... 10

Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (2025) .......... 17

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026) .......... 3

Kyle Yoder & April Tan, *Election Officials & the Misuse of Public Records Requests*, Ctr. for Election Innov. and Rsch. (June 2024) .......... 7

Letter from Adrian Fontes, Ariz. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen. (Aug. 29, 2025) .......... 19

Letter from Karen Sellers, Exec. Dir. of the Ky. State Bd. of Elections, to Michael Gates, Deputy Assistant Att'y Gen. (Aug. 29, 2025) .......... 19

Letter from Michael Gates, Deputy Assistant Att'y Gen., to Jared DeMarinis, Md. State Admin. of Elections (July 14, 2025) .......... 19

Letter from Michael Gates, Deputy Assistant Att'y Gen., to Jocelyn Benson, Mich. Sec'y of State (July 21, 2025) .......... 21

Letter from Michael Gates, Deputy Assistant Att'y Gen., to Michael Adams, Ky. Sec'y of State (July 17, 2025) .......... 20, 22

Letter from Michael Gates, Deputy Assistant Att'y Gen., to Shirley Weber, Cal. Sec'y of State (July 10, 2025) .......... 19

Letter from Michael Gates, Deputy Assistant Att'y Gen., to Susan Beals, Va. Comm'r of Elections (July 15, 2025) .......... 19, 22

Letter from Michael Gates, Deputy Assistant Att'y Gen., to William Francis Galvin, Sec'y of the Commonwealth of

Mass. (July 22, 2025) .................................................................. 20

Letter from Shenna Bellows, Me. Sec'y of State, to Craig Hickman, Me. State Senator (Feb. 1, 2024) .................................. 22

Letter from Shirley Weber, Cal. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen. (Sept. 12, 2025)............................... 19

Paul Gronke et. al., *Today's Election Administration Landscape: Findings from the 2024 Elections & Voting Information Center* (2025) ............................................................. 7

Reply to Opp'n to Mot. to Expedite, *United States v. DeMarinis*, No. 26-1878 (4th Cir. filed July 29, 2026), Dkt. No. 24 ........................................................................................ 11

Samantha J. Gross, *"I have no idea what any of these even mean": Massachusetts clerks are getting bombarded with conspiracy-fueled records requests about the 2020 election*, Boston Globe (Sept. 18, 2022), ....................................................... 7

Steve Mistler, *Election deniers are swamping officials with records requests — including Maine's*, Maine Pub. (Sept. 7, 2022)....................................................................................... 7

U.S. Election Assistance Comm'n, *2024 Archived Resources* .......... 20

U.S. Election Assistance Comm'n, *EAVS 2022-24 Crosswalk*.......... 20

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (2025).... 17, 21, 23, 24

U.S. Election Assistance Commission, *Best Practices: Public Records Requests* (2023) ............................................................... 7

## STATEMENT OF INTEREST

*Amici* are local election officials and local governments representing twenty-two jurisdictions, including those from the many states that have received demands for voter rolls under the Civil Rights Act of 1960 ("CRA") from the U.S. Department of Justice ("DOJ") since 2025.[1] They sign this brief to support affirmance of the District Court's dismissal and denial of the motion for order to show cause. Local election officials are responsible for administering local, state, and federal elections in their respective jurisdictions. In Maine and other states that are subject to the National Voter Registration Act ("NVRA"), local government officials are duty-bound to promote the exercise of the right to vote. 52 U.S.C. § 20501(a)(2). *Amici* are committed to holding free and fair elections for their residents by fulfilling the purposes of the NVRA, which include "ensur[ing] that accurate and current voter registration rolls are maintained," *id.* § 20501(b)(4), and "enhanc[ing] the participation of eligible citizens as voters," *id.* § 20501(b)(2). In Maine and other states in the First Circuit, elections are administered at the municipal level, meaning that many have limited staff and resources at their disposal to fulfil those purposes.

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is attached as Appendix A; local election officials signing this brief do so in their individual capacities. Pursuant to Fed. R. App. P.29(a)(2), all parties have consented to the filing of this brief.

While state election officials possess the statewide voter registration list ("SVRL") at issue in this case, local election officials in Maine perform list maintenance activities that support its accuracy and submit responses to the Election Administration and Voting Survey ("EAVS") about those activities, as they do in other states. Because the DOJ is investigating those activities and is citing those survey responses in support of its investigations in Maine and other states, *amici* write to provide context and accurate information about those processes using their combined decades of election administration experience across the country.

*Amici* are also interested in the outcome of this case because local election officials nationwide could soon face similar demands from the federal government. The DOJ has sought contact information for local election officials in the states it has sued to obtain voter rolls. Further, it indicated in a recent court filing that it is considering filing criminal charges against election officials in connection with their list maintenance duties and the state voter rolls it is seeking to acquire, appearing to follow an executive order that directed such prosecutions. It is vital, then, given the potential downstream consequences, that the Court understand the facts of election administration, what constitutes proper list maintenance, and the purported basis of this lawsuit.

## SUMMARY OF ARGUMENT

In 2025, the DOJ began to send letters to local and state governments across the country demanding copies of voter rolls with sensitive voter data.[2] The letters to the states changed over time, but generally asked questions about state compliance with federal voter list maintenance laws, suggested that certain data points from the EAVS Comprehensive Report indicated potential noncompliance, and demanded copies of the SVRLs, including unique identifiers for voters.[3] Eventually, the government began to cite the CRA to support the DOJ's authority to demand the records. Most states refused, and the DOJ has sued thirty states and Washington, D.C. as a result. Every district court that has evaluated motions to compel and dismiss has dismissed the cases.[4]

---

[2] Ali Swenson & Gary Fields, *The Justice Department Seeks Voter and Election Information From at Least 19 States, AP Finds*, AP News (Aug. 3, 2025), https://perma.cc/4UEC-B3VZ (documenting initial wave of letters to states demanding voter rolls, and noting that several counties received similar requests from the DOJ).

[3] *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://perma.cc/3T7M-6SNS (storing copies of the correspondence between states and the DOJ).

[4] *United States v. Simon*, No. 25-cv-03761, slip op. at 2 (D. Minn. Aug. 17, 2026) ("[F]ederal courts in Michigan, Oregon, California, Maryland, Colorado, Wisconsin, Maine, Arizona, Rhode Island, Massachusetts, New Mexico, Illinois, New Jersey, Kentucky, Virginia, New York, New Hampshire, Connecticut, Pennsylvania, West Virginia, the District of Columbia, and Nevada have dismissed Plaintiff's claims demanding production of unredacted statewide voter registration lists.")

*Amici* support Appellees' briefing. Courts have the ability to evaluate records demands under the CRA, and it is important that they do so; otherwise, local and state election officials in Maine and across the country would have no recourse for burdensome demands that encompass sensitive information like voter records. And as the District Court determined, investigations into list maintenance are not a valid use of the Attorney General's record request authority under the CRA. Even if they were, the data cited by the DOJ as a basis for its investigations cannot be a proper basis for those demands.

## ARGUMENT

### I. COURTS PLAY A VITAL ROLE IN ASSESSING ELECTION-RELATED RECORDS REQUESTS, INCLUDING DEMANDS UNDER THE CIVIL RIGHTS ACT

Local election officials regularly receive records requests from the public and the government and, while the majority of requests are routine and lawful, *amici* and other local election officials rely on courts to evaluate less-routine requests and identify the limits of production obligations. If there were no limits to those obligations and if courts did not serve as arbiters of the validity of novel elections-related records requests, local elections officials would be hard-pressed to find time to fulfil their day-to-day election administration responsibilities while also responding to every single request. *Amici* appreciate the importance of local

government transparency and its power to build trust in elections, but limitless requests can do the opposite while also burdening election administration.

In this case, the District Court properly exercised its authority to decide whether the DOJ had issued its demand for a "congressionally authorized purpose" and that the information it sought was "relevant to the authorized purpose." Addendum to Br. for United States as Appellant ("Add.") at 11 (citing *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3 (1st Cir. 1996). If, as the DOJ contends, courts have very limited authority to review CRA demands, local election officials like *amici* appear to be next in line for its sweeping demands, and could be left without recourse if those demands were overbroad.

### A. The District Court properly exercised its authority to evaluate the DOJ's demand.

The District Court properly exercised its authority to evaluate the validity of the DOJ's demand for the SVRL. Add. at 11. The statute governing Attorney General requests under the CRA grants district courts the jurisdiction to compel records demanded by the Attorney General by "appropriate process." 52 U.S.C. § 20705. Examining the term "appropriate process" in another statute, the Supreme Court found that because the statute did not "specify[] the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). "Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures," *United*

*States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026), so *Powell* should control.

The DOJ argues that courts may play only a "limited" role in assessing their demands under the CRA in these cases concerning voter rolls, Brief for the United States as Appellant ("U.S. Br.") at 14, but the courts considering this argument have roundly rejected it in these parallel cases concerning the voter roll demands. *United States v. Aguilar*, No. 3:25-cv-00728, 2026 WL 2364502, at *2–3 (D. Nev. Aug. 14, 2026) (collecting cases); *United States v. Koski*, No. 3:26CV42, 2026 WL 2032532, at *1 n.2 (E.D. Va. July 14, 2026) (same). And the only circuit court to have issued a decision in these cases agrees that *Powell* and related decisions "carve[] out a role for the courts in reviewing civil investigative demands like the government's." *United States v. Benson*, 179 F.4th 470, 483 n.2 (6th Cir. 2026).

**B. Without judicial review, local elections offices and their attorneys could be overwhelmed by records demands.**

Local election officials are willing to respond to lawful requests but do not have time to evaluate unlawful ones. They have historically provided voter information to the public through record requests and understand the important balance of transparency and voter privacy that creates public confidence in the electoral process. However, *amici* and other local election officials in Maine and around the country have seen the number of records requests expand exponentially

in recent years.[5] National surveys of local election officials demonstrate both that the volume of records requests has increased and that the requests themselves have become more burdensome.[6]

This new flood of requests has taken considerable time and resources. Depending on the type of record requested, production can be a simple process or it can be a large process requiring multiple teams and diversion from other election administration work. Local election offices nationwide have had to devote days or weeks of staff time to accommodate requests, or even had to hire additional staff.[7]

---

[5] *See, e.g.,* Steve Mistler, *Election deniers are swamping officials with records requests — including Maine's*, Maine Pub. (Sept. 7, 2022), https://perma.cc/TC7Y-XVKV (describing an increase in election record requests in Maine driven by conspiracy theories); Samantha J. Gross, *"I have no idea what any of these even mean": Massachusetts clerks are getting bombarded with conspiracy-fueled records requests about the 2020 election*, Boston Globe (Sept. 18, 2022), https://perma.cc/2GV8-RRG2.

[6] *See* Paul Gronke et. al., *Today's Election Administration Landscape: Findings from the 2024 Elections & Voting Information Center*, at 20 (2025), https://perma.cc/EH7G-LPLD ("[O]ver 60% of requests are unduly burdensome and impede the ability of [local election officials] to perform their duties."); U.S. Election Assistance Commission, *Best Practices: Public Records Request*s, at 1 (2023), https://perma.cc/V5EH-G95E ("Since the 2020 election cycle, election officials have reported an increase in public records requests, requiring time and resources added to their official duties of administering elections. Flooding elections offices with public records requests may impact key service delivery during critical periods of an election cycle when staff time and resources are already stretched thin.").

[7] Kyle Yoder & April Tan, *Election Officials & the Misuse of Public Records Requests*, Ctr. for Election Innov. and Rsch. (June 2024), https://perma.cc/569H-7745.

For example, a request for records that do not already have a clear public inspection or production procedure in place could involve running the request by legal counsel to determine whether a response is required or would violate privacy laws; converting files from formats used in voting software to shareable or printable documents; monitoring public inspection sessions; devoting time to physical reproduction like printing and copying; applying redactions to protect voter privacy; responding to questions about what the documents mean; and responding to incidents arising from misinformation.

The last point is worth emphasizing: Election records can be complicated to interpret, and when records are misunderstood by people who have obtained them, they can create cascading problems for local elections officials and voters. In an example relevant to list maintenance, since 2020, organizations claiming to be concerned with the accuracy of voter rolls have harnessed state voter eligibility statutes to issue mass challenges against registered voters.[8] These organizations request public versions of voter rolls, compare them against various datasets, and use those comparisons to accuse certain voters of being ineligible to vote. Such erroneous accusations under state challenge statutes can result in hearings that take considerable resources from elections offices while creating burdens for ordinary

[8] Andrew Garber, *Mass Voter Challenges*, Brennan Ctr. for Just. (July 21, 2026), https://perma.cc/9LCA-QC7F.

voters who have done nothing wrong.[9]

Novel election records requests coming from the DOJ since 2025 are yet another unjustified burden. In addition to demanding copies of state voter rolls with sensitive voter data, the demand letters issued by the DOJ beginning in 2025 sought voluminous information from state election officials, including in Maine, with a tight deadline.[10] While the states' responses appeared to require significant time and effort, the DOJ appears to have sent the demand letters after minimal due diligence. *United States v. Amore*, 831 F. Supp. 3d 149, 154 (D.R.I. 2026) (In a hearing in the parallel case in Rhode Island, "the United States proposed that its unprecedented demands for unredacted voting rolls are the result of its 'trust but verify' approach to the states' list maintenance efforts.") For example, the letters requested

[9] For example, groups in Pennsylvania became convinced that voter rolls were not properly maintained, and began sending datasets to local election officials. Local officials devoted time reviewing records, responding to emails, and holding meetings with organizations to try to explain that their list maintenance practices were proper and lawful. Brett Sholtis, *'PA Fair Elections,' tied to powerful conservative groups, pushes to remove people from voter rolls*, WESA (Sept. 28, 2024), https://perma.cc/2D9E-NMYM. Misunderstanding the law and voter roll information, those groups returned with formal challenges to voters' eligibility just before the 2024 general election, diverting local election officials from their typical duties during the busiest weeks of election administration to hold hearings and forcing eligible voters to appear at those hearings to defend their eligibility. Carter Walker, *Efforts to challenge Pennsylvania voters' mail ballot applications fizzle,* Spotlight PA (Nov. 8, 2024), https://perma.cc/F4SE-ZWMQ.

[10] Appendix ("A") 32–34 ("July 24 Letter to Maine") (giving Maine 14 days to describe all list maintenance activities, identify local election officials, review and respond to EAVS data questions, and provide the SVRL).

information such as local election official contact information that could have been found with basic online research and asked questions about the implications of EAVS data without seeming to understand the purpose and use of EAVS data. *See* Part II.B, *infra* (describing the EAVS questions in the demand letters). One district court has characterized the demand as a "fishing expedition." *Amore*, 831 F. Supp. 3d at 158.

It is reasonable to believe that local election officials will be the next to receive time-consuming requests. The letters sent to states asked for names of all local election officials responsible for list maintenance in the states. See, e.g., A32. The DOJ has also demonstrated willingness to make unprecedented requests of local election officials in other circumstances recently, including by asking for access to voting machines[11] and demanding years of voter roll data.[12] And the DOJ has signaled that it is looking into filing criminal charges against election officials in connection with their list maintenance duties, possibly driven by an executive order

[11] Assoc. Press, *Justice Department Requests Access to Dominion Voting Equipment Used in Missouri in 2020*, CNN (Sept. 4, 2025), https://perma.cc/XYT3-ZDH2.

[12] Gilare Zada, *SF Officials Push Back as DOJ Seeks Data on Voters Removed Over Citizenship Rules*, KQED (July 31, 2025), https://perma.cc/4JNW-E9CK.

directing such prosecutions.[13]

An opinion from this or any court that opens the door to unreviewable CRA demands could result in an unsustainable burden on local election officials. *Amici* and other local election officials should not be forced to drop day-to-day election administration duties to respond to unrestricted records requests from the DOJ.

## II. THE DOJ DID NOT PROVIDE A SUFFICIENT BASIS FOR ITS DEMAND

*Amici* agree with the District Court's conclusions and the Appellees' arguments that the DOJ did not supply a sufficient purpose for its request. Brief of Defendants-Appellees State of Maine and Shenna Bellows ("Maine Br.") at 31–44; Add. at 15. But even if it had, the DOJ's "concerns" about Maine's EAVS data, U.S. Br. at 7, could not amount to a proper basis for an investigative demand. In its briefing, the DOJ correctly characterizes the NVRA and the Help America Vote Act

[13] Potential prosecution is not mere conjecture. The federal government has mentioned such an outcome in multiple venues. In a parallel case in the Fourth Circuit, the DOJ asserted that, if it were successful in obtaining the SVRL through a CRA demand, states might then "elect voluntary compliance to avoid the criminal sanctions that may be incurred by state officials that knowingly conspire with noncitizens to permit them to vote . . . or knowingly tabulate fictitious ballots." Reply to Opp'n to Mot. to Expedite at 8, *United States v. DeMarinis*, No. 26-1878 (4th Cir. filed July 29, 2026), Dkt. No. 24 (citations omitted). Further, the White House issued an executive order in March 2026 including a number of directives concerning elections. Among other things, the executive order directs that "[t]he Attorney General shall prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election . . . ." Exec. Order No. 14399, 91 Fed. Reg. 17125 § 2(b) (Mar. 31, 2026), https://perma.cc/ZNV6-ZQ3R.

("HAVA"): They require Maine and other states subject to them to "make reasonable efforts to perform list maintenance." *Id.* at 25 (citing 52 U.S.C. § 20507(a)(4), § 21083(a)(2)(A) and (4)(A)). But neither the EAVS data the DOJ presents as a basis for its demand nor the evidence it seeks in the SVRL have any bearing on whether states meet their reasonable effort requirements.

**A. The efforts of state and local election officials in Maine meet the list maintenance requirements of the NVRA and HAVA.**

Nationwide, local election officials like *amici* participate in state list maintenance programs that the DOJ seeks to enforce, and are familiar with the federal statutory requirements: state programs must consist of reasonable effort to remove certain categories of ineligible voters. HAVA requires "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(4). The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the registrant's death or change of address. *Id.* § 20507(a)(4). As to changes of address, the NVRA carves out a safe harbor provision, outlining an option for states to meet their change-of-residence list maintenance obligations by establishing a program under which election officials send confirmation notices to voters who appear to have moved based on the information contained in the National Change of Address ("NCOA") database maintained by the United States Postal

Service. *Id.* § 20507(c)(1); *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019) (defining the provision as a "safe harbor"). Under this statutory safe harbor process, election officials may then remove voters who filed a change-of-address form only if they (1) do not respond to that notice; and (2) have not voted for two consecutive general elections for federal office following the failure to respond to a confirmation notice. 52 U.S.C. § 20507(d)(1).

Circuit courts evaluating these provisions have found that they require state list maintenance programs to do only what the statutes plainly say: make a "reasonable effort." 52 U.S.C. § 21083(a)(4), § 20507(a)(4). The Sixth Circuit recently offered a construction of the NVRA's requirements based on dictionary definitions, given the absence of a definition in the text of the NVRA itself: It requires "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026). The Eleventh Circuit has explained, "The failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a local election office's list maintenance] effort unreasonable." *Snipes*, 935 F.3d at 1207 (discussing a county's process for identifying and removing deceased voters from rolls).

Circuit courts have also read list maintenance requirements to distinguish between mandatory and permissive removal programs, with death and change-of-

address being the only mandatory components. One circuit explained that "the statutory language is plain and unambiguous and requires the states to employ a general program of list maintenance that makes a reasonable effort to remove voters based *only* on account of death or change of address" and not on other ineligibility factors. *Id.* at 1201 (emphasis added). Considering litigation over list maintenance associated with criminal convictions, another circuit echoed the distinction between mandatory and permissive programs: "[T]he mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away. Removal due to criminal conviction is not included on this list of mandatory purging, and we will not amend the statute by reading that requirement into its text when Congress obviously chose not to do so." *Am. Civ. Rts. Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 182–83 (3d Cir. 2017). Maine has programs of list maintenance for voters who have died or moved away that at least meet, and likely exceed, statutory requirements.

In a response to the DOJ demand letter, the Maine Department of State described its reasonable list maintenance programs, including efforts that local election officials make. A35–37. In Maine, those officials review state vital records monthly to cancel the registrations of deceased voters, and those efforts are supplemented by the state Bureau of Corporations, Elections and Commissions ("CEC") at least annually when it cancels additional registrations based on the Social Security Administration's Death Master File. A36–37. As for change-of-address, the

CEC has sent confirmation notices based on NCOA data and additionally participated in the a list maintenance program called the Electronic Registration Information Center ("ERIC"), A36, which goes beyond the NVRA's safe harbor NCOA process by comparing both motor vehicle and voter registration records between participating states to identify potential moves.[14]

Based on its response to the DOJ's questions and the applicable legal standard, Maine's list maintenance program is reasonable, and the SVRL could not demonstrate otherwise. The DOJ posits that "[t]he SVRL is perhaps the most relevant evidence as to whether Maine's list maintenance program is reasonable," suggesting that by finding some unspecified number registrants who should not be registered, the DOJ can show that Maine is not meeting its statutory list maintenance obligations. U.S. Br. at 25. But the statutes require "serious attempt[s]" to follow list maintenance processes that are "rational and sensible," *Benson*, 136 F.4th at 625, not an unspecified threshold of a particular rate of error. By the statutory standards, the processes that Maine described *are* rational and sensible attempts. Indeed, they appear to exceed the NVRA's textual safe harbor process for voters who may have changed residences by utilizing not only NCOA datasets but also comparing more

[14] *See* ERIC, *How ERIC Works*, https://perma.cc/4WSE-HLEB. ERIC keeps data secure by utilizing cryptographic hashes that convert sensitive information into a string of what appear to be random characters; this encryption ensures that sensitive voter data is protected within the participating states' own environments. ERIC, *Technology & Security Overview*, https://perma.cc/MMJ3-CZXJ.

residency data with other states. And the DOJ's suggestion that it would like to evaluate rates of "noncitizens," U.S. Br. at 25, is unrelated to the mandatory list maintenance provisions that apply to deceased voters and those who have moved—not to other categories of ineligibility. *Snipes*, 935 F.3d at 1201; *Philadelphia City Comm'rs*, 872 F.3d at 182–83. Even if the DOJ's purpose of list maintenance evaluation was sufficient for a CRA demand—and it is not—the records it seeks would not answer the question of whether state list maintenance programs meet the statutory reasonableness standards established by HAVA and the NVRA.

### B. In the experience of local election officials, EAVS data points are not evidence of unreasonable list management practices.

Individual EAVS data points without any context cannot serve as a proper basis for a CRA request. In its demand letters to states, and now in its briefing in this and parallel litigation in other states, the DOJ calls certain data points from the 2024 EAVS report "concerns," U.S. Br. at 6, and refers to them as "anomalies," *id.* at 27, that may serve as the "basis" of its CRA requests, *id*. Local election officials like *amici* are often responsible for submitting data in response to these surveys and have significant familiarity with EAVS data, including in a number of states facing this voter roll litigation.[15] These data points are not a sufficient basis to suspect

[15] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report*, at 238 (2025), https://perma.cc/GKD8-5FN2 ("2024 EAVS Report") ("In 2024, most EAVS data were reported at the local jurisdiction level.")

unreasonable list maintenance practices, in Maine or elsewhere.

The EAVS is a survey of state and local election officials conducted on a biennial basis by the U.S. Election Assistance Commission ("EAC"). HAVA created the EAC to "serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections." 52 U.S.C. § 20922. The EAC uses data from the EAVS to fulfill that mandate.

EAVS data can be helpful in identifying general trends in voting, but its individual data points cannot be used effectively to draw conclusions about the sufficiency of specific states' list maintenance practices. The 2024 EAVS Report never claims to serve that purpose, and instead points to "produc[ing] a general understanding of core aspects of the election process and the management challenges faced by election officials," helping the EAC determine how to better support election officials and voters, and informing lawmakers and the public about the impact of voting laws, among other purposes.[16] The Congressional Research Service's overview of that report reminds readers that "some data may not be straightforwardly comparable across years, states, or localities."[17] And as one

[16] *Id*. at i.

[17] *See* Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings*, at 2 (2025), https://perma.cc/J6UH-47DQ.

researcher aptly described it, the EAVS data is "close enough for social science, but not close enough for the court house."[18]

One reason that EAVS data is not enough to draw specific conclusions about list maintenance is the simple fact that elections in the United States are administered under state law at the local level. Differences across states and local jurisdictions, and changes in election laws over time across all fifty states, are not perfectly captured in standardized question and response categories of the nationwide survey. The survey might be written in ways that local election officials across different jurisdictions will interpret differently, and indeed is regularly updated to accommodate new voting practices and confusion across jurisdictions.

For example, the DOJ asked states about confirmation notices, asking why some states sent them out at rates above the national average, why some states sent

[18] Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?*, MIT Political Science Department Research Paper No. 2018-20, at 3 (2018), https://perma.cc/Q8LM-FXCQ.

them out at rates below the national average, and why some states had missing data.[19] But the instructions for confirmation notice questions told local election officials to omit data if they did not collect it, and multiple states told the DOJ that conflicting instructions about the notices confused officials, which could account for variances in data across states.[20] Indeed, these questions about the rate of confirmation notices

---

[19] *E.g.*, Letter from Michael Gates, Deputy Assistant Att'y Gen., to Jared DeMarinis, Md. State Admin. of Elections, at 2 (July 14, 2025), https://perma.cc/MNK2-T7F9 ("Letter to Maryland") (inquiring about why the state sent confirmation notices at a rate "well above" the national average"); Letter from Michael Gates, Deputy Assistant Att'y Gen., to Susan Beals, Va. Comm'r of Elections, at 2 (July 15, 2025), https://perma.cc/AYC9-XDYL ("Letter to Virginia") (inquiring about why the state sent confirmation notices at a rate "well below the national average"); Letter from Michael Gates, Deputy Assistant Att'y Gen., to Shirley Weber, Cal. Sec'y of State, at 2 (July 10, 2025), https://perma.cc/R3J6-EXM8 ("Letter to California") (inquiring about "missing" data).

[20] *See, e.g.*, Letter from Adrian Fontes, Ariz. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen., at 2 (Aug. 29, 2025), https://perma.cc/7NJW-U47C ("Letter from Arizona") (describing how different counties understood the question about confirmation notices differently and how that confusion impacted the data); Letter from Karen Sellers, Exec. Dir. of the Ky. State Bd. of Elections, to Michael Gates, Deputy Assistant Att'y Gen., at 2 (Aug. 29, 2025), https://perma.cc/EK3Z-RFGH ("Letter from Kentucky") (identifying conflicting definitions of "confirmation notices" in the EAVS instructions); Letter from Shirley Weber, Cal. Sec'y of State, to Harmeet Dhillon, Assistant Att'y Gen., at 5–6 (Sept. 12, 2025), https://perma.cc/82SD-7ZZC ("Letter from California") (noting that the instructions for the confirmation notice questions makes it clear that if jurisdictions do not track an item, they may indicate on the EAVS that data is not available).

sent to registered voters was altered for clarity in the following EAVS survey.[21] Likewise, the DOJ asked states about voter removals from rolls,[22] but most questions in the EAVS about voter removals and the instructions used to answer them were altered for clarity in the next EAVS cycle.[23]

Another reason that EAVS data cannot support a basis for the CRA demand is that the timing of the nationwide survey may not align with the timing of state election administration. For example, the DOJ asked states about low rates of removals from voter rolls, but the NVRA *requires* a waiting period of two federal elections after it appears that a registered voter may have moved before their registration may be cancelled, a delay of at least four years. 52 U.S.C. § 20507(d)(1). Further, the NVRA prohibits systematic removal of registrants during the ninety-day period before an election, which can add months to the prohibition on removal, especially if a jurisdiction has a special election scheduled between primaries and

---

[21] U.S. Election Assistance Comm'n, *EAVS 2022-24 Crosswalk*, at row 139, https://perma.cc/K25L-7C9E. As the "Crosswalk" spreadsheet is described on the EAC's "2024 Archived Resources" page, it "documents changes that have been made to the EAVS questions between 2022 and 2024." U.S. Election Assistance Comm'n, *2024 Archived Resources*, https://perma.cc/5K5Y-PFSS.

[22] *E.g.*, Letter from Michael Gates, Deputy Assistant Att'y Gen., to William Francis Galvin, Sec'y of the Commonwealth of Mass., at 2 (July 22, 2025), https://perma.cc/NB3G-E39C ("Letter to Massachusetts"); Letter from Michael Gates, Deputy Assistant Att'y Gen., to Michael Adams, Ky. Sec'y of State, at 2–3 (July 17, 2025), https://perma.cc/CH92-8RPR ("Letter to Kentucky"),.

[23] *See EAVS 2022-24 Crosswalk*, *supra* note 21, at rows 171–79.

general elections. *Id.* § 20507(c)(2). The DOJ should at least be aware of this potential for delay, because the 2024 EAVS Report that the DOJ used to identify its EAVS "anomalies" flags this issue specifically:

> [D]ata on registered and eligible voters as reported in the EAVS should be used with caution, as these totals can include registrants who are no longer eligible to vote in that state but who have not been removed from the voter lists because the removal process laid out by the NVRA can take up to two election cycles to be completed.[24]

Beyond the EAVS data points themselves having limited value for drawing conclusions about the reasonableness of list maintenance practices, the DOJ's approach to identifying purported "anomalies" was flawed, beginning with the question it posed to Maine and many other states, using near-identical language: "there are nearly as many registered voters listed as active as the citizen voting age population in [your state] . . . . Please explain what actions [your state] is taking to ensure that ineligible voters are being removed."[25] To begin, the question seems

---

[24] *See 2024 EAVS Report*, *supra* note 15, at 131.

[25] Compare, e.g., A33, July 24 Letter to Maine, *supra* note 10, with Letter from Michael Gates, Deputy Assistant Att'y Gen., to Jocelyn Benson, Mich. Sec'y of State, at 2 (July 21, 2025) https://perma.cc/AAS3-VP4D ("Letter to Michigan"); Letter to Virginia, *supra* note 19, at 2; Letter to Kentucky, *supra* note 22, at 2 (all sharing very similar language). It is worth noting that one of the many states that came under DOJ suspicion for having a voter registration rate that is too high was Michigan. See Letter to Michigan, at 2 (identifying a high registration rate and asking what the state is doing to "ensure that voters who should not be on the statewide voter registration list are being removed."). The DOJ sent Michigan a letter even though a Sixth Circuit decision in May 2025—months before the DOJ

under-researched; apart from the verbatim language directed at states whose registration rates were higher than average, a state's general program for list maintenance is usually publicly available, codified in state law or summarized in reports by the state's chief election official.[26] Next, it presupposes that a high registration rate points to unreasonable list maintenance practices. But there are several possible explanations for high registration rates. As Maine explained, the 2024 EAVS Report cited by the DOJ also shows that Maine's percentage of registered voters who voted in the 2024 election (80.9 percent) is also significantly above the national average of 74.8 percent, which could reflect strong civic engagement by Maine citizens. Maine Br. at 56 n.6. Finally, the citizen voting age population is from 2023, while the registration data is from 2024, creating an imperfect rate calculation.[27]

The DOJ's overall national strategy of CRA demands to states also suggests that it did not conduct individualized research or take steps to find out more about state list maintenance practices before suing. The DOJ has issued demands to most

---

letter— had affirmed that Michigan's list maintenance program was reasonable. *Benson*, 136 F.4th at 626–27.

[26] For example, in Maine, the CEC reports out on the state voter registration system to the Maine Legislature annually. Letter from Shenna Bellows, Me. Sec'y of State, to Craig Hickman, Me. State Senator, at 1 (Feb. 1, 2024), https://perma.cc/3E4Q-8JWA.

[27] *See 2024 EAVS Report*, *supra* note 15, at 160.

states, in most cases citing some EAVS data points that fell outside of the national average for a particular element of election administration. But naturally, every state will have some EAVS data points that are higher or lower than average, whether because of differences in state law, because the EAVS data collection period did not synchronize with the state's most relevant time period to identify useful data, or for some other reason. If an EAVS data point that is higher or lower than the average is considered an "anomaly" worth investigating, then every state will have some such "anomalies."

Finally, in the case of Maine and many other states that have since been sued, the states *did* answer the DOJ's questions about list maintenance as related to specific EAVS data points. The DOJ sued thirty states nonetheless, apparently finding none of the responses sufficient. Therefore, when the DOJ now cites EAVS data as a "basis" for its demands, it is unclear whether the DOJ's analysis of that data incorporates the states' answers and, if it does, why the context provided by the states' narrative responses was insufficient.

EAVS data is not useless. Election administrators and state policymakers can and do review the data to identify general trends and seek areas for improvement, and local election officials regularly work with the EAC to improve the quality of

the collected data.[28] However, it is not useful as a basis for an investigation into sensitive voter information. The way that the DOJ has identified data points and interpreted variances across states as "anomalies" without seeming to review information provided by the states does not suggest a valid basis for an investigation into list maintenance, even if such an investigation was a purpose authorized by the CRA.

## CONCLUSION

The District Court came to the correct conclusion that it had jurisdiction to determine whether the demand was issued pursuant to a proper purpose and that the DOJ's purpose of list maintenance enforcement cannot support a demand under the CRA. For all of the foregoing reasons, the judgment of the District Court should be affirmed.

Respectfully submitted,

*/s/ Shannon Eddy*
Shannon Eddy
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788
shannon@publicrightsproject.org

*Counsel for Amici Curiae*

[28] "From late 2021 to early 2022, the EAC convened a working group of state and local election officials to gather their insights on terms that needed updates, voter registration data collection practices, and potential revisions to survey questions [regarding voter registration practices]." *2024 EAVS Report*, *supra* note 15, at 130.

## Appendix A – List of *Amici*

### Local Governments

*City of Boston, Massachusetts*

*County of Mendocino, California*

*City of Minneapolis, Minnesota*

### Local Election Officials

Lisa Brown
*Clerk/Register of Deeds, Oakland County, Michigan*

Bill Burgess
*Clerk, Marion County, Oregon*

Barb Byrum
*Clerk, Ingham County, Michigan*

Katharine Clark
*Clerk, Santa Fe County, New Mexico*

Rich Coglianese
*Board of Elections Member, Union County, Ohio*

Cynthia Cornejo
*Interim Registrar of Voters, County of Alameda, California*

Daryl Daugs
*Former Chief Deputy Auditor, Kitsap County, Washington*

Lisa Deeley
*Commissioner, City of Philadelphia, Pennsylvania*

Jilline Dobratz
*Clerk, City of West Bend, Wisconsin*

Justin Douglas
*Commissioner, Dauphin County, Pennsylvania*

Lynn Goya Clark
*Clerk, Clark County, Nevada*

William George Kingston
*Supervisor of the Checklist, Town of New Castle, New Hampshire*

Nicholas J. Lima
*Registrar/Director of Elections, City of Cranston, Rhode Island*

Jo Ellen Litz
*Commissioner, Lebanon County, Pennsylvania*

Daniel Loomis
*Clerk, Douglas County, Oregon*

Dele Lowman
*Voter Registration & Elections Board Member, Dekalb County, Georgia*

Robin Major
*Elections Administrator, Monmouth County, New Jersey*

Kirk McDonough
*Board of Canvassers Chair, City of Cranston, Rhode Island*

Jimmy Sabatino
*Council Chair, Luzerne County, Pennsylvania*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they are governmental entities and officials for whom no corporate disclosure is required pursuant to Federal Rule of Appellate Procedure 26.1.

## CERTIFICATE OF COMPLIANCE

I, Shannon Eddy, hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,026 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14.

*/s/ Shannon Eddy*
Shannon Eddy
Public Rights Project

Dated: August 24, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Shannon Eddy*
Shannon Eddy
Public Rights Project

Dated: October 2, 2026